PROSKAUER ROSE LLP
Gregory I. Rasin
Elise M. Bloom
Steven D. Hurd
1585 Broadway
New York, NY  10036-8299
Telephone 212.969.3000
Fax 212.969.2900
E-mail grasin@proskauer.com
*Attorneys for Defendant*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| JANNIE PILGRIM, GIOVANNA HENSON, JESAN SPENCER, BRENDA CURTIS, | : | Civil Action No.: 07-6618 (CM) (AJP) |
| | : | |
| Plaintiffs, | : | |
| | : | **DEFENDANT'S RULE 56.1** |
| against | : | **STATEMENT OF UNDISPUTED** |
| | : | **MATERIAL FACTS** |
| THE MCGRAW-HILL COMPANIES, INC., | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, Defendant The McGraw-Hill Companies, Inc. ("McGraw-Hill"

or the "Defendant"), by its attorneys Proskauer Rose LLP, submits the following Statement of

Undisputed Material Facts as to which, for purposes of Defendant's motion for summary

judgment, there is no genuine issue to be tried.[1]

---

[1] Defendant's Motion for Summary Judgment and Statement of Undisputed Material Facts are supported by the Declaration of Gregory I. Rasin, Esq. ("Rasin Decl.") and accompanying exhibits. References to the deposition transcripts of Giovanna Henson, Jesan Spencer, Brenda Curtis, David Murphy, William Harper, Ken Caruso, Sheila O'Neill, Brett Marschke, Richard Fisher, Vladimir Stadnyk, and Marianne Gattinella are noted as "Henson Tr. _," "Spencer Tr. _," "Curtis Tr. _,""(Murphy Tr. _," "Harper Tr. _," "Caruso Tr. _," "O'Neill Tr. _," "Marschke Tr. _," "Fisher _," "Stadnyk Tr. _," and "Gattinella Tr. _," respectively, and are annexed to the

## I.    PROCEDURAL BACKGROUND.

1.    On December 16, 2005, Plaintiffs Giovanna Henson, Jesan Spencer, and Brenda Curtis ("collectively Plaintiffs") filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging claims of discrimination on the basis of race and retaliation for opposition to unlawful employment actions. (Rasin Decl. Ex. M)

2.    On May 21, 2007, the EEOC issued Notices of Right to Sue to all of the Plaintiffs. (Rasin Decl. Ex. N.)

3.    Thereafter, on July 23, 2007, Henson, Spencer and Curtis, along with Plaintiff Jannie Pilgrim, jointly filed a Complaint with this Court, alleging the same claims of race discrimination and retaliation as stated in their EEOC charges. (Rasin Decl. Ex. L.)

4.    In the Complaint, Plaintiffs assert claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 *et seq.* ("§ 1981"); the New York State Human Rights Law, New York Executive Law § 296 *et seq.* ("NYSHRL"); and, the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107(a), 8-502 *et seq.* ("NYCHRL"). (Rasin Decl. Ex. L ¶ 3.)

---

Rasin Decl. as Exs. A, B, C, D, E, F, G, H, I, J, and K respectively. References to the affidavits of Deborah O'Connor, Ken Caruso, Anne Maffei, Rita M. Bolger, Joseph Held, Carl Cederholm, Evonne Inglesh, Paul Coughlin, Shari Stein, Nancy (Tomeo) Farrelly, and Susan George are noted as "O'Connor Aff. ¶ _," "Caruso Aff. ¶ _," "Maffei Aff. ¶ _," "Bolger Aff. ¶ _," "Held Aff. ¶ _," "Cederholm Aff. ¶ _," "Inglesh Aff. ¶ _," "Coughlin Aff. ¶ _," "Stein Aff. ¶ _," "Farrelly Aff. ¶ _," and "George Aff. ¶ _" and are annexed to the Rasin Decl. as Exs. UU, VV, WW, XX, YY, ZZ, AAA, BBB, CCC, DDD, and EEE respectively. All other exhibits annexed to the Rasin Decl. are noted herein as "Rasin Ex. _."

## II.    THE COMPANY.

### A.    Background

5.    McGraw-Hill is a worldwide corporation engaged in publishing and information services with its headquarters located in New York City.  (*See* The McGraw-Hill Companies, Inc., "About Us: Overview," www.mcgraw-hill.com/aboutus/overview.shtml (last accessed May 15, 2008).

6.    The Company is divided into three operating segments: (1) McGraw-Hill Education ("MHE"); (2) Financial Services, including Standard & Poor's ("S&P"); and (3) Information and Media Services ("IMS").  (*See* The McGraw-Hill Companies, Inc., "About Us: Overview," wwww.mcgraw-hill.com/aboutus/overview.shtml (last accessed May 15, 2008).

7.    A Corporate Segment provides support services including Human Resources to these three operating segments.  (Murphy Tr. 103-04; Fisher Tr. 6; O'Neill Tr. 4-5; Marschke Tr. 122).

8.    Plaintiffs Spencer and Henson worked for the Corporate Segment during the periods of their alleged discrimination while Plaintiff Curtis worked for S&P. (*See* Rasin Decl. Ex. O.)

### B.    Defendant's Policies.

9.    McGraw-Hill has an Equal Employment Opportunity ("EEO") Policy confirming its commitment to the principles of equal employment opportunity for all individuals. (*See* Rasin Decl. Ex. P at D001145-46.)

10.    McGraw-Hill's EEO Policy encourages any employee who feels he or she has been denied equal opportunity or subjected to discrimination to raise their concerns without fear of retaliation. (*Id.*)

11.    McGraw-Hill has several avenues for employees to raise EEO concerns internally without precluding charges of discrimination filed with the EEOC or state and local fair employment agencies, including the Open Door Policy, the Fast and Impartial Resolution ("FAIR") program, and the Employee Hotline. (*See* Rasin Decl. Ex. P.)

12.    All of these policies are explained and made accessible to every employee on the Company's intranet.  (*Id.*)

## III.    PLAINTIFF GIOVANNA HENSON.

### A.    Henson's Employment History.

13.    Henson began employment with McGraw-Hill on or about June 16, 1997 in the position of Junior Research Associate at S&P.  (Henson Tr. 23-24, 32.)

14.    At the time of her hire, Henson initially earned $26,000 per year and her position was a grade level 11. (Henson Tr. 23-24.)

15.    Henson worked at the JJ Kenny Division of S&P as a Research Associate for approximately three to four years, during which time she received several salary increases and promotions. (Henson Tr. 32-35.)

16.    While she worked at S&P, Henson attended the New York Institute of Technology and received a Master's of Science Degree in Human Resources Management and Labor Relations in 2001. (Henson Tr. 14-15, 35.)

17.    Henson's last position at S&P was Senior Research Associate, at a grade level 13 and a salary of $35,000.  (Henson Tr. 33-35.)

### B.    Henson's Performance as HR Coordinator.

18.    On or about March 20, 2001, Henson applied for and received a promotion to the position of Human Resources ("HR") Coordinator working in the McGraw-Hill Corporate Segment. (Henson Tr. 35-37.)

19.    Henson's promotion was an "in-grade" promotion meaning that her grade level remained at level 13. (Henson Tr. 31.)

20.    As an HR Coordinator, Henson was initially assigned to work for Dina Parello (Caucasian), Human Resources Director, and Sheila O'Neill (Caucasian), Vice President of Human Resources in the Corporate Segment. (Henson Tr. 40, 137.)

21.    Approximately six or seven months after Henson became an HR Coordinator, Parello became dissatisfied with Henson's performance and Henson was assigned to report exclusively to O'Neill. (Henson Tr. 40.)

22.    Henson's responsibilities as an HR Coordinator included, among other things: scheduling interviews for job applicants; conducting new hire orientation; compiling new hire materials and packets; assisting O'Neill in employee and manager training by setting up the Power Point presentations for the training sessions; assisting with the Performance Management Program ("PMP") used to evaluate employees; organizing take-our-daughters-to-work day; compiling information for McGraw-Hill's Affirmative Action Plans and Diversity Reports; keeping schedules for O'Neill, Parello and Ivy Latimer (African American), Director of EEO and Diversity Initiatives; and, providing administrative support to O'Neill, Parello, Latimer and Cherise Little (African American), Human Resources Representative. (Henson Tr. 40-48.)

23.    Because Henson directly reported to her, O'Neill was responsible for reviewing Henson's performance and completing annual performance evaluations for her. (Henson Tr. 138.)

24.    As an HR Coordinator, Henson's performance was satisfactory and she received overall performance ratings of "performance achieved expectations" on her annual performance

reviews for 2001, 2002 and 2003. (Henson Tr. 137-39; Rasin Decl. Ex. Q at D00114, D00122-23 & D00135.)

25.    In 2004, McGraw-Hill implemented a new performance appraisal system called "Performance Management Process" ("PMP"). (Harper Tr. 31-33, 42-43.)

26.    Henson received an overall rating of "fully meets performance standards" on her performance review for 2004. (Henson Tr. 137-39; Rasin Decl. Ex. Q at D00163.)

27.    The "fully meets performance standards" rating Henson received in 2004 under the new system is equivalent to the "performance achieved expectations" rating that she received on her reviews under the old appraisal system. (Henson Tr. 137-39.)

28.    While Henson's overall performance ratings as an HR Coordinator were satisfactory, Henson's performance reviews noted that she exhibited deficiencies with detail-oriented projects such as proofreading and with her communications and interpersonal skills. (Rasin Decl. Ex. Q at D00133, D00134.)

29.    At O'Neill's suggestion, Henson took a course on communications skills to help her improve them. (Henson Tr. 154-55.)

30.    Despite the communications course that Henson took, in February 2005, O'Neill provided Henson with a verbal warning regarding her performance problems. O'Neill advised Henson that Henson continued to exhibit deficiencies with respect to her interpersonal and communication skills. (Rasin Decl. Ex. R.)

C.    **Henson's Applications for Promotion.**

31.    Henson claims that she applied for the following positions in 2003, 2004 and 2005: (i) Talent Acquisition Specialist in the Corporate Segment in or about June 2003; (ii) Human Resources Representative at IMS in or about September 2003; (iii) Human Resources Representative at MHE between October and December 2003; (iv) Recruiting Specialist,

6

Campus Recruiting at S&P in or about November 2004; and, (v) Human Resources Representative at S&P in or about June 2005. (Rasin Decl. Ex. L at ¶¶ 44-45; Henson Tr. 103-5, 111, 115, 119-30.)

32.     The job requisition form for HR Representative position at IMS demonstrates that it was posted internally on McGraw-Hill's website as a job opening in or about September 2003. (Rasin Decl. Ex. S at D07416.)

33.     The job requisition form for the HR Representative position at MHE demonstrates that the position became open in or about October 2003 and was filled in or about December 2003. (Rasin Decl. Ex. T at D07457; *see also* Henson Tr. 111.)

34.     The Recruiting Specialist, Campus Recruiting position at S&P involved long hours, traveling to different college campuses and attending career fairs. (O'Connor Aff. ¶4.)

35.     Organizing first round interview schedules on university campuses and final round interviews as well as working with campus recommended vendors to prepare for Company briefings and special events were significant components of the Recruiting Specialist, Campus Recruiting position. (O'Connor Aff. ¶ 4.)

36.     Experience working with university career services offices was preferred for the Recruiting Specialist, Campus Recruiting position due to the volume of the work load. (O'Connor Aff. ¶ 4.)

37.     The Recruiting Specialist, Campus Recruiting position was a grade level 16, which was three grade levels higher than Henson's grade level at the time of her application to this position (*i.e.*, grade level 13). (Henson Tr. 127-28.)

38.    The job opening for the Recruiting Specialist, Campus Recruiting position was posted internally on McGraw-Hill's intranet and Henson submitted an application through the intranet. (O'Connor Aff. ¶ 4.)

39.    The hiring manager for the Recruiting Specialist, Campus Recruiting position, Deborah O'Connor, interviewed candidates for the position including Henson and Blessing Mariano (Asian). (O'Connor Aff. ¶¶ 5-6.)

40.    Mariano had extensive prior work experience in campus recruiting and had been doing the exact same job as the Recruiting Specialist, Campus Recruiting position at her prior employer, Morgan Stanley. (O'Connor Aff. ¶ 6; Rasin Decl. Ex. U.)

41.    Henson has no personal knowledge as to Mariano's prior experience in campus recruiting. (Henson Tr. 130.)

42.    Henson has admitted that she does not know whether Mariano was qualified for the Recruiting Specialist position at McGraw-Hill. (Henson Tr. 130.)

43.    During the selection process for the Recruiting Specialist position, O'Connor learned that Henson had previously applied for this position but had withdrawn from consideration. (Henson Tr. 124-25; O'Connor Aff. ¶ 5.)

44.    Henson did not have experience preparing campus interview schedules, nor did she have experience working with university career services offices. (O'Connor Aff. ¶ 5.)

45.    O'Connor offered the Recruiting Specialist position to Mariano because of her extensive prior relevant work experience and Financial Services industry experience. (O'Connor Aff. ¶ 6; Henson Tr. 124.)

46.    Henson applied for the Human Resources Representative position at S&P in or about June 2005. (Henson Tr. 119.)

47.    The hiring manager for the HR Representative position at S&P, Rich Fisher, interviewed candidates for this position, including Henson and Jessica Brookins (Hispanic). (Fisher Tr. 167-68.)

48.    Henson has never supervised Brookins and admittedly knows nothing about Brookins' work experience or background.  (Henson Tr. 122-23.)

49.    Fisher determined that Brookins was the best candidate for the HR Representative position because she was employed at a grade level 16, which was the same grade level as the position, while Henson was only a grade level 13, and Brookins had received higher ratings on her performance evaluations than Henson. (Fisher Tr. 169-70, 172; *see also* Henson Tr. 31.)

50.    Fisher considered the candidates' grade levels because the grade levels depict the level of responsibility the candidates held in their current positions. (Fisher Tr. 172.)

51.    Fisher ultimately offered the position to Brookins.  (Fisher Tr. 169-70, 172.)

**D.    Henson's Alleged Protected Activity.**

52.    On or about December 20, 2004, O'Neill witnessed Henson crying at her desk and asked her why she was crying, and the two of them had a discussion regarding several upsetting events in Henson's life.  (Henson Tr. 70, 74-76, 78.)

53.    During her discussion with O'Neill, Henson described how she had been robbed at gun point while visiting a friend in Harlem.  (Henson Tr. 76, 78.)

54.    In reference to Henson's experience of being robbed,  Henson stated, "you don't know what it's like being black" and O'Neill responded, "Yes, that's right. I don't know what it's like being black." (O'Neill Tr. 150.)

55.    O'Neill did not understand that Henson's comment about being black was purportedly intended by Henson to be a complaint of racism or discrimination at McGraw-Hill. (O'Neill Tr. 90, 149-50.)

**E.      Henson's Resignation.**

56.      In or about June 2005, Henson applied for a position with the New York City Department of Education ("NYCDOE"). (Henson Tr. 144-48.)

57.      On her application of employment to the NYCDOE, Henson stated that her reasons for leaving McGraw-Hill were "voluntary" and that she was in search of a "better opportunity." (Rasin Decl. Ex. V.)

58.      On or about July 17, 2005, Henson was offered the position of Special Assistant to the Deputy Director Medical Leaves and Benefits at the NYCDOE at a starting salary of $68,000. (Henson Tr. 25-29, 148.)

59.      Henson's salary at McGraw-Hill in July 2005 was approximately $45,000. (Henson Tr. 29.)

60.      A few days after Henson was offered the position at the NYCDOE, she accepted the job. (Henson Tr. 25-29, 148.)

61.      Shortly after accepting the position at the NYCDOE, Henson resigned her employment at McGraw-Hill and August 12, 2005 was her last day. (Henson Tr. 148.)

**IV.      PLAINTIFF JESAN SPENCER.**

**A.      Spencer's Employment History.**

62.      Spencer began employment with McGraw-Hill on or about December 5, 2000, as a Senior Manager of Human Resources ("HR") in the Corporate Segment. (Spencer Tr. 15.)

63.      At the time of her hire, Spencer earned $85,000 per year and was a grade level 19. (Spencer Tr. 33, 36.)

64.      From her hire through February 2005, she was part of a group that provided HR support to the Publication Services Group ("PSG") (a part of the IMS segment) and reported

directly to Bill Harper (African American), Director of Human Resources for PSG. (Spencer Tr. 33, 56, 128; Harper Tr. 7-8, 40.)

65.    As Senior Manager of Human Resources, Spencer's responsibilities included, among others: organizing and conducting employee training; coordinating the intern and other diversity recruitment programs; resolving employee relations issues and addressing employees' questions; and, providing HR support to her clients, the management employees of Business Week and the other business departments within PSG which included PLATTS, Aviation Week and Healthcare Information Services. (Spencer Tr. 47-49; Harper Tr. 5, 7-9.)

B.    **Spencer's Performance Under Harper's Supervision.**

66.    From December 2000 until December 2002, Spencer performed well in her position and her performance was reflected in the overall ratings she received from Harper on her 2001 and 2002 annual performance reviews, which were "performance exceeded expectations," the second highest possible rating. (Spencer Tr. 180, 184; Harper Tr. 40-42.)

67.    In 2003 and 2004, Harper determined that Spencer's performance reflected a need for improvement in certain crucial areas including verbal communications skills and conducting training, which caused Harper to receive mixed feedback on her performance from their PSG clients. (Harper Tr. 48-49; Rasin Decl. Exs. W, X, and Y.)

68.    Harper provided feedback to Spencer regarding her performance and, on at least one occasion, spoke to her about her poor management of the training programs for their clients. (Rasin Decl. Ex. Y at D00825.)

69.    Harper suggested that Spencer receive coaching from a communications specialist, Peter Delisser, to improve her verbal communications skills. (Rasin Decl. Ex. W at D00632.)

70.    Spencer failed to build effective relationships with Business Week department heads in 2003 partially because she did not begin the process until the third quarter of the year, despite Harper's request in early 2003 to build these relationships throughout the entire year. (Rasin Decl. Ex. W at D00630.)

71.    Spencer received negative feedback from clients directly for not handling employee relations issues correctly, such as the criticism she received for mishandling the hiring process of intern Sang Mi Pak.  (Rasin Decl. Ex. Y at D00801.)

72.    Spencer failed to meet her 2004 performance goal of recruiting diverse candidates for the editorial side of Business Week when none of the ten candidates she identified were found suitable for hire. (Rasin Decl. Ex. X at D03380-81.)

73.    As a result of Spencer's performance deficiencies as determined by Harper, Spencer's performance reviews from Harper for 2003 and 2004 were not as strong as her reviews in the years prior and she received an overall rating of "performance achieved expectations" on her 2003 review and a rating of "fully meets performance standards" on her 2004 review. (Rasin Decl. Exs. W at D00632 & X at D003392.)

74.    In 2004, McGraw-Hill had implemented a new online performance appraisal system called "Performance Management Process" ("PMP").  (Harper Tr. 31-33, 42-43.)

75.    The "fully meets performance standards" rating Spencer received in 2004 under the new PMP system is equivalent to the "performance achieved expectations" rating that she received on her 2003 review under the old appraisal system.  (Harper Tr. 42-43.)

C.    **Spencer's Performance Under Caruso's Supervision.**

76.    In February 2005, Harper was promoted to the position of Vice President of Human Resources for the Business Information Group ("BIG") (a part of the IMS segment) and

Ken Caruso joined McGraw-Hill as a Senior Director of Human Resources in the Corporate Segment. (Spencer Tr. 63-64; Harper Tr. 9-10.)

77.     Upon joining McGraw-Hill, Caruso became Spencer's direct supervisor and their services were dedicated to providing HR support to Business Week. (Spencer Tr. 63-64; Harper Tr. 8-9.)

78.     Like Harper, Caruso determined that Spencer exhibited deficiencies with respect to her oral communications skills and clarity in conducting training sessions and noted them in her mid-year review for 2005 which took place in August 2005. (Caruso Tr. 34-35, 73; Rasin Decl. Ex. AA.)

79.     Throughout the second-half of 2005, Caruso received serious and continued complaints about Spencer from their clients at Business Week regarding her communication skills, lack of organization and responsiveness, and failure to follow through in response to their questions and requests. (Rasin Decl. Ex. Z; Caruso Tr. 70, 72.)

80.     Caruso noted deficiencies with respect to Spencer's diversity recruitment efforts in 2005, similar to the deficiencies noted in 2004. (Rasin Decl. Exs. X & Z.)

81.     Spencer failed to recognize that the candidates she had identified for interviews and placement at McGraw-Hill were not a good fit for the Company and recommended candidates that were clearly too senior and/or experienced for its hiring needs. (*Id.*)

82.     Caruso noted her performance deficiencies in Spencer's performance evaluation for 2005 and gave her an overall rating of "target achievement" on the evaluation, the same rating that Harper had given her for 2003 and 2004. (Spencer Tr. 80; Rasin Decl. Ex. Z.)

83.     The performance deficiencies that Caruso noted in Spencer's evaluation for 2005 were consistent with the deficiencies he had noted in her 2005 mid-year review, which took

place in August 2005, and with the deficiencies Harper observed and noted in her performance reviews for 2003 and 2004. (Rasin Decl. Exs. W, X, Z, and AA.)

84.    Spencer received annual salary increases for 2005 and 2006, and her title, benefits, grade level and goals remained the same. (Spencer Tr. 78-79; Caruso Aff. ¶ 6.)

**D.    Spencer's Complaint About Caruso.**

85.    In or about December 2005, Spencer complained to Brett Marschke, the Vice President of Human Resources for IMS, that Caruso cursed in her presence in the workplace, used a disrespectful tone and demeanor toward her, and reduced her job responsibilities. (Marschke Tr. 48-51; Spencer Tr. 85-91; Rasin Decl. Ex. BB.)

86.    During her conversation with Marschke in December 2005, Spencer wondered aloud whether Caruso's conduct toward her was discriminatory. (Marschke Tr. 48-51; Rasin Decl. Ex. BB.)

87.    Marschke told Spencer that he would discuss her complaint about Caruso with O'Neill and speak with Caruso. (Spencer Tr. 83-84; Marschke Tr. 61-62; O'Neill Tr. 54, 59.)

88.    Spencer's duties were not significantly or systematically reduced under Caruso. There were occasions when Caruso would assume responsibility for a particular task previously performed by Spencer, but this was task specific and based on issues with her performance of that particular task. (Caruso Aff. ¶¶ 4-5.)

89.    Spencer's grade level, title and goals never changed while she reported to Caruso and she received a salary increase. (Spencer Tr. 78-79; Caruso Aff. ¶ 6.)

90.    After being contacted by Marschke, O'Neill spoke with Spencer regarding her allegations about Caruso's cursing, disrespectful treatment and reduction in her duties. (Spencer Tr. 87-91; O'Neill Tr. 13, 51-52.)

91.    O'Neill understood that Spencer was complaining about Caruso's use of foul language in the workplace and a reduction in her responsibilities but did not interpret Spencer to be a complaining of discrimination. (O'Neill Tr. 13, 51-52, 57, 65, 214-15.)

92.    Marschke spoke with Caruso regarding Spencer's allegations and reprimanded him for his use of profane language in the workplace.  (Marschke Tr. 87; Caruso Tr. 110.)

93.    When Marschke spoke with him, Caruso expressed dismay at Spencer's allegations and struggled to recall when he had used profane language in her presence.  (Caruso Tr. 104-112; Marschke Tr. 62, 67-69.)

94.    Caruso admitted to Marschke that he may have used the words "fuck" and "shit" and that he may have used the word "bitch" as an expletive in the context of phrases like "son of a bitch" or "what a bitch" in reference to stressful situations.  (Caruso Tr. 104-112; Marschke Tr. 62, 67-69.)

95.    Caruso denies having used the word "bitch" by itself in Spencer's presence or in reference to Spencer, any woman specifically, or women in general.  (Caruso Tr. 104-106.)

96.    Caruso never said "fuck you" to Spencer or explicitly called Spencer a "bitch." (Spencer Tr. 102, 158.)

97.    Caruso did not curse exclusively to or in the presence of African American employees. (Spencer Tr. 225-26.)

98.    Spencer never heard Caruso make a racial slur.  (Spencer Tr. 117.)

99.    Caruso told Marschke that he would be more careful not to use foul language in the workplace and he thereafter apologized to Spencer.  (Caruso Tr. 110-13.)

100.    Following his conversation with Marschke, Caruso stopped cursing in the workplace and in Spencer's presence. (Spencer Tr. 98-101; *see also* Caruso Tr. 113-14; O'Neill Tr. 75.)

101.    Spencer told O'Neill that Caruso had stopped cursing. (*Id.*)

**E.    Spencer's Transfer.**

102.    O'Neill followed up with Spencer regarding her complaint of Caruso's behavior and asked Spencer if she would meet with O'Neill and Caruso so that O'Neill could mediate any remaining problems Spencer perceived. (Spencer Tr. 91-92.)

103.    Spencer refused to meet with O'Neill and Caruso to mediate the problems she claimed to have with Mr. Caruso. (Spencer Tr. 91-92.)

104.    After Spencer refused to meet with O'Neill and Caruso, in or about April 2006, Spencer requested to O'Neill that she be transferred from her position and O'Neill agreed to look into the available options. (Spencer Tr. 101; O'Neill Tr. 205-206.)

105.    Following Spencer's request to transfer to her, O'Neill in conjunction with Marschke and Harper evaluated the Company's business needs and determined that there was an opening for a Senior HR Manager position in the Business Information Group ("BIG") that was comparable to Spencer's current position. (O'Neill Tr. 206-213; Marschke Tr. 90, 108-110; Harper Tr. 53-54.)

106.    Due to the growth and business needs at BIG at the time, Harper, as the Vice President of BIG, had been asking Marschke for additional support and he was pleased to accept Spencer. (Harper Tr. 54-56.)

107.    The position at BIG had the same title, the same pay, the same benefits, the same grade level and the same job responsibilities as Spencer's current position. (Spencer Tr. 109; Harper Tr. 58-59, 129-30; Marschke Tr. 108-110.)

108.    Spencer expressed her desire to accept the position at BIG to Harper. (Harper Tr. 54-56.)

109.    Spencer also initially expressed interest in the position to O'Neill, but later told O'Neill that she was reluctant to leave her current position with BusinessWeek. (O'Neill Tr. 206-207, 212-213.)

110.    Around the same time that Spencer became reluctant to transferring, Spencer came to O'Neill and accused Caruso of inappropriately grabbing himself near her cubicle. (O'Neill Tr. 51-52; Spencer Tr. 95-96.)

111.    The day following Spencer's accusation, O'Neill spoke to Caruso regarding Spencer's allegation of him inappropriately grabbing himself and Caruso denied doing so. (Caruso Tr. 114-120, 148-49.)

112.    O'Neill felt that Spencer's complaint, coupled with her refusal to mediate her problems, demonstrated the unsalvageable nature of her relationship with Caruso and the need for Spencer's transfer. (O'Neill Tr. 207-208.)

113.    In early June 2006, Spencer transferred to the Senior Human Resources Manager position at BIG. (Spencer Tr. 174-75.)

114.    As a Senior Human Resources Manager at BIG, Spencer reported directly to Toi Eaton (Asian), Director of Human Resources at BIG, who reported to Harper, and she did not have any contact with Caruso. (Harper Tr. 56-57.)

115.    Caruso transferred to the position of Senior Director of Human Resources at the JD Power & Associates division of McGraw-Hill in California on or about July 31, 2006. (Caruso Tr. 5-7.)

116.    Spencer was not supervised by any of the individuals whom she claims discriminated or retaliated against her while at BIG. (Spencer Tr. 62-63.)

117.    While working at BIG, Spencer requested a reduced schedule as well as a leave period to deal with personal and family issues. (Spencer Tr. 169-170, 176.)

118.    Despite her reduced schedule, Spencer's responsibilities as a Senior Human Resources Manager at BIG were similar to those she had while working a full schedule under Caruso, which included conducting training, designing job descriptions, recruitment efforts such as developing a list of candidates for hire to Aviation Week, and providing HR support to her clients. (Spencer Tr. 174-76; Harper Tr. 58-59, 127-30.)

119.    During the time that she worked at BIG, O'Neill asked Spencer how she was doing and Spencer responded positively. (O'Neill Tr. 215-16.)

120.    In early 2007, Spencer told O'Neill that she had decided to resign her employment with McGraw-Hill. (Spencer Tr. 237-38.)

121.    When Spencer told O'Neill that she was resigning, O'Neill asked her to reconsider and offered to speak with Harper about Spencer's dissatisfaction with her assignments which Spencer mentioned in that conversation. (O'Neill Tr. 215-16; Spencer Tr. 238-39.)

122.    Spencer declined O'Neill's offer to speak with Harper on Spencer's behalf and told O'Neill she had already decided to resign. (Spencer Tr. 238-39.)

123.    By the time Spencer declined O'Neill's offer and told O'Neill she was resigning, Spencer had already decided to start her own business and had begun the process of buying and registering a business in her name, d/b/a/ Spencer Healthy Life. (Spencer Tr. 16, 20, 160-61, 243-44, 255-57; Rasin Decl. Ex. CC.)

124.    Spencer registered her business, d/b/a Spencer Healthy Life, on or about May 5, 2006, which was before her transfer to the position at BIG and approximately nine months before her resignation.  (Rasin Decl. Ex. CC.)

125.    Her entire life Spencer had desired to start her own business.  (Spencer Tr. 243-44.)

126.    On or about February 2, 2007, Spencer resigned from her position at McGraw-Hill and now works at Spencer Healthy Life. (Spencer Tr. 16, 243-44.)

## V.    PLAINTIFF BRENDA CURTIS.

### A.    Curtis's Employment History

127.    Curtis was employed as an Office Manager in the E-Business Department of S&P in the Securities Services Division of McGraw-Hill beginning on or about May 29, 2002, working for the Executive Managing Director of Securities Services, Vladimir Stadnyk.  (Rasin Decl. Ex. DD.)

128.    In late July 2005, due to a corporate reorganization within S&P, Curtis' position was eliminated and when Stadnyk was promoted to his supervisor's position, Executive Managing Director of Data Information Services.   Stadnyk's supervisor's Administrative Assistant, Ecri Gutierrez, then became his Administrative Assistant.  (Stadnyk Tr. 13-14, 17-19; Rasin Decl. Ex. EE.)

129.    Curtis was advised of the elimination of her position in July of 2005, and the fact that Gutierrez was to become Stadnyk's Administrative Assistant, Curtis was kept on the S&P payroll until October 3, 2005.  (*Id.*)

130.    On September 14, 2005, in exchange for valid consideration, Curtis signed a Termination and Release Agreement.  (*Id.*; Curtis Tr. 131.)

19

131.    Curtis released McGraw-Hill from any liability that may have arisen out of her employment, including any liability under Title VII, § 1981, the NYSHRL and the NYCHRL. (Rasin Decl. Ex. EE.)

132.    Upon her separation, Stadnyk provided Curtis with a letter of reference.  (Rasin Decl. Ex. FF.)

133.    The first draft of the letter states that Curtis's position was eliminated due to a reorganization, that she "shared her expertise with computer applications with other support staff" and developed "efficiencies for the business unit," and explicitly recognizes that Curtis "consistently performed at a professional level" of the staff.  (*Id.*)

134.    After she received the letter, Curtis asked Stadnyk to revise the letter to include more detail.  (Curtis Tr. 111-112).

135.    On October 6, 2005, pursuant to her request, Stadnyk provided a second, more detailed letter of reference to Curtis.  (Rasin Decl. Ex. GG.)

136.    In that letter, Stadnyk stated that Curtis "shared her computer applications expertise with other staff and management, developed tracking spreadsheets, and other efficiencies for the business unit, and created training materials for the online T&E reporting and office supply purchasing systems.  She consistently performed at a professional level and was a productive member of my staff."  (*Id.*)

**B.    Curtis's Applications to McGraw-Hill Following Her Termination.**

137.    Following her termination, Curtis alleges she applied for eight positions with McGraw-Hill:    (1) Administrative Assistant/Office Manager to Vice President in Global Licensing and Contracts; (2) an Office Manager position in Vista Research Inc.; (3) an Assistant Compliance Officer Position; (4) an Administrative Assistant position to the Chief Information Officer of Technology for S&P; (5) a Graphic Design Position in Marketing; (6) an

20

Administrative Assistant position in Corporate and Government Ratings; (7) an Administrative Assistant position in S&P Ratings; (8) an Administrative Assistant position serving Structured Finance and reporting to Paul Kelly; and (9) an Administrative Assistant to the Senior Vice President of Global Client Services & Sales.  (Rasin Decl. Ex. L ¶ 54; Curtis Tr. 144-159, 161, 163; Rasin Decl. Exs. HH, JJ, LL, NN, PP, RR & TT; Farrelly Aff. ¶ 3.)

138.    Curtis contends the positions for which she applied after her discharge were discriminatorily given to pre-selected Caucasian candidates (Rasin Decl. Ex. L ¶ 54).

139.    Since Vista Research Inc. was acquired by McGraw-Hill in April 2005, there has been no opening for an Office Manager position and neither Curtis nor anyone else was interviewed or hired for such a position.  (Maffei Aff. ¶ 3.)

140.    On August 5, 2005, Curtis Applied for an Assistant Compliance Officer position. The position required a four year degree.  (Rasin Decl. Ex. JJ; Bolger Aff. ¶ 3.)

141.    Curtis had only obtained her GED, and had never worked as a compliance officer. (Curtis Tr. 44-45, 159.)

142.    The hiring manager offered the position to the most qualified candidate, an African American woman with a Bachelor's Degree in Business Administration and six years of compliance experience.  (Rasin Decl. Ex. KK; Bolger Aff. ¶¶ 4, 5.)

143.    Curtis also applied to be the Administrative Assistant for the Chief Information Officer of Technology for S&P.  (Rasin Decl. Ex. LL.)

144.    Initially, the hiring manager selected an African American woman he felt held the skill set required for the position, having previously served as an Administrative Assistant in Data Operations for McGraw-Hill.  (Held Aff. ¶ 5.)

145.    When that candidate chose to remain with her current manager and turned down the position, the hiring manager chose to hire another African American woman who held the requisite experience, having previously served as Executive Assistant/IS Project Coordinator to the Chief Information Office of Par Pharmaceuticals, Inc., where she was responsible for vendor/contract relations for hardware and software maintenance as well as wireless communication services.  (Held Aff. ¶ 6.)

146.    The successful candidate held a Bachelor's Degree and had worked previously as a Research Assistant for an S&P customer, Goldman Sachs Group.  (Held Aff. ¶ 6.)

147.    Unlike the selected candidate, Curtis did not hold a bachelor's degree.  (Curtis Tr. 43-45).

148.    Curtis also alleges she applied for a Graphic Design Position in Marketing. (Curtis Tr. 148; Rasin Decl. Ex. NN.)

149.    The responsibilities of this position included creating advertising and digital marketing materials and reviewing design work to ensure brand compliance and consistency. (Cederholm Aff. ¶ 4; Rasin Decl. Ex. OO.)

150.    A bachelor's degree and four to eight years of graphic design experience were required.  (*Id.*)

151.    Curtis, having never worked as a graphic designer, had neither the requisite degree nor experience required for this position.  (Curtis Tr. 44-45, 148.)

152.    The successful candidate (Caucasian) had a bachelor's degree and over five years of experience in graphic design.  (Cederholm Aff. ¶ 6.)

153.    In addition, the hiree was already doing graphic design for S&P as an outside contractor when Curtis applied.  (*Id.*)

154.    Curtis applied for an Administrative Assistant/Office Manager position in Global Licensing and Contracts.  (Rasin Decl. Ex. HH.)

155.    An African American woman who worked at S&P since 1993 and was already working in Global Licensing and Contracts as a temporary Administrative Assistant/Contract Coordinator applied for and was awarded this position.  (Rasin Decl. Ex. II; Inglesh Aff. ¶ 4).

156.    Curtis also applied for an Administrative Assistant position in Corporate & Government Ratings.  (Rasin Decl. Ex. PP.)

157.    An Hispanic woman with a Bachelor's Degree and over nine years of experience working in S&P's Financial Services Ratings area was hired for the position.  (Coughlin Aff. ¶¶ 3, 4; Rasin Decl. Ex. QQ.)

158.    The candidate who was hired had previously served as Administrative Assistant to one of the hiring manager's direct reports in the Corporate and Government Ratings Group. (Coughlin Aff. ¶ 5.)

159.    Curtis applied for an Administrative Assistant position in S&P Ratings.  (Rasin Decl. Ex. RR.)

160.    An Hispanic woman who came highly recommended by the hiring manager's colleagues, and had eight years of prior experience working with BusinessWeek, filled the position. (Stein Aff. ¶ 5; Rasin Decl. Ex. SS.)

161.    Curtis applied for an Administrative Assistant position serving Structured Finance and reporting to Paul Kelly, the Managing Director of Ratings for Structured Finance (Curtis Tr. 135-36).

162.    The Office Manager for the group, acting as a proxy for Kelly, was to screen the applicants and determine which of them would move on to a second round of interviews with him. (Farrelly Aff. ¶ 3).

163.    After receiving Curtis's resume through her sister, who worked in Structured Finance at the time of Curtis's application, the Office Manager added her to her list of potential candidates for the position. (Farrelly Aff. ¶ 4).

164.    After interviewing Curtis, however, the Office Manager did not select her to move on to the second round of interviews, but selected three other applicants, including an African American woman, to move on to the next round of interviews. (Farrelly Aff. ¶ 5).

165.    Curtis also applied to be the Administrative Assistant to the Senior Vice President of Global Client Services & Sales. (Rasin Decl. Ex. TT.)

166.    Hiring for this position was cancelled due to the fact that the Vice President traveled frequently and found he did not need a full-time Administrative Assistant, particularly in light of the assistance he received from both the Administrative Assistant to his direct report and the Administrative Assistant to the President for Global Client Services & Sales when necessary. (George Aff. ¶ 5).

167.    As a result, neither Curtis nor anyone else was interviewed or hired for the position. (George Aff. ¶ 6.)

C.    **Curtis's Alleged Complaints of Racial Discrimination**

168.    Curtis contends that, in retaliation for her complaint to Gattinella and her alleged complaints of discriminatory treatment to Stadnyk, Hunsucker, Whelan and Menon, she was not selected for the positions for which she applied after her discharge (Curtis Tr. 133-37) and Stadnyk failed to provide her with a proper letter of recommendation (Curtis Tr. 133-34).

24

169.    On September 30, 2005, Curtis spoke to Marianne Gattinella, the Vice President of Human Resources, as part of Gattinella's investigation into Plaintiff Jannie Pilgrim's complaint through her lawyer of discriminatory treatment.    (Defendant's Objections and Supplemental Answers to Plaintiffs' Second Demand on Defendant for Interrogatories; Gattinella Tr. 46-48.)

Curtis told Gattinella that she had "some concerns around alleged discriminations, from her perspective, that she had seen." (Gattinella Tr. 63.)

170.    Curtis contends she also complained of discriminatory treatment to Stadnyk, Joyce Hunsucker, a former Director of Human Resources, Gail Whelan, a former Director of Human Resources, and Prema Menon.  (Curtis Tr. 89-90, 173.)

171.    McGraw-Hill denies that such complaints were ever made.

172.    Stadnyk testified Curtis never made any complaints of discrimination to him. (Stadnyk Tr. 26.)

173.    Neither Gattinella, Stadnyk, Whelan, Menon, nor Hunsucker ever shared any alleged complaints by Curtis with any of the hiring managers at issue.  (Inglesh Aff. ¶ 6; Coughlin Aff. ¶ 7; Bolger Aff. ¶ 6, George Aff. ¶ 7; Held Aff. ¶ 7; Stein Aff. ¶ 6; Cederholm Aff. ¶ 7; Farrelly Aff. ¶ 6; Maffei ¶ 4.)  The hiring managers had no knowledge of Curtis's purported complaints.  (*Id.*)

Dated: New York, New York      By:      _____/s/ Gregory I. Rasin_____
     June 27, 2008                             Gregory I. Rasin
                                       Elise M. Bloom
                                       Steven D. Hurd
                                       1585 Broadway
                                       New York, New York 10036-8299
                                       Telephone: 212.969.3000
                                       Fax: 212.969.2900
                                       Email: grasin@proskauer.com
                                       Attorneys for Defendant