**EXHIBIT B TO THE JUNE 26, 2008
DECLARATION OF GREGORY I. RASIN, ESQ.**

# ORIGINAL

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

JANNIE PILGRIM, GIOVANNA HENSON,

JESAN SPENCER and BRENDA CURTIS,

                Plaintiffs,       '07 CIV

      -against-               6618

THE MCGRAW-HILL COMPANIES, INC.,

                Defendant.

----------------------------------------x

                January 3, 2008

                9:31 a.m.

      Deposition of JESAN SPENCER, held at

the offices of Proskauer Rose LLP, 1585

Broadway, New York, New York, pursuant to

Notice, before Mildred Cassese, a Registered

Professional Reporter and Notary Public of

the State of New York.

**Computer Reporting Incorporated** 

501 Fifth Avenue  New York, NY 10017

(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

1                          *J. Spencer*

2          Q.    Do you know her in any context other

3    than through your employment at McGraw-Hill?

4          A.    Only through employment at

5    McGraw-Hill.

6          Q.    Do you know Giovanna Henson?

7          A.    Yes, I do.

8          Q.    How do you know her?

9          A.    Only through employment at

10   McGraw-Hill.

11         Q.    Do you know Brenda Curtis?

12         A.    Only through employment at

13   McGraw-Hill.

14         Q.    Have you had any conversation with

15   Ms. Pilgrim, Ms. Henson or Ms. Curtis about your

16   deposition today during which your attorneys did

17   not participate?

18         A.    No, I haven't.

19         Q.    You were first employed by McGraw-Hill

20   in December of 2000; is that correct?

21         A.    Correct.

22         Q.    And you worked for McGraw-Hill until

23   February of 2007?

24         A.    Correct.

25         Q.    During the time that you were working

*J. Spencer*

1    for McGraw-Hill, was Ariella Spencer living with

2    you?

3         A.    Yes.

4         Q.    The entire time?

5         A.    Yes.

6         Q.    During the time that you worked for

7    McGraw-Hill, was Daniel Simmons living with you?

8         A.    Yes.

9         Q.    Was he living with you the entire

10   time?

11        A.    Yes.

12        Q.    Are you currently working?

13        A.    No, I'm not working.

14        Q.    Have you held any job since February

15   of 2007?

16        A.    Currently I have my own business.

17        Q.    What's the name of that business?

18        A.    Spencer Healthy Life.

19        Q.    What kind of a business is that?

20        A.    Health food.

21        Q.    When you say that is a health food

22   business, can you explain to me specifically what

23   the business does?

24        A.    Counsels clients who come in who want

1                              *J. Spencer*

2    different than from what Maxine and Esmee do?

3         A.    He makes calls to confirm whether

4    clients are coming in to be spoken with.

5         Q.    How many days a week does Yvonne work?

6         A.    She works one day a week.

7         Q.    Other than the salary that you draw

8    from Spencer Healthy Life, have you obtained any

9    other money, whether it be profits or any other

10   form of compensation?

11        A.    No.

12        Q.    Is Spencer Healthy Life registered

13   anywhere?

14        A.    I have a business certificate for it.

15        Q.    And the business certificate is issued

16   under the name of Spencer Healthy Life?

17        A.    Yes.

18        Q.    And it's registered in New York?

19        A.    Yes, it is.

20        Q.    I want to shift gears a little bit and

21   talk about your application for employment with

22   McGraw-Hill.

23              How did you learn that there was a

24   position available at McGraw-Hill?

25        A.    A friend of mine called me, informed

*J. Spencer*

1
2    strategies maybe they might have been working on.
3        Q.    When you say what strategies, what are
4    you talking about?
5        A.    What are they trying to implement to
6    grow the business, to grow the -- grow their
7    readership.
8        Q.    So not human resource strategies; more
9    business strategies?
10       A.    More business strategies.
11       Q.    Did you obtain an offer after your
12   meeting with the people that you just described?
13       A.    I did receive an offer.
14       Q.    Who did the offer come from?
15       A.    Mr. Harper.
16       Q.    What position were you offered?
17       A.    Senior human resource manager
18   supporting information and media services.
19       Q.    What was the compensation that you
20   were offered?
21       A.    I believe $85,000 a year.
22       Q.    And to whom were you to report in your
23   senior human resources manager position?
24       A.    Direct report to Mr. Harper.
25       Q.    Did you accept that offer?

1                         *J. Spencer*

2        Q.    Does that sounds about right?

3        A.    I don't recall.

4        Q.    It is true, though, that the job at

5    McGraw-Hill offered you a higher annual salary

6    than the position at Coopers & Lybrand?

7        A.    Yes, it offered me more.

8        Q.    When you were extended the offer --

9    strike that.

10                Are you familiar with the term "grade

11    level"?

12        A.    Yes, I am.

13        Q.    And are you familiar with the term

14    "grade level" within the context of McGraw-Hill?

15        A.    Yes.

16        Q.    When you got the job offer at

17    McGraw-Hill, was the job that you were offered

18    assigned a particular grade level?

19        A.    Yes, it was.

20        Q.    What was that grade level?

21        A.    Level 19.

22        **MS. BLOOM:**  I ask if you can mark that

23        and I'd like to mark it Spencer Exhibit 1.

24        **(Spencer Exhibit 1,** Offer letter dated

25        November 6, 2000, marked for identification,

*J. Spencer*

1
2   McGraw-Hill in December of 2000, you said you were
3   reporting directly to Mr. Harper; is that correct?
4        A.    That is correct.
5        Q.    What were your duties and
6   responsibilities?
7        A.    My overall duties and responsibilities
8   while reporting to Mr. Harper was to partner with
9   the department heads, to determine in what way
10  they needed HR assistance, develop competency
11  based questions, entry level employees, interns,
12  managers and directors.
13              Oversee, manage and coordinate all
14  aspects of the intern program.
15              Develop a diversity slate.
16              Complete the competency based
17  questionnaire.
18              Handle all -- handle and resolve all
19  employee relations issues to make sure that no
20  issue led to any litigation.
21              Conduct training on an as-needed
22  basis.
23              Develop and manage the sexual
24  harassment training.
25              Partner or meet with the business

*J. Spencer*

1

2      department heads by sitting in on their meetings

3      to understand their role and their

4      responsibilities.

5              Recruit for the administrative

6      assistant position for the president of Business

7      Week.

8              Handle all employee relations issues

9      with the health care group.

10             Disseminate information on an

11     as-needed basis to all businesses that were

12     supported.

13             Meet with employees to address

14     one-on-one benefit issues, concerns.

15             Review the numbers of individuals in

16     each of the departments based upon data sent by

17     the group that works on affirmative action.

18             Initiate and develop a leadership

19     development program for department heads.

20             Attend department head meetings headed

21     up by the president to provide updates on HR's

22     accomplishments for the business.

23             Communicate results of surveys as they

24     were conducted.

25             That's as much as I can remember, that

*J. Spencer*

1  
2  I can recall to present.

3      Q.    When you worked under Mr. Harper's

4  supervision, did you do each of the things that

5  you just outlined for us?

6      A.    Yes, I did.

7      Q.    Were you familiar with the personnel

8  policies of McGraw-Hill?

9      A.    When I came on board he explained to

10 me where the policies were and asked me to become

11 familiar with the policies.

12     Q.    And did you do that?

13     A.    Yes, over a period of time.

14     Q.    In order to be effective in a human

15 resource or a senior human resource position, it

16 is necessary to be familiar with the personnel

17 policies of the company, correct?

18     A.    It's correct.

19     Q.    Now, when -- you said that you would

20 handle and resolve all employee relations issues

21 to make sure no issue led to any litigation.

22          Did you interface with in-house legal

23 counsel?

24     A.    When needed.

25     Q.    You interfaced or communicated with

*J. Spencer*

1

2     A.     In other words, if a person is absent,

3     for example, if a person is absent, how many days

4     do you provide for them before you put them on

5     disability, things like that.

6            Q.     You reported to Mr. Harper until

7     February of 2005; is that right?

8            A.     Approximately February 2005.

9            Q.     And during the time that you reported

10    to Mr. Harper, you received salary increases; is

11    that correct?

12           A.     That's correct, I did.

13           Q.     Do you remember how many?

14           A.     Well, let me put it to you this way, I

15    don't recall a time when I worked with him that I

16    didn't receive a salary increase.

17           Q.     Did you like working for Mr. Harper?

18           A.     Did I like working for Mr. Harper?  I

19    liked my job.

20           Q.     Did you think that he was a fair

21    supervisor?

22           A.     At times.

23           Q.     Well, were there times when you didn't

24    think he was fair?

25           A.     Yes.

1                          *J. Spencer*

2          A.    I'm claiming I was treated differently

3     from white males and white females.

4          Q.    Are you claiming that you were treated

5     differently from black males?

6          A.    I didn't see my boss's interaction

7     with black males.  I notice his interaction with

8     blacks as a whole.

9          Q.    When you refer to your boss, who are

10    you referring to?

11         A.    I'm referring to Ken Caruso, because

12    he is the reason I'm here.

13         Q.    When you say he is the reason I'm

14    here, he is the person that you're claiming

15    discriminated against you?

16         A.    Yes.

17         Q.    You're not claiming that Mr. Harper

18    discriminated against you; is that right?

19         A.    This case is not regarding Mr. Harper.

20         Q.    So you're not claiming that Mr. Harper

21    discriminated against you; is that right?

22         A.    Regarding my color and my sexuality,

23    no.

24         Q.    Well, are you claiming that Mr. Harper

25    discriminated against you in any way other than

*J. Spencer*

1
2       with regard to your color or sexuality?

3            A.    Mr. Harper treated me differently in

4       terms of some assignments that he would give me,

5       one of which I've already mentioned.

6            Q.    Are you claiming that he treated you

7       differently -- strike that.

8                  But you're not claiming that he

9       treated you differently because of your sex or

10      your color, correct?

11           A.    No, I'm not claiming that with regard

12      to Mr. Bill Harper.

13           Q.    Now, if you can look at Exhibit 5,

14      please, your answers to interrogatories, and I'd

15      like to direct your attention specifically to

16      interrogatory No. 12, and your answer to that

17      interrogatory, interrogatory No. 12 asks you to

18      identify each and every individual who allegedly

19      discriminated against you on the basis of your

20      race or color and who allegedly retaliated against

21      you.

22                 Do you see that question?

23           A.    Yes.

24           Q.    And in response to that question you

25      provided three names:  Ken Caruso, Sheila O'Neil

63

*J. Spencer*

1

2  and Brett Marschke; is that right?

3       A.    Yes, as listed here.

4       Q.    Are you claiming that there's anybody

5  else who discriminated against you on the basis of

6  your race, your color or your sexuality, other

7  than the three people whose names appear here?

8       A.    Only the three people whose names

9  appear.

10      Q.    Are you claiming that anybody else

11  retaliated against you other than the three people

12  whose names appear here?

13      A.    Only the three people that I see here.

14      **MS. BLOOM:**    The videographer needs to

15      change his tape, so we'll take a break.

16      (There was a pause in the proceedings.)

17      **THE VIDEOGRAPHER:**    Returning to the

18      record at 11 o'clock from 10:59 at the

19      beginning of tape 2.

20      Q.    Now, Ms. Spencer, you reported to

21  Mr. Harper until February of 2005 and then your

22  reporting relationship changed; is that right?

23      A.    That's correct, it did change.

24      Q.    At that time in February of 2005 you

25  began reporting to Ken Caruso; is that correct?

1                    *J. Spencer*

2        A.    I reported to Ken Caruso.

3        Q.    At some point in time you stopped

4   reporting to Mr. Caruso and started reporting to

5   Mr. Harper again; is that correct?

6        A.    Yes.

7        Q.    And when was that?

8        A.    Approximately May of 2000 -- between

9   May and June of 2006.

10        Q.    And you continued to report to

11   Mr. Harper until your employment with McGraw-Hill

12   ended; is that right?

13        A.    Correction.  When I -- there's a

14   correction.  I have to go back.  I didn't report

15   to Mr. Harper.  I reported to Toi Eaton, not

16   Mr. Harper.

17        Q.    Did you have any reporting

18   relationship to Mr. Harper?

19        A.    No, I did not.

20        Q.    And you're not claiming that Toi Eaton

21   discriminated or retaliated against you; isn't

22   that right?

23        A.    I'm not claiming that.

24        Q.    Prior to the time that your reporting

25   relationship changed in 2005 from your reporting

1                           *J. Spencer*

2      claiming in this case that you had been

3      discriminated against because you are a black

4      woman; is that right?

5           A.     That's what I stated.

6           Q.     Can you tell me in as much detail as

7      possible all the ways in which you believe you

8      were discriminated against at McGraw-Hill because

9      you are a black female?

10          A.     Well, it began when Ken Caruso came on

11     board, and within a couple of months time when he

12     would speak to me in his office he would call me

13     in and refer to women as bitches.  He'd say shit

14     and fuck to me at every conversation that he had.

15               Then when I would express to him about

16     other concern, I'd share information about other

17     minority -- other blacks being concerned about how

18     they were treated, he would tell me they should

19     leave.

20               He spoke to me in a very demeaning

21     way.  He shooed me out like -- like I was some

22     kind of dog.

23               Then when I complained about him, he

24     began to retaliate against me.

25               He raced his voice.

*J. Spencer*

He pointed his finger in my face.

He shooed me out.

He practically told me to get out at
times.  When he had a phone call, he told me to
just leave.

And I made note that he didn't treat
any white male or any white female like he treated
me, and that was confirmed.

Sheila Mitchell also complained about
his behavior.

Pat France complained, who was the
only black department head, that when he came on
board that he never -- he went to see all the
white males and white female department heads but
never saw her.

And then when I told him that blacks
were concerned, minorities were concerned about
how we were treated, he said they should leave,
and at that juncture I knew he meant me.

He never spoke to me in the morning.

And his behavior every time was
punitive, punishment.

He treated me like I was a worthless
person.  I might as well have been a dog or a

74

*J. Spencer*

1

2    slave.  I have never been treated like that at

3    McGraw-Hill by anyone.

4              And being in HR I knew that behavior

5    wasn't normal for an HR person like me reporting

6    to someone.

7         Q.    Are there any other ways in which you

8    claim that he discriminated against you?

9         A.    He reduced my responsibilities to

10   nothing.

11             He gave me clerical responsibilities.

12             He took away my visibility with my

13   business partners.

14             He told -- he told -- one of the

15   managers told me when I said to her, I don't get

16   to talk to you, I don't get to see you, she says

17   Ken Caruso told her not to come -- told the

18   managers, not the department heads, not to come to

19   me, to go directly to him.

20             I had no job.  He took my job away.

21   He had me ordering boxes for people who were rich.

22             He had me going into Lawson and

23   looking up salaries for people, and he had Lawson.

24             He asked me to escort a tenured

25   employee to the Social Security office to find out

*J. Spencer*

1
2  if we could fix his Social Security adjustments

3  because an error was made way before I came into

4  the company.

5          I might as well have been the nanny.

6      Q.    When you say one of the managers told

7  you that Ken Caruso had told them not to go to you

8  but to go to him, who was that manager?

9      A.    Sheila DiBiase.

10     Q.    Are there any other ways in which you

11  claim Mr. Caruso discriminated against you?

12     A.    He took away everything that I had in

13  terms of a job.  I was at McGraw-Hill for seven

14  years, for seven years.  I worked hard to get

15  there.

16          I had a Master's.  I networked.  By

17  the time he finished, nobody knew who I was.

18          I sat at a desk every day with little

19  work to do.  My managers didn't know I existed,

20  and then he talked about I didn't do my job, I

21  didn't do my work.

22          He took the work away. I couldn't have

23  work.  I was nonexistent at McGraw-Hill.  Seven

24  years, down the drain.  Nothing.  I loved my job.

25  I loved -- literally loved my job.

*J. Spencer*

1

2    Q.    Are there any other ways --

3         THE WITNESS:    I got to take a break.

4         MS. BLOOM:    I'd like her -- I'm sorry,

5    I'd just like her to finish the answer.

6    Q.    Are there any other ways in which you

7    claim that Mr. Caruso discriminated against you?

8    A.    That is discrimination, alienation,

9    taking everything you have, all your credentials

10   away, that is discrimination.

11   Q.    Are there any other ways in which you

12   claim he discriminated against you?

13   A.    That's all I can think of for now.

14   Q.    Is there anything that would refresh

15   your recollection?

16   A.    I can't think of anything for now.

17        MR. SOLOTOFF:    We'd like to take that

18   break.

19   Q.    Have you finished your answer?

20        MR. SOLOTOFF:    She has.

21        MS. BLOOM:    I just want to make

22   sure --

23        MR. SOLOTOFF:    She has.  Counsel,

24   you're abusing her now.

25        MS. BLOOM:    No, I'm not.

1                          *J. Spencer*

2          A.    Mr. Caruso took all my work-related

3     assets and diminished them to the point where I

4     would be considered a non, barely functioning HR

5     coordinator.

6                    He reduced me from a senior HR manager

7     of Business Week to someone who was just about a

8     clerical, and considered it such.

9                    My reputation was lost.

10         Q.    During the time that you reported to

11    Mr. Caruso, did your grade level change at all?

12         A.    No.  My grade level didn't change.

13         Q.    Did your title change at all?

14         A.    My title didn't change.

15         Q.    And in terms of your compensation,

16    your compensation increased during the period that

17    you reported to Mr. Caruso; isn't that correct?

18         A.    I'm going to say under Mr. Caruso I

19    don't recall him ever having responsibility for

20    giving me an increase.  I don't recall it.

21         Q.    Do you recall receiving an increase

22    during the period of time that you reported to Mr.

23    Caruso?

24         A.    I recall him being there in 2005, and

25    from previous work past that my increase would

79

*J. Spencer*

1

2    have been given to me round about the time he was

3    there, but I believe that increase came from

4    Mr. Harper.

5         Q.    And so it's your testimony that you

6    got an increase in the year 2005 but you don't

7    attribute that increase to Mr. Caruso?

8         A.    I don't recall that.  I don't remember

9    Mr. Caruso ever sitting me down and saying to me

10   Jesan Spencer, this is the increase I allotted to

11   you.  I just don't recall that.

12        Q.    But you do remember you got an

13   increase for the year 2005?

14        A.    I do remember I got an increase for

15   the year 2005.

16        Q.    And you got an increase for the year

17   2006?

18        A.    I guess I did.  I don't really recall.

19        Q.    When you talked about PMP earlier

20   today, you were talking about the performance

21   reviews that employees would get?

22        A.    Performance management process.

23   That's process in which they use to evaluate you.

24        Q.    And it would result in actual

25   performance -- a written performance evaluation;

1                          *J. Spencer*

2     isn't that right?

3          A.     It would be a written -- yes, you

4     would get a performance evaluation in writing.

5          Q.     And you did get a performance

6     evaluation in writing from Mr. Caruso in 2005;

7     isn't that correct?

8          A.     I received a performance evaluation

9     from him.

10          Q.     Do you remember what the overall

11     rating was on that review?

12          A.     Target.

13          Q.     And that was the same overall rating

14     that you had gotten the previous year from

15     Mr. Harper, correct?

16          A.     Target rating for Mr. Harper as well.

17          Q.     The previous year?

18          A.     Correct.

19          Q.     You said before the break that

20     Mr. Caruso had retaliated against you.

21               What did you mean by your statement

22     that he retaliated against you?

23          A.     Well, once I complained about his

24     attitude towards me, that's when I noticed that I

25     wasn't meeting with the department heads.  I had

1                          *J. Spencer*

2    very little projects, if any, to do.

3              My phone barely rang.  I got no calls,

4    little or no calls from any department heads.

5              And that's when he started giving me

6    more clerical work.  That's when he would make --

7    tell the department heads a certain date or

8    certain deadline for information, and then I would

9    know that the dates or the deadlines had changed

10   and I would be considered late, if I had to get

11   information.

12             If he wanted them, for example, to

13   give them ratings pre-PMP ratings for his people

14   before final ratings were in place, he would have

15   me get on the phone and call them to remind them

16   to send them in.  Sometimes he asked me to do that

17   two or three times a day.  A generalist doesn't

18   call a department head two or three times during

19   the course of the day.

20             When he needed to get some documents

21   I'd say okay, you know, I need the document, you

22   have to have the document to Ken by such and such

23   a date, such and such a time, and they would say

24   that's not what Ken told me.  He wouldn't share

25   the information.  He kept information to himself,

82

1                     *J. Spencer*

2    and if he asked me to do something, form, get some

3    information to them, he would give me one date,

4    but their expectation was a different date, so I

5    was the one who looked like I was always late.

6          Q.     Are there any other ways in which you

7    claim what Mr. Caruso retaliated against you?

8          A.     He didn't share any information.  I

9    knew nothing that was going on in Business Week,

10   the business that I was supposed to be supporting,

11   strategies, change in organizational charts,

12   staffing changes, down-sizings.

13                 I was out of the loop.  I was out of

14   the network.

15         Q.     Are there any other ways in which you

16   claim he retaliated against you?

17         A.     None that I can think of right now.

18         Q.     Now, you said a few minutes ago that

19   he started to retaliate against you once you

20   complained about his attitude.

21                 When did you complain about his

22   attitude?

23         A.     I started complaining about Ken's

24   attitude towards -- in '05, spring of '05 all the

25   way up to September of '05, September, October of

1                              *J. Spencer*

2          '05.

3                Q.     And to whom did you complain?

4                A.     Well, I first complained to him.  I

5     brought the matter to his attention, and he

6     continued, he didn't stop.

7                       And as I reiterated before, I stopped

8     complaining to him when he told me, when I said

9     minorities are concerned about how they are being

10    treated, and he said to me they should leave, so I

11    stopped complaining to him because I knew he

12    meant, well, you should leave as well, and then it

13    began -- it began to dawn on me that he wanted to

14    get me out, so then I complained to Brett

15    Marschke.

16               Q.     When did you complain to Mr. Marschke?

17               A.     It had to be between August, maybe

18    September, October.

19               Q.     Of '05?

20               A.     Of '05.

21               Q.     And did you complain to anybody else

22    about Mr. Caruso?

23               A.     Well, then I went -- then Sheila

24    O'Neil -- not that she came to me.  She didn't

25    come to me.  It took her a while to come to me.

1                    *J. Spencer*

2    As a matter of fact, she didn't make an

3    appointment to see me.

4                    I happened to be talking to her

5    assistant outside her door, and then she came out,

6    and said, oh, I need to speak to you.  Brett

7    circled by me.

8        Q.    When was that?

9        A.    She had done some traveling, it took

10   her a while to get to see me, it took about maybe

11   four weeks, maybe five weeks for her to see me.

12       Q.    So when do you claim that you

13   complained to Ms. O'Neil about Mr. Caruso?

14       A.    Well, I first complained to Brett.

15   Brett talked to Sheila and then it just happened

16   that Sheila happened to see me, so it was after I

17   spoke to Brett, some time after I spoke to Brett.

18       Q.    But you don't know when?

19       A.    Not the exact time, no.

20       Q.    Did you complain to anybody else about

21   Mr. Caruso?

22       A.    Did I complain?  I wouldn't say that I

23   complained.  I went to lunch with a friend of mine

24   and I said to her, I must be imagining things,

25   something's just not -- something's going on here.

1                          *J. Spencer*

2                  I only shared information, I didn't

3      complain.  I was just so upset.

4          Q.    And who was the friend that you went

5      to lunch with?

6          A.    Angela King.

7          Q.    What's Ms. King's position or what was

8      her position at McGraw-Hill?

9          A.    She worked on the corporate side in, I

10     think it's corporate training.

11         Q.    Did you complain about Mr. Caruso on

12     more than one occasion to Mr. Marschke?

13         A.    I only met Brett on one occasion when

14     we talked.

15         Q.    Did you complain about Mr. Caruso to

16     Ms. O'Neil on more than one occasion?

17         A.    Yes, I did.

18         Q.    How many times?

19         A.    Well, she and I met, I guess, about

20     three, four times, but each situation was a

21     different situation.

22         Q.    And when you complained to Mr.

23     Marschke, what specifically, what conduct was it

24     of Mr. Caruso that you were complaining about?

25         A.    I complained to him about everything

1                       *J. Spencer*

2    that Ken had done, his cursing, his treatment of

3    me, his attitude towards me, his demeanor, the

4    work ethic that he had regarding me.

5              That he never said good morning.

6              He made a great, it seemed to me he

7    made a great effort to speak to all white males

8    and white females, when he ignored me.

9              He asked them how they were doing.  He

10   never asked me how I was doing.  He never said

11   good morning or good afternoon.  I would speak to

12   him and I hardly would get a verbal answer.

13             One woman hurt her foot.  He stopped

14   to have a whole conversation, oh, how are you

15   doing?  Her name was -- her first name is Karen, I

16   don't remember her last name right now -- he went

17   through a whole how are you doing, you have to

18   take care of yourself.

19             He never asked me any of those things.

20             He got very indignant one time when I

21   said, you know, my son is sick, I'm here.  I need

22   to at least have some time to just take care of

23   him, and he's, like, upset because I asked for the

24   time.

25             I didn't get any consideration -- I

1                          *J. Spencer*

2    got a little bit of consideration after I talked

3    to Brett about the fact that I needed to just look

4    at my son, and I hardly ever do that.

5         Q.    You needed to take time off because of

6    your son?

7         A.    I needed to be with him, he was ill,

8    he got sick, he got, I think, a virus or the flu.

9         Q.    Was there anything else that you

10   complained about with regard to Mr. Caruso to Mr.

11   Marschke?

12        A.    Those are the things that I could

13   recall that I complained to Mr. Marschke about.

14        Q.    Now, you said that you spoke to Sheila

15   O'Neil three or four times about Mr. Caruso; is

16   that right?

17        A.    Yeah.   Some of those discussions were

18   on her asking to meet with me.

19        Q.    When was the first time?

20        A.    The first time I met with Sheila was

21   roughly in about '05, it must have been after I

22   spoke to Mr. Marschke, as I said previously.

23        Q.    What specifically did you discuss with

24   Ms. O'Neil at that time?

25        A.    I told her exactly what I was going

1                           *J. Spencer*

2      through.  I told her how he treated me.  I told

3      her that I was a nonentity.

4                    I wasn't being mentioned.  I wasn't

5      being helped.

6                    I was given assignments without

7      explanation of how to do it.  I wasn't a comp

8      person, but I needed help with comp.

9                    He said to me that I could attend

10     compensation training and then on -- when I was

11     supposed to attend he says, oh, we have to do a

12     RIF that day, you can't go -- RIF, a reduction in

13     force.

14                   I told him how he ingratiated himself

15     with white males and white females, but that

16     didn't happen to me.

17                   I also told him how he asked me to

18     reserve conference rooms, help the temp to reserve

19     .conference rooms, because we had a temp at the

20     time and he wanted the room filled.

21                   After I had the room filled and had

22     all the confirmations made, he said there was too

23     many people in the room.

24                   Then when we didn't have a room, I

25     managed to use my contacts to get a conference

89

1                              *J. Spencer*

2    room and then he complained that the room was too

3    small.

4              When I set up the conference room with

5    materials on the tables and whatever we needed,

6    he'd come in and switch -- like I didn't set up

7    the room appropriately.  How when I did training

8    he would cut me off.

9              How when I had one script he would

10   come in with another script, a script as if he was

11   talking to, giving a lecture read to high

12   executive business level people, so when I got to

13   talk with the script that I had that he approved

14   of, it made my presentation pale in comparison to

15   his.

16              That's what I told her also about.

17        Q.    This is the PMP training?

18        A.    PMP training and anything else he

19   would ask me to do to stand up in front of people.

20              We had coaching for managers in the

21   department heads.  He would do the same thing.

22   Anything I did he went out of his way to show

23   dissatisfaction.

24        Q.    Did you tell Ms. O'Neil anything else

25   about Mr. Caruso in that first conversation?

1                    *J. Spencer*

2        A.    I told her about the cursing.  I told

3    her how he would use the word "bitches," call

4    women bitches in front of me, how he would say

5    "fuck."

6              I told her how he ordered me out the

7    room.  I told her when I was sitting, having a

8    conversation for which he invited me into his

9    office the phone would ring and he'd say leave,

10    but wouldn't, like, please leave or hold on a

11    minute -- he's, like, leave, like, get out.

12              I'd write something for him, I'd write

13    drafts of what I used to use for Mr. Harper, and

14    all of a sudden he wasn't satisfied, but he never

15    gave me any blueprints to work with.

16              If you want me to do something, show

17    me a blueprint.  He'd wait till I'd give it to him

18    then he'd mark it up and say he was dissatisfied.

19    I'll do it myself.

20        Q.    And you told Ms. O'Neil all of this?

21        A.    She knew everything.  I told her

22    everything that was to tell.

23        Q.    When you say she knew, I'm interested

24    in what you told her.

25        A.    What I'm telling you.  You asked me

1                        *J. Spencer*

2    what I told her; those are the things I told her.

3            Q.    Did you tell her anything else during

4    this first conversation with her about Mr. Caruso?

5            A.    Nothing that I can recall.  If I

6    recall anything, I'll just add it in.

7            Q.    Now, you said that you spoke to her a

8    total of three or four times about Mr. Caruso.

9                   When was the next time?

10           A.    I don't recall exact time, but the

11   next time we talked about Mr. Caruso is the time

12   when she called me and she wanted to, I believe,

13   mediate, and I wasn't willing to mediate with

14   Sheila O'Neil.

15           Q.    What do you mean she wanted to

16   mediate?

17           A.    She wanted to be a person, to sit,

18   like, in the middle and kind of hear, you know,

19   what he had to say, what I had to say, and kind of

20   -- she could help in getting the situation

21   resolved; to build communication she said.

22           Q.    So Ms. O'Neil contacted you and said

23   that she wanted to try to build communications

24   between you and Mr. Caruso and you refused to do

25   that?

*J. Spencer*

1

2        MR. SOLOTOFF:   Objection.   You're

3    mischaracterizing her testimony.

4        MS. BLOOM:   She's fully capable of

5    telling me if that's what I'm doing.

6        MR. SOLOTOFF:   That's what you're

7    doing.

8        Q.    Ms. Spencer?

9        A.    She said to me, I want to build

10   communication.   I'd like to meet with you and I'd

11   like to meet with Ken to do my best, in essence,

12   to get the situation, we can -- if we can get the

13   situation resolved -- I can't remember her exact

14   words.

15       Q.    And you refused to do that?

16       A.    I refused to meet with Sheila O'Neil

17   because she doesn't have a reputation for solving

18   any problems when it comes to minorities.

19              She didn't do it for Marci Brown.   She

20   didn't do it for Robin Hicks.   She barely did it

21   for Angela King.   She didn't do it for Terry

22   Irizarry, a person who worked with her.

23              All she did is when they came to her

24   and told her the problem, she offered them

25   packages.

1                    *J. Spencer*

2         A.    I don't remember ever going to her and

3    asking her for any help.  We didn't have that kind

4    of relationship.

5         Q.    Now, when was the next time that you

6    talked to Ms. O'Neil about Mr. Caruso?

7         A.    As far as I can recollect, the next

8    time I talked to Sheila O'Neil, because I was very

9    upset, Ken came over and scratched his private

10   areas.

11        Q.    When was that?

12        A.    I believe that was in between -- I'm

13   trying to think -- maybe '06 -- between '05, '06,

14   I don't remember exact time.

15        Q.    What is it that you claim Mr. Caruso

16   did?

17        A.    He scratched his private areas and

18   then he denied, he didn't do it.  He said he may

19   have tugged at his shirt.

20        Q.    Was anyone else present when this

21   happened?

22        A.    No one else was present.

23        Q.    Where did it happen?

24        A.    In my cubicle.

25        Q.    When you say in your cubicle --

*J. Spencer*

1

2      A.     That's the office space that I'm

3   provided with.

4      Q.     Is your cubicle among other cubicles?

5      A.     The cubicle is connected, so the

6   person on the other side of me, but it's just

7   high, the cabinets are high cabinets, you don't

8   see them and they don't see you.

9      Q.     Now, what, if anything, did Ms. O'Neil

10  say to you when you came to her and you said that

11  Mr. -- you said that Ken Caruso had scratched his

12  private areas?

13     A.     She said she would investigate it.

14  She would look into it.

15     Q.     And did she do that?

16     A.     Yes, she said she did.

17     Q.     And how did that get resolved?

18     A.     She said that Ken said he didn't do

19  it.  He said he might have been -- I don't know

20  her exact words, that he was tugging at his shirt.

21     Q.     And what, if anything, else did she

22  say or do with regard to your complaint?

23     A.     She just said he said he wasn't doing

24  it.  I don't remember anything after that.

25     Q.     Were there any other occasions upon

1                          *J. Spencer*

2    about it.

3                  And that's when I told her, based upon

4    my experience and being a generalist and doing

5    employee relations, that when someone exhibits the

6    attitude and behaviors, they're really told, well,

7    whether you did or you didn't, you need to cease

8    and desist, you need to stop.

9                  I never heard those words from her.

10       Q.    Well, this time when you say she came

11   to you and asked if he was still cursing, can you

12   tell me when in relationship to the first

13   conversation that you had with Ms. O'Neil where

14   you told her about the cursing, the second

15   conversation took place?

16       A.    Can you repeat that one more time.

17       Q.    You said that Ms. O'Neil was basically

18   following up with you to see if he had stopped

19   cursing.

20                  How soon after --

21       A.    It was a long time after the initial

22   conversation.

23       Q.    Describe -- when you say a long time,

24   how long?

25       A.    Probably a couple of months, months.

1                          *J. Spencer*

2          Q.     And you told her that he was still

3     cursing?

4          A.     He was still cursing.

5          Q.     Did he stop cursing at any point in

6     time while you reported to him?

7          A.     He stopped cursing -- his cursing

8     continued, but then later on he stopped as I, if I

9     can recall correctly, as I really decided to talk

10    to Sheila about looking for another position, so

11    if I can recall I remember him stopping after I

12    mentioning to her having that conversation with

13    him -- that second conversation with her, that

14    follow-up conversation.

15         Q.     I just want to make sure I have the

16    timing right.

17                You talked to Brett Marschke, correct?

18         A.     Yes.

19         Q.     And then after that Sheila approached

20    you when you were talking to Sheila's assistant?

21         A.     Yes.

22         Q.     And at that time you told Sheila,

23    among other things, about the cursing?

24         A.     I told -- not at that time when she

25    approached me.  I want to be correct.  There was a

*J. Spencer*

1

2    time that elapsed, and after she came back from

3    her travels, then we had the conversation.

4        Q.    And prior to that had you complained

5    to her about Mr. Caruso?

6        A.    My first complaint was Brett.

7        Q.    So this was the first time that you

8    had spoken to Ms. O'Neil about Mr. Caruso?

9        A.    That's correct.

10       Q.    And during that first conversation,

11   which was after Ms. O'Neil came back from her

12   travels, one of the things you told her about was

13   Mr. Caruso's cursing?

14       A.    I told her whatever I stated,

15   everything that I had to say.

16       Q.    And at some point after that, within

17   two months or so --

18       A.    Two or three months.

19       Q.    -- she followed up with you to see if

20   he had stopped cursing?

21       A.    Right.

22       Q.    And you told her that he hadn't?

23       A.    That he hadn't, and then later on

24   after that he stopped cursing.

25       Q.    How long after that did he stop

1                           *J. Spencer*

2    cursing?

3         A.    Maybe a month or so.  I don't quite

4    recall.

5         Q.    And was that, did he stop cursing

6    before or after you complained to Ms. O'Neil about

7    Mr. Caruso scratching his private areas?

8         A.    I don't recall.

9         Q.    Now, you said that you talked to

10   Ms. O'Neil about looking for another position.

11              When was that?

12        A.    Somewhere in -- I'm just trying to

13   think -- oh -- between, I believe it was in '06,

14   '05, end of '05, '06.

15        Q.    Was it before or after you complained

16   to Ms. O'Neil about Mr. Caruso scratching his

17   private parts?

18        A.    It was probably I think around about

19   maybe the same time.

20        Q.    Which came first?

21        A.    I don't recall.

22        Q.    And had he stopped cursing at that

23   point, "he" being Mr. Caruso?

24        A.    There was a point in time that he did

25   stop cursing.

1                        *J. Spencer*

2          Q.    When he would curse, was he cursing at

3    you or just cursing in general?

4          A.    He would look directly at me and

5    curse.

6          Q.    Well, when you say that he used the

7    word "fuck," did he just say the word "fuck" or

8    did he say something else?

9          A.    He could be talking about something

10   and say fuck, like I'm looking at you.

11         Q.    He never said fuck you, though; is

12   that right?

13         A.    He didn't use the word "fuck you."

14         Q.    Did you have any other conversations

15   with Ms. O'Neil about Mr. Caruso, other than the

16   ones that you've described to me today?

17         A.    None that I can recall.

18         Q.    In your answers to interrogatories,

19   which we previously marked as Spencer Exhibit 5,

20   you identified Ms. O'Neil as one of the people who

21   discriminated and/or retaliated against you.

22         A.    Yes.

23         Q.    Can you tell me how Ms. O'Neil or how

24   you believe Ms. O'Neil discriminated against you?

25         A.    Well, I'm HR, so that means HR can

1                              *J. Spencer*

2    education.

3         Q.    How many interviews had you had?

4         A.    Two.

5         Q.    The job at BIG, were there any changes

6    in your compensation?

7         A.    No changes in my compensation.

8         Q.    Any changes in your grade level?

9         A.    No changes in the grade level.

10        Q.    Any changes in your benefits?

11        A.    No changes in my benefits.  Changes in

12   my job responsibilities.

13        Q.    Were there any jobs that you applied

14   for during your tenure at McGraw-Hill that you

15   didn't get?

16        A.    I didn't apply for any jobs.  I loved

17   my position with Business Week.  If I was going to

18   grow I wanted to grow into something with Business

19   Week, I wanted to grow into Business Week

20   additional responsibilities, additional things,

21   projects to work on; a change in title perhaps, a

22   change in grade level.  You can get that all

23   within the same position that you possess.

24        Q.    But there were no jobs that you

25   applied for at McGraw-Hill that you did not get,

1                          *J. Spencer*

2     were being treated, he told me they should leave.

3     These minorities should leave.

4          Q.    Are those his exact words?

5          A.    Yes.  And I happened to be a black

6     female and a minority.

7          Q.    Are you claiming that he made any

8     other statements to you that were derogatory

9     because of the fact that you're a black female?

10                MR. SOLOTOFF:    Other than what she's

11          already testified to?

12                MS. BLOOM:    Right.  The question was

13          any other.

14          A.    Just what I told you.

15          Q.    Did you ever hear Mr. Caruso make any

16     type of a racial slur?

17          A.    He didn't make racial slurs, but what

18     he said to people of color, Sheila Mitchell who

19     was his assistant had to go see Brett and complain

20     about his attitude slash behavior.

21          Q.    Did you ever hear him make a racial

22     slur?

23          A.    Not in my -- not immediately in my

24     presence.

25          Q.    Are you aware of anybody else ever

1                          *J. Spencer*

2    just don't remember her name.  She worked in

3    corporate training and she was in with the group

4    of Angela King.

5         Q.    During the course of your employment

6    at McGraw-Hill -- you've now told me each of the

7    positions that you held; is that right?

8         A.    Senior HR manager was my position at

9    McGraw-Hill.

10        Q.    You held that first with

11   responsibility for Business Week and then you held

12   that with responsibility for BIG; is that correct?

13             MR. SOLOTOFF:    Objection.  Again you

14        mischaracterized her testimony.

15        Q.    Ms. Spencer?

16        A.    I held senior HR manager's position

17   supporting information services and media, which

18   included at one time Platts, Aviation Week and

19   Health Care.

20        Q.    During your tenure at McGraw-Hill did

21   you also deal with employee relations issues

22   involving white employees?

23        A.    I handled both whites and I handled

24   employee relations issues whites, males and

25   females, Hispanics and blacks and other

1                          *J. Spencer*

2    nationalities that fall under the category of

3    Caucasian.

4         Q.    And with regard to any of the whites

5    or other nationalities that fall under the

6    category of Caucasian, were you ever involved in

7    the termination of any of those people?

8         A.    Through reductions in force.  When

9    they were asked to leave due to poor performance,

10   or attendance issues.

11        Q.    When you say that Mr. Caruso reduced

12   your job responsibilities, can you tell me

13   specifically what responsibilities you had that

14   you claim he took away from you?

15        A.    Well, I was responsible for all the

16   employee relations issues.  They came to a

17   reduction in the sense of the level.

18             I no longer met with department heads.

19             I no longer met with managers.

20             I had no visibility at the department

21   head meetings.

22             He claimed that my involvement was

23   diversity, I wasn't sourcing the correct -- the

24   candidates that were suitable for Business Week.

25             So diversity efforts began to peter

1                    *J. Spencer*

2    out.

3              I used to work with inroads -- could

4    have been involved with inroads, despite someone

5    else taking it over, I believe on the corporate

6    side or in the training department.

7         Q.    Someone else took over that

8    responsibility?

9         A.    Well, someone else headed it up, but

10    should Business Week had wanted to get an intern,

11    then I would -- I would have been the person

12    instrumental in helping that transpire, and when I

13    talked to him about the possibility of exploring

14    that, he told me they don't need an intern, they

15    are not interested.

16         Q.    Did you hire an intern that year?

17         A.    When I was working for Ken we didn't

18    work on inroads.  He thought that that's something

19    I should not be doing.

20         Q.    Are there any other -- I'm sorry --

21         A.    I didn't conduct presentations.  HR --

22    I didn't conduct HR presentations to the -- to the

23    president and his department heads.  That ceased.

24              In other words, I would give them

25    updates on how we were supporting their -- HR was

J. *Spencer*

1
2    linked to the business and how we were supporting
3    some of their efforts.
4              I no longer was involved in going to
5    the individual department head meetings.
6              I would level jobs -- one of the
7    things I forgot to mention I would level jobs or
8    write position descriptions based upon the
9    manager's request.  He would ask me to go to my
10   files, pull out the copies and go behind closed
11   doors and start revising the descriptions and
12   sending them to them.
13        Q.    Anything else, any other job duties
14   that you had that he took away from you or you
15   claim he took away from you?
16        A.    I used to be on -- there were
17   committees that you could join based upon your
18   manager's recommendation, but I wasn't recommended
19   for any committee.  The only committee is when we
20   were doing a video for a new PMP system and then
21   when I went to him and said I'd like to be part of
22   the presentation, because I did sit in with the
23   writers, he chose to stand up in front of the
24   group and present and never even recognized me.
25   Just said thanks to Jesan Spencer and that was

132

1                        *J. Spencer*

2     about it.

3          Q.    Were there any other job duties that

4     you claim you had that he took away from you, "he"

5     being Mr. Caruso?

6          A.    Mr. Caruso took away interface.  My

7     job was interface with the business units.  I

8     didn't have that.  That's where my work came from.

9     Employee relations.  He did that.  I spoke to, I

10    believe the man's name was Howard Mannes, and I

11    said, Howard, for example, Ken Caruso sent me to

12    talk about this employee.

13               He says, I've already spoken to Ken

14    about this.

15         Q.    So is it your testimony that

16    Mr. Caruso actually assumed the duties that you

17    used to do?

18         **MR. SOLOTOFF:**  Objection.  She didn't

19         say that.

20         A.    Mr. Caruso took away my

21    responsibilities.  What he did with them was

22    between him and his people.  I can't say what he

23    assumed and what he did.  I wasn't involved in any

24    of the work where at the end of the year you look

25    at the salary and make sure they fit into a

1                    *J. Spencer*

2    every opportunity I could to hear about how -- to

3    listen to how he communicated to white males and

4    white females, and the conversations were so

5    completely different.

6                    Even the terms of how he talked to

7    Sheila Mitchell.

8          Q.    Did he ever actually call you a bitch?

9          A.    Well, he might as well.  You say bitch

10   to a person and there's no one else in the room,

11   who else are you talking about?

12         Q.    When he used the word "bitches," give

13   me a context, an example of how he used it.

14         A.    Those bitches.

15         Q.    And to whom was he referring?

16         A.    To other women, because he called

17   women bitches.

18         Q.    Which women?

19         A.    Well, he didn't give me the names.

20         **MS. BLOOM:**  This would be a good time

21   to break for lunch.  Thank you very much.

22   Come back in an hour.  It's about five of 1

23   right now.

24                    (Luncheon recess taken at 12:57 p.m.)

25

1                           *J. Spencer*

2    reduction in force.

3         Q.    With regard to the business that you

4    currently own, can you tell me when you first

5    registered that business?

6         A.    When I registered the business?

7         Q.    Yes.

8         A.    I don't even remember.  I'm trying to

9    think -- I don't remember.

10        Q.    Were you still working at McGraw-Hill

11   at the time?

12        A.    I don't remember because there was so

13   much paperwork involved when I decided to do a

14   business, that I really don't recall.

15        Q.    Did it take a while to complete the

16   paperwork?

17        A.    No.  It doesn't take a long time, no.

18   You mean the paperwork to register the business?

19        Q.    Well, you just said there was so much

20   paperwork involved, I'm trying to understand how

21   long it took.

22        A.    There was a lot of pieces that get

23   connected.

24        Q.    Sitting here today, you can't remember

25   when it was that you registered the business?

161

*J. Spencer*

1

2      A.    No.

3      Q.    Do you have any documents that would

4 refresh your recollection?

5      A.    Not with me.

6      Q.    You have some at home?

7      A.    I might have them where the store is.

8 I might have them in storage.

9      Q.    What would those documents be?

10     A.    I don't understand your question.

11     Q.    Well, if I wanted to obtain copies of

12 the documents that would help refresh your

13 recollection as to when you registered your

14 business, tell me what documents I would ask for.

15     A.    Oh, the one that you're asking for,

16 the date, whatever I did the paperwork to register

17 my business.  Registering your business isn't the

18 time when you start a business.

19     Q.    How long -- you said registering your

20 business isn't the time when you start the

21 business.

22           When did you actually start the

23 business?

24     A.    I didn't start my business until

25 March.

169

1                           *J. Spencer*

2                   The only people they send to Lincoln

3        are the army and military to try to induce you to

4        go to -- to get military training, because that's

5        what they think over at Lincoln.  And he realized

6        when he went there that was something that he

7        didn't look forward to.  He didn't think about it.

8              Q.    Is he still at Lincoln today?

9              A.    He still goes to Lincoln.

10             Q.    How much time did you take off of work

11       in that last year?

12             A.    How much time?  You mean the time that

13       I requested off?

14             Q.    Yes.

15             A.    We scheduled it so I only came in I

16       think three days a week.  I spent two days at

17       home, three days at work, but also during that

18       time I did a little bit of work from home when

19       necessary.

20             Q.    In addition to the reduced work

21       schedule that you just described, you also took

22       off or requested time off to deal with issues

23       pertaining to your son?

24             A.    When was -- what time are you talking

25       about?

1                          *J. Spencer*

2          Q.    During your last year at McGraw-Hill.

3          A.    I requested time off, yes, but I'm not

4    clear whether you're telling me that I requested

5    more than one, let's call it, leave.

6          Q.    How much time off did you request in

7    your last year at McGraw-Hill?

8          A.    I don't recall.

9          Q.    And the time that you requested off

10   was time off to address the issues with your son;

11   is that right?

12         A.    Time off to address the issues with my

13   son, time off also to address some issues with my

14   mom, which I didn't bring to anybody's attention.

15         Q.    What were those issues with your mom?

16         A.    My mom is 90 years old and she works,

17   and she needed some help with her housing

18   situation.

19         Q.    What's your mom's name?

20         A.    Lola.

21         Q.    Lola what?

22         A.    Spencer.

23         Q.    What was the help she needed with her

24   housing?

25         A.    Well, her apartment, the man had not

174

*J. Spencer*

1

2      Q.      What did you do when you got to BIG?

3      A.      I met with Toi Eaton.

4      Q.      What were your job responsibilities?

5      A.      She told me I was going to be -- she

6    wanted me to work on some recruiting issues with

7    the recruiting department.  Then there was this

8    group, I don't remember what the group did, but

9    there was this group that dealt with, I believe,

10   some part of outsourcing.

11              I would be meeting with them and

12   meeting with the directors, but I never did

13   because she met with the directors.

14              She wanted me to, since she asked me

15   to bring over any job descriptions that related to

16   Aviation Week because then they would have them,

17   design other jobs for, so she wanted me to design

18   job descriptions.

19              She asked me to do some PMP training.

20     Q.      What was your job title?

21     A.      Senior manager of human resources for

22   BIG.

23     Q.      How long did you stay at BIG?

24     A.      I went to BIG between on or about May

25   or June, end of May, beginning of June, and I left

1                    *J. Spencer*

2    in February of 2007, so I started in 2007 and

3    ended in 2007.

4         Q.    You started in May or June of 2006 and

5    ended in February of 2007?

6         A.    Right, 2006.

7         Q.    So about half a year you were there?

8         A.    Wait, let me just think.  Yes, 2000 --

9    that's correct.

10        Q.    During that half a year what job

11   duties did you actually perform?

12        A.    I did some research for recruiting

13   group which was -- and gave them a list of

14   organizations to source, candidates for positions

15   in Aviation Week.

16             I, since I didn't have access to

17   Lawson, no one could provide it for me, and I had

18   that at all times, I had to go to Bill's

19   administrative assistant and ask her to look up

20   salaries and titles and levels in order to level

21   jobs that were given me to level.

22             And I also had to spend time getting

23   approval or position numbers for the jobs that

24   were being recruited for.

25             In total, the number PMP sessions I

1                          *J. Spencer*

2   conducted probably were about five or six.

3            Then I spent my time doing drafts of

4   position requests that had to be billed and maybe

5   once in a while I'd get an employee relations

6   issue from one of the directors, who indicated

7   that an employee was going to leave -- was going

8   to be AWOL from the military, when in essence that

9   department had called the military and told them

10  that she was going to be AWOL.

11           And I reserved some conference rooms.

12           There wasn't very much that I did.

13  Some training.

14      Q.    What kind of training?

15      A.    PMP training, just overviews; nothing

16  in depth.

17      Q.    Now, during the six months or so that

18  you were at BIG, for how much of that time were

19  you on a reduced schedule?

20      A.    If I recall correctly, I probably was

21  only on a reduced schedule maybe about, maybe a

22  month.

23      Q.    And at what point during your

24  employment at BIG was that one month?

25      A.    I don't recall.

1                         *J. Spencer*

2    document that's been marked as Spencer Exhibit 8,

3    and I've simultaneously provided a copy of that

4    document to your counsel.

5              Do you recognize this as a copy of

6    your review for 2001?

7              (Witness reviews document.)

8         A.    This is a copy of the performance

9    appraisal for the period of January through the

10   end of the year of 2001.

11        Q.    And, Ms. Spencer, is that your

12   signature on the last page of this document?

13        A.    That's my signature on the last page

14   of the document.

15        Q.    And you didn't write anything under

16   the section that says employee comments; is that

17   right?

18        A.    There is nothing written under that

19   section.

20        Q.    What was the rating that you received

21   for 2001?

22        A.    Performance exceeds expectations.

23        Q.    Were you satisfied with this review?

24        A.    I was satisfied.

25        Q.    Do you think the review was fair?

1                           *J. Spencer*

2                   (Witness reviews document.)

3          A.     I recall this review for the period

4    2002.

5          Q.     Ms. Spencer, did you sign this review?

6          A.     This review was signed by me.

7          Q.     And it's a review that you were given

8    by Mr. Harper; is that correct?

9          A.     Yes.  This review was conducted by

10   Bill Harper.

11         Q.     And you wrote no comments under the

12   employee comment section; is that right?

13         A.     No comments written.

14         Q.     And the rating that you received for

15   this year was what?

16         A.     Performance exceeds expectation was

17   the rating received.

18         Q.     Were you satisfied with that rating?

19         A.     I was comfortable with that rating.

20         Q.     Did you think it was fair?

21         A.     I thought it was a rating that I

22   deserved.

23              **(Spencer Exhibit 10,** 2003 Management

24          Performance Appraisal and Development

25          Planning Worksheet, marked for

1                          *J. Spencer*

2          A.    I recognize this appraisal for 2005.

3          Q.    This was a review that you were given

4     by Mr. Caruso; is that right?

5          A.    Mr. Caruso gave me this review.

6          Q.    And he rated your overall performance

7     as target achievement, correct?

8          A.    Yes, he did.

9          Q.    Were you satisfied with that rating?

10         A.    I was satisfied with the rating, but

11    not his comments.

12         Q.    What specifically was it about his

13    comments was it that you weren't satisfied with?

14         A.    It's in the area of the competencies

15    and overall performance summary.  Those are the

16    areas in which he made comments that I was not

17    satisfied with.

18         Q.    Which specific comments were you not

19    satisfied with?

20         A.    On 2005, on the 2005 talent management

21    Jesan was successful in identifying diverse

22    candidates of a consistency high caliber; however,

23    in speaking about the individual whom she referred

24    to Business Week sales, as one case in point, the

25    candidate was clearly too senior for any present

1                          *J. Spencer*

2                  **THE WITNESS:**   Repeat the question,

3          please.

4                  (Record read.)

5          A.    To my knowledge, he wasn't responsible

6      for anything related to my diversity slate because

7      he had divorced himself from it.

8          Q.    Do you know Malin Sellis?

9          A.    Malin?  Do you have the spelling of

10     the first name?

11         Q.    Last name is Sellis, S E L L I S.

12         A.    She is a temp that worked for us.

13         Q.    What was her race?

14         A.    I don't know what her race was, but

15     she -- I don't know what her race was.  I didn't

16     ask her.

17         Q.    She wasn't African American, though,

18     was she?

19         A.    Visually, I don't think so, but you

20     can't judge a person by their color.

21         Q.    Do you know whether she ever

22     complained about Mr. Caruso cursing?

23         A.    Complained to whom?

24         Q.    To anybody at McGraw-Hill.

25         A.    Oh, she told Sheila and I about it all

226

1                           *J. Spencer*

2    the time.  Sheila complained about Caruso cursing.

3         Q.    So presumably Mr. Caruso cursed in

4    front of Ms. Sellis as well?

5         A.    She heard it.  She didn't know who he

6    was talking to at the time.  When she did complain

7    about it she knew he was talking to me, because I

8    was in there more than she was.

9         Q.    But she heard him curse?

10        A.    She heard him curse.  She even said to

11   me, Jesan, how do you take it?

12        Q.    And do you know if he cursed in front

13   of her?

14        A.    I have no idea.

15        Q.    I'd like to go back to Exhibit 5, your

16   answers to interrogatories, please.

17              If you look at interrogatory No. 10

18   and your answer to that interrogatory, this is the

19   one that identifies Patricia Kuusisto.

20              Can you tell me what other doctors

21   you've been to see besides her from December 1997

22   to the present?

23        A.    None.

24        Q.    None?

25        A.    No doctors.

1                          *J. Spencer*

2          Q.     Well, have you been on any job

3     interviews?

4          A.     I haven't been on any job interviews.

5          Q.     What made you start your own business?

6          A.     Because I had to work.  I had nothing

7     to do.  Everything I had was taken away from me.

8     I didn't know where to begin.

9          Q.     Nobody at McGraw-Hill asked you to

10    leave; isn't that right?

11         A.     While I was where?  At --

12         Q.     The last job that you held at

13    McGraw-Hill was at BIG; is that correct?

14         A.     Correct.

15         Q.     And nobody told you that they wanted

16    you to leave the company, did they?

17         A.     They didn't have to ask me to leave.

18    The way I was treated was enough.  They gave me no

19    job, nothing to do, twiddling my thumbs, walking

20    out, taking walks around the block and walks

21    around the block.

22               That's enough to tell you to leave.

23    They don't have to say so.  All they do is have to

24    say put her in Siberia in the back, give her

25    nothing to do.  She'll leave.  Because, you know

1                               J. Spencer

2       what, people who get those kind of assignments,

3       they leave.

4               Q.      No one asked you to leave, did they?

5               A.      That was leaving to me.

6               Q.      Well, it was a decision that you made

7       that you didn't like your job?

8               A.      Fostered by their behavior and how

9       they treated me, so they forced me out.

10              Q.      Was there anybody, once you got to

11      BIG, that forced you out?

12              A.      The behaviors forced me out.  The

13      attitudes forced me out.  The lack of work forced

14      me out.  You don't have to verbally tell somebody

15      that they need to leave.  You can physically take

16      everything away from them and then you know that

17      you see the handwriting on the wall.

18                      And then they do the appraisal, well,

19      you haven't done this, and you haven't done that,

20      but they haven't given it to you.  That's how

21      McGraw-Hill operates.  They did the same thing to

22      -- Jeff Dodge did the same thing to Roberta

23      Ransou.  He took way all her responsibilities and

24      then at the end said, oh, by the way, you haven't

25      been doing your job, why don't you take a package

1                    *J. Spencer*

2    and leave.  That's how it goes.

3        Q.    Did anybody offer you a package in

4    connection with your departure?

5        A.    I don't recall being offered a

6    package.

7        Q.    Did anyone ask you to leave?

8        A.    As I stated before, they don't have to

9    ask you to leave.  It's a nonverbal get out.

10       Q.    Who did you tell you were resigning?

11       A.    I told Sheila O'Neil I was leaving.

12       Q.    Did you tell her in person or in a

13   writing?

14       A.    I told her in person.

15       Q.    What did you tell her was the reason

16   why you were leaving?

17       A.    I told her how I, the -- that the work

18   assignment that she indicated was a grade level

19   19, which is a senior manager of human resources,

20   was not.  I said what it was was more like a

21   clerical job.

22       Q.    What did she say to you?

23       A.    She says, Jesan, I'll go over there

24   and I'll talk to Bill and I'll fix it.

25             She couldn't fix it and I told her she

238

1                              *J. Spencer*

2    couldn't fix it.  I told her it is too little too

3    late.

4          Q.    So she offered to go and to talk to

5    Bill Harper and to fix your situation?

6          A.    She couldn't fix it.  Any time a VP

7    goes over to speak to someone like a Bill Harper

8    or anybody, your director, they're going to view

9    that as a complaint, they're going to make your

10   life holy hell.  I happen to know that.

11              You can't go to somebody on top and

12   talk about your boss, about what Toi Eaton didn't

13   do, because they are going to give you -- you are

14   going to have a horrible time.  The

15   handwriting was on -- the die had been cast.

16   There's nothing Sheila O'Neil could do.  She

17   couldn't salvage Robin Hicks.  They complained to

18   her.  She tried to fix that.  She couldn't

19   salvage -- she could not salvage any situation

20   where black people came to her and said I'm having

21   this issue.

22         Q.    Regardless of --

23         A.    She couldn't even fix Angela King's

24   situation.

25         Q.    When you went to Ms. O'Neil she did

1                    *J. Spencer*

2    offer to try to fix it, but you declined?

3        A.    That --

4            **MR. SOLOTOFF:**    Excuse me.  Asked,

5        answered; asked, answered; asked and

6        answered.  One more time and I will instruct

7        her not to answer.

8        Q.    Ms. Spencer --

9            **MR. SOLOTOFF:**    Can you please read

10       back the last sets of questions and --

11           **MS. BLOOM:**    No, we're not going to do

12       that.  There is a pending question that I'd

13       like an answer to.  If you're going to

14       direct her not to answer, go ahead and just

15       direct her not to answer and we can take --

16           **MR. SOLOTOFF:**    You're harassing this

17       witness because she's answered it.  It's

18       been asked and answered, counsel.

19           **MS. BLOOM:**    Your choices are let her

20       answer the question or direct her not to

21       answer, and if you direct her not to answer

22       I'm very happy to go over this with the

23       magistrate on Monday.

24           **MR. SOLOTOFF:**    Objection.  Note my

25       objection.  It's already been asked and

1                           *J. Spencer*

2    that I have and the whole list of jobs that I had

3    leveled since I had been with the McGraw-Hill

4    Companies that I shipped over and I put them in

5    order, so if anyone wanted to look at them they

6    were categorized by grade level, they were

7    categorized by title, and that took a while to do.

8              I didn't want anyone to say that I

9    left and I left work behind for them to do.

10        Q.    How long did it take you, or to finish

11   up all the work that you were doing?

12        A.    Well, I was there for full days.  It

13   wasn't like half day here and half day here.  I

14   worked like I normally would do, what was expected

15   of me.

16        Q.    And you devoted all your time to

17   finishing things up?

18        A.    I devoted my time to finishing things

19   up.  There wasn't anything else for me to do.

20   There was no work.

21        Q.    Did you submit a formal resignation

22   letter?

23        A.    I did not submit a formal resignation

24   letter.

25        Q.    Had you made a decision to open your

1                          *J. Spencer*

2    own business at the time that you left

3    McGraw-Hill?

4         A.    All my life I made a decision to open

5    my own business.  They talk about that in

6    McGraw-Hill, people opening their own business.  I

7    mean, that's a goal, that was a wonderful goal to

8    try to accomplish.

9         Q.    So opening your own business was a

10   goal of yours for your entire life?

11        A.    Well, it's something that I thought

12   about, I entertained.  My grandmother owned her

13   own business.

14        Q.    Are you enjoying owning your own

15   business?

16        A.    I don't know.  I haven't thought about

17   it yet.  I'm too busy dealing with this.

18        Q.    When you say "too busy dealing with

19   this," what are you talking about?

20        A.    Well, I'm here, this is where my time

21   is today.  It's not in my business.

22        Q.    Other than the time that you spent

23   here today, how much time have you spent dealing

24   with this lawsuit?

25        A.    I think about it.  I realized I had a

1                          *J. Spencer*

2      had you already registered your business?

3          A.    You asked me that question before and

4      I said I think I did.  I don't remember because

5      there was a paper -- I said there was paperwork

6      involved.

7          Q.    Had you taken any steps towards

8      registering it?

9          A.    After I left McGraw-Hill?

10         Q.    Before you left McGraw-Hill.

11         A.    There was a lot of things I thought

12     about way into going to McGraw-Hill regarding my

13     business.

14         Q.    Had you taken any steps towards

15     registering your business before you left

16     McGraw-Hill?

17         A.    I probably did take steps to register

18     the business, but it wasn't my business at the

19     time.

20         Q.    Was it a business that you bought from

21     somebody else?

22         A.    I bought it from someone else.

23         Q.    When did you buy it?

24         A.    Well, I officially bought it in March

25     of '07.

1                        *J. Spencer*

2        Q.     How long had you been negotiating?

3        A.     Oh, this negotiation took a long time

4    and I didn't have to be there as the owner.   I

5    could have been an absentee owner.

6        Q.     When did you actually reach a deal

7    with the prior owner?

8        A.     I didn't have a deal with the prior

9    owner.  The prior owner's philosophy was

10   everything's lined up, all the I's are dotted and

11   your lawyer comes to the closing, hands me a

12   check, we have a deal.

13       Q.     So you had a lawyer in connection with

14   the purchase?

15       A.     I had to get a lawyer.

16       Q.     Who is the lawyer?

17       A.     Alan Katz.

18       Q.     Where is he located?

19       A.     In White Plains.

20       Q.     Did you assume an existing lease for

21   the business or did you get a different lease?

22       A.     I don't recall.

23       Q.     Was the business in the same location

24   that it's in now?

25       A.     It is.

1                          *J. Spencer*

2          Q.    What is the name of the business?

3          A.    Healthy Life.

4          Q.    Who was the prior owner?

5          A.    Maria.

6          Q.    What was Maria's last name?

7          A.    Velez, Maria Velez.

8          Q.    So there was an actual closing for the

9     sale of the business?

10         A.    There had to be.

11         Q.    You think that was some time in March

12    of '07?

13         A.    It was in March.

14         Q.    Do you know Rene Dubose?

15         A.    Rene Dubose --

16         Q.    Dubose.

17         A.    I know of Rene Dubose, yes.

18         Q.    Did you and Ms. Dubose have lunch

19    together in December of 2005 at or about the time

20    that you complained to Mr. Marschke about

21    Mr. Caruso?

22         A.    Ms. Dubose and I had lunch often.

23         Q.    Was that because you were friends?

24         A.    She made my acquaintance when she

25    first came to McGraw-Hill.