**EXHIBIT C TO THE JUNE 26, 2008
DECLARATION OF GREGORY I. RASIN, ESQ.**

# ORIGINAL

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

JANNIE PILGRIM, GIOVANNA HENSON,

JESAN SPENCER and BRENDA CURTIS,

               Plaintiffs,      '07 CIV

      -against-           6618

THE MCGRAW-HILL COMPANIES, INC.,

               Defendant.

----------------------------------------x


               January 11, 2008

               9:58 a.m.


       Deposition of BRENDA CURTIS, held at

the offices of Proskauer Rose LLP, 1585

Broadway, New York, New York, pursuant to

Notice, before Mildred Cassese, a Registered

Professional Reporter and Notary Public of

the State of New York.

**Computer Reporting Incorporated** 

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

**B. Curtis**

1

2      A.    You know, I don't recall exactly when.

3    I really can't recall when.

4      Q.    Have you now told me all the documents

5    that you reviewed in preparation for the

6    deposition?

7      A.    I told you about the applications and

8    the three letters or memos, whatever they are, so

9    I'm clear on that.

10            And the interrogatories, so that's it.

11            Now, there are a lot of applications

12    so I didn't mention all of them, you know.

13      Q.    You didn't mention them because you

14    don't remember them, correct?

15      A.    Right, exactly.

16      Q.    What's your highest level of

17    education?

18      A.    My highest level is high school, but I

19    have some college.

20      Q.    What high school did you go to?

21      A.    South Shore.

22      Q.    When did you graduate?

23      A.    Actually, I got my GED.

24      Q.    So when did you attend South Shore

25    High School?

1                           *B. Curtis*

2          A.    In '70 -- '70 -- in the '70s, late

3      '70s.

4          Q.    And South Shore High School is in

5      Brooklyn, correct?

6          A.    That's correct.

7          Q.    Am I correct that you were not

8      graduated from South Shore High School?

9          A.    No, I did not graduate from South

10     Shore High School.  I got my GED.

11         Q.    When did you get your GED?

12         A.    In '77.

13         Q.    And you said you attended college?

14         A.    Yes.

15         Q.    Which college?

16         A.    New York City Technical College.

17         Q.    Where is that?

18         A.    That's 300 Jay Street, and that's in

19     Brooklyn.

20         Q.    When did you attend there?

21         A.    I attended there -- I attended, I want

22     to say was it '82 and '83?

23         Q.    For how long did you attend?

24         A.    Maybe for a year and a half or so,

25     '82, '83.

1                              *B. Curtis*

2          Q.    Did you get a degree?

3          A.    No, I did not.

4          Q.    What were you studying?

5          A.    Executive secretarial sciences.

6          Q.    Can you tell me your job history?

7          A.    Starting from where?

8          Q.    Starting from when you left high

9    school.

10         A.    Oh, wow.  I worked -- I believe I

11   worked at a car -- like a car cab company as a

12   receptionist first.

13               And then --

14         Q.    Do you remember the years?

15         A.    No, I don't remember that far back.

16               And then I worked probably for World

17   Com.

18         Q.    Do you remember the years?

19         A.    I think that was 1979 I started there,

20   1979, and they relocated to Leesburg, Virginia.

21               So what year was that?  I don't

22   remember the year.

23         Q.    Okay.

24         A.    But, you know, it's on my resume but I

25   don't remember the year.

                              *B. Curtis*

1

2          A.       Yes, yes, yes.

3          Q.       Ms. Curtis, you claim that you were

4     discriminated against based upon your race by

5     McGraw-Hill; is that correct?

6          A.       That's correct.

7          Q.       And you also claim that you were

8     retaliated against by McGraw-Hill; is that

9     correct?

10         A.       That's correct.

11         Q.       Ms. Curtis, can you tell me all the

12    ways that you were discriminated against by

13    McGraw-Hill?

14         A.       Okay.

15                  Well, first I was singled out upon

16    hiring to manage out another black person.

17                  And I was constantly being used as a

18    black person to watch other black people.

19                  I complained about race discrimination

20    to my boss.

21                  I complained about race discrimination

22    to HR.

23                  And I also complained about race

24    discrimination to Maryann Gattinella.

25                  After receiving -- well, actually

1                          *B. Curtis*

2              My so-called elimination of job

3      because of a RIF, only to find out that somebody

4      was sitting in my seat the next day, someone who I

5      used to train.

6          Q.    Have you now told me all the ways you

7      were discriminated against on the basis of your

8      race --

9              **MR. SOLOTOFF:**   She's not finished.

10         Q.    -- while you were at McGraw-Hill?

11         A.    I'm not finished.

12             Vladimir Stadnyk created a hostile

13     work environment for me, and he did that by

14     speaking to different people, and I had one of

15     which came to me to let me know that he was

16     speaking about me in a negative light.

17             Nothing was ever done about any of my

18     complaints -- and that is with two -- that is to

19     Vlad and to HR, to Maryann Gattinella.

20             I heard Frank Cicotta make a statement

21     about the evaluations department being ghetto.  He

22     was talking to a white colleague of his and I went

23     to Vlad because Peggy Bartolone wore jeans into

24     work when there was clearly a directive that says

25     no jeans.

1                           *B. Curtis*

2          Q.     What were her words?

3          A.     Her words were we're targeting to get

4     her out.  We need to get Lasina out.  She's had

5     some performance issues.  And she looked up in the

6     air and said, and she filed a race discrimination

7     charge against Peggy Bartolone.

8                 So I said oh, I said wow, and she says

9     well, we have to look into it because you know

10    that's a serious charge.

11                So, you know, but she can't say that

12    now that you're here, so we'll see what happens.

13    And that's what she said to me.

14         Q.     Gail Whelen?

15         A.     Yes, Gail Whelen said this.

16         Q.     What did Prema Menon say to you?

17         A.     Prema Menon was given all this stuff

18    and, you know, basically Prema Menon was asking me

19    how do I feel about everything.

20                And I let her know that I was

21    uncomfortable because I told her that I came in

22    and I'm thinking that, you know, I got my job and

23    now I've got all this nasty stuff here, so she

24    said, well -- she is the one who actually helped

25    me to come up with, you know, let's start all over

1                          *B. Curtis*

2    with Lasina, you know, because I said, you know, I

3    really would like to start from scratch because I

4    don't know what Peggy did to Lasina to make Lasina

5    want to file a race discrimination charge, I said,

6    I don't know, things can happen.

7              So I said this is clearly, you know,

8    it's -- it still exists, so I can't say that she

9    didn't experience it.

10             So she said well, why don't you go to

11   Vlad and ask him to start fresh with Lasina, so

12   that's what I did, and that was shut down because

13   they used her prior, all her prior stuff against

14   her.

15   Q.    Didn't you testify before that Vlad

16   said you could start new with her?

17   A.    No, no.  I said that he said how are

18   you going to start fresh, you know, what happened,

19   happened.

20             He says you can start your managing

21   with her fresh, but you can't start fresh, and

22   that's what he explained to me.

23   Q.    And did Joyce Hunsucker say to you I

24   want you to manage her out?

25   A.    No.  Joyce Hunsucker said, now, that's

1                          *B. Curtis*

2    she's reporting to someone else --

3         A.    Lower.

4         Q.    She is the same grade?

5         A.    She is the same grade, but --

6              **MR. SOLOTOFF:**   Wait til the question

7         is asked.

8              **THE WITNESS:**  Okay.

9              **MR. SOLOTOFF:**   And only answer the

10        question.

11        Q.    Made the same salary, correct?

12        A.    Oh, I don't know what her salary is

13   now.

14        Q.    You said that you suffered racial

15   discrimination because they lessened the

16   importance of your job or title?

17        A.    Yes.

18        Q.    How did they lessen the importance?

19        A.    Vlad referred to me as his admin.  I

20   had a dual role but my title was the office

21   manager.

22              He would never refer to me as the

23   office manager.  And he did it so -- staying true

24   to form he did so in my letter of recommendation,

25   my reference letter, and he would not -- he

1                              *B. Curtis*

2              MR. RASIN:   Just object to the form.

3              MR. SOLOTOFF:   I'm objecting to the

4         form.

5              MR. RASIN:   Okay, and you don't -- no

6         speaking objections.

7         A.    What I am saying to -- okay -- what

8    I'm saying is that in my opinion from what, where

9    I stood, after looking and seeing what his pattern

10   was, he was being racially discriminatory.

11        Q.    Are you saying he didn't want you to

12   hire a black woman?

13        A.    That is not what I said.  That is not

14   what I said.

15        Q.    Now, you said that you thought it was

16   race discrimination because your letter of

17   recommendation was not great, correct?

18        A.    It was not properly written.  I didn't

19   say it wasn't great.  I said it wasn't properly

20   written.

21        Q.    Did you suggest revisions to it?

22        A.    Yes.  And was denied.

23        Q.    Were any revisions made?

24        A.    After I contacted Mary -- I think

25   Maryann Gattinella, the legal department and I

*B. Curtis*

1 believe Pierre was one of the people that was

2 copied on it.  I'm not sure.

3     Q.    So changes were made to your letter of

4 recommendation?

5     A.    Yeah.  After I was told it would not

6 be and I'd just have to accept it the way it was.

7     Q.    What was wrong with the letter of

8 recommendation?

9     A.    It demeaned my title again.

10     Q.    Was there anything else wrong with the

11 letter of recommendation?

12     A.    Yes.  He mentioned that I gave

13 assistance to the admins with my computer

14 expertise, but failed to mention that I not only

15 gave the admins, I trained Samantha Gordon, I

16 trained Marcus Armstead.  I was by his desk

17 helping him constantly with, you know, all kinds

18 of editing issues with Word, Power Point, Excel.

19     Vlad, I gave him assistance daily and

20 actually had a gentleman that used to sit outside

21 my desk named Steve, away from my desk, who would

22 laugh sometimes and say why don't you just hold a

23 training class and just, you know, get everybody

24 and just teach them how to do this stuff?

1                          *B. Curtis*

2        Q.    And you didn't think he was joking?

3        A.    No, no, of course not.

4              **MR. RASIN:**    Can we mark that, please.

5              **(Curtis Exhibit 5,** Termination and

6        release agreement dated August 25, 2005,

7        marked for identification, as of this date.)

8        Q.    I show you what's been marked as

9    Curtis No. 5, and ask you if you can tell me what

10   that document is?

11       A.    This is my termination and release

12   agreement.

13       Q.    You were given that document on August

14   25, 2005, correct?

15       A.    I'm not sure if it was actually the

16   25th.  It could have been a little bit afterwards.

17       Q.    Do you know?

18       A.    I'm not sure.

19       Q.    And you signed this document on

20   September 14, 2005, correct?

21       A.    That's correct.

22       Q.    Now, that's your signature on --

23       A.    Yes, it is.

24       Q.    -- page 6, correct?

25       A.    That's correct.

**B. Curtis**

1

2    Q.    There's other writing on page 6.  Is

3    that all your writing, except for Ms. Hunsucker's

4    signature?

5    A.    I don't understand.

6    Q.    Well, there's some printing and

7    there's a date and there's a Social Security

8    number -- did you fill that in?

9    A.    Oh, yes, that's -- yes.

10    Q.    And then on the next page on the

11    bottom of that page it's numbered D 00012.

12    Is that your signature?

13    A.    Yes, it is.

14    Q.    And you put in the date?

15    A.    Yes, I did.

16    Q.    And you did not revoke this agreement

17    in any way within seven days after you signed it;

18    is that correct?

19    A.    No, that's correct.

20    Q.    And you received the monies that are

21    specified in the agreement, correct?

22    A.    That's correct.

23    Q.    And if you look at paragraph 6 of the

24    agreement, you were advised to consult with an

25    attorney about the agreement; is that correct?

1                          *B. Curtis*

2          A.    That's correct.

3          Q.    And you were told to do that because

4    it included a waiver, discharge and general

5    release of all claims as set forth in paragraph

6    10; is that correct?

7          A.    That's correct.

8          Q.    And you read paragraph 10; is that

9    correct?

10         A.    Yes.

11         Q.    In fact, you read the whole agreement;

12   is that correct?

13         A.    Yes.

14         Q.    Did you consult with an attorney?

15         A.    No, I didn't.

16         Q.    Now, you allege that after October 3,

17   2005 you were retaliated against; is that correct?

18         A.    That's correct.

19         Q.    Can you tell me how you were

20   retaliated against?

21         A.    Well, I don't see them here, but those

22   letters are clear confirmation of the retaliation

23   practice.

24                Also my letter of recommendation, you

25   know, me not being -- Joyce Hunsucker not telling

*B. Curtis*

1

2  me about positions that were coming up or

3  positions that were available, and me finding out

4  through other people.

5            And then when I would let her know

6  that I wanted to apply for the positions, I was

7  being blocked.  I had bogus interviews set up, and

8  then was told I was overqualified by the office

9  manager.  Office manager blocked me from even

10  getting into the hiring managers who were

11  responsible for the position.

12            My applications, none of my

13  applications were -- you know, the positions I

14  applied for were either left open, I learned

15  later, or filled by a Caucasian.

16            I recently went for a position in

17  Vista Research, and that position was given to a

18  temp that's an entertainer who's a friend of Craig

19  Swagger's.

20            **MR. RASIN:**  Could you read the answer

21        back, please.

22            (Record read.)

23      Q.    Have you now told me the ways that you

24  think you were retaliated against?

25      A.    No, not at all.

*B. Curtis*

1

2      Q.    Could you tell me the rest?

3      A.    Yes.   I reported racial discrimination

4      to Maryann Gattinella, and expressed to her that I

5      believe that I was not getting considered for

6      positions within McGraw-Hill because of it.

7                   I told Gattinella that I watched

8      African American people train white people to

9      replace them as their manager with evaluations.

10                  And some of these people have left

11     because, you know, it's very demeaning.  They've

12     moved on, but they had an exit interview.   I

13     didn't have an exit interview.

14                  So that's another form of retaliation.

15     They never gave me an exit interview.

16                  Joyce Hunsucker would not get back to

17     me on positions that I would discover were opened

18     until after, according to her, they were filled.

19                  I later found that the positions were

20     not filled at that time.

21                  I went on an interview with Nancy

22     Tomeo and Craig Swagger for four positions

23     actually that were available, to my knowledge, all

24     four were available, and at the time when I sat

25     there one was reporting into a Tom Gillis.

*B. Curtis*

1

2    Q.    Could you look at Exhibit 4, please.

3          In your complaint you allege that you

4    applied for seven positions that you were

5    qualified for.

6    A.    Yes.

7    Q.    And if you look at interrogatory No.

8    14 and your answer to it, are those the seven

9    positions that you applied for for which you were

10   qualified?

11   A.    This is after I left?  Are you saying

12   after I left?

13   Q.    I'm saying after you were advised that

14   your job was being eliminated.

15   A.    Okay.

16         This only lists five.

17   Q.    Are those the jobs you applied for?

18   A.    Applied for others, yes, but these are

19   some of them, yes.

20   Q.    Well, I thought you said that your

21   answers to interrogatories were complete.

22         Are you now telling me that you gave

23   me incomplete answers?

24   A.    I probably --

25         MR. SOLOTOFF:    You know, counsel,

1                          **B. Curtis**

2              We discussed the others but the one

3   that they wanted to consider me for and they were,

4   like, trying to fill quickly was the Tom Gillis

5   position.

6              They refused to further me into the

7   hiring manager, which was Tom Gillis, so I never

8   got to meet Tom Gillis, and I was told bogusly

9   that they were not available at first.  I was told

10  that they were in London, only to find out that

11  they were not in London at the time, they were

12  actually in the office.

13             Then I get a phone call from Nancy

14  Tomeo at home saying she decided that I was

15  overqualified.

16             After she said that I went in to ask

17  her, you know, I start -- I didn't understand why

18  I was not being sent on to the hiring managers,

19  because I'm over -- that made no sense to me.  I'm

20  qualified to do the job, so I was qualified.

21             This matter of being overqualified,

22  that's a matter of opinion.  Unless you're

23  actually in the position you cannot say whether a

24  person is not going to do good or is going to be

25  board; you can't say that.  A lot of people know

1                           *B. Curtis*

2      how to, including myself, make their own job

3      meaningful.

4                   So I never got to see the hiring

5      managers.

6                   I applied for a position and I never

7      got feedback on it, you know, and, you know, they

8      would never tell me whether -- I would just not

9      hear anything, you know.  You apply, you should

10     hear something, you know, we're not accepting your

11     application because, you know, we think you're

12     lousy or whatever.  I never got any feedback,

13     although some of the positions that I applied for

14     after I left.

15                  Also I spoke with Gattinella about my

16     concerns, about not being considered for positions

17     within McGraw-Hill Companies and nothing was done

18     about it, so that's a retaliatory act.

19                  **THE WITNESS:**  I'm sorry, can I take a

20          break?  My head is about to explode.

21                  **MR. RASIN:**  Sorry, I didn't hear what

22          you said.

23                  **THE WITNESS:**  I want to take a break.

24          My head is about to explode right now.  I've

25          got a headache.

1                         *B. Curtis*

2        that is outrageous.

3               **MR. RASIN:**   You can say whatever you

4        want.   Just object and that's all you have

5        to do.

6               **MR. SOLOTOFF:**   My objection is the

7        interrogatory says plaintiff filed --

8               **MR. RASIN:**   Don't read the

9        interrogatories.  She can read --

10              **MR. SOLOTOFF:**   Notice my objection.

11              **MR. RASIN:**   It's noticed.

12              **MR. SOLOTOFF:**   Thank you.

13       Q.    Is this a complete list of the jobs

14       you applied for?

15       A.    No.   There are others.

16       Q.    Why didn't you give me a complete list

17       when you answered the interrogatory?

18       A.    You know, there's some things that I

19       applied for like the structured finance, there

20       were a few admin spots that I was applying for.

21       Q.    That's here.

22       A.    That's one.

23       Q.    It says apply for two positions.

24       A.    Well, there was four.

25       Q.    Why didn't you put that in your

1                          *B. Curtis*

2    answers to interrogatories?

3         A.    Because -- well, he's saying here that

4    I filed for additional positions.

5                I didn't list everything.  Was I

6    supposed to list everything?

7         Q.    You told me this morning, you swore

8    that your answers were complete.

9         A.    I swore they were correct.

10        Q.    You also swore that they were

11   complete.

12        A.    I did?

13        Q.    Yes.

14                So you're now telling me your answers

15   are incomplete; is that right?

16        A.    No.  It says here the plaintiff filed

17   for additional positions without acceptance, so

18   it's not -- I just didn't list them all.  There

19   was another, a Cliff Griep -- because, you know,

20   they didn't take my application for, like, Cliff

21   Griep, and there was -- I think there was an

22   application for Paul Coughlin.  I don't remember

23   the department that he was in.

24                I don't remember where Cliff Griep

25   was.  I can't give you information I don't

*B. Curtis*

1

2    remember.  If I don't remember where -- what

3    department, the person, I cannot tell you, give

4    you that information.  I don't remember what

5    department Cliff Griep was in.  I didn't fill an

6    application out.

7         Q.    You applied for a job in global

8    licensing and the contracts group, right?

9         A.    That's correct.

10         Q.    That was an office manager job?

11         A.    That's correct.

12         Q.    You applied online?

13         A.    Yes, I did.

14         Q.    Did you get interviewed?

15         A.    Yes, I did.

16         Q.    Who interviewed you?

17         A.    I think Yvonne English.

18         Q.    Anybody else interview you?

19         A.    Not that I can remember.

20         Q.    Did the hiring manager interview you?

21         A.    She is the hiring manager.

22         Q.    Did you -- did someone in HR interview

23    you?

24         A.    I don't recall.

25         Q.    Did you get that job?

*B. Curtis*

1

2    A.    No, I did not.

3    Q.    Who got that job?

4    A.    It was a person in that department, in

5    global licensing and contracts.

6    Q.    Who was the person?

7    A.    I don't remember her name.

8    Q.    What was the race of the person?

9    A.    She's Latino.

10    Q.    You don't remember her name?

11    A.    No, I don't.

12    Q.    The next job is marketing, graphic

13    designer position?

14    A.    Right.

15    Q.    Did you apply for that job?

16    A.    Yes, I did.

17    Q.    Did you get an interview?

18    A.    No, I did not.

19    Q.    Had you ever worked in any job as a

20    graphic designer?

21    A.    No, I have not, but I was actually

22    referred to this person by Vlad himself.

23    Q.    But had you ever worked as a graphic

24    designer?

25    A.    No, I had not.

1                          *B. Curtis*

2          Q.    In your entire career you've never

3    worked as a graphic designer?

4          A.    No.

5          Q.    Do you think you were qualified to be

6    a graphic designer?

7          A.    Yes.

8          Q.    Why?

9          A.    Because I've been doing that at home.

10         Q.    You've been doing it professionally at

11   home?

12         A.    Like I told you, I do logos, I do

13   business cards, stationery.  It's all a part of

14   graphic designing.

15         Q.    Do you know who got that job?

16         A.    No, I do not.

17         Q.    Do you know the race of the person

18   that got that job?

19         A.    No, I do not.

20         Q.    Which of these jobs was filled by a

21   Caucasian?

22         A.    I'm not sure.

23         Q.    Do you know if any of these jobs was

24   filled by a Caucasian?

25         A.    I couldn't know that after I'm not

*B. Curtis*

1    there.  When you leave, you don't know.

2    Q.    Well, would you look at interrogatory

3    number 50.

4    A.    Yes.

5    Q.    On what basis are you saying that the

6    jobs were filled by Caucasians?

7    A.    On the basis of after I left.

8    Q.    I don't understand your answer.  On

9    the basis after you left --

10    A.    Okay.  I wouldn't have -- I wouldn't

11    know that while I was there or while I'm applying

12    for a position until actually I sit down and I can

13    look at evidence of your -- the applications,

14    which shows that -- I really don't know who the

15    people are, but I'm going by the name.  It looks

16    like they could be Caucasian or there was no one

17    selected for the position, like, okay, of one,

18    there's a position, I believe, the structured

19    finance position was filled by a Caucasian, I

20    believe.

21    Q.    Who was that?

22    A.    I don't remember the name.

23    Q.    Where did you get this name?

24    A.    I believe it's on the application.

1          *B. Curtis*

2          Q.    Whose application?

3          A.    Their application.

4          Q.    When did you review the application of

5    the person who got the job?

6          A.    I saw several applications yesterday,

7    as I explained to you.

8          Q.    So yesterday was when you realized

9    that it might be a Caucasian who got the job; is

10   that correct?

11         A.    Yeah.

12         Q.    Then when you answered these

13   interrogatories on December 11th on what basis did

14   you swear that it was Caucasians who got the job?

15         A.    On what basis did I swear it was

16   Caucasians that got the job?

17         Q.    Right.

18         A.    Well, that was the common practice of

19   McGraw-Hill.  When I was there I watched black

20   people train white people and later they'd have to

21   report to them and then white people would leave.

22   It happened to me.

23         MR. SOLOTOFF:    You mean --

24         Q.    Ms. Curtis, until yesterday you had no

25   idea who was hired for these jobs; is that

1                          *B. Curtis*

2    correct?

3         A.    I didn't know -- I don't know the

4    people, no, I don't know them.  I can't say I know

5    them.

6         Q.    Ms. Curtis, until yesterday you didn't

7    know who got these seven jobs; is that correct?

8              **MR. SOLOTOFF:**    Notice my objection.

9         You're beginning to harass the witness.

10             **MR. RASIN:**    I'm not harassing the

11        witness.

12             **MR. SOLOTOFF:**    It says, upon

13        information and belief --

14             **MR. RASIN:**    You don't have to read

15        me the interrogatory -- it's my deposition,

16        Larry.

17             **MR. SOLOTOFF:**    Do not harass the

18        witness.

19             **MR. RASIN:**    I'm not harassing the

20        witness.

21             **MR. SOLOTOFF:**    It also says or by

22        persons with equal or less qualifications.

23        Why don't you read the whole thing.

24             **MR. RASIN:**    Larry, you're coaching

25        her.

1                    **B. _Curtis_**

2        Q.    It was yesterday that you learned who

3    were hired for these jobs; is that correct?

4        A.    I learned -- I learned that some of

5    them could have been Caucasian by going by the

6    name.

7        Q.    Yesterday, correct?

8        A.    Yes.

9        Q.    And before that you had no idea who

10   got the job; is that correct?

11       A.    It was my suspicion.

12       Q.    But before yesterday you had no idea

13   who was the successful candidate for these seven

14   jobs; is that correct?

15            MR. SOLOTOFF:    Asked and answered.

16       Asked and answered --

17       Q.    Is that correct --

18            MR. RASIN:    That's enough, Larry.

19            MR. SOLOTOFF:    Asked and answered.

20            MR. RASIN:    Larry, you're not the

21       judge.

22            MR. SOLOTOFF:    Excuse me, we can call

23       the judge.

24            MR. RASIN:    If you'd like.

25            MR. SOLOTOFF:    Okay, the fact of the

1                        *B. Curtis*

2           matter is you're asking her a dozen times.

3                    **MR. RASIN:**   Enough, Larry --

4                    **MR. SOLOTOFF:**  Stop --

5                    **MR. RASIN:**  She's not answering.

6           Q.    Until yesterday you had no idea who

7      got these jobs; is that correct?

8           A.    No.  I suspected -- I'm going to --

9           Q.    But did you know the names of anyone

10     who got the job --

11                   **MR. SOLOTOFF:**   She's answering your

12               questions -- it's all on the record.  Let

13               the video show what you're doing --

14          A.    I still don't know the names of the

15     people.

16                   **MR. RASIN:**   The video will show.

17          Q.    The executive assistant,

18     administrative position that you put here, did you

19     get interviewed for that job?

20          A.    Structured finance?

21          Q.    No.  It said administrative position

22     as executive assistant.

23          A.    And then it says structured finance.

24          Q.    I think that's the next job.

25          A.    The first one says administrative

*B. Curtis*

1
2    position as an executive assistant structured
3    finance.
4        Q.    I think there's a colon between
5    assistant and structured finance, or a semi colon.
6        A.    So what is this position for?  You
7    have to be clear.
8        Q.    This is your answer, not mine.
9        A.    No.  This is administrative position
10    as an executive assistant structured finance.
11    That's what it is.
12        Q.    Did you interview for those jobs?
13        A.    Yeah.  I applied for two positions.  I
14    interviewed for one, but was blocked by Nancy
15    Tomeo, who said I was overqualified.
16        Q.    Who did you interview with?
17        A.    Nancy Tomeo.
18        Q.    And who is she?
19        A.    She's the office manager.
20        Q.    Do you know who got that job?
21        A.    I believe it to be a Caucasian.
22        Q.    Do you know who got the job?  Do you
23    know the name of the person --
24        A.    I don't know the name of the person.
25        Q.    Do you know the race of the person who

1                          *B. Curtis*

2      got the job?

3          A.    I believe it to be Caucasian.

4          Q.    Do you know the race of the person who

5      got the job?

6              **MR. SOLOTOFF:**    Asked and answered.

7          Q.    Do you know it as a fact?

8          A.    I believe them to be Caucasian.

9          Q.    There is a job called executive

10     managing director office manager.

11             Do you see that job?

12         A.    Yes.

13         Q.    Did you interview for that job?

14         A.    Oh, yeah, that was my job.

15         Q.    Whatever job it was, did you interview

16     for it?

17         A.    Well, for my job, yeah, sure I did.

18         Q.    Are you talking about interviewing for

19     your job in 2002?

20         A.    I mean that was my job, yeah, I was an

21     office manager for an executive managing director.

22         Q.    Did you interview for a job after you

23     were informed --

24         A.    I --

25         Q.    Let me finish.

1                    *B. Curtis*

2              MR. SOLOTOFF:   Wait until he finishes

3        the question.

4        Q.    Did you interview for a job after you

5   were informed that your job was being eliminated,

6   another job as an office manager for an executive

7   managing director?

8        A.    Yes, I did.

9        Q.    And did you get interviewed for that

10  job?

11       A.    Yes, I did.

12       Q.    Who interviewed you?

13       A.    Lorraine Muller, I believe -- was it

14  Lorraine Muller -- yeah, I believe it was Lorraine

15  Muller and Doris Agosto.

16       Q.    Who is Lorraine Muller?

17       A.    She is -- I don't remember what her

18  duties are -- I think she's an office manager.

19       Q.    Was she the hiring manager for the

20  job?

21       A.    No.

22       Q.    Who was the hiring manager for the

23  job?

24       A.    Paul Coughlin.

25       Q.    Did you interview with Paul Coughlin?

1                          **B. Curtis**

2          A.    Yes, I did.

3          Q.    Did you get that job?

4          A.    No, I did not.

5          Q.    Do you know who got that job?

6          A.    It was a person in the department.

7          Q.    Do you know the name of the person

8     that got the job?

9          A.    No, I don't know the name.

10         Q.    Do you know the race of the person

11    that got the job?

12         A.    I believe that to be Latino, but I'm

13    not certain.  It could be Caucasian.

14         Q.    You applied for a job as assistant

15    compliance officer?

16         A.    Correct.

17         Q.    Did you get interviewed for that job?

18         A.    No, I did not.

19         Q.    Had you ever done any compliance work

20    in your career?

21         A.    I was doing it in my position.

22         Q.    What is compliance work?

23         A.    I was doing, I was making sure that my

24    department complied with the rules and regulations

25    given forth by the company, and this was involving

1                              **B. Curtis**

2     SEC, all the -- you know, the code of ethics, all

3     kinds of -- I had to make sure everybody signed

4     the code of ethics, so I worked closely with that

5     and I worked closely with the compliance office.

6                   And that's why I was interested in

7     that position, because I worked closely with them,

8     so I knew everything that they were doing.

9          Q.     Have you ever done a job as a

10    compliance officer?

11         A.     No, I have not.

12         Q.     Did that job, was one of the

13    requirements of that job to have a four-year

14    degree?

15         A.     I don't remember.

16         Q.     Who did you work with in compliance?

17         A.     I don't remember the people that I

18    worked with.

19         Q.     Part of your job working for -- as the

20    office manager was to assure that people complied

21    with the code of business ethics at McGraw-Hill;

22    is that what you --

23         A.     That's correct.

24         Q.     Did you, was it part of your job to

25    know the code of business ethics at McGraw-Hill?

1                          *B. Curtis*

2    things I had to sign.

3         Q.    Well, at the time when you were asked

4    to read and sign the code of business ethics, did

5    you do so?

6         A.    Yes, I did.

7         Q.    Did you take that seriously?

8         A.    Oh, yes.

9         Q.    And you were required to read and sign

10   that code of business ethics every year; is that

11   correct?

12        A.    That's correct.

13        Q.    And every year when you read and

14   signed that code of business ethics, did you take

15   it seriously?

16        A.    Yes, I did.

17        Q.    And were you truthful in your

18   affirmation each year as to that code of business

19   ethics?

20        A.    Yes, I was.

21        Q.    Now, did you apply for any other jobs

22   at McGraw-Hill other than the ones that are listed

23   in your answer to interrogatory No. 14?

24        A.    Yes, I applied for a position with

25   Cliff Griep that's not listed here and I don't

1                        **B. Curtis**

2    Hunsucker about it because I found out that it had

3    opened up.

4           Q.    And the job for Mr. Held, what job was

5    that?

6           A.    I believe that was an IT position.

7           Q.    What was the position?

8           A.    It was an administrative executive

9    assistant or something like that.

10          Q.    Did you apply for that job online?

11          A.    Yes, I did.

12          Q.    When did you apply for that job?

13          A.    I think it was around November, it

14    could have been, November of 2005 maybe, November,

15    December.

16          Q.    Did you get interviewed for that job?

17          A.    No, I did not.

18          Q.    Who was the HR rep or the hiring HR

19    person for that job?

20          A.    I don't remember if it was Valerio or

21    Mariano.  I'm not certain.

22          Q.    Did you interview for that job?

23          A.    No, I did not.

24          Q.    Do you know who got that job?

25          A.    I don't know the person.

*B. Curtis*

1

2          (Witness reviews document.)

3     A.    Okay, Vladimir Stadnyk.  Joyce

4  Hunsucker.

5          People who would not take care of my

6  concerns of race discrimination.  Gail Whelen.

7  Maryann Gattinella, afterwards didn't give me

8  help.

9     Q.    Are those the people that you claim

10  discriminated against you?

11     A.    Yes.

12     Q.    And you've already testified today as

13  to how they discriminated against you; is that

14  correct?

15     A.    I believe I have.

16     Q.    Did you ever hear anyone at Standard &

17  Poor's or McGraw-Hill make a racial epithet?

18     A.    Yes.

19     Q.    Who?

20     A.    Frank Cicotta.

21     Q.    What did he say?

22     A.    He said that -- he was telling a

23  colleague of his that the department, his

24  department was the ghetto.

25     Q.    What department is that?