**EXHIBIT F TO THE JUNE 26, 2008
DECLARATION OF GREGORY I. RASIN, ESQ.**

1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      ------------------------------------------x

5      JANNIE PILGRIM, GIOVANNA HENSON, JESAN

6      SPENCER and BRENDA CURTIS,

7                    Plaintiffs,    Case No.

8            -against-          07CIV 6618

9      THE McGRAW-HILL COMPANIES, INC.,

10              Defendant.    **ORIGINAL**

11      ------------------------------------------x

12                    April 15, 2008

13                    2:30 p.m.

14

15         Deposition of KENNETH CARUSO, held at

16      the offices of Proskauer Rose, LLP, 1585

17      Broadway, New York, New York, pursuant to

18      notice, before Renate Reid, Registered

19      Professional Reporter and Notary Public of

20      the State of New York.

21

22

23

24

25

5

```
1                    Kenneth Caruso
2       break is taken.
3           A.  I understand.
4           Q.  We will be noting any breaks that
5       are taken and the time of the breaks.
6           A.  Okay.
7               MS. BLOOM:  Can I ask the court
8           reporter for the time?
9               THE REPORTER:  Yes.  It's now
10          2:32.
11          Q.  Mr. Caruso, with whom are you
12      currently employed?
13          A.  With McGraw-Hill Company.
14          Q.  In what capacity?
15          A.  As the senior director of human
16      resources for JD Power & Associates.
17          Q.  Where is your office located?
18          A.  In West Lake Village, California.
19          Q.  And what is your current grade
20      level?
21          A.  23.
22          Q.  How long have you been employed
23      with McGraw-Hill?
24          A.  Since February 2005.
25          Q.  What is your current salary?
```

6

1                      Kenneth Caruso
2          A.   192,000 and change.
3          Q.   And with that, you have additional
4    benefits, pension benefits, health
5    benefits, correct?
6          A.   I do.
7          Q.   In February 2005, where were you
8    employed?
9          A.   In New York City.
10         Q.   Where in New York City?
11         A.   With McGraw-Hill, with the
12   Business Week organization.
13         Q.   What was the address of your
14   office?
15         A.   1221 Avenue of the Americas.
16         Q.   What floor were you located on?
17         A.   The 47th floor.
18         Q.   And what was your position when
19   you first started with McGraw-Hill in New
20   York City?
21         A.   Senior director of human resources
22   for Business Week.
23         Q.   And how long were you senior
24   director of HR for Business Week?
25         A.   From my start on February of 2005

1                          Kenneth Caruso

2          through July 31st of 2006.

3              Q.  And from July 31, 2006, did you

4          remain employed with McGraw-Hill?

5              A.  I did.

6              Q.  And where did you go?

7              A.  Transferred out to JD Power &

8          Associates.

9              Q.  Who made the decision that you

10         transfer to JD Power & Associates?

11             A.  I did.

12             Q.  When did you make that decision?

13             A.  The opportunity was first

14         presented to me in April of 2006, and over

15         the course of the next few weeks, I made

16         the decision to transfer.

17             Q.  And how did the opportunity

18         present itself?

19             A.  Through my supervisor at the time,

20         Brett Marschke.

21             Q.  What was his title?

22             A.  I believe it was vice president of

23         human resources for the information and

24         media segment.

25             Q.  Were you a direct report of Brett

1                    Kenneth Caruso

2          Q.  That would include you as well,

3     correct?

4          A.  Correct.

5          Q.  How did you do that; how did you

6     strongly encourage mid-year reviews while

7     you were at Business Week?

8          A.  Through training on the

9     application and communications to

10    managers.

11         Q.  Did you abide by what you strongly

12    encouraged?

13         A.  Can I ask for a clarification?

14              MR. SOLOTOFF:  I'll rephrase the

15         question.

16         Q.  Did you lead in providing mid-year

17    reviews of your subordinates?

18         A.  I did provide my subordinates with

19    mid-year reviews.

20         Q.  And that includes Jesan Spencer?

21         A.  It does.

22         Q.  Sheila Mitchell?

23         A.  It does.

24         Q.  The mid-year reviews that you

25    speak of, were those reduced to writing?

1                         Kenneth Caruso

2           A.   The mid-year reviews were

3      documented in writing in the application,

4      but also delivered to the employee

5      verbally in conversation.

6           Q.   You said document --

7                MR. SOLOTOFF:   Can you read back

8           the answer.

9                (Record was read back.)

10          Q.   What application are you referring

11     to?

12          A.   The PMP application.

13          Q.   The PMP application says mid-year

14     review?

15          A.   There is a field within the PMP

16     application that allows managers to

17     document a mid-year review.

18          Q.   Was the mid-year review of Jesan

19     Spencer in writing?

20          A.   Yes.   There was a written review

21     and also a verbal conversation at the

22     time.

23          Q.   Did you sign the written review?

24          A.   The mid-year did not incorporate a

25     manager's signature.

1                        Kenneth Caruso

2       competency number 2, how did you rate her

3       as communicate effectively?

4           A.   I rated her as "requires

5       development".

6           Q.   And then you wrote a manager's

7       comment subsequent to that?

8           A.   I did.

9           Q.   And those are your comments of

10      her, correct, that's listed on Bates stamp

11      4001?

12          A.   I wrote these comments.  They are

13      reflective of my own feedback, as well as

14      feedback that I had solicited about Jesan

15      from some of the Business Week managers.

16          Q.   And with respect to section 2,

17      competency assessment, competency number

18      4, which is, I think, "lead by example"?

19              MS. BLOOM:   I'm sorry, Bates

20              number, please?

21              MR. SOLOTOFF:   Bates number

22              Spencer 4002.

23          Q.   How did you rate her?

24          A.   I rated her as proficient.

25          Q.   And the manager's comments were

72

1                    Kenneth Caruso
2              MS. BLOOM:  Would you mind saying
3         the Bates numbers for me?
4              MR. SOLOTOFF:  Bates-stamped
5         Spencer 4004.
6         Q.  You wrote, "in most situations,
7     Jesan takes ownership for her tasks up
8     front", correct?
9         A.  I did.
10        Q.  And you wrote, "the issue was,
11    again, one of timeliness, her sense of
12    urgency", which you said, "which is often
13    lacking, and her ultimate follow-through
14    to closure".
15            That's what you wrote?
16        A.  I did.
17        Q.  And you ranked her as proficient;
18    is that correct?
19        A.  I did.
20        Q.  And, below that, you have
21    "collaboration and integration", which is
22    on the same Bates stamp page.  And in this
23    assessment, you rated her highly
24    proficient; isn't that correct?
25        A.  I did.

1                          Kenneth Caruso
2          Q.  And you wrote, "Jesan does have
3      strong working relationships and
4      collaborative interactions with many
5      individuals.  I find her to be engaging
6      and more than willing to offer her
7      assistance up front, when requested.
8      Going forward, I do want Jesan to take
9      greater initiative in approaching me when
10     she feels she has excess capacity or can
11     accomplish something more.  I have not
12     seen this behavior from her to date,
13     consistently, despite verbal feedback to
14     this effect in her mid-year review".
15          You wrote that?
16          A.  I did.
17          Q.  When was her mid-year review?
18          A.  It would have occurred in August
19     of 2005.  The exact date, I don't recall.
20          Q.  In the next assessment, which is
21     on Spencer 4005, you listed her as
22     proficient, correct?
23          MS. BLOOM:  That's the same
24          assessment that you were just reading
25          from?

1                        Kenneth Caruso

2            well aware that your question implies

3            information that's not accurate and

4            doesn't accurately reflect his earlier

5            testimony.

6                 MR. SOLOTOFF:  Again, you're

7            speaking for him.

8                 MS. BLOOM:  I'm not speaking for

9            him.

10           Q.  Do you recall your earlier

11      testimony?

12                MS. BLOOM:  Excuse me.  I'm not

13           speaking for him, but it is my job to

14           insure that the questions are

15           appropriate, and that one wasn't.

16                MR. SOLOTOFF:  It is.

17                MS. BLOOM:  We'll have to agree to

18           disagree on that.

19                MR. SOLOTOFF:  Okay.

20           Q.  Was Jesan Spencer transferred to

21      BIG?

22           A.  Jesan began working with BIG, I

23      think, on May 31st, 2006.

24           Q.  On May 31st, 2006, when she began

25      working at BIG, was that as a result of a

79

```
1                        Kenneth Caruso
2       transfer?
3            A.  It was as a result of a transfer.
4            Q.  Did you approve of the transfer?
5            MS. BLOOM:  Object to the form of
6            the question.  You can answer.
7            A.  I was not involved at all in the
8       transfer discussions.
9            Q.  Whether you were involved in the
10      transfer discussions or not, did you
11      approve of the transfer?
12           MS. BLOOM:  Object to the form of
13           the question.  You can answer.
14           A.  I was not asked to approve.
15           Q.  Did you fight for Jesan Spencer to
16      stay in her job under your supervision?
17           A.  I did not.
18           MR. SOLOTOFF:  I'd like to have
19           this marked as Caruso number 2.  It
20           had been previously marked as O'Neill
21           12.
22           (Caruso Exhibit 2 was marked for
23           identification).
24           Q.  Can you, please, identify this
25      document.
```

1                       Kenneth Caruso

2          Q.   Have you ever heard of employees

3     complaining that -- about being managed

4     out of the company?

5          A.   Have I ever heard employees

6     complaining about being managed out of the

7     company?

8          Q.   Yes.

9          A.   I have not been involved in

10    conversations on that topic, as it relates

11    to the broader McGraw-Hill corporation.

12    The vocabulary for the business, in my

13    experience within McGraw-Hill, always

14    referenced the specific business area or

15    business unit in which you were working.

16    In this case, Business Week.

17         Q.   It doesn't use the words,

18    "Business Week" does it, in this sentence?

19         A.   It does not.

20         Q.   Have you ever heard the expression

21    made by an employee that they felt that

22    they were being managed out of the

23    company?  Have you ever heard that

24    expression, by any employee, while you

25    were a senior director of human resources?

1                          Kenneth Caruso

2              A.   I have heard the term.  It's not

3         one that we use particularly within

4         McGraw-Hill.

5              Q.   Have you ever heard the term, in

6         McGraw-Hill, by employees that they

7         complained that they're being set up to

8         fail?

9                   MS. BLOOM:   Object to the form of

10                  the question.  You can answer.

11             A.   Again, I'm aware of that concept.

12        It's not one about which I've heard

13        specific complaints at McGraw-Hill.

14             Q.   What does that concept mean to

15        you?

16             A.   It actually references, in my

17        opinion, the way that goals are defined

18        and their adherence to those SMART

19        principles that we discussed.  In other

20        words, if a goal is not specific,

21        measurable, achievable or relevant, then,

22        the employee's ability to be successful

23        against those goals might be called into

24        question.

25             Q.   Did there come a time where you

104

```
 1                    Kenneth Caruso
 2      learned that Jesan Spencer had made a
 3      complaint about your conduct as a
 4      supervisor?
 5              MS. BLOOM:  Object to the form of
 6          the question.  You can answer.
 7          A.  I am aware that Jesan had made a
 8      complaint about my conduct.  I don't
 9      believe it was specifically related to my
10      supervision of her.
11          Q.  Weren't you her supervisor?
12          A.  I was.
13          Q.  And what was the nature of the
14      complaint concerning your conduct?
15          A.  I believe that she had complained
16      about my use of language in the office.
17          Q.  What kind of language?
18              MS. BLOOM:  What kind of language
19          did she complain about; is that the
20          question?
21          Q.  You referred to language.
22            What do you mean by language?
23              MR. SOLOTOFF:  I'll rephrase the
24          question.
25          A.  My reference is to colorful
```

1                          Kenneth Caruso

2          language.

3                  Q.  What does that mean?

4                  A.  Curse words.

5                  Q.  What curse words?

6                  A.  As I recall, it was about my use

7          of the word, "bitch" and the word, "fuck".

8                  Q.  Do you deny ever using those words

9          in the presence of Jesan Spencer?

10                     MS. BLOOM:  Objection to the form

11                 of the question.  You can answer.

12                     MR. SOLOTOFF:  I'll rephrase the

13                 question.

14                 Q.  Did you use the word "bitch" in

15         the presence of Jesan Spencer?

16                 A.  I did.  It was never a reference

17         to Jesan, and only used as an expletive in

18         the context of phrases like "son of a

19         bitch" or "what a bitch", meaning bitch of

20         a situation, etcetera.

21                 Q.  Did it refer to a woman -- women

22         as being bitches, like, "she's a bitch"?

23                 A.  Not that I recall.

24                 Q.  If Jesan said that you made the

25         reference to the word bitches in reference

                          Kenneth Caruso

1

2      to women, in her presence, would she be

3      lying?

4          A.   She would be.

5          Q.   Do you think the word bitch is an

6      appropriate word in the workplace?

7          A.   I do not.

8          Q.   Do you think it's appropriate to

9      use the reference of regarding a bitch, as

10     offensive to Jesan Spencer?

11             MS. BLOOM:   Object to the form of

12         the question.   You can answer.

13             THE WITNESS:   I'm sorry, I didn't

14         understand the question.

15             MR. SOLOTOFF:   I'll rephrase the

16         question.

17         Q.   How often did you use the word

18     bitch in Jesan Spencer's presence?

19             MS. BLOOM:   Objection.

20         Mischaracterizes his testimony.   You

21         can answer.

22         A.   I'm not aware of the exact number

23     of times.

24         Q.   Was it more than once?

25         A.   It was.

1                    Kenneth Caruso

2          Q.  Was it more than ten times?

3          A.  Approximately ten.

4          Q.  Was it every day?

5          A.  Not to my recollection.

6          Q.  Almost every day?

7          A.  No.  My use of the word would

8     occur in high stress situations, when

9     there was a large volume of work to get

10    done and I would become stressed as a

11    result of, you know, outside factors.

12         Q.  Give us every context in which you

13    used the word bitch.

14         A.  I'm sorry?

15         Q.  Give us every context in which you

16    used the word bitch.

17         A.  As I said, it was a -- as an

18    expletive, to blow off steam, and usually

19    as part of, you know, one of two phrases;

20    either "son of a bitch" or "what a bitch",

21    to refer to the situation.

22         Q.  Ms. Spencer complained about your

23    use of the word bitch.

24              Was it appropriate for her to

25    complain about it, if you used it in the

108

1                          Kenneth Caruso

2        context in which you just described?

3             A.   It was.

4                  MR. SOLOTOFF:   Read my question

5        again, and his answer, please.

6             (Record was read back).

7             Q.   Why was it appropriate for her to

8        complain?

9             A.   Because those are inappropriate

10       words for the workplace, and they made her

11       uncomfortable.

12            Q.   Could you see if she was -- could

13       you see, by looking at her, whether she

14       was uncomfortable when you made those

15       statements?

16            A.   I was unaware that she was being

17       made uncomfortable by these words, until

18       her complaint was brought to my attention

19       from Brett.

20            Q.   When was it brought to your

21       attention?

22            A.   I believe, in December of 2005.

23            Q.   Could you understand how Jesan

24       Spencer, as an African/American female,

25       would be offended by the use of the word

```
 1                       Kenneth Caruso
 2           bitch in any context?
 3                   MS. BLOOM:  Object to the form of
 4               the question.  You can answer.
 5               A.  I can understand how Jesan, as a
 6           female, regardless of race, could be
 7           offended by the use of the word, or how
 8           any individual, male or female, could be
 9           offended.
10               Q.  Brett told you in December 2005
11           that Jesan Spencer complained to him about
12           your language; is that correct?  Was that
13           your testimony?
14               A.  Yes.
15               Q.  When in December 2005?
16               A.  I don't remember.
17               Q.  Is there a document that would
18           refresh your recollection as to when he
19           told you?
20               A.  Not to my knowledge.
21               Q.  Where were you when he told you
22           about Jesan Spencer's complaints to him?
23               A.  In his office.
24               Q.  Tell us what the circumstances
25           were that led you to be in his office at
```

110

Kenneth Caruso

1    the time that he told you about Jesan

2    Spencer's complaints.

3        A.  As I recollect, we were meeting on

4    other issues, and at the -- toward the

5    close of our meeting, Brett referenced to

6    me the fact that Jesan had been to see him

7    and had registered her complaint regarding

8    my inappropriate use of the word.

9        Q.  Was he specific as to which word

10   he was referring to?

11       A.  Yes, he was.

12       Q.  What was that?

13       A.  Bitch.

14       Q.  What did he say to you and what

15   did you say to him in regard to that

16   conversation?

17       A.  I don't remember the specifics of

18   the conversation, other than that he

19   mentioned that Jesan had been to see him,

20   that she had complained, that he did coach

21   me during the conversation that such

22   language was inappropriate from me, and

23   that I was not to continue using that kind

24   of language, that word.

1                          Kenneth Caruso

2            I responded that I was sorry, that I

3      was embarrassed, and I asked him if he

4      thought it an okay idea for me to speak

5      with Jesan, to apologize to her, which,

6      subsequently, I did.

7            We met one-on-one, which I -- I

8      apologized to her, I committed -- I told

9      her that actually I had not ever gotten

10     that kind of feedback before, so I was

11     grateful that it had been brought to my

12     attention, and that I would endeavor not

13     to -- I would not use the word again.

14           I also asked her, as part of that

15     conversation, to, quote unquote, "keep me

16     honest on it", and if there were

17     situations in which I inadvertently used

18     the word, to bring it to my attention

19     immediately.  And she agreed to do that.

20         Q.  When did you have that

21     conversation with Jesan Spencer?

22         A.  It was shortly after my

23     conversation with Brett.

24         Q.  A day later, two weeks later?

25         A.  Probably two days later.

112

1                        Kenneth Caruso

2          Q.   Did you make notes of that

3     conversation you had with Jesan Spencer?

4          A.   I did not.

5          Q.   Why not?

6          A.   I did not.

7          Q.   Didn't Jesan Spencer complain to

8     you about your language and the use of the

9     word, bitch, prior to your learning about

10    her complaint from Brett Marschke?

11         A.   I don't recall that.

12         Q.   Didn't she tell you a number of

13    times that she found your language, using

14    the word, bitch, as being offensive to

15    her, as an African/American female, at any

16    time?

17         A.   Not to my recollection.

18         Q.   Do you think Ms. Spencer would

19    remember doing that?

20             MS. BLOOM:   Objection to the form

21         of the question.

22         A.   I'm not sure as to what Ms. Jesan

23    would remember or not remember.

24         Q.   After you -- you said you

25    apologized to Jesan Spencer, correct?

113

Kenneth Caruso

1

2      A.   I did.

3      Q.   What were your words?

4      A.   At the time?

5      Q.   Yes.

6      A.   I would have said, I'm sorry.

7      Q.   What did you say?

8      A.   I believe I said, I'm sorry.

9      Q.   Did you say what you were sorry

10   about?

11     A.   For using the word and for

12   offending her.

13     Q.   After that, did you continue to

14   use the word, bitch, in her presence?

15     A.   Not to my recollection, no.  I do

16   remember a number of weeks after that

17   first conversation, actually speaking with

18   her again on the topic, to ask if, in

19   accordance with my original commitment to

20   her to stop, I had, in fact, stopped.  And

21   she -- her feedback to me, at the time,

22   was that yes.

23     Q.   When was that conversation?

24     A.   Probably three weeks afterwards,

25   four weeks after.

114

Kenneth Caruso

1     

2    Q.  Four weeks after your initial

3    apology?

4    A.  My initial apology.  A number of

5    weeks afterwards.

6    Q.  After that conversation, did you

7    then continue to use the word, bitch, in

8    her presence?

9    A.  I don't think so.

10    Q.  You're not sure?

11    A.  No, I'm sure I did not.

12    Q.  Did you have any other

13    conversations with Brett Marschke

14    regarding Jesan Spencer's complaints,

15    other than the one you've already

16    testified to?

17    A.  Not another conversation, as it

18    related to my use of language.  There was,

19    later then, in 2006, another complaint

20    that Jesan made, I believe first to Sheila

21    O'Neill and then to Brett.  Brett found

22    out through Sheila.

23    Q.  When was that conversation with

24    Brett concerning Sheila O'Neill's comment

25    to Brett?

115

1                    Kenneth Caruso

2          A.   In March, April, 2006.

3          Q.   Where did that conversation take

4     place?

5          A.   Where?

6          Q.   Yes.  With Brett Marschke,

7     concerning the comments of Sheila O'Neill

8     to him.

9          A.   Again, in his office.

10         Q.   What were the circumstances that

11    led you to be in his office at that time?

12         A.   I was regularly in Brett's office,

13    so I don't know the specific full agenda

14    of that conversation or meeting.  I do

15    know that one of the agenda items that we

16    talked about was this complaint.

17         Q.   What did he say to you and what

18    did you say to him in this conversation?

19         A.   He told me that Jesan had spoken

20    to Sheila O'Neill and that she had

21    described a -- an event, a situation where

22    I had been speaking to Jesan, and at the

23    end of our discussion, I had grabbed my

24    crotch.

25         Q.   And did he say anything else?

116

1                     Kenneth Caruso

2          A.   He told me that Sheila would be

3     speaking to me soon about the issue.

4          Q.   What did you say to him?

5          A.   I was shocked, and recollected the

6     conversation that Jesan had referenced,

7     but told him that her account of me

8     grabbing my crotch was not true.

9          Q.   What else did you say to him?

10         A.   I told him that that was -- that

11    that action was simply not one that I had

12    ever done in my life, and so that's why I

13    was certain that it had not occurred.

14         Q.   This conversation you had with

15    Brett Marschke, concerning this complaint

16    about grabbing your crotch, was anyone

17    else present?

18         A.   No.

19         Q.   Did you make notes of that

20    conversation?

21         A.   I did not.

22         Q.   This conversation was in March

23    2006?

24              MS. BLOOM:   Objection.

25              Mischaracterizes his testimony.   I

1                   Kenneth Caruso

2           believe he said he couldn't remember

3           exactly when it was.

4               MR. SOLOTOFF:  Excuse me.  Now

5           you're telling him what his testimony

6           was.  Let the record reflect that

7           she's making speaking objections.

8             I'll rephrase the question.

9               MS. BLOOM:  I wasn't making a

10          speaking objection.  The objection of

11          mischaracterizing someone's testimony

12          is a fair objection, and it's actually

13          inappropriate for you to

14          mischaracterize his testimony.  So, I

15          stand by my objection.

16          Q.  When did you have this meeting

17      with Brett Marschke, the one you're

18      describing?

19          A.  I believe it was in April, 2006.

20          Q.  What gives you that belief?

21          A.  Because I know it was only a

22      number of weeks before then I was told

23      that Jesan would be taking a new position

24      within the BIG HR team, which occurred at

25      the end of May.

118

1                           Kenneth Caruso

2            Q.   When were you told that she would

3       be taking a position in BIG; was that

4       before or after this conversation about

5       grabbing your crotch?

6            A.   It was after the conversation

7       about grabbing my crotch.

8            Q.   Did you discuss that complaint

9       with -- that you just learned of with

10      Brett Marschke, with Jesan Spencer?

11           A.   I did not.   The -- I think within

12      24 or 48 hours, I spoke to Sheila O'Neill,

13      who documented my description of events, I

14      think.

15           Q.   Did you see those documents --

16           A.   Sheila --

17           Q.   I'm sorry, I don't mean to

18      interrupt.   Go ahead.

19           A.   Sheila told me that Jesan would be

20      taking a few days of vacation, I think,

21      and so she and I -- Jesan and I did not

22      discuss the incident.

23           Q.   What did you tell Sheila O'Neill

24      happened in response to the complaint

25      about grabbing your crotch?

<pre>
 1                    Kenneth Caruso
 2       A.   I told her that the conversation
 3    that Jesan was referencing had happened
 4    toward the end of the day, about 4:30 in
 5    the afternoon, when I was headed
 6    downstairs to the floor in which Business
 7    Week senior managers were located.
 8          And, so, because it was close to the
 9    end of the day, and I didn't think I would
10    see Jesan that again that day, I just
11    stepped into her cube to talk about a
12    couple of business-related things, and it
13    was a three-minute conversation,
14    four-minute conversation, and then I left.
15    I went downstairs.
16       Q.   Was the conversation with Jesan
17    Spencer?
18       A.   Yes.
19       Q.   And did you grab your crotch in
20    that three-minute conversation?
21       A.   I did not.
22       Q.   What did you tell Sheila O'Neill
23    happened?
24       A.   I told her definitively that I had
25    not grabbed my crotch.  I told her that
</pre>

1                    Kenneth Caruso

2          there was a possibility that perhaps I had

3          adjusted my shirt at my belt line, because

4          I had been losing some weight and my

5          clothes were not fitting properly.  But,

6          even that, I told that to Sheila, but

7          mentioned to her that that was speculation

8          on my part, so I had no recollection.

9              Q.   When was this conversation, was it

10         before or after Jesan Spencer went to BIG?

11             A.   It was before she went to BIG.

12             Q.   Did there come a time that you

13         learned that Jesan Spencer, along with

14         three other individuals, filled an EEOC

15         complaint with the Equal Employment

16         Opportunity Commission?

17             A.   Yes.  I believe that was in

18         February, 2006.

19             Q.   Did you see that complaint?

20             A.   I did not, to my recollection.

21             Q.   Did someone read it to you?

22             A.   I did have a --

23             MS. BLOOM:  If you're going to

24         talk about any conversations with

25         counsel, I'm going to direct you on

148

Kenneth Caruso

Q. Did Brett Marschke ever share with
you his notes regarding Sheila Mitchell's
complaints to him about your profanity?

A. Never.

Q. Did Brett Marschke share his notes
with you about Jesan Spencer's complaints
to him about your use of the word, bitch?

A. Never. I was not aware that there
were notes.

Q. Did Sheila O'Neill show you her
notes about Jesan Spencer's complaints
about your behavior towards her that was
offensive?

A. Never.

MS. BLOOM: I'm sorry, I had an
objection to the form of that
question. He just answered too
quickly.

Q. Did you have an occasion to speak
to Sheila O'Neill about Jesan Spencer
before she left to go to BIG?

A. My conversations with Sheila
O'Neill about -- that referenced Jesan
were strictly around the incident where

1                       Kenneth Caruso

2        it's alleged that I grabbed myself.  So,

3        yes, that occurred before Jesan's

4        transfer.

5            Q.   Now, I think you said you

6        described to Sheila O'Neill adjusting your

7        shirt; is that what you said to her?

8            A.   Yes.

9            Q.   And when you say, adjusting your

10       shirt, you mean pushing it down below your

11       belt?

12           A.   Either, frankly.  I mean, either

13       pull it out a bit, if it felt too tight,

14       or tucking it back into my belt.

15           Q.   How could tucking your shirt into

16       your belt be perceived as grabbing your

17       crotch?

18           A.   I don't know.  I never -- my

19       description of tucking my shirt, or

20       adjusting my shirt at my belt line, was

21       simply speculation on my part to try to

22       conceive how Jesan might have interpreted

23       my action as grabbing myself.  I never

24       presented it as the reason, because I was

25       unsure from the very start.