**EXHIBIT G TO THE JUNE 26, 2008
DECLARATION OF GREGORY I. RASIN, ESQ.**

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

4    JANNIE PILGRIM, GIOVANNA HENSON, JESAN

5    SPENCER and BRENDA CURTIS,

6

                         Plaintiffs,

7

            - against -        CASE NO.: 07CIV 6618

8

     THE McGRAW-HILL COMPANIES, INC.,

9

10                     . Defendant.

------------------------------------------X

11                                          ORIGINAL

12          DEPOSITION OF SHEILA O'NEILL, taken by

13   Plaintiffs, pursuant to Notice on Friday, February

14   29, 2008, commencing at 9:36 a.m., before Chandra D.

15   Brown, a Registered Professional Reporter and Notary

16   Public within and for the State of New York.

17

18

19

20

21

22

23

24

25

4

```
 1                         S. O'Neill

 2        A     I do.

 3        Q     From time to time, counsel may object for

 4   whatever reason.   There are no speaking objections,

 5   but if he does make an objection, you are still

 6   required to answer the question.

 7              Do you understand that?

 8        A     I do.

 9        Q     Are you currently employed?

10        A     Yes, I am.

11        Q     With whom?

12        A     McGraw-Hill Companies.

13        Q     In what capacity?

14        A     I'm vice president of Human Resources.

15        Q     How long have you been vice president of

16   Human Resources?

17        A     In this current role since March of 2007.

18        Q     When you say, "this current role," what

19   are you talking about?

20        A     I support the information and media group

21   in Human Resources.

22        Q     Prior to March 2007, what role were you

23   in?

24        A     Vice president Human Resources supporting

25   the corporate departments.
```

5

1              S. O'Neill

2      Q    What were the corporate departments?

3      A    Finance, information management, legal,

4  Human Resources, global strategy.  That was it.

5      Q    Anything else?

6      A    No.

7           Yes.  One other one.  Corporate affairs.

8      Q    I'm going to refer to your prior position

9  as VP H/R for corporate.

10          When did you last serve in that capacity?

11     A    Through March 2007.

12     Q    Was that a promotion in March 2007 to the

13 VP of H/R in support of the other institutions that

14 you are now supervising --

15     A    Yes.

16     Q    -- or providing services to?

17     A    Yes.

18     Q    Okay.

19          What is your current salary?

20          MR. RASIN:  Do not answer.

21          Objection.  I'm going to direct her not to

22     answer...

23          MR. SOLOTOFF:  Can you make a note of

24     every direction that counsel gives where he's

25     instructing the witness not to answer?  I don't

1                        S. O'Neill

2       Q      Not you?

3       A      Not me.

4       Q      In global strategy, was there any race

5    discrimination complaints in that group?

6       A      No.

7       Q      Jesan Spencer worked as H/R in

8    BusinessWeek.  Does that fall under H/R?

9       A      It falls under corporate H/R.

10      Q      Did anyone investigate her race

11   discrimination complaints?

12             MR. RASIN:  Objection.

13      A      I investigated her complaint regarding the

14   behavior of her manager.

15      Q      But you didn't take that as a race

16   discrimination complaint?

17      A      I did not.

18      Q      With respect to global strategy, was there

19   a race discrimination complaint?

20      A      No.

21      Q      Now, you know who Vladimir Stadnyk is?

22      A      He's an executive at S & P.

23      Q      How long has he held that position?

24      A      I don't know.

25      Q      Do you know of any race discrimination

1                          S. O'Neill

2        A     It was, let's see, yesterday from about

3   12:00 to 5:00, and the day before from 2:00 to 5:00.

4        Q     I'll ask you again:  Did you review any

5   other documents before coming here today other than

6   what you've already testified to?

7        A     This (indicating).

8        Q     This referring to the exhibit?

9        A     I'm sorry.

10             And e-mails, my notes.

11       Q     What you testified to earlier?

12       A     Yes.

13       Q     Anything else?

14       A     No.

15       Q     Who conducted the investigation of Jesan's

16  complaints to the company?

17       A     Which complaint?

18       Q     Any complaint.

19       A     I conducted the complaint regarding Ken

20  Caruso.

21       Q     What was that complaint?

22       A     That he cursed and the second one was that

23  he had touched himself inappropriately in front of

24  her.

25       Q     Let me see if I can clarify something.

52

1                        S. O'Neill

2              You were the investigator; is that

3    correct?

4        A    Yes.

5        Q    No one else?

6        A    For the touching inappropriately

7    complaint, I was the investigator.

8        Q    Who was the investigator regarding the

9    cursing?

10       A    The first time was Brett Marsche.

11       Q    You said if there was a first time.  Was

12   there a second time?

13       A    Which was the first time I spoke to Jesan.

14   She told me she had talked to Brett about it

15   previously.

16       Q    Was Brett Marsche the investigator of the

17   complaint that Jesan Spencer had made regarding Ken

18   Caruso's cursing?

19       A    Yes.

20       Q    Did you later become an investigator of

21   those claims as well?

22       A    Yes.

23       Q    Were you assisting Brett Marsche in that

24   investigation or were you investigating the matter

25   independent of Brett Marsche?

54

1                        S. O'Neill

2      A    Yes.

3      Q    What was his conclusions?

4      A    That he would speak with Ken; that he had

5  talked to Jesan and that it was resolved.  But if

6  Jesan wanted to speak to me, she could get in touch

7  with me.

8      Q    That was left to her?

9      A    Yes.

10     Q    You were not instructed to conduct an

11 investigation of your own; is that correct?

12     A    That's correct.

13     Q    If Jesan Spencer did not speak with you

14 there was nothing for you to investigate; is that

15 correct?

16          So the commencement of whatever

17 investigation, you call it, began in March 2006, is

18 because Jesan came to you?

19     A    I saw Jesan and I mentioned to her that if

20 she wanted to talk to me, that I was here.  But

21 we -- I saw her and I offered that up.

22     Q    I see.

23          Brett Marsche, what's his title and

24 position?

25          MR. RASIN:  Objection.

57

1                        S. O'Neill

2    it to stop.

3        Q    What was the offensive language that she

4    was complaining about?

5        A    That -- she said that Ken -- when I asked

6    her the word, like shit, it sucks, and that she

7    didn't appreciate it.

8        Q    Ken Caruso, that's the Ken you're

9    referring to?

10       A    Yes.

11       Q    Did she mention any other curse words to

12   you?

13       A    No.

14       Q    Did she mention the word "bitch" or

15   "bitches"?

16       A    No.

17       Q    Did she mention to you that she believed

18   that he made these comments in front of her as a

19   black woman --

20       A    No.

21       Q    -- and not in front of white women?

22       A    No.

23       Q    Did you ask her?

24            MR. RASIN:  Did she ask her --

25

1                      S. O'Neill

2      Q    Did you have a conversation with Brett

3  Marsche concerning Jesan Spencer?

4      A    I did.

5      Q    When was that?

6      A    That was in that late December, early

7  January 2005.

8      Q    Was it one conversation or a number of

9  conversations?

10     A    It was one.

11     Q    Where was it?

12     A    In my office.

13     Q    He came to you or you called him in?

14     A    He came to me.

15     Q    Was there anyone else present?

16     A    No.

17     Q    What did he say to you and what did you

18  say to him at this December, early January meeting?

19     A    That he wanted me to know that he had told

20  Jesan that if she wanted to speak with me, that she

21  could.  That's what I remember from the

22  conversation, and that he had looked into some

23  things she was concerned about regarding Ken's

24  language.

25     Q    Ken Caruso was Jesan Spencer's supervisor?

65

1                          S. O'Neill

2    correct?

3         A    Yes.   Yes.

4         Q    Isn't it true that Jesan Spencer

5    complained that Ken Caruso referred to women as

6    bitches in her presence as a black female?

7         A    I'm sorry.  Say that again.

8         Q    Isn't it true that Jesan Spencer

9    complained that Ken Caruso referred to women as

10   bitches and he did that in front of her as a black

11   female?

12              MR. RASIN:  Objection.

13        A    In the EEO complaint?

14              MR. RASIN:  He's asking you whether it's

15        true.

16        Q    I'm asking you whether it's true.

17        A    I don't know if it's true.

18        Q    Isn't it true that Jesan Spencer brought

19   it to your attention that Ken Caruso referred to

20   women as bitches and did that in her presence as a

21   black female but not in front of white females or

22   white men?

23        A    It's not true that she brought it to my

24   attention.

25        Q    Had she brought that to your attention,

75

```
 1                    S. O'Neill

 2       Q    Did you ask him if he did it over the

 3  phone?

 4       A    I asked him where and he said in his

 5  office.

 6       Q    Did he say who was present?

 7       A    He said Jesan and maybe Sheila Mitchell.

 8       Q    You said he stopped that conduct, the

 9  conduct of using the words "oh, shit" in their

10  presence; is that correct?

11            MR. RASIN:   Objection.

12       A    Yes.

13       Q    How do you know he stopped?

14       A    Because in April when I spoke with Jesan,

15  I asked her, How, you know, was it going?  And she

16  told me the cursing had stopped.

17       Q    You spoke with her after April?

18       A    Not specifically about that behavior.  We

19  spoke in March.  I checked into it.  I followed up

20  in April and asked her.

21       Q    Do you know whether it continued in May?

22       A    I don't know.

23       Q    Did you ask her as a follow-up?

24       A    No, because she had told me it had

25  stopped.
```

90

1                    S. O'Neill

2    only one.

3        Q    How about Jannie Pilgrim?

4        A    No.

5        Q    Didn't Jannie Pilgrim complain to you

6    about Rich Fisher's comments to her about black

7    employees under his jurisdiction?

8        A    No.

9        Q    She never mentioned anything to you?

10       A    Mentioned --

11       Q    That Rich Fisher made comments about black

12   employees under his jurisdiction.

13       A    No.

14       Q    Giovanna Henson, who is she?

15       A    Giovanna was the H/R coordinator who

16   worked in corporate H/R and did work for Ivy Latimer

17   and myself, and she was a direct report to me.

18       Q    Didn't Giovanna Henson complain about the

19   African-American experience at McGraw-Hill?

20       A    No.

21       Q    Not at all?

22       A    No.

23       Q    Did you review exit interviews by

24   African-American employees where they complained

25   about discrimination and unfair treatment while

1                           S. O'Neill

2    development.  This directly impacts professional

3    development and compensation.  I pursued a higher

4    degree to further my career path at the McGraw-Hill

5    Companies.

6              I pursued a master's degree in Human

7    Resources, management and labor relations at the

8    New York Institute of Technology; however, I was

9    denied six or more opportunities at the McGraw-Hill

10   Companies.  Most of the times, I was never given a

11   clear explanation as to why I was denied the

12   positions that I applied for.  I've been an employee

13   of the McGraw-Hill companies for eight years, and I

14   feel that there should have been some type of

15   follow-up, especially since I was an internal

16   candidate.  Many times this was not the case."

17              Had you seen that before today?

18        A    Yes.

19        Q    When did you see it for the first time?

20        A    The person who conducted the exit

21   interview brought it to my attention.

22        Q    Who was that person?

23        A    Beverly Mate.

24        Q    Was that at or about the time that the

25   exit interview was conducted?

1                        S. O'Neill

2        A     It was afterwards.

3        Q     Giovanna Henson had complained to you

4   about the African-American experience at

5   McGraw-Hill; had she not?

6        A     No.

7        Q     She did make a comment like that, didn't

8   she?

9        A     What comment are you referring to?

10       Q     About African-American employees at

11  McGraw-Hill?

12       A     No.

13       Q     She did not make such comment?

14       A     No, about African-American employees at

15  McGraw-Hill.

16       Q     What did she complain with regard to

17  African-American employees?

18       A     She did not complain.

19       Q     What did she say in any reference that she

20  made to African-American in connection with

21  McGraw-Hill?

22       A     She did not say -- make a comment about

23  African-Americans at McGraw-Hill.

24       Q     None whatsoever?

25       A     No.

150

1                        S. O'Neill

2        Q    Did she say you don't know what it's like

3    working as an African-American at McGraw-Hill, and

4    your response was, "No, I do not"?

5        A    She said, "You don't know what it's like

6    being black," and I said, "Yes, that's right.  I

7    don't know what it's like being black."

8        Q    When did she make that comment to you?

9        A    It was around Christmas holiday in 2004.

10   I think it was December 20th.

11       Q    Are you saying she didn't make this

12   comment in 2005 after she was turned down for a

13   position that she had applied for?  Is that your

14   testimony that it was not then but in 2004?

15       A    I recall it as being in late 2004.

16       Q    Did you know what it was like being an

17   African-American employee at McGraw-Hill?

18       A    Can you just say that question again?

19       Q    Do you know what it was like for

20   African-American employees at McGraw-Hill?

21       A    No.

22       Q    Didn't you conduct surveys of

23   African-Americans and what their experience was at

24   McGraw-Hill?

25       A    That was an employee engagement survey for

1                    S. O'Neill

2    to you back in July and August?

3              MR. RASIN:   Objection.

4    A    No.

5    Q    Now, I believe you testified earlier, but

6    correct me if I'm wrong, you spoke with Brett

7    Marsche before you spoke with Jesan Spencer about

8    Jesan Spencer's complaints to Brett Marsche; is that

9    correct?

10             MR. RASIN:   Objection.

11   A    Brett spoke to me.

12   Q    When was that conversation?

13   A    As I said earlier, I think it was late

14   2005, maybe early 2006.  And he spoke to me to say

15   Jesan might come and speak to me.  He had offered

16   that up and he wanted me to know.

17   Q    Did he give you a sense as to how urgent

18   that was or not?

19   A    I understood it -- to be available that he

20   had spoken to Jesan, everything seemed to be okay;

21   but if she wanted to speak to me, she could.

22   Q    Okay.

23             Was it your understanding that you were

24   not conducting an investigation of some

25   discrimination complaint at the time you met with

1                              S. O'Neill

2     Jesan Spencer on March 6, '06?

3          A    I did not understand that to be a

4     discrimination complaint.

5          Q    Under any circumstances?  Under those

6     circumstances?

7          A    Under those circumstances.

8          Q    At no time in March or April or May or

9     subsequent to that were you ever made aware that

10    Jesan Spencer had complained about race

11    discrimination at McGraw-Hill?

12         A    In -- you know, I'm fuzzy on the dates,

13    but I was aware at some point that Jesan was part of

14    the EEO charge.

15         Q    But what I'm trying to find out in

16    relation to your last conversation with Jesan

17    Spencer as it's reflected in these notes, was it

18    before that last conversation or after that last

19    conversation?

20         A    I'm sorry.  Say that one more time.

21         Q    I'm trying to find out approximately when

22    you found out about the EEO complaint of Jesan

23    Spencer.  Was that before your last conversation

24    with Jesan Spencer, as reflected in your notes here,

25    or after you concluded your discussions with Jesan

1                              S. O'Neill

2    Spencer?

3         A    You know, I really -- I don't recall when

4    I found out.

5         Q    Let me see if I can come at it at a

6    different way.

7              At some point, Jesan Spencer got

8    transferred into another position; is that correct?

9         A    Yes.

10        Q    She was no longer working for Ken Caruso?

11        A    Yes.

12        Q    Do you know when that took place?

13        A    In April 2006, we started the discussion,

14    but I can't recall the exact date that she went to

15    the business information group.  It was some time

16    shortly thereafter.

17        Q    In relation to her going to BIG, which is

18    the business information group, when did you learn

19    about the EEOC complaint?

20        A    I don't remember.

21        Q    Was it before or after her going to BIG?

22        A    Really, I don't remember when I learned of

23    it.

24        Q    Was she still employed with the company

25    when you learned of it?

206

1                          S. O'Neill

2      A    Yes.

3      Q    Did Ms. Spencer want to be transferred to

4  BIG?

5      A    She requested a transfer.

6      Q    To where?

7      A    At first, it was a general request for a

8  transfer.

9      Q    Then after that, was she more specific?

10     A    Jesan told me she had been interviewing

11 for a position -- for an H/R position at McMillan,

12 which is part of McGraw-Hill education.

13     Q    She didn't get that job; is that correct?

14     A    Yes.

15     Q    Didn't she tell you that she did not want

16 to be transferred to BIG?

17     A    At first, Jesan seemed pleased about it.

18 And then she changed her mind and said she didn't

19 want to.

20     Q    And she was specific as to why she didn't

21 want to; isn't that correct?

22     A    Yes.

23     Q    She didn't want to have to work under

24 Bill Harper?

25     A    She said that she didn't want to work in

207

1                       S. O'Neill

2    BIG with Bill.  So, in some of these notes, I listed

3    the reasons that she gave me.

4         Q    How did it come to pass that she was

5    transferred to BIG when she didn't want to be

6    transferred to BIG?

7         A    It came to be because Jesan did not want

8    to have any kind of facilitated problem resolution

9    session with Ken, and she had made it clear she

10   didn't want to work for Ken.  So, the opportunity

11   that we could find was within the information and

12   media group.

13        Q    Who did you discuss that with?

14        A    With Bill Harper.

15        Q    Who else?

16        A    Brett Marsche.

17        Q    Anyone else?

18        A    David Murphy.

19        Q    When did you have that conversation with

20   them that she should be transferred to BIG?

21        A    I had the conversation with them that

22   talked about where was there an opportunity for

23   another assignment with them.

24        Q    They said BIG?

25        A    Because Brett Marsche was the senior H/R

208

S. O'Neill

1

2  person for information and media, there was an

3  opportunity to move some head count and find a

4  position working in BIG.

5      Q     By putting Jesan in BIG, they were

6  accommodating Ken Caruso's wishes, weren't they?  He

7  did not want her under his supervision; isn't that

8  correct?

9      A     No.  He specifically said that he could

10 work with Jesan Spencer.

11     Q     You discussed the matter with Brett

12 Marsche, David Murphy and Bill Harper; is that

13 correct?

14     A     Yes.

15     Q     Were these three different conversations?

16 Was this a meeting of some sort or was it more than

17 one meeting?  Can you please describe in what the

18 circumstances were that these conversations were

19 taking place?

20     A     There was a meeting with Brett and Bill

21 where we talked about --

22     Q     And yourself?

23     A     Yes.  Yes.

24           And I can't recall if it was a meeting or

25 phone call with Brett and David.

209

1                    S. O'Neill

2       Q    Let's take the first meeting.  That first

3  meeting was with Brett and Bill or was it the phone

4  call that you're referring to?  Which came first?

5            MR. RASIN:  Objection.

6       Q    You said there were two conversations.

7       A    Yes.  The first conversation was with

8  Brett.

9       Q    You and Brett?

10      A    Brett and myself.

11      Q    Was that in his office?

12      A    I don't recall.

13      Q    You don't know where it was?

14      A    No.

15      Q    Was anyone else present?

16      A    No.

17      Q    Do you know when that meeting took place?

18      A    Well, it had to be in this same time

19  period of, you know, the --

20      Q    In the month of March?

21      A    No.  It was later.

22      Q    April?

23      A    Right.  It was the end of April, early

24  May.

25      Q    End of April, early May.

210

1                          S. O'Neill

2              What did Brett say to you at that meeting

3    and what did you say to Brett?

4        A    The first meeting was that Jesan had

5    requested a transfer and that we should explore that

6    and to look within information and media to see if

7    there was another opportunity for her.

8        Q    Is BIG information and media?

9        A    Yes, it is.

10       Q    Did she request a transfer to BIG

11   specifically?

12       A    No.

13       Q    Did you tell that to Brett Marsche that

14   she did not request a transfer to BIG?

15       A    I said that she requested a transfer.

16       Q    So that was the generic, general concept

17   transfer?

18       A    Yes.

19       Q    In other words, "get me out from under Ken

20   Caruso type" transfer?

21            MR. RASIN:  Objection.

22           A    I didn't understand it that way.

23       Q    You didn't think that she was -- her

24   request for a transfer was to get away from

25   Ken Caruso?

1                    S. O'Neill

2       A    I understood her transfer was that it --

3   she found it difficult working there and a transfer

4   was a good solution that she was recommending.

5       Q    The general sense of a transfer?

6       A    Yes.

7       Q    Brett Marsche did not mention to you her

8   EEOC complaint, is that correct, in this

9   conversation?

10      A    I don't recall if he did or not.

11      Q    You said this is around April or May?

12      A    Right.

13      Q    Of 2006?

14      A    Right.

15      Q    But you knew, at the time you met with

16  Brett Marsche, that Jesan did not want to be

17  transferred to BIG, correct?

18      A    I'm not sure if I knew then.

19      Q    When did you know?

20      A    When I told -- when Jesan and I met and we

21  discussed the opportunity at BIG, she told me that

22  she didn't want to.  And then we went for lunch and

23  she told me the reasons why.

24      Q    That was after you met with Brett for the

25  first time to discuss this?

212

1                          S. O'Neill

2        A      Yes.

3        Q      When did you meet with Brett and

4    Bill Harper by phone or the second time?

5        A      There are notes in here on the date.   I

6    just don't have it off the top of my head.

7               MR. SOLOTOFF:   Let the record reflect the

8               witness needs to look at the document, which is

9               okay, by the way.

10       A      It says here April 13.

11       Q      Okay.

12              It was April 13th.   Thank you.

13              On April 13, you had that meeting with

14   Brett Marsche the second time and Bill Harper,

15   correct?

16       A      Yes.

17       Q      And it was -- one of them was on the

18   phone?

19       A      You know, I can't remember if we were in

20   my office.   I think we were, but I'm not a hundred

21   percent.

22       Q      Did they tell you on April 13th that Jesan

23   Spencer had filed an EEOC complaint?

24       A      I don't know if they told me then.   I

25   don't know if they ever told me.

1                         S. O'Neill

2    Q    Okay.

3         You don't recall them telling you?

4    A    No.

5    Q    Now, on April 13, did you tell them that

6  Jesan Spencer did not want to be transferred to BIG

7  and her reasons why?

8    A    Let me just look at something.  I don't

9  think I knew at that time what her specific

10  objections were.  It was after we met that Jesan

11  told me the specific objections.

12   Q.   So is it closer to May?

13   A    It was closer to May.

14   Q    You had learned what her specific

15  objections were transferring to BIG, correct?

16   A    Correct.  Right.

17   Q    Who put in the orders -- I don't know what

18  you call them, orders or form papers or whatever it

19  is -- transferring Jesan Spencer to BIG?

20   A    At that time, to initiate that, it was on

21  a paper document.  So, that would have to be

22  initiated by Ken Caruso, and Bill would have

23  provided the information about the new -- the

24  accounting code and any other codes that were

25  needed.

214

                              S. O'Neill

1

2        Q      That form that you're talking about, is

3    that an employee action form or something like that?

4        A      Yes.   The name is the turnaround document

5    but same difference.

6        Q      Jesan Spencer's consent was not required

7    in writing, was it --

8        A      No.

9        Q      -- to be transferred?

10       A      No, it was not.

11       Q      Once the form was signed by Brett Marsche

12   and Bill Harper -- or Ken Caruso, rather, it's a

13   fait accompli?

14       A      Yes.

15       Q      Before Jesan Spencer left her work under

16   Ken Caruso, she had been a pretty successful H/R

17   manager for many years in BusinessWeek, is that

18   correct, as you understand it?

19              MR. RASIN:   Objection.

20       A      I understood that, you know, Jesan did a

21   good job and had been in that role for a couple of

22   years.

23       Q      When she spoke with you, she told you that

24   she felt that she was being marginalized, that the

25   work -- or minimalized; that the work she was being

215

1                         S. O'Neill

2    given by Ken Caruso was somehow being degraded in

3    terms of her job duties and responsibilities.

4    Didn't she tell you that?

5        A    Yes, she did.

6        Q    Where was she being assigned at BIG?

7        A    The new role was to support -- it's H/R

8    supporting Aviation Week, a group called the "global

9    customer operations and BIG technology."

10       Q    How soon after Ken Caruso and Brett

11   Marsche signed the turnaround form was Jesan Spencer

12   transferred to Aviation?  Was that something that

13   took place in a day, a week, a month?

14       A    I wasn't involved in that.  So I don't

15   know how long that was.

16       Q    Are employees transferred usually against

17   their will to positions that they don't want or do

18   they usually get transferred to positions they want?

19   What is the policy of McGraw-Hill regarding

20   transfers?

21       A    Say that again for me.

22       Q    Is it the general practice to transfer

23   employees to positions that they don't want?

24       A    It's not a general practice.

25       Q    Now, did you follow up with Jesan Spencer

1                          S. O'Neill

2    after she was transferred to Aviation Week to

3    determine how she was being treated there?

4        A     When I would see Jesan at different

5    events, I would ask her how she was doing.

6        Q     And what did she tell you?

7        A     She would say "okay."

8        Q     She would just say "okay"?

9        A     Right.

10       Q     Did you follow up and check with anyone at

11   management to see whether she was doing MORs?

12       A     No.

13       Q     Did you check with management to see what

14   work she was doing, if any?

15       A     I asked Bill Harper how Jesan was doing.

16       Q     And he said?

17       A     Pretty good.

18       Q     When did you ask him that?

19       A     I don't remember.

20       Q     When Ken Caruso and Brett Marsche signed

21   the employee turnaround papers, had you known at

22   that point in time that Jesan had filed an EEO

23   complaint?

24       A     I really don't recall when I knew.

25       Q     Whenever it is that you found out that

238

1                    S. O'Neill

2  handling the discrimination complaints.  My job was

3  to let Bill know, let Toi know, let Brett Marsche

4  know.  I offered to intervene for Jesan to talk to

5  Bill and Toi to discuss her job and the scope of the

6  job, and she said she did not want me to do that.

7           THE WITNESS:  Can we take five?

8           MR. RASIN:  Sure.

9      Q    We're almost finished anyway.  You still

10 want to take five?

11     A    I just want to get a little water.

12           MR. RASIN:  We'll take a break.

13           (Whereupon, a short recess was taken.)

14           (Whereupon, the aforementioned e-mail

15      communications Bates stamped D03815 through

16      D03817, was marked as O'Neill Exhibit 13 for

17      identification as of this date by the

18      reporter.)

19           MR. SOLOTOFF:  Back on.

20 BY MR. SOLOTOFF:

21     Q    Looking at Number 13, O'Neill 13, do you

22 recognize that document?

23     A    (Witness views document.)

24          Yes.

25     Q    What is it?

1                    S. O'Neill

2          MR. RASIN:  Objection.

3     Q     If you know.

4     A     I don't know specifically that he reviewed

5     any of her applications.

6     Q     Was there a diversity council around

7     2004/2005, a council called "Diversity Council"?

8     A     I don't know the year that

9     Standard & Poor's established a diversity council.

10    Q     You're not sure whether or how you learned

11    about the African-American Affinity Group, correct?

12    A     I don't recall those circumstances.

13    Q     Do you know whether Jannie Pilgrim was

14    principally responsible for helping create the

15    African-American Affinity Group?

16    A     I don't know that for sure.

17    Q     Or the Diversity Council?

18    A     I don't know that.

19    Q     If Giovanna Henson was looking for a

20    position for promotion purposes and she was

21    interviewed and her application was being

22    considered, would it have been ordinary or usual for

23    the persons who are reviewing her application to

24    call you and ask you for your opinion about

25    Giovanna Henson?

258

1                        S. O'Neill

2        A    It would not be ordinary.

3        Q    Were you in a position to recommend

4    Giovanna Henson for a promotion?

5        A    If by "promotion," meaning grade-level

6    promotion, I was in a position to.

7        Q    But how about a promotion to another

8    position in the group or in the company?

9        A    No, I was not in the position to do that.

10       Q    Just a couple questions regarding

11   reduction in force.

12            What is a reduction in force?

13       A    That is when the business conditions are

14   such that the number of employees needed to do the

15   work in the business needs to be reduced so there

16   will be lower expenses.

17       Q    Can employees be selected to be reduced

18   out of employment for the reason that they are an

19   undesirable employee?

20       A    No.

21       Q    That would be unappropriate?

22       A    Say that again, please.

23       Q    For the reason that they are an

24   undesirable employee.

25       A    Can you start from beginning on that one?

259

                              S. O'Neill

1

2     Q    Okay.

3          Is it possible for management to reduce an

4   employee off employment, from employment, by using a

5   RIF as an excuse for eliminating an undesirable

6   employee?

7          MR. RASIN:  Objection.

8     A    No.

9     Q    Why not?

10    A    Because a reduction in force is

11  specifically related to the business reasons why

12  fewer people are needed and fewer types of jobs are

13  needed.  So it's based on the job itself.

14    Q    It would be inappropriate to eliminate an

15  employee and throw them into the mix to get them out

16  of the job and use a RIF as a reason for doing that,

17  wouldn't it?

18         MR. RASIN:  Objection.

19    A    Yes.

20    Q    Who is Deborah O'Connor?  We didn't

21  mention her name earlier.

22    A    She is a recruiter who works as part of

23  the talent acquisition team at Standard & Poor's.

24    Q    Who is Vladimir Stadnyk?

25         MR. RASIN:  We did this, didn't we?

260

1                          S. O'Neill

2              MR. SOLOTOFF:  I don't think we did, did

3     we?

4     A     You asked that this morning.

5     Q     What was his position; do you recall?

6     A     He's the executive at Standard & Poor's.

7     Q     Has he ever left that position?

8     A     I don't know his history.

9     Q     Who is Joyce Hunsucker?

10    A     She is a former H/R generalist who works

11    supporting Standard & Poor's.

12    Q     Have you ever heard of the acronym BEAM?

13    A     Yes, I have.

14    Q     What is that?

15    A     Black Employees at McGraw-Hill.

16    Q     When was this formed?

17    A     I don't know the exact date but it's well

18    over a year ago.

19    Q     2007?

20    A     I don't know the exact date.

21    Q     2006?

22    A     Could have been.  Again, I don't know the

23    exact date.

24    Q     Okay.

25              MR. SOLOTOFF:  I have no further