**EXHIBIT L TO THE JUNE 26, 2008
DECLARATION OF GREGORY I. RASIN, ESQ.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

JANNIE PILGRIM, GIOVANNA HENSON,
JESAN SPENCER, BRENDA CURTIS,

**07 CIV 6618**

                                    Plaintiffs

                                                                **COMPLAINT**

        -against-


THE McGRAW-HILL COMPANIES, INC.,

                                                                **PLAINTIFFS DEMAND A
                                                                JURY TRIAL ON THEIR
                                                                CLAIMS**

                                    Defendant.

------------------------------------------------X

        Plaintiffs Jannie Pilgrim ("Pilgrim"), Giovanna Henson ("Henson"), Jesan Spencer

("Spencer"), Brenda Curtis ("Curtis") (collectively, "Plaintiffs"), by and through their

attorneys, Solotoff& Solotoff as and for their Complaint against defendant The McGraw-Hill

Companies, Inc. ("McGraw-Hill" or the "Company"), allege upon personal knowledge as to

themselves and their own acts, and upon information and belief as to all other matters, as to

which allegations they believe substantial evidentiary support will exist after a reasonable

opportunity for further investigation and discovery as follows:

                                    **INTRODUCTION**

        1.    Plaintiffs bring this action on their behalf, as African Americans, who are or were

employees or applicants for employment of McGraw-Hill during the period from in or about

January 2003 through to the date of Plaintiffs' discharge, the filing of the EEOC Charge in or

about December 2005, thereafter, and prior thereto. Defendant maintained policies and

continuous patterns and practices that had a hostile and discriminatory adverse effect on African

Americans and particularly the Plaintiffs.

2.     This Action is accordingly brought by former McGraw-Hill employees on behalf of themselves as persons of color, who have been subjected to McGraw-Hill's continuing policies and practices of race discrimination, discriminatory treatment, hostile work environment and retaliation.

3.     Plaintiffs bring this civil action seeking, declaratory and equitable relief, and monetary damages under 42 U.S.C §2000e et seq., (Title VII)(as amended); 42 U.S.C. §1981 *et seq.*; the New York State Human Rights Law, Executive Law §296 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code the City of New York, Sections 8-107(a) *et seq.* and 8-502 *et seq.*; for purposeful discrimination and retaliation, and for malice and reckless disregard for the federally protected rights of the Plaintiffs, and for violation of applicable rules and regulations prohibiting discrimination and retaliation in the employment context, to redress the violation of Plaintiffs' rights by defendant, and for the deprivation by defendant of various terms, conditions, and privileges of Plaintiffs' employment due to Plaintiffs' race and color.  On or about December 16, 2005 Plaintiffs had duly filed and served official EEO Charges placing the Defendant and the Equal Employment Opportunity Commission [EEOC] on notice of their claims and demands in this matter.  No other application for the relief herein sought has been made to this or any other Court of competent jurisdiction. On or about May 21, 2007 Plaintiffs had requested and received a "Right-to-Sue" Letter from the EEOC in this matter (See Attached), and has commenced this action within the requisite limitations of time, has exhausted all available administrative remedies and will timely notify the NYC Human Rights Commission of this lawsuit.

4.     The McGraw-Hill Companies (hereinafter "McGraw-Hill" or "Defendant" or "Employer") is one of the largest global publishers in the field of education, finance, and business analysis, risk assessment, and energy information and services, textbooks, aviation,

2

aerospace, and the defense market. McGraw-Hill employs over 17,000 employees. They are the largest global information provider which includes education, finance, aviation, and media. They are one of the largest publishers of non-fiction text books from elementary to college level, from traditional text books to the largest in on-line and multi-media learning. McGraw-Hill helps teachers teach and learners learn. McGraw-Hill is also in the financial services industry, and the world's foremost provider of independent credit ratings, indices, risk evaluation, investment research, data, and evaluations. McGraw-Hill provides investors with independent bench marks that make them confident about their financial decisions. Business Week is a leading global resource of ground breaking news and analysis in a fast changing business world and a cross print, television and online media company. McGraw-Hill provides essential insight that provides competitive edge to business leaders and consumers.

5.     McGraw-Hill is one of the largest global publishers in the field of education, finance and business analysis, risk assessment and energy information and services, textbooks, aviation, aerospace, and the defense market. McGraw-Hill is also in the financial services industry, and serves as the foremost provider of independent credit ratings, indices, financial risk evaluation, investment research, data, and evaluations through its Standard & Poor's Division ("S&P"). S&P, for example, provides investors with independent bench marks that make them knowledgeable and confident about their financial decisions.

6.     As employer McGraw-Hill was at all times herein, responsible personally and individually, as employer, for the acts of its principals, officers, supervisors, directors, agents, and/or co-employees, and more particularly, for the acts of the employers, managers, officers, directors, supervisors, aiders and abettors, and co-employees, individually, and personally at its principal place of business and offices located in the United States and around the world.

3

7.    At all the relevant time periods herein required, and by way of example, and not limited thereto, and upon information and belief, McGraw-Hill employed approximately 17,000 employees of which approximately 1500 employees were/are African Americans (male and female) on a per year basis.  On average, over the course of the last five (5) years through the filing of the Plaintiff's EEOC Charges in this case, on a per year basis, less than ten (10) per cent of the work force was/is African American. Yet less than a small fraction of *"Grade Level #22"* and above, managers and executives in these positions, are held by African Americans. Less than two (2%) percent of approximately over 500 positions of *"Grade Level #22"* and above are held by African Americans. African Americans are predominantly assigned to the lowest grade level positions with the least chance of advancement.  Over Ninety-Five (95%) percent of *"Grade Level #22"* and above managerial positions, are held by Caucasians. This distribution of the races is a result of a pattern and practice of discrimination against African Americans.

8.    At all the relevant time periods herein required, less than a small fraction of African Americans receive an overall performance evaluation rating of four (4) or above. African Americans are predominantly evaluated with lower performance evaluation ratings than Caucasians. Moreover, as a result of the poor evaluation ratings a disproportionate number of African Americans are "managed out" of their jobs, receive lower wages, lower wage or merit increases, and less employee benefits than their Caucasian counterparts, and have less of an opportunity to retain employment or gain advancement. This adverse treatment by race is a result of a continuous pattern and practice of discrimination against African Americans.

9.    At all the relevant time periods herein required, less than a small fraction of African Americans receive promotions. African Americans are predominantly denied promotions though they are equally qualified or greater qualified than Caucasians who receive the

4

promotions or are hired from outside of the firm. This distribution of the races is a result of a pattern and practice of discrimination against African Americans.

10.    This Action and EEOC Charge is brought by Plaintiffs who were, at the time of the EEOC filing, then present and former McGraw-Hill employees. McGraw-Hill has a pattern and history of discriminating against African American applicants for employment and in a hostile and adverse manner discriminate against its African American employees, *inter alia*: by discouraging qualified African Americans employment; by refusing and not hiring qualified African Americans employment; by advancing Caucasian employees more quickly than African American employees; by denying African American employees equal job assignments, promotions, training and other terms and conditions of employment; and by causing African Americans to suffer a hostile work environment; and by retaliating against those who oppose its unlawful practices.

11.    McGraw-Hill has a pattern and history of hostile and discriminatory treatment against African American employees; *inter alia,* who have been subjected to McGraw-Hill's continuing policies and practices of illegal discrimination by reason of race and color in compensation and terms and conditions of employment.

12.    This action seeks make whole relief for the plaintiffs, and punitive damages.

## JURISDICTION AND VENUE

13.    This action is brought pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), and § 1981 *et seq.*

14.    Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under the NYSHRL and the NYCHRL.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c) since McGraw-Hill is a corporation subject to personal jurisdiction in this District and therefore would

be deemed to reside in this District, and/or 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims herein occurred in this District. The Plaintiffs' claims arose in the Southern District of New York.

16. McGraw-Hill employs more than 6,000 employees in its New York City offices.

## PARTIES
## THE NAMED PLAINTIFFS

17. Pilgrim is an African American woman and a resident of the State of New Jersey. Pilgrim was first employed in 2000. She was employed as a *Human Resource Manager* in McGraw-Hill's Standard & Poor's (hereinafter "S&P") Division of the Company.

18. Henson is an African-American woman and a resident of the State of New York. Henson was first employed in 1997. In or about March 2001 she was employed as a *Human Resource Coordinator* in McGraw-Hill's Corporate (hereinafter "Corporate") - Human Resources Department. She was employed by McGraw-Hill to August 2005.

19. Spencer is an African American woman and a resident of Yonkers, New York. Spencer was first employed in December 2000. She was a *Senior Manager of Human Resources* in McGraw-Hill's Business Information and Media Services (hereinafter "IMS"), responsible in part for its publication of the "Business Week" magazine. She was employed by McGraw-Hill to in or about January 2007.

20. Curtis is an African American woman and a resident of Brooklyn, New York. Curtis was first employed in 2002. More recently she was employed as an Office Manager McGraw-Hill Security Services at S&P. She was terminated from her job on October 3, 2005.

## THE DEFENDANT

21. Upon information and belief, McGraw-Hill is a domestic corporation, incorporated under the laws of the State of New York with its principle place of business at 1221 Avenue of the Americas, New York, New York 10020.

6

22. Upon information and belief, McGraw-Hill is one of the largest global publishers in the field of education, finance, and business analysis, risk assessment, and energy information and services, textbooks, aviation, aerospace, and the defense market, with over 17,000 employees world-wide.

23. Upon information and belief, McGraw-Hill executed assurances that it would comply with anti-discrimination and anti-retaliation statutes.

24. McGraw-Hill posted revenues of more than Five (5) Billion Dollars in 2004-2005.

25. As an employer it was at all relevant times herein, responsible personally and individually, for the acts of its principals, officers, supervisors, directors, agents, and/or co-employees, and more particularly, for the acts of the employers, managers, officers, directors, supervisors, aiders and abettors, and co-employees, individually, and personally at its principal place of business and offices located in the United States around the world.

26. Upon information and belief, at all the relevant time periods herein required, the McGraw-Hill employed approximately 1500 African Americans (male and female).

27. Upon information and belief, on average, over the course of the last five years, on a per year basis, less than ten (10) per cent of the work force was/is African American.

28. At all relevant times herein, McGraw-Hill has been present and has regularly done and/or transacted business in the Southern District and this State.

### FACTUAL ALLEGATIONS AS TO THE NAMED PLAINTIFFS

**PILGRIM:**

29. Pilgrim has a Masters Degree in Human Resource Management, and a post graduate degree in Training and Development.

30.   Pilgrim has been employed by McGraw-Hill since March 2000 and was promoted to her position as a Grade Level #18, Human Resource Manager in the Standard & Poor's ("S&P") Division of the Company.

31.   In or about October 2004 Pilgrim created an ad-hoc *voluntary* African American Affinity Group (hereinafter "Affinity Group") consisting of approximately 15 African American employees from throughout the McGraw-Hill organization, and from around the country, to complain about the discriminatory and hostile work environment and to seek support from management to provide mentoring, a recruitment strategy to improve the recruitment of African Americans into the Company, to encourage African American employees to support each other to over come the *"tap on the shoulder"* practices that benefit Caucasian employees through out the Company, and to overcome the adversity suffered by African Americans in compensation, performance evaluation, recruitment and retention.

32.   In 2004 the Affinity Group sought financial and organizational support from the McGraw-Hill Director of EEO and Diversity. The Affinity Group also reached out to the McGraw-Hill Senior Director of IMS Human Resources. The Affinity Group met with McGraw-Hill Human Resources management a few times, and expressed their concerns about the policies and practices affecting African American employees and diversity training. Management did not provide a senior manager to address the issues presented or provide the necessary funds to support a change in the practices presented by the Affinity Group.  Pilgrim was told by the McGraw-Hill Director of EEO and Diversity that the African American Affinity Group "was not the flavor of the month" and said "If you ever repeat this, I will deny it." The African American Affinity Group disbanded.

33.   Thereafter, in or about 2004 and 2005, Pilgrim co-founded a Diversity Council (hereinafter "Council") at the S&P Division of McGraw Hill.  It was initially organized to review

data and formulate diversity recruitment strategies and develop talent acquisition strategies in the effort to help recruit and change policies and practices on diversity for all minorities, including African Americans. Nevertheless, the Council did not focus on the concerns of African Americans.

34.    The Council did report that minorities, including African Americans' opinions were not valued; that African Americans were discouraged from encouraging other African Americans from working at McGraw-Hill because of how they're treated; African Americans did not participate in decision making and consistently reported less favorable interaction with their managers; African Americans expressed that they were not rewarded for superior performance and not paid fairly; and African Americans were not encouraged to take on more responsibilities that would lead to promotions.

35.    In 2005 Pilgrim complained that the recruitment strategies were ineffective for recruiting African Americans.

36.    Pilgrim also complained about racist comments directed at her and concerning other African Americans made by her (Caucasian) supervisor, a Vice President of Human Resources. Shortly thereafter, Pilgrim was retaliated against and taken off the Council and her work responsibilities were diminished and reduced to clerical functions. African American representation on the Council was also significantly reduced.

37.    Pilgrim was informed and believed the issue of the lack of diversity, particularly African Americans, was brought to the attention of David Murphy (hereinafter "Murphy"), (Caucasian) Executive Vice President of McGraw-Hill Human Resources at central headquarters. Murphy acknowledged that he was aware of the diversity problems and was advised of the problem many times. In 2004, for example, at a Talent Acquisition meeting including senior management, Murphy announced to recruiters and human resource personnel

9

and upper management that McGraw-Hill "does not hire African Americans from New Jersey because African Americans do not have cars." At the same meeting (Caucasian) Vice President of Talent Acquisition announced that the internal referral program [or "tap on the shoulder" program] was discriminatory and resulted in a lack of diversity and hiring of minorities [including African Americans].

38.    Upon information and belief, McGraw-Hill was, and is, aware of the many problems affecting African American employees as herein identified, the Company did not change its practices or implement recommendations made by many African American Human Resource employees, including Pilgrim [see herein further Henson, Spencer and Curtis], or provide economic support or leadership to accomplish the efforts of many of McGraw-Hill's African American employees who complained of discrimination and sought equal employment opportunities from within the Company. Each of the named Plaintiffs was retaliated against for complaining. Other African American employees complained at the exit interviews, or filed EEO Charges with the EEOC, and/or left the Company.

39.    Pilgrim reported that discharged and resigning African American employees complained in exit interviews of race discrimination, a hostile work environment towards Blacks, and denial of fair and equal employment opportunities through out the company and of needed mandatory diversity training. There simply was no equal employment opportunity training program or race discrimination or race harassment training through out the Company. No investigations were conducted of these complaints or effectively or reasonably followed up. The exit interview forms purposely omit any questions regarding discrimination or race discrimination.

40.    Pilgrim's supervisor (Caucasian), Vice President of Human Resources made repeated racist, hostile and offensive remarks. Pilgrim also complained directly to (Caucasian)

Harold McGraw, III, President and CEO. Shortly thereafter, Pilgrim was again retaliated against and suffered retaliatory harassment. Management reduced her job functions to clerical in nature, she was told that she will "rot in the position;" she would be "made to feel as though she was in jail without a key;" she would not get any training and would not be allowed to be reassigned or transferred or promoted. Management threatened to "manage her out" and told her to resign and terminate her employment. She heard, and was told that, her supervisor (Caucasian) Vice President of Human Resources make repeated racist remarks, and that the problems Blacks have in the Company is created by Blacks against Blacks.

41.    Although Pilgrim was highly evaluated and consistently exceeded expectations, Pilgrim was at times underpaid, denied stock options and other benefits, and not given subsequent fair and equitable evaluations, or other opportunities for promotions, mentoring and training. When she complained to her (Caucasian) supervisor Vice President of Human Resources he said to her "Do you think you should make as much as a White man."

42.    Pilgrim remained employed ready, willing and able to advance her career until she complained, suffered retaliation, retaliation harassment and was constructively involuntarily forced to be discharged under protest. She has suffered humiliation, embarrassment, loss of enjoyment of life, pain and injury, and economic loss.

**HENSON:**

43.    Henson was hired by McGraw-Hill in 1997. In May 2001 Henson received a Masters of Science Degree in Human Resources Management and Labor Relations. She was last employed as a Grade Level #13, Human Resource Coordinator in McGraw-Hill's Corporate Human Resources Department. She remained a Grade Level #13 from in or about 2001 to August 2005.

11

44.    Henson was an employee in good standing. From in or about 2003 to 2005 Henson applied for many positions. In 2003 Henson applied for a position as a Human Resource Representative for the Information Media Service (IMS) Division. She was denied the position. The position was given to a less qualified Caucasian female. Henson again applied for a position as a Human Resources Representative for the Standard and Poor's (S&P) Division. The position was given to a pre-selected equal or less qualified Caucasian female. Henson sought a position as a Recruiting Specialist, Campus Recruiting in S&P. The position was assigned to a non-African American, from outside of the company with less qualifications and experience than Henson. She applied for a position as Talent Acquisition Specialist in Corporate. The position was given to an external candidate, an equally or less qualified, Caucasian female. She applied for a position she qualified for as a Human Resources Representative in McGraw-Hill Education Division. The position was given to a Caucasian female.

45.    From 2001 to the date Henson resigned in August 2005, she observed that Caucasians have "side deals" regarding career opportunities. She also observed that African Americans have lower performance evaluation scores on corporate reports and surveys. Henson sought assignment and reassignment and promotion on no less than six occasions. She was qualified for the positions she sought at McGraw-Hill. In all but one occasion she was denied a promotion to an equally or less qualified Caucasian who was pre-selected before the job was posted. She was denied a fair and equal employment opportunity and promotion, or at times interviewed for the positions even though the candidate had been pre-selected. She had no Advocate or mentor and was unable to secure the assignments or promotions. She complained about the hostility she as an African American felt, of racism and discrimination. No thorough or appropriate investigation was conducted of Henson's complaints she was constructively discharged and forced to resign under protest.

12

46.    Henson was informed and observed that minorities, including African Americans, were discouraged from applying for positions; jobs are posted for a few days because the candidates have been pre-selected; some jobs are not posted at all. African Americans are managed out of positions if their supervisor has issues with them, however, if Caucasians have issues with their supervisor the managers are able to "find" another opportunity and position for them.

47.    Henson had observed that many African Americans do not receive "in-grade" promotions, at times for four (4) to five (5) years; or receive lateral positions but not a full promotion. Caucasian temporary employees have filled open positions that were not posted, again depriving African Americans of an opportunity to apply. Henson also observed, for example that Caucasians hired at the time of African Americans, were receiving more money than the African Americans. In some instances the Caucasians had less experience than the African American employees.

48.    In 2004 and often in 2005 Henson suffered a hostile work environment based on how the Defendant treated African Americans at work, that their complaints were going ignored, and of her complaints to the (Caucasian) Vice President of Human Resources at Corporate being ignored. Henson complained that for over four years she remained a Grade Level 13 and remained stagnant and unable to gain promotion despite her good work record and evaluations. On one occasion, she complained to the Vice President of Human Resources that she was so upset that she cried and could not continue working. She complained that "you do not know what it is like being an African American in this Company." The Vice President of Human Resources at Corporate did not conduct any investigations. Henson suffered retaliation, constructive discharge, embarrassment, and humiliation, loss of enjoyment of life, pain and injury, and economic loss.

13

**SPENCER:**

49.     Spencer has a Masters Degree in Human Resources and Organizational Development. She was first employed in December 2000. She is a Grade Level #19 and was and is an exceptional employee. She was a Senior Manager of Human Resources in McGraw-Hill's Business - Information and Media Services (IMS) responsible for providing human resources support for "Business Week" magazine employees.

50.     Spencer had been denied opportunities to meet "diversity goals" related to her position as Senior Manager of Human Resources. Spencer had complained to her supervisor, (Caucasian) Senior Director of Human Resources for IMS. He ignored Spencer's complaints of racist attitudes, and he effectively retaliated and demoted her for complaining, reducing her job responsibilities to clerical functions, denied her employment benefits, and an opportunity to meet her performance goals. He effectively adversely changed her terms and conditions of employment and decreased her potential for merit increases or future promotion. He demeaned her with foul and offensive language which he did not do in front of Caucasians. The Senior Director of Human Resources treated her with a lack of respect by reason of her color. He set her up for failure, acted in a hostile, angry, condescending and disrespectful discriminatory manner that he did not demonstrate towards Caucasian employees and other employees not of color. Spencer was set up for being "managed out." As a result she was denied opportunities for advancement, pay increases, and benefits.

51.     Spencer complained to her supervisors and high ranking officials about racism, discrimination, hostile work environment, and retaliation. Thereafter Spencer had been marginalized and removed from any meaningful support systems and job duties. After complaining, like other African American employees, she was less regarded and forced to suffer retaliation harassment, and retaliation, her job duties, responsibilities, and assignments were

14

significantly reduced and diminished, marginalized and reduced to grunt work. She sought job preservation and advancement, and complained of retaliation, retaliation harassment and discrimination, and hostile work environment, instead she was constructively discharged and forced to terminate her employment involuntarily under protest. She suffered retaliation, constructive discharge, embarrassment, and humiliation, loss of enjoyment of life, pain and injury and economic loss.

**CURTIS:**

52.    Curtis is an African American female and was first employed by McGraw-Hill in May 2002. She was a Grade Level #17 and was a good employee. Her position was as Office Manager for McGraw-Hill Security Services at S&P. She held the position for three years. She was told that she was terminated ostensibly due to job elimination effective October 2005.

53.    From in or about 2003 and during her employment Curtis complained to her (Caucasian) Executive Managing Director about the hostile practices and discriminatory treatment relating to race and employment benefits and performance evaluations which affected her potential for wage and merit increases.

54.    After October 3, 2005 Curtis was unemployed. She has/had sought to be re-employed at McGraw-Hill. She applied for seven positions that she was qualified for. Some of the positions she sought were for positions that were of lesser Grade than the Office Manager's position. Curtis learned that the positions that she sought were filled by Caucasians, and in some occasions were pre-selected.

55.    After October 2005, while unemployed, Curtis sought reemployment for four positions. On at least one occasion McGraw-Hill pre-selected a Caucasian employee for a position Curtis was qualified for, nevertheless, they made Curtis go through a "sham" interview and schedule changes only to deny her the position saying she was over qualified. Curtis now

believes that she was retaliated against, post- employment, because she complained of racism and discrimination during her employment. Curtis had remained ready willing and able to be reemployed. She has suffered retaliation, embarrassment, and humiliation, loss of enjoyment of life, pain and injury, and economic loss.

## FACTS COMMON TO ALL CAUSES OF ACTION

56.   McGraw-Hill's policies governing compensation and promotions are similar across all divisions, and build upon common features and centralized policies, programs and excessive subjectivity which provide a conduit for hostile race and color bias that affects all class members in a similar fashion.

57.   Few objective requirements and qualifications for specific assignments, promotions or raises exist. High ranking supervisors, predominantly Caucasian, have substantial discretion in setting salaries within a range of grade levels for each employee. Salaries are also adjusted based upon performance reviews, which are largely based upon subjective judgments of performance.

58.   The same supervisors control whether employees are given the opportunity to meet certain goals, and therefore control performance outcomes.

59.   McGraw-Hill cultivates and maintains a strong corporate culture that permits and encourages race stereotyping that affects African American, and particularly the Plaintiffs, in a similar way.

60.   McGraw-Hill policies governing compensation and promotions uniformly provide for Caucasian managers and high ranking Caucasian supervisors to exercise significant subjectivity in making employee evaluations, wage and pay scale assignments, merit increases, job assignments, training, and promotion decisions.

16

61.    Each division of McGraw-Hill operates in a basically similar fashion as regarding hiring, and for example, employee referrals, compensation, bonus award programs, performance evaluation programs, and promotions operating off of centralized personnel policies, pay grade classifications, internal centralized computer personnel resource systems, applicant pools, and employee referral incentive programs.

62.    Subjectivity is a primary feature of the employee referral program throughout the Company. The referral program (Advocate or Mentor program) rewards employees (hereinafter "Advocates") who identify potential employees for positions, assignments, and promotions within the Company.

63.    This centralized program pays the Advocate if the referred employee is hired, assigned or promoted. This program encourages a "tap on the shoulder" hiring system that rewards and encourages stereotyping, hostility, racism, subjectivity, and discrimination.

64.    The referrers or Advocates are predominantly Caucasian who favor the overwhelming Caucasian employee work force that advocate for Caucasians. McGraw-Hill also encourages Caucasian management to support and ensure Caucasian referrals. This "tap on the shoulder" policy is a centralized internal promotion system that has a significant detrimental discriminatory effect on African American new hires, African American employee assignments, reassignments, and promotions; company wide. African Americans lack Advocates, mentors and referrers. Plaintiffs are informed and believe that McGraw-Hill has long recognized that the "tap on the shoulder" program runs counter to diversity and affirmative action goals.

65.    Subjectivity is a primary feature of employee wage increases. Wage increases are a function of the performance evaluation program centralized throughout the Company. Subjectivity is a primary feature of the performance evaluation program and therefore salary decisions. The subjectivity in salary decisions occur in two fundamental ways: (1) wage

17

supervised by Caucasian high ranking supervisors and managers; and (2) these same high ranking Caucasian supervisors and managers determine the extent of the wage increases, if any, for African American employees compared to Caucasians.

66.    Plaintiffs believe that African American employees predominantly receive lower performance evaluations than Caucasian employees, and African American employees predominantly receive lower wages, and lower wages within grade range, and lower wage or merit increases than Caucasian employees who perform substantially similar work, with similar or lesser skills and experience.

67.    Less than two (2%) of 500 employees above the grade level of 22 up to as high as grade level 27 in the company are African American employees. Qualified African Americans, except a very small number, have experienced a "glass ceiling" and have been denied employment and/or promotion to a grade level above a 21.

68.    Upon information and belief, at all the times required herein, McGraw-Hill had failed to achieve its EEO affirmative action goals, and has not met any of its goals.

69.    Plaintiffs, who have formal training in Human Resource Management are informed and believe that McGraw-Hill had assured the United States government, Office of Contract Compliance (OFCCP), and the Equal Employment Opportunity Commission that McGraw-Hill will comply with all applicable federal, state, and local laws, rules and regulations that prohibit race discrimination, and retaliation in the employment context. Upon information and belief, McGraw-Hill has been audited by the Office of Federal Contract Compliance Programs (OFCCP) on no less than five occasions in recent years because it did not meet its goals. Upon information and belief, McGraw-Hill has failed or refused to disclose the true conditions as herein alleged.

18

70.    Qualified African Americans have been identified by the company through a number of recruitment programs, such as conferences and recruitment programs with the National Black MBA Association. Nevertheless, the Association's resumes were either discarded, or placed in a circular file, or retained in isolated folders yielding lack of internal reference, and were provided less consideration than was provided advantage to Caucasians who benefit from the "tap on the shoulder" program.

71.    This pattern of unequal assignments, pay, training, and advancement opportunities and "tap on the shoulder" policy added to the hostile work environment experienced by African American employees, and was not the result of random or non-discriminatory factors. Rather, it is the result of the formal and informal on-going, systemic, and continuous pattern and practice of discrimination in assignments, pay, training, and promotions, and reliance on policies and practices that are discriminatory and hostile against African American employees.

72.    The "tap on the shoulder" program encouraged Caucasian employees to select Caucasian applicants often less qualified than potential African American applicants, and at times, before the position is posted. The Caucasian applicant is pre selected for the position before the posting. In some instances the position is posted for five days, often after a Caucasian was selected. African Americans who applied to the posted position are forced to be late in applying, or are taken through a "sham" interview process, that results in their not being hired, or assigned, or promoted. McGraw-Hill encouraged, promoted, and fostered these methods knowing that McGraw-Hill had a discriminatory and hostile work environment against African American new hires, applicants, and employees, and existing employees that seek a change in job assignment, re-assignment or promotion within the company.

73.    Plaintiffs were informed and believe that such policies and practices are examples of the hostile discriminatory work environment against African Americans and include, without limitation, the following:

(a)    Failure to consistently post job and promotional openings to ensure that all employees have notice of and a fair and equal opportunity to seek advancement or more desirable assignments and training;

(b)    Reliance upon poorly weighted or questionably weighted, arbitrary and subjective criteria utilized by nearly all Caucasian managers, and high ranking supervisors in making assignments, training, pay, performance reviews and promotional decisions. Even where McGraw-Hill policy states objective requirements, these requirements are often applied in an inconsistent manner and ignored, or manipulated, at the discretion of management to affect the outcomes.

( c)    Reliance on race stereotypes in making employment decisions such as hiring, assignments, promotions, pay and training;

(d)    Pre-selection and grooming of Caucasians for advancement, favorable assignments, protection, and training;

(e)    Maintenance of largely race-segregated job categories and departments;

(f)    Deterrence and discouragement of largely African Americans from seeking advancement, training, and favorable assignments and pay;

(g)    Paying African American employees lower compensation than similarly situated Caucasian employees;

(h)    Assigning African Americans to lower paying positions, and lower levels of pay within Grade Range, and with lesser advancement potential than those given to

20

Caucasians, and advancing Caucasians quicker than similarly situated African Americans;

(i)     Providing African Americans less training and support or mentoring than that given to Caucasian employees and managers;

(j)     Harassing African Americans and subjecting them to a hostile work environment;

(k)     Retaliation and retaliation harassment against African Americans who have tried to correct McGraw-Hill's discriminatory policies, or who have complained either internally or externally about McGraw-Hill's treatment of McGraw-Hill's African Americans, and potential African American new hires.

74.     African Americans received disproportionately lower performance evaluations by the largely Caucasian supervisors and managers who supervise them. A performance evaluation of a #2 is cited by McGraw-Hill management as a basis for "managing the employee out" of the Company.  If the African American employee refused to accept a forced resignation, that employee was placed on a Performance Improvement Program (PIP).  This PIP program is largely subjective by the same managers and supervisors who issued the initial low rating.  A disproportionate number of African American employees rated #2 and who are on PIP programs are discharged.  Whereas, predominantly Caucasian employees rated #2 on a PIP program retain their employment or seek an Advocate to get "tapped on the shoulder" to remain employed or reassigned. African American employees are compelled to resign and sign EEO and Title VII releases waiving their civil rights.

75.     Caucasians in higher grade level positions receive or have the opportunity to receive, bonus plans, often between $33,000.00 to $55,000.00 dollars, stock options, restricted stock, and other benefits and conditions of employment (ie., training, mentoring, reward

programs, and advancement opportunities) that are not enjoyed by a vast number of African American employees.

76.    African American applicants "for hire," and African American employees are openly discouraged from applying to positions for which they are qualified. They are often required to overcome artificial barriers that Caucasians are not required to overcome. They are advised by Caucasian supervisors and managers that they need not apply, or the qualifications for a position are tailored to meet the qualifications of a known and pre selected Caucasian candidate, or the position is filled before they have an equal and fair opportunity to apply.

77.    African American employees are subjected to racist and hostile remarks, retaliation, and retaliation harassment for complaining, and forced resignations or termination. In this regard African Americans suffer discriminatory treatment in the employment context, and interruption of their careers.

78.    McGraw-Hill, despite the presence of an expanding workforce of qualified African Americans with Associate, Bachelor and Masters Degrees from recognized colleges, maintains McGraw-Hills' policies, practices, and programs heighten the sense of hostility towards African American employees; discourages African American applicants; and denied African American employees the substantial number of employment opportunities and promotions at McGraw-Hill.

79.    During the period of this litigation, prior to the filing of the EEOC Charge in this matter, McGraw-Hill had failed, and otherwise refused to conduct an equal employment opportunity (non-discrimination) training program, conduct investigations of the numerous complaints made by African American employees of race discrimination, hostile work environment, and denial of fair and equal employment opportunities, or monitor its programs. McGraw-Hill had otherwise ignored the discrimination and hostile environment of its practices

22

and policies on African Americans and had failed and refused to take action to prevent, protect, and/or stop the Company's continuous illegal conduct towards Plaintiffs.

80.    At all the times hereinafter required and during Plaintiffs' employment, the Company's high ranking officials, supervisors, agents, and co-employees of McGraw-Hill, acting on behalf of the Company, had the highest power to recommend and implement policy affecting the terms and conditions of employees under their jurisdiction and with the requisite authority, to assure OFCCP and EEO compliance, and to discipline personnel and recommend and influence employment action against an employee that violates those assurances under their jurisdiction.

81.    From in or about January 2003, up to including the filing the EEOC Charge in this matter, thereafter, and prior thereto, on a continuous basis, McGraw-Hill's working environment was set up so as to preclude or prevent African Americans from advancing in the Company maintaining "glass walls" and "glass ceilings."

82.    McGraw-Hill's recruiting, promotion, and assignment process through, to, and including African American's employment termination and discriminatory actions, pervade the employment process, thus creating a discriminatory policy, and pattern of practice; for example,

(a)    McGraw-Hill's recruitment practices targets universities that historically have a low number of African American graduates/population;

(b)    McGraw-Hill's recruitment practices ignore Historically Black Colleges that have a higher number of African American graduates, and post-graduates/population;

(c)    When and if the McGraw-Hill's staff attends targeted diversity events, for example, the National Black MBA Association's national and local chapters, McGraw-Hill does not follow up or hire qualified African American candidates/applicants from that program;

23

83.     Furthermore, the discriminatory and hostile practices continue through the retention and promotion stages and include for example:

(a)     African Americans (males/females) suffer less frequent in-grade promotions or wage increases;

(b)     African Americans (males/females) suffer less training and/or mentoring;

(c)     African American employees are less regarded than Caucasian employees. African American employees who "advocate" for, or refer for hire, a qualified African American candidate is less regarded than a Caucasian employee who advocates or refers a Caucasian candidate;

(d)     Caucasian employees are permitted to go through informal channels (*i.e.*, the "tap on the shoulder" route to success) that greatly increases their chances of being hired, whereas African Americans are compelled to go though the formal channels, hence decreasing their opportunity to be hired or promoted;

(e)     Caucasian employees who are "managed out" or voluntarily resign are more often replaced by Caucasians, whereas, African Americans who are "managed out" or voluntarily or forced to resign are replaced by non-African Americans;

(f)     In Human Resources, in particular, African American women are "managed out" with greater frequency then Caucasian women, even though there are a greater number of Caucasian women in Human Resources as compared with the number of African American women, for example;

(i)     Caucasian managers in S&P have the opportunity to do their own recruiting, rather than allowing the H.R. to recruit employees. As a result, Caucasian managers tend to more frequently hire other Caucasians rather than African Americans or set limits on the number of Black employees;

24

(ii)    Qualified African Americans are denied promotions more frequently than equally or less qualified Caucasians;

(iii)    If an African American is hired to a marginally elevated position or promoted in a Department, then Caucasians in that Department express the attitude that the hire or promotion was "race-based," and therefore the African American has no merit and not worthy of hire or promotion, thus reflecting a pervasive attitude and stereotype that substantiate African American's belief that they are less valued employees than their Caucasian counterparts;

(iv)    African American (male/female) employees are not included in outside social events that are necessary for career advancement (e.g., drinks at the Bars, golf, mixers and to their homes) that Caucasian employees attend organized by Caucasian managers or directors;

(v)    African Americans suffer a severe adverse impact in levels of Level 22 and above and corporate-wide. Caucasian executives or managers are in the position to hire, promote, discipline and evaluate employee performances for merit salary increases, stock options and other benefits, that result in a severe adverse impact to African Americans;

(vi)    African Americans are discouraged from applying for promotions, or told that they are less qualified by reason of a "lack of a particular competency," while a Caucasian, who "lacks the same competency," is given the promotion;

(vii)    Caucasians are often promised positions, and African Americans are not. As a result, African Americans are advised not to apply for certain positions, or are otherwise discouraged from formally applying, and therefore fall through the tracking system;

25

84.    Further, African American employees have been subjected to a variety of racist remarks by the Caucasian, high ranking officials, and Vice Presidents of Human Resources, including, for example:

(a)    African Americans in New Jersey are not hired because they do not own cars; (b) Black women should resolve their own problems; ( c) As long as I continue to look good I don't care what happens to those Black women; (d) Do you (Black employee) expect to make as much as a "White man;" (e) I am not going to hire another Black woman; (f) I would not hire someone like them, referring to Black employees; (g) She was hired because she was Black; (h) She was promoted because she was Black; (i) We hired her (Black) to look good for the numbers; (j) Those persons (Blacks) should be happy that they have a job [referring to (African American student interns)]; (k) References were made by management to employees of "modern day lynching;" (l)  In response to complaining of discrimination "You are going to be forced to rot in your job, you will not get a promotion, and it's going to be like your in jail without a key; (m) Your people (Blacks) won't come to support you; (n) Blacks create problems for Blacks;(o) The Affinity Group Blacks will burn down the building [a reference to the slaves that rose up against the Masters quarters and burned down their homes]; (p) Executive V. P. of Human Resources said he that your complaints are a Black eye on the Department and he will block any promotion. (q) Caucasian Director in Human Resources said everyone in your position [referring to managers in H.R. in S&P] was set up to fail. He named persons of color [Caucasian manager was promoted].

85.    Upon information and belief, African American employees, including Human Resource personnel, have made formal and informal complaints in regard to the above hostile and discriminatory matters, and other unfair treatment and inequities, in different contexts including, but not limited to: during exit interviews; during "one-on-one" meetings; in group

meetings, and directly to Harold McGraw, CEO and President, David Murphy, Executive Vice President of Human Resources; Sara McAuley, Vice President of Human Resources; Richard Fisher, Vice President of Human Resources; Sheila O'Neal, Vice President of Human Resources, and other high ranking officials, managers, and Human Resource personnel.

86.    Despite said complaints, the Company had failed to take any action to remedy these violations or properly investigate these complaints.

87.    Though McGraw-Hill was, and is aware, of the many problems presented by African Americans as herein, and hereinabove identified, the Company did not change its practices or implement recommendations made by many African American employees, or provide economic or leadership support to McGraw-Hills African American employees who sought to make a change from within. McGraw-Hill's reaction was to retaliate and harass those African American employees who complained.

88.    As a result, African American employees and particularly the Plaintiffs had been caused to suffer economic loss and damage, loss of compensation and other benefits, loss of merit and wage increases, stock options, pension contribution benefits, loss of back pay, and front pay damages, and emotional damages and injuries, humiliation, embarrassment, loss of enjoyment of life.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (42 U.S.C. § 2000e et seq. Discrimination)

89.    Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "88" of this Complaint as if fully set forth herein.

90.    This claim is brought on behalf of all Plaintiffs.

91.    Under **42 U.S.C. § 2000e et seq.**   That Title VII of Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., provides in pertinent part that it is unlawful to:

(1) fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
   "

92.     At all relevant times herein, Plaintiffs and McGraw-Hill were parties to an implied employment contract.

93.     At all relevant times herein, Plaintiffs were qualified to work for McGraw-Hill.

94.     McGraw Hill has created a hostile, discriminatory, and retaliatory work environment against the Plaintiffs, and other African American employees.

95.     McGraw Hill adversely discriminated against the Plaintiffs, and had created a system of employment that denied African Americans the same fair and equal opportunities for job assignments, upward mobility and compensation afforded to similarly situated Caucasian employees.

96.     The Defendant's discriminatory practices described above have denied the Plaintiffs equal terms, conditions and privileges of employment, and failed to afford Plaintiffs, the full and equal benefit of the laws by reason of Plaintiffs' race or color.

97.     Defendant has thus interfered with Plaintiffs' ability to contract with the Company and have deprived them of the full and equal benefits of laws and proceedings.

98.     By and through their course of conduct, Defendant and its agents, employees or servants violated Title VII, 42 U.S.C. § 2000e et seq.

99.     As a result of Defendant's hostile and discriminatory conduct, Plaintiffs, and others similarly situated, have suffered damages and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continue to suffer physical,

28

mental and emotional distress, embarrassment, humiliation, and damage taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff, and great expense in an amount to be determined by a jury at trial.

100.   Defendant's conduct complained of herein was purposeful, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiffs' rights, and accordingly, Plaintiffs, and all those similarly situated, are entitled to recover both compensatory and punitive damages from Defendant as well as attorneys' fees, expert fees, costs and disbursements.

101.   Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages.

### AS AND FOR THE SECOND CAUSE OF ACTION
#### (42 U.S.C. § 2000e et seq. Retaliation)

102.   Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "101" of this Complaint as if fully set forth herein.

103.   Defendant denied Plaintiffs equal terms, conditions, and privileges of employment, and failed to afford them full and equal benefits of laws and proceedings in retaliation for their complaints about race and color discrimination.

104.   Defendants retaliated against Plaintiffs, and other African Americans for complaining that their equal employment opportunity rights have been violated, created retaliatory harassment and threatened to retaliate against them for complaining. By creating a hostile work environment that creates fear in those who do complain about discrimination and retaliation, and in denying them, and others similarly situated, equal employment opportunity in respect to their terms and conditions of employment; work assignments, evaluations, promotions, benefits, and more particularly for creating artificial barriers and hurdles to a fair and equal employment opportunity, Defendants violated Plaintiffs' rights, and the rights of others similarly situated.

29

105.   By and through their course of conduct, Defendant and its agents, employees or servants violated Title VII, 42 U.S.C. § 2000e et seq.

106.   As a result of Defendant's retaliatory conduct, and retaliatory harassment, Plaintiffs have suffered and continued to suffer loss of employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer physical, mental and emotional distress, embarrassment, humiliation, and damage to their reputation, and great expense in an amount to be determined by a jury at trial.

107.   Defendant's conduct complained of herein was purposeful, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiffs' rights, and accordingly, Plaintiffs are entitled to recover both compensatory and punitive damages from Defendant, taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff as well as attorneys' fees, costs and disbursements.

108.   Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices unless and until this Court grants relief.

## AS AND FOR THE THIRD CAUSE OF ACTION
### ( 42 U.S.C. § 1981 et seq. Discrimination)

109.   Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "108" of this Complaint as if fully set forth herein.

110.   This claim is brought on behalf of all Plaintiffs.

111.   Under 42 U.S.C. § 1981(a), "all persons . . . shall have the same right . . . to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . ."

112.   At all relevant times herein, Plaintiffs and McGraw-Hill were parties to an implied employment contract.

30

113.   At all relevant times herein, Plaintiffs were qualified to work for McGraw-Hill.

114.   McGraw Hill has created and maintained a system of hiring, retaining and promoting McGraw-Hills employees which is very subjective and discriminated against African Americans.

115.   McGraw Hill had systemically, and adversely and purposefully discriminated against, the Plaintiffs, and has created a system of employment that denies African Americans the same fair and equal opportunities for job assignments, upward mobility and compensation afforded to similarly situate Caucasian employees.

116.   The Defendant's discriminatory practices described above have denied the Plaintiffs equal terms, conditions and privileges of employment, and failed to afford Plaintiffs, the full and equal benefit of the laws by reason of Plaintiffs' race or color.

117.   Defendant has thus interfered with Plaintiffs' ability to contract with the Company and have deprived them of the full and equal benefits of laws and proceedings.

118.   By and through their course of conduct, Defendant and its agents, employees or servants violated **42 U.S.C. § 1981** *et seq.*

119.   As a result of Defendant's discriminatory conduct, Plaintiffs, and others similarly situated, have suffered damages and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continue to suffer physical, mental and emotional distress, embarrassment, humiliation, and damage, taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff and great expense in an amount to be determined by a jury at trial.

120.   Defendant's conduct complained of herein was purposeful, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiffs' rights, and accordingly, Plaintiffs,

31

and all those similarly situated, are entitled to recover both compensatory and punitive damages from Defendant as well as attorneys' fees, expert fees, costs and disbursements.

121.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory practices unless and until this Court grants relief.

**AS AND FOR THE FOURTH CAUSE OF ACTION**
(42 U.S.C. § 1981 *et seq.* Retaliation)

122.    Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "121" of this Complaint as if fully set forth herein.

123.    Defendant denied Plaintiffs equal terms, conditions, and privileges of employment, and failed to afford them full and equal benefits of laws and proceedings in retaliation for their complaints about race and color discrimination.

124.    Defendants retaliated against African Americans for complaining that their equal employment opportunity rights have been violated, in creating retaliatory harassment, and threatening to retaliate against them for complaining, in creating a hostile work environment that created fear in those who did complain about discrimination and retaliation, and in denying them, and others similarly situated, equal employment opportunity in respect to their terms and conditions of employment; work assignments, evaluations, promotions, benefits, and more particularly for creating "glass walls," "glass ceilings," artificial barriers and hurdles to a fair and equal employment opportunity, and for retaliation for complaining about said conduct, all in violation of Plaintiffs' rights, and the rights of others similarly situated.

125.    By and through their course of conduct, Defendant and its agents, employees or servants violated 42 U.S.C. § 1981 *et seq.*

126.    As a result of Defendant's retaliatory conduct, Plaintiffs have suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and

32

has suffered and continues to suffer physical, mental and emotional distress, embarrassment, humiliation, and damage to their reputation, and great expense in an amount to be determined by a jury at trial.

127.    Defendant's conduct complained of herein was purposeful, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiffs' rights, and accordingly, Plaintiffs are entitled to recover both compensatory and punitive damages from Defendant, taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff as well as attorneys' fees, costs and disbursements.

128.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's hostile, discriminatory and retaliatory practices unless and until this Court grants relief.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (NYSHRL Discrimination: Race and Color)

129.    Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "128" of the Complaint as if fully set forth herein.

130.    Article 15 of the New York State Executive Law §296 *et seq* sets forth this State's Human Rights Law which encompasses a fundamental public policy against discrimination by establishing equality of opportunity as a civil right.

131.    Throughout the relevant time period, McGraw Hill has subjected the Plaintiffs to discriminatory treatment because of each individual's race or color, as set forth above, and denied Plaintiffs equal terms, conditions, and privileges of employment due to their race and color.

132.    By and through their course of conduct, Defendant and its agents, employees or servants violated the NYSHRL (New York State Executive Law § 296, et seq.) which makes it unlawful for an employer to discharge or otherwise discriminate against any individual with

33

respect to the terms, conditions or privileges of employment because of that individual's race or color.

133.    As a result of Defendant's discriminatory conduct, Plaintiffs have suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continues to suffer physical, mental and emotional distress, humiliation, embarrassment, damage to their reputation and great expense in an amount to be determined at trial.

134.    As a result of Defendant's hostile work environment Plaintiffs have suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and suffered and continues to suffer physical, mental and emotional distress, humiliation, embarrassment, damage to their reputation and great expense in an amount to be determined at trial.

135.    Defendant's conduct complained of herein was willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiffs' rights and, accordingly, Plaintiffs are entitled to recover back pay, compensatory damages, taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff, and such other and further relief in an amount to be determined at trial.

136.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory practices unless and until this Court grants relief.

### AS AND FOR THE SIXTH CAUSE OF ACTION
### (NYSHRL Retaliation)

137.    Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "136" of this Complaint as if fully set forth herein.

34

138. Defendant denied Plaintiffs equal terms, conditions, and privileges of employment, in retaliation for their complaints about race and color discrimination.

139. By and through their course of conduct, Defendant and its agents, employees or servants violated the NYSHRL which makes it unlawful for an employer to retaliate against an employee who opposed an employment practice made unlawful by the NYSHRL.

140. As a result of Defendant's retaliatory conduct and harassment, Plaintiffs have suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and have suffered and continue to suffer physical, mental and emotional distress, embarrassment, humiliation, anxiety, damage to his reputation, and great expense in an amount to be determined at trial.

141. Defendant's conduct complained of herein was purposeful, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiffs' rights, and accordingly, Plaintiffs are entitled to recover back pay, compensatory damages, taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff, and such other and further relief in an amount to be determined at trial.

142. Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices unless and until this Court grants relief.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### (NYCHRL Discrimination: Race and Color)

143. Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "142" of this Complaint as if fully set forth herein.

144. The New York City Administrative Code Sections 8-107(a) *et seq.* and 8-502 *et seq.* makes it unlawful to discriminate against an employee in the terms, conditions or privileges of employment on the basis of race or color.

35

145.   The Administrative Code makes it unlawful to violate any provision of the Administrative Code or to aid, abet, incite, compel or coerce the doing of any of the forbidden acts, or to attempt to do so.

146.   Defendant is liable under the New York City Administrative Code because it and its agents participated in, or aided, abetted, incited, compelled or coerced the doing of the acts of discrimination as alleged herein.

147.   As a result of Defendant's violation of the New York City Administrative Code, Plaintiffs have suffered damages consisting of loss of income and other compensation, in an amount to be determined by a jury at trial.

148.   Plaintiffs are also entitled to recover attorney's fees, costs and expenses.

149.   Defendant's conduct complained of herein was purposeful, willful, malicious, oppressive, wanton and heedlessly in disregard of Plaintiffs' rights, and accordingly, Plaintiffs are entitled to recover both exemplary and punitive damages taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff, from the Defendant.

150.   Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices unless and until this Court grants relief.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### (NYCHRL Retaliation)

151.   Plaintiffs reiterates and realleges each and every allegation contained in paragraphs "1" through "150" of this Complaint as if fully set forth herein.

152.   Defendant denied Plaintiffs equal terms, conditions, and privileges of employment, in retaliation for their complaints about race and color discrimination.

153. · By and through their course of conduct, Defendant and its agents, employees or servants violated the NYCHRL which makes it unlawful for an employer to retaliate against an employee who opposes an employment practice made unlawful by the NYSHRL.

154. As a result of Defendant's retaliatory conduct and harassment, Plaintiffs have suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and have suffered and continue to suffer pain and distress, embarrassment, humiliation, and loss of enjoyment of life.

155. Defendant's conduct complained of herein was purposeful, willful, malicious, oppressive, wanton, and heedlessly in disregard of Plaintiffs' rights, and accordingly, Plaintiffs are entitled to recover back pay, compensatory damages; recover of attorney's fees, costs and expenses, exemplary and punitive damages, taking into consideration the net tax effect in the amount of ten million ($10,000,000.00) dollars for each Plaintiff, and such other and further relief in an amount to be determined at trial.

156. Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices unless and until this Court grants relief.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for relief and that a judgment is entered against Defendant as follows:

a. For Plaintiffs' individual, claims, all damages they have sustained as a result of defendant's conduct, including back pay, front pay, general and specific damages for lost compensation and job benefits they would have received but for the discriminatory practices of the defendant, damages for emotional distress, and punitive damages, according to proof;

37

b.      Exemplary and punitive damages in an amount commensurate with Defendant's ability to pay and to deter future conduct;

c.      A preliminary and permanent injunction against Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in unlawful practices as alleged herein, including, but not limited to Defendant's practice of unlawful employment hiring, advancement and retention practices;

d.      A declaratory judgment that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. §2000e et seq. (Title VII)(as amended); 42 U.S.C. §1981; New York State Executive Law §296 *et seq*; The New York City Administrative Code Sections 8-107(a) *et seq.* and 8-502 *et seq.*;

j.      An adjustment of wage rates and benefits, including stock options and other benefits for Plaintiffs to that level which Plaintiffs would have enjoyed but for the Defendant's discriminatory practices;

k.      An Order requiring Defendant to implement policies and procedures sufficient to prevent and address unlawful conduct in the future;

l.      On the First and Second Cause of Action under 42 U.S.C. §2000e et seq. (Title VII)(as amended for discrimination based upon race, a money judgment representing compensatory damages, back pay, front pay, and other employment benefits, together with interest on said amounts, and punitive damages in an amount to be determined by a jury at trial, and liquidated damages for Defendant's willful violation of 42 U.S.C. §2000e et seq. (Title VII)(as amended); on the basis of race and color discrimination, plus attorney's fees, expert fees, interest, costs and disbursements;

38

m.    On the Third Cause of Action under 42 U.S.C. § 1981 *et seq.* for discrimination based upon race, a money judgment representing compensatory damages, back pay, front pay, and other employment benefits, together with interest on said amounts, and punitive damages in an amount to be determined by a jury at trial, and liquidated damages for Defendant's willful violation of 42 U.S.C. § 1981 *et seq.* on the basis of race and color discrimination, plus attorney's fees, expert fees, interest, costs and disbursements;

n.    On the Fourth Cause of Action for retaliation under 42 U.S.C. § 1981 *et seq.*, a money judgment representing compensatory damages, back pay, front pay, and other employment benefits, together with interest on said amounts, and punitive damages in an amount to be determined by a jury at trial, and liquidated damages for Defendant's willful violation of 42 U.S.C. § 1981 *et seq.* on the basis of race and color discrimination and retaliation, plus attorney's fees, expert fees, interest, costs and disbursements;

o.    On the Fifth Cause of Action under the Court's supplemental jurisdiction for violation of the New York State Human Rights Law on the basis of race and color discrimination, a money judgment representing back pay, front pay and other employment benefits, together with interest on said amounts, and other compensatory damages in an amount to be determined at trial, expert fees, with interest, costs and expenses;

p.    On the Sixth Cause of Action under the Court's supplemental jurisdiction for violation of the New York State Human Rights Law, by retaliation for Plaintiff's opposition to Defendants' race and color discrimination, a money judgment representing back pay, front pay and other employment benefits, together with interest on said amounts, and other compensatory damages in an amount to be determined at trial, plus expert fees, with interest, costs and expenses;

39

q.    On the Seventh Cause of Action for under the Court's Supplemental Jurisdiction for violation of the New York City Human Rights Law by discrimination and retaliation based on race, a money judgment representing back pay, front pay and other employment benefits, together with interest on said amounts, and other compensatory damages and punitive damages, in an amount to be determined at trial, plus attorneys' fees and expert fees, with interest, costs and disbursements; and

r.    On the Eighth Cause of Action for under the Court's Supplemental Jurisdiction for violation of the New York City Human Rights Law by discrimination and retaliation based on race, a money judgment representing back pay, front pay and other employment benefits, together with interest on said amounts, and other compensatory damages and punitive damages, in an amount to be determined at trial, plus attorneys' fees and expert fees, with interest, costs and disbursements; and

s.    Costs incurred, including reasonable attorneys' fees, including Pre- and post-judgment interest, as provided by law; and

t.    Award such other and further relief, including a special master, as this Court may deem appropriate and any equitable, including injunctive and declaratory relief as may be required in the interests of justice.

DATE: July 16, 2007
     Great Neck, New York

                    Respectfully submitted,
                    By:
                    Solotoff & Solotoff*
                    Lawrence Solotoff (LS1356)
                    Cheryl Solotoff (CS3031)
                    *Attorneys for Plaintiffs Jannie Pilgrim, Giovanna Henson, Jesan Spencer, and Brenda Curtis

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

By: Lawrence Solotoff (LS1356)

40