# EXHIBIT M TO THE JUNE 26, 2008
# DECLARATION OF GREGORY I. RASIN, ESQ.

*U.S.GPO:1991-0-295-869/40500

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

| ENTER CHARGE NUMBER |
| --- |
| ☐ FEPA |
| ☒ EEOC  160-2006-01030 |

_____ and EEOC

NYSDHR & NYCCHR
(State or local Agency, if any)

NAME (Indicate Mr., Miss, or Mrs.)
MS. JOAN SYMOR

HOME TELEPHONE NO. (Include Area Code)
914-476-1897

STREET ADDRESS  404 RORAHWOD AVE   CITY, STATE AND ZIP CODE  YONKORS, N.S.  10704   COUNTY

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME
THOMBSAND BELL COMPANIES

NO. OF EMPLOYEES/MEMBERS
15+

TELEPHONE NUMBER (Include Area Code)
212-714-2300

STREET ADDRESS  1221 AVENUES OF ANNERICAS, N.S. 10020

NAME                                    TELEPHONE NUMBER (Include Area Code)

STREET ADDRESS                          CITY, STATE AND ZIP CODE

CAUSE OF DISCRIMINATION BASED ON (Check appropriate boxes)
☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ AGE  ☐ RETALIATION  ☒ OTHER (Specify)  SYSTEMIC

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
12/14/05

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

* SEE ADDENDUM ATTACHED
On behalf of others similarly situated.

[stamp] RECEIVED JAN 4 2006

☐ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

LAWRENCE SOLOTOFF
Notary Public, State of New York
No. 06926
Qualified in Nassau County
Commission Expires October 31, 1997

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT  12/14/05

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE

D03412

415 GPO 1991 0-205-460-41494

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

ENTER CHARGE NUMBER

☐ FEPA

☒ EEOC  160-2006-01031

NYSDHB & NYCCHR
(State or local Agency, if any)  **

and EEOC

| NAME (Indicate Mr., Ms., or Mrs.) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| MS Jannie M. PILGRIM, Giovanna Henson | 908-955-4275 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 66 Hillside Lane   Holland NJ 08848 | | Hunterdon |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| The McGraw-Hill Companies | 15+ | 212-714-2370 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 1221 Avenue of the Americas | 10020 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate boxes(es))

☒ RACE  ☒ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ AGE  ☒ RETALIATION  ☒ OTHER(Specify) Systemic

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)
12/8/05

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

☀ See the addendum attached.
on Behalf of others similarly situated.

[stamp: RECEIVED]

** OTHER of Matters complaints
Giovana Henson
206 w148th street   (212)491-4839
Apt 10
New York, NY 10039

Brenda Curtis   1-718-292-2324
1020 Elton St., Unit #B, B'klyn, N.Y. 11208

I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

NOTARY – When necessary to meet State and Local Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT
Jannie M [signature]

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, and year)
3/17/06

LAWRENCE SOLOTOFF
Notary Public, State of New York
No. 9105076
Qualified in Nassau County
Commission Expires October 31, 2005

[signature] Charging Party

278

## EEOC CHARGE ADDENDUM

Claimants Jannie Pilgrim ("Pilgrim"), Giovanna Henson ("Henson"), Rene DuBose ("DuBose"), Jesan Spencer ("Spencer"), Brenda Curtis ("Curtis") (collectively, "Claimants"), by and through their attorneys, Solotoff& Solotoff and Farrell Fritz, P.C., as and for their Charge, and on behalf of all others similarly situated, against respondent The McGraw-Hill Companies, Inc. ("McGraw-Hill" or the "Company"), allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as to which allegations they believe substantial evidentiary support will .exist after a reasonable opportunity for further investigation and discovery as follows:

### INTRODUCTION

1.    Claimants bring this charge on behalf of all African Americans (males and females) who are or were employees or applicants for employment of McGraw-Hill during the period from in or about January 2003 through to the present date, and prior thereto. This work force is less than 10% of the entire work force. Over 90% of the work force in the United States is Caucasian males and females. African American employees and persons of color in large measure have college degrees and Masters Degrees as the named Claimants, yet they are predominantly assigned to the lowest paying positions with the least chance of advancement, or terminated with disruption to their careers. This disparate distribution of the races is the result of purposeful discrimination and of practices that serve no reasonable business purpose yet have a disproportionate impact on African Americans.

2.     This Charge is accordingly brought by present and former McGraw-Hill employees on behalf of themselves and all other similarly situated African American men and women, persons of color, who have been subjected to McGraw-Hill's continuing policies and practices of race discrimination. Claimants, and those that they represent, charge that McGraw-Hill discriminates against McGraw-Hill's African American employees by hiring and advancing Caucasians more quickly than African Americans, by denying persons of color equal job assignments, promotions, training and compensation, and by retaliating against those who oppose McGraw-Hill's unlawful practices.

3.     Claimants file this Charge seeking equitable relief, and monetary damages under 42 U.S.C. §1981 *et seq.*; Title VII, 42 U.S.C. §2000e et seq.; the New York State Human Rights Law, Executive Law §296 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code the City of New York, §8-107(a) *et seq.* and §8-502 *et seq.*; for purposeful discrimination and practices, and for malice and reckless disregard for the federally protected rights of the Claimants, and those they represent, and for violation of applicable rules and regulations prohibiting discrimination in the employment context, to redress the violation of Claimants' rights by respondent, and for the deprivation by respondent of various terms, conditions, and privileges of Claimants' employment due to Claimants' and the members they represent's race and color.

4.     The McGraw-Hill Companies (hereinafter "McGraw-Hill" or "Respondent" or "Employer") is one of the largest global publishers in the field of education, finance, and business analysis, risk assessment, and energy information and services, textbooks, aviation, aerospace, and the defense market. McGraw-Hill employs

2

280

over 17,000 employees. They are the largest global information provider which includes education, finance, aviation, and media. They are one of the largest publishers of non-fiction text books from elementary to college level, from traditional text books to the largest in on-line and multi-media learning. McGraw-Hill helps teachers teach and learners learn. McGraw-Hill is also in the financial services industry, they are the world's foremost provider of independent credit ratings, indices, risk evaluation, investment research, data, and evaluations. They provide investors with independent bench marks that make them confident about their financial decisions. Business Week is a leading global resource of ground breaking news and analysis in a fast changing business world. McGraw-Hill's a cross print, television and online media company. McGraw-Hill provides essential insight that provides competitive edge to business leaders and consumers.

5.    McGraw-Hill is one of the largest global publishers in the field of education, finance and business analysis, risk assessment and energy information and services, textbooks, aviation, aerospace, and the defense market. McGraw-Hill is also in the financial services industry, and serves as the foremost provider of independent credit ratings, indices, financial risk evaluation, investment research, data, and evaluations through McGraw-Hill's Standard & Poor's Division ("S&P"). S&P, for example, provides investors with independent bench marks that make them knowledgeable and confident about their financial decisions.

6.    As employer McGraw-Hill was at all times herein, responsible personally and individually, as employer, for the acts of McGraw-Hill's principals, officers, supervisors, directors, agents, and/or co-employees, and more particularly, for the acts of

3

the employers, managers, officers, directors, supervisors, aiders and abettors, and co-employees, individually, and personally at McGraw-Hill's principal place of business and offices located in the United States and around the world.

7.    At all the relevant time periods herein required, McGraw-Hill employed approximately 17,000 employees of which approximately 1500 employees were/are African Americans (male and female) on a per year basis.  On average, over the course of the last five (5) years, on a per year basis, less than ten (10) per cent of the work force was/is African American. Yet less than a small fraction of *"Grade Level #22"* and above, managers and executives in these positions, are held by African Americans. Less than two (2%) percent of approximately over 500 positions of *"Grade Level #22"* and above are held by African Americans. African Americans are predominantly assigned to the lowest grade level positions with the least chance of advancement.  Over Ninety-Five (95%) percent of *"Grade Level #22"* and above managerial positions, are held by Caucasians. This disparate distribution of the races is a result of purposeful discrimination and practices that serve no reasonable business purpose and yet have a disproportionate discriminatory impact on African Americans.

8.    At all the relevant time periods herein required, less than a small fraction of African Americans receive an overall performance evaluation rating of four (4) or above.   African Americans are predominantly evaluated with lower performance evaluation ratings than Caucasians. Moreover, as a result of the poor evaluation ratings a disproportionate number of African Americans are "managed out" of their jobs, receive lower wages, lower wage or merit increases, and less employee benefits than their Caucasian counterparts, and have less of an opportunity to retain employment or gain

4

advancement. This disparate distribution of the races as to performance and benefits is a result of purposeful discrimination and discriminatory practices that serve no reasonable business purpose yet have a disproportionate discriminatory impact on African Americans.

9.    At all the relevant time periods herein required, less than a small fraction of African Americans receive promotions. African Americans are predominantly denied promotions though they are equally qualified or greater qualified than Caucasians who receive the promotions or are hired from outside of the firm.  This disparate distribution of the races as to promotion is a result of purposeful discrimination and discriminatory practices that serve no reasonable business purpose yet have a disproportionate discriminatory impact on African Americans.

10.    This Charge is brought by present and former McGraw-Hill employees on behalf of themselves and all other African Americans and persons of color (male and female) similarly situated.  McGraw-Hill has a pattern and history of discriminating against African American applicants for employment and McGraw-Hill's African American employees, *inter alia*: by discouraging qualified African Americans employment; by refusing and not hiring qualified African Americans employment; by advancing Caucasian employees more quickly than African American employees; by denying African American employees equal job assignments, promotions, training and other terms and conditions of employment; and by causing African Americans to suffer a hostile work environment within the Company; and by retaliating against those who oppose McGraw-Hill's unlawful practices.

11.    This Charge is brought by present and former McGraw-Hill employees on behalf of themselves and all other African Americans similarly situated. McGraw-Hill has a pattern and history of discriminating against African American employees; *inter alia*, who have been subjected to McGraw-Hill's continuing policies and practices of illegal discrimination by reason of race and color in compensation and terms and conditions of employment, including, for example, stock options, bonuses, incentives, wage and merit increases and other employment benefits.

12.    This Charge seeks an end to McGraw-Hill's discriminatory practices, make whole relief for the Claimants, the class, and punitive damages.

## PARTIES
## THE NAMED CLAIMANTS

13.    Pilgrim is an African American woman and a resident of the State of New Jersey. Pilgrim was first employed in 2000. She is currently employed as a *Human Resource Manager* in McGraw-Hill's Standard & Poor's (hereinafter "S&P") Division of the Company.

14.    Henson is an African-American woman and a resident of the State of New York. Henson was first employed in 1997. In or about March 2001 she was employed as a *Human Resource Coordinator* in McGraw-Hill's Corporate (hereinafter "Corporate") - Human Resources Department. She was employed by McGraw-Hill to August 2005.

15.    DuBose is an African American woman and a resident of the State of New York. DuBose is currently *Director of Human Resources* of McGraw-Hill's PLATTS Division (responsible in part for oil and energy information and media services) she is responsible for Human Resources on a global basis involving employees in the United

6

States, Singapore, Hong Kong, Tokyo and London in connection with PLATTS. She is currently employed.

16.    Spencer is an African American woman and a resident of Yonkers, New York. Spencer was first employed in December 2000. She is a *Senior Manager of Human Resources* in McGraw-Hill's Business Information and Media Services (hereinafter "IMS"), responsible in part for McGraw-Hill's publication of the "Business Week" magazine. She is currently employed.

17.    Curtis is an African American woman and a resident of Brooklyn, New York. Curtis was first employed in 2002. More recently she was employed as an Office Manager McGraw-Hill Security Services at S&P. She was terminated from her job on October 3, 2005. She is currently unemployed and ready, willing, and able to work for McGraw-Hill. Plaintiff is informed and she believes that she is eligible for rehire.

<u>THE RESPONDENT</u>

18.    Upon information and belief, McGraw-Hill is a domestic corporation, incorporated under the laws of the State of New York with its principle place of business at 1221 Avenue of the Americas, New York, New York 10020.

19.    Upon information and belief, McGraw-Hill is one of the largest global publishers in the field of education, finance, and business analysis, risk assessment, and energy information and services, textbooks, aviation, aerospace, and the defense market, with over 17,000 employees world-wide. McGraw-Hill executed assurances that McGraw-Hill would comply with anti-discrimination and anti-retaliation statutes.

20.    McGraw-Hill posted revenues of more than Five (5) Billion Dollars in 2004.

7

21.    As an employer it was at all relevant times herein, responsible personally and individually, for the acts of McGraw-Hill's principals, officers, supervisors, directors, agents, and/or co-employees, and more particularly, for the acts of the employers, managers, officers, directors, supervisors, aiders and abettors, and co-employees, individually, and personally at its principal place of business and offices located in the United States around the world.

22.    Upon information and belief, on average, over the course of the last five years, on a per year basis, less than ten (10) per cent of the work force was/is African American.

23.    At all relevant times herein, McGraw-Hill has been present and has regularly done and/or transacted business in this Region and State.

## FACTUAL ALLEGATIONS AS TO THE NAMED CLAIMANTS

## PILGRIM:

24.    Pilgrim has a Masters Degree in Human Resource Management, and a post graduate degree in Training and Development.

25.    Pilgrim has been employed by McGraw-Hill since March 2000 and was promoted to her current position as a Grade Level #18, Human Resource Manager in the Standard & Poor's ("S&P") Division of the Company.

26.    In or about October 2004 Pilgrim created an ad-hoc voluntary African American Affinity Group (hereinafter "Affinity Group") consisting of approximately 15 African American employees from throughout the McGraw-Hill organization, and from around the country, to seek support from management to provide mentoring, a recruitment strategy to improve the recruitment of African Americans into the Company,

8

to encourage African American employees to support each other to over come the "tap on the shoulder" practices that benefit Caucasian employees through out the Company, and to overcome the adversity suffered by African Americans in compensation, performance evaluation, recruitment and retention.

27.    In 2004 the Affinity Group sought financial and organizational support from the McGraw-Hill Director of EEO and Diversity. The Affinity Group also reached out to the McGraw-Hill Senior Director of IMS Human Resources. The Affinity Group met with McGraw-Hill Human Resources management a few times, and expressed their concerns about the policies and practices affecting African American employees and diversity training. Management did not provide a senior manager to address the issues presented or provide the necessary funds to support a change in the practices presented by the Affinity Group. Pilgrim was told by the McGraw-Hill Director of EEO and Diversity that the African American Affinity Group "was not the flavor of the month" and said "If you ever repeat this, I will deny it." The African American Affinity Group disbanded.

28.    Thereafter, in 2004 Pilgrim co-founded a Diversity Council (hereinafter "Council") at the S&P Division of McGraw Hill.  The Council was initially organized to review data and formulate diversity recruitment strategies and develop talent acquisition strategies in the effort to help recruit and change policies and practices on diversity for all minorities, including African Americans. Nevertheless, the Council did not focus on the concerns of African Americans.

29.    The Council did find however, minorities, including African Americans' opinions were not valued; African Americans are discouraged from encouraging other African Americans from working at McGraw-Hill because of how their treated; African

9

Americans do not participate in decision making and consistently report less favorable interaction with their managers; African Americans feel that they are not rewarded for superior performance and not paid fairly; and African Americans are not encouraged to take on more responsibilities that would lead to promotions.

30.     In 2005 Pilgrim complained that the recruitment strategies were ineffective for recruiting African Americans.

31.     Pilgrim also complained about racist comments directed at her and concerning other African Americans made by her (Caucasian) supervisor, a Vice President of Human Resources. Shortly thereafter, Pilgrim was retaliated against and thrown off the Council and her work responsibilities were diminished and reduced to clerical functions. African American representation on the Council was also significantly reduced.

32.     Pilgrim was informed and believes the issue of the lack of diversity, particularly African Americans, was brought to the attention of David Murphy (hereinafter "Murphy"), (Caucasian) Executive Vice President of McGraw-Hill Human Resources at central headquarters. Murphy acknowledged that he was aware of the diversity problems and was advised of the problem many times. In 2004, for example, at a Talent Acquisition meeting including senior management, Murphy announced to recruiters and human resource personnel and upper management that McGraw-Hill "does not hire African Americans from New Jersey because African Americans do not have cars." At the same meeting (Caucasian) Vice President of Talent Acquisition announced that the internal referral program [or "tap on the shoulder" program] has an adverse impact on diversity and minorities [including African Americans].

10

33.    Upon information and belief, McGraw-Hill was, and is, aware of the many problems affecting African American employees as herein identified, the Company did not change its practices or implement recommendations made by many African American Human Resource employees, including Pilgrim [see herein further Henson, DuBose, Spencer and Curtis], or provide economic support or leadership to accomplish the efforts of many of McGraw-Hills African American employees who sought to improve the employment opportunities of African American employees from within the Company. Each of the named Claimants was retaliated against for complaining. Other employees complained at the exit interviews, or filed EEO Charges with the EEOC, and/or left the Company.

34.    Pilgrim reported that discharged and resigning African American employees complained in exit interviews of race discrimination and denial of fair and equal employment opportunities through out the company and of needed mandatory diversity training. There simply was no equal employment opportunity training program or race discrimination or race harassment training through out the Company. No investigations were conducted of these complaints or effectively or reasonably followed up. The exit interview forms purposely omit any questions regarding discrimination or race discrimination.

35.    Pilgrim's supervisor (Caucasian), Vice President of Human Resources made repeated racist, hostile and offensive remarks. Pilgrim also complained directly to (Caucasian) Harold McGraw, III, President and CEO. Shortly thereafter, Pilgrim was again retaliated against and suffered retaliatory harassment. Management reduced her job functions to clerical in nature, she was told that she will "rot in the position;" she would

11

289

be "made to feel as though she was in jail without a key;" she would not get any training and would not be allowed to be reassigned or transferred or promoted. Management threatened to "manage her out" and suggested that she terminate her employment. She was also again told that her supervisor (Caucasian) Vice President of Human Resources continued to make repeated racist remarks to others, and that the problems Blacks have in the Company is created by Blacks against Blacks.

36.    Although Pilgrim was highly evaluated and consistently exceeded expectations, Pilgrim was at times underpaid, denied stock options and other benefits, and not given subsequent fair and equitable evaluations, or other opportunities for promotions, mentoring and training. When she complained to her (Caucasian) supervisor Vice President of Human Resources he said to her "Do you think you should make as much as a White man."

37.    Pilgrim remains employed ready, willing and able to advance her career. She has suffered emotional pain and injury, and economic loss.

**HENSON:**

38.    Henson was hired by McGraw-Hill in 1997. In May 2001 Henson received a Masters of Science Degree in Human Resources Management and Labor Relations. She was last employed as a Grade Level #13, Human Resource Coordinator in McGraw-Hill's Corporate Human Resources Department. She remained a Grade Level #13 from in or about 2001 to August 2005.

39.    Henson was an employee in good standing. From in or about 2003 to 2005 Henson applied for many positions. In 2003 Henson applied for a position as a Human Resource Representative for the Information Media Service (IMS) Division. She

12

was denied the position. The position was given to a less qualified Caucasian female. Henson again applied for a position as a Human Resources Representative for the Standard and Poor's (S&P) Division. The position was given to a pre-selected equal or less qualified Caucasian female. Henson sought a position as a Recruiting Specialist, Campus Recruiting in S&P. The position was assigned to a non-African American, from outside of the company with less qualifications and experience than Henson. She applied for a position as Talent Acquisition Specialist in Corporate. The position was given to an external candidate, an equally or less qualified, Caucasian female. She applied for a position she qualified for as a Human Resources Representative in McGraw-Hill Education Division. The position was given to a Caucasian female.

40.    From 2001 to the date Henson resigned in August 2005, she observed that Caucasians have "side deals" regarding career opportunities. She also observed that African Americans have lower performance evaluation scores on corporate reports and surveys. Henson sought assignment and reassignment and promotion on no less than six occasions. She was qualified for the positions she sought at McGraw-Hill. In all but one occasion she was denied a promotion to an equally or less qualified Caucasian who was pre-selected before the job was posted. She was denied a fair and equal employment opportunity and promotion, or at times interviewed for the positions even though the candidate had been pre-selected. She had no Advocate or mentor and was unable to secure the assignments or promotions. She complained about racism and discrimination. No thorough or appropriate investigation was conducted of Henson's complaints before she felt compelled to resign.

41.     Henson is informed and believes that minorities, including African Americans, are discouraged from applying for positions; jobs are posted for a few days because the candidates have been pre-selected; some jobs are not posted at all. African Americans are managed out of positions if their supervisor has issues with them, however, if Caucasians have issues with their supervisor the managers are able to "find" another opportunity and position for them.

42.     Henson has observed that many African Americans do not receive "in-grade" promotions, at times for four (4) to five (5) years; or receive lateral positions but not a full promotion.  Caucasian temporary employees have filled open positions that were not posted, again depriving African Americans of an opportunity to apply.  Henson also observed, for example that Caucasians hired at the time of African Americans, were receiving more money than the African Americans.  In some instances the Caucasians had less experience than the African American employees.

43.     In 2004 and often in 2005 Henson complained to the (Caucasian) Vice President of Human Resources at Corporate.  Henson complained that for over four years she remained a Grade Level 13 and remained stagnant and unable to gain promotion despite her good work record and evaluations. On one occasion, she complained to the Vice President of Human Resources that she was so upset that she cried and could not continue working. She complained that "you do not know what it is like being an African American in this Company." The Vice President of Human Resources at Corporate did not conduct any investigations.

**DUBOSE:**

14

44.    DuBose has a Masters Degree in Human Resources. She was first employed in 2003. She is currently a Grade Level #21, Director of Human Resources of McGraw-Hill's PLATTS Division (responsible in part for oil and energy information for Information Media Services) she is responsible for Human Resources on a global basis involving employees in the United States, Singapore, Hong Kong, Tokyo and London in connection with PLATTS.

45.    DuBose received special recognition for the "360 Leadership Development Program," and her anti-sexual harassment training program in PLATTS. She received "best practice" recognition by the Executive Vice President of Human Resources in September 2004.

46.    In 2004 DuBose sought a promotion to three positions in the Company, each above the grade level of #22: One was for Senior Director of Human Resources for Construction, that was given to a Caucasian female, pre-selected, and had less experience than DuBose; Senior Human Resources Director for Business Week that was given a Caucasian male from out side of the Company, DuBose was barred from interviewing for the position and was discouraged from seeking the position because DuBose was told by a higher ranking Caucasian supervisor (VP of Human Resources IMS) that she, DuBose, was "too out spoken" (a cultural stereotype); Director of Human Resources in London that was not posted and given to a Caucasian male who was preselected for the position. DuBose was barred from being interviewed, or allowed to apply.

47.    DuBose complained to higher management about the lack of diversity for African Americans and made recommendations to improve the opportunities of African American employees in the company. Shortly thereafter, her supervisor mistreated her,

15

293

and she was evaluated a #2 and was subjected to being "managed out" of the company. No investigation was made of her complaints of racism and race discrimination concerning her denial of promotions, her evaluation and her being subjected to be managed out.

**SPENCER:**

48.    Spencer has a Masters Degree in Human Resources and Organizational Development. She was first employed in December 2000. She is a Grade Level #19 and was and is an exceptional employee. She is currently a Senior Manager of Human Resources in McGraw-Hill's Business - Information and Media Services (IMS) responsible for providing human resources support for "Business Week" magazine employees.

49.    Spencer has been denied opportunities to meet diversity goals related to her performance reviews and position as Senior Manager of Human Resources. Spencer has complained to her supervisor, (Caucasian) Senior Director of Human Resources for IMS. He ignores Spencer's complaints of racism and he effectively retaliated and demoted her for complaining, reducing her job responsibilities to clerical functions, denies her employment benefits, and an opportunity to meet her performance goals. He effectively adversely changed her terms and conditions of employment and decreased her potential for merit increases or future promotion. He demeans her with foul and offensive language calling females "Bitches." Senior Director of Human Resources treats her with a lack of respect, in part by reason of her color. He sets her up for failure, with a hostile, angry, condescending, and disrespectful attitude that he does not demonstrate to Caucasian employees and other employees not of color. Spencer fears that she is being

16

294

set up for a lower performance evaluation and being "managed out." As a result she fears being unfairly evaluated, denied opportunities for advancement, pay increases, and benefits.

50.    Spencer does not have an Advocate. She fears that she is less regarded than Caucasian employees. Spencer has been removed from those who may "advocate" for her, or are not able to do so under the circumstances. Spencer has been marginalized and removed from any meaningful support systems. Like other African American employees she is less regarded then Caucasian employees who seek job preservation and advancement. She suffers emotional pain and injury.

**CURTIS:**

51.    Curtis is an African American female and was first employed by McGraw-Hill in May 2002. She was a Grade Level #17 and was a good employee. Her position was as Office Manager for McGraw-Hill Security Services at S&P. She held the position for three years. She was terminated upon information and belief due to job elimination effective October 2005.

52.    From in or about 2003 and during her employment Curtis complained to her (Caucasian) Executive Managing Director about differential treatment relating to race and employment benefits and performance evaluations which affected her potential for wage and merit increases.

53.    After October 3, 2005 Curtis was unemployed. She has/had sought to be re-employed at McGraw-Hill. She applied for seven positions that she was qualified for. Some of the positions she sought were for positions that were of lesser Grade than the

17

Office Manager's position. Curtis learned that the positions that she sought were filled by Caucasians, and in some occasions were pre-selected.

64.    After October 2005, while unemployed, Curtis sought reemployment for four positions. On at least one occasion McGraw-Hill pre-selected a Caucasian employee for a position Curtis was qualified for; nevertheless, they made Curtis go through sham interviews and schedule changes only to deny her the position saying she was over qualified. Curtis now believes that she was retaliated against, post- employment, because she complained of racism and discrimination during her employment. Curtis remains ready willing and able to be reemployed.

## FACTS COMMON TO ALL AFRICAN AMERICAN EMPLOYEES

55.    At all the times required herein, McGraw-Hill has failed to achieve its EEO affirmative action goals, and upon information and belief, has not met any of its goals.

56.    Claimants, who have formal training in Human Resource Management are informed and believe that McGraw-Hill has assured the United States government, Office of Contract Compliance, and the Equal Employment Opportunity Commission that it will comply with all applicable federal, state, and local laws, rules and regulations that prohibit race discrimination, and retaliation in the employment context. Upon information and belief, McGraw-Hill has been audited by the Office of Federal Contract Compliance Programs (OFCCP) on no less than five occasions in recent years. Upon information and belief, McGraw-Hill has failed or refused to disclose the true conditions as herein alleged.

18

57.    McGraw-Hill's policies governing compensation and promotions are similar across all divisions, and build upon common features and centralized policies, programs and excessive subjectivity which provide a conduit for race and color bias that affects all class members in a similar fashion. Few objective requirements and qualifications for specific assignments, promotions or raises exist.   High ranking supervisors, predominantly Caucasian, have substantial discretion in setting salaries within a range of grade levels for each employee. Salaries are also adjusted based upon performance reviews, which are largely based upon subjective judgments of performance. The same supervisors control whether employees are given the opportunity to meet certain goals, and therefore control performance outcomes.

58.    McGraw-Hill cultivates and maintains a strong corporate culture that permits and encourages race stereotyping that affects putative class members in a similar way. For example, minorities, including African Americans receive lower performance ratings.

59.    McGraw-Hill policies governing compensation and promotions uniformly provide for Caucasian managers and high ranking Caucasian supervisors to exercise significant subjectivity in making employee evaluations, wage and pay scale assignments, merit increases, job assignments, training, and promotion decisions.

60.    Each division of McGraw-Hill operates in a basically similar fashion as regarding hiring, and for example, employee referrals, compensation, bonus award programs, performance evaluation programs, and promotions operating off of centralized personnel policies, pay grade classifications, internal centralized computer personnel resource systems, applicant pools, and employee referral incentive programs.

61.    Subjectivity is a primary feature of the employee referral program throughout the Company. The referral program (Advocate or Mentor program) rewards employees (hereinafter "Advocates") who identify potential employees for positions, assignments, and promotions within the Company. This centralized program pays the Advocate if the referred employee is hired, assigned or promoted.    This program encourages a "tap on the shoulder" hiring system that rewards and encourages racism, subjectivity, favoritism and nepotism. The referrers or Advocates are predominantly Caucasian employee, and favors the overwhelming Caucasian employee work force that advocate for Caucasians. It also encourages Caucasian management to support and ensure Caucasian referrals. This "tap on the shoulder" policy is a centralized internal promotion system that has a significant detrimental impact on African American new hires, African American employee assignments, reassignments, and promotions; company wide. African Americans lack Advocates, mentors and referrers.  Claimants are informed and believe that McGraw-Hill has long recognized that the "tap on the shoulder" program runs counter to diversity and affirmative action goals.

82.    Subjectivity is a primary feature of employee wage increases. Wage increases are a function of the performance evaluation program centralized throughout the Company.  Subjectivity is a primary feature of the performance evaluation program and therefore salary decisions. The subjectivity in salary decisions occur in two fundamental ways: (1) wage increases are based in large measure on performance evaluations that are approved and supervised by Caucasian high ranking supervisors and managers; and (2) these same high ranking Caucasian supervisors and managers

20

298

determine the extent of the wage increases, if any, for African American employees compared to Caucasians.

63.    Claimants are informed and believe that African American employees predominantly receive lower performance evaluations than Caucasian employees, and African American employees predominantly receive lower wages, and lower wages within grade range, and lower wage or merit increases than Caucasian employees who perform substantially similar work, with similar or lesser skills and experience.

64.    Less than two (2%) of 500 employees above the grade level of 22 up to as high as grade level 27 in the company are African American employees. Qualified African Americans, except a very small number, have experienced a "glass ceiling" and have been denied employment and/or promotion to a grade level above a 21.

65.    Qualified African Americans have been identified by the company through a number of recruitment programs, such as conferences and recruitment programs with the National Black MBA Association. Nevertheless, the Association's resumes are either discarded, or placed in a circular file, or retained in isolated folder yielding lack of reference, and are provided less consideration than is provided advantage to Caucasians who benefit from the "tap on the shoulder" program.

66.    This pattern of unequal assignments, pay, training, and advancement opportunities and "tap on the shoulder" policy is not the result of random or non-discriminatory factors. Rather, it is the result of the formal and informal on-going and continuous pattern and practice of intentional discrimination in assignments, pay, training, and promotions, and reliance on policies and practices that have an adverse impact on African Americans that cannot be justified by business necessity, and for

21

299

which alternative policies and practices with less discriminatory impact could be utilized that equally serve any asserted justification.

67. The "tap on the shoulder" program encourages Caucasian employees to select Caucasian applicants often less qualified than potential African American applicants, and at times, before the position is posted. The Caucasian applicant is pre selected for the position before the posting. In some instances the position is posted for five days, often after a Caucasian was selected. African Americans who apply to the posted position are forced to be late in applying, or are taken through a sham interview process, that results in their not being hired, or assigned, or promoted. McGraw-Hill encourages, promotes, and fosters these methods knowing that it has an adverse impact on African American new hires, applicants, and existing employees that seek a change in job assignment, re-assignment or promotion within the company.

68. Claimants are informed and believe that such policies and practices include, without limitation:

(a) Failure to consistently post job and promotional openings to ensure that all employees have notice of and a fair and equal opportunity to seek advancement or more desirable assignments and training;

(b) Reliance upon poorly weighted or questionably weighted, arbitrary and subjective criteria utilized by nearly all Caucasian managers, and high ranking supervisors in making assignments, training, pay, performance reviews and promotional decisions. Even where McGraw-Hill policy states objective requirements, these requirements are often applied in an inconsistent manner and ignored, or manipulated, at the discretion of management to affect the outcomes.

22

300

( c)    Reliance on race stereotypes in making employment decisions such as hiring, assignments, promotions, pay and training;

(d)    Pre-selection and grooming of Caucasians for advancement, favorable assignments, protection, and training;

(e)    Maintenance of largely race-segregated job categories and departments;

(f)    Deterrence and discouragement of largely African Americans from seeking advancement, training, and favorable assignments and pay;

(g)    Paying African American employees lower compensation than similarly situated Caucasian employees;

(h)    Assigning African Americans to lower paying positions, and lower levels of pay within Grade Range, and with lesser advancement potential than those given to Caucasians, and advancing Caucasians quicker than similarly situated African Americans;

(i)    Providing African Americans less training and support or mentoring than that given to Caucasian employees and managers;

(j)    Harassing African Americans and subjecting them to a hostile work environment;

(k)    Retaliating against African Americans who have tried to correct McGraw-Hill's discriminatory policies, or who have complained either internally or externally about McGraw-Hill's treatment of its African Americans, and potential African American new hires.

69.    African Americans receive disproportionately lower performance evaluations by the largely Caucasian supervisors and managers who supervise them. A

23

performance evaluation of a #2 is cited by McGraw-Hill management as a basis for "managing the employee out" of the Company. If the African American employee refuses to accept a forced resignation, that employee is placed on a Performance Improvement Program (PIP). This PIP program is largely subjective by the same managers and supervisors who issued the initial low rating. A disproportionate number of African American employees rated #2 and who are on PIP programs are discharged. Whereas, predominantly Caucasian employees rated #2 on a PIP program retain their employment or seek an Advocate to get "tapped on the shoulder" to remain employed or reassigned. African American employees are compelled to resign and sign EEO and Title VII releases waiving their civil rights.

70.    Caucasians in higher grade level positions than African Americans are employed, receive or have the opportunity to receive, bonus plans, often between $33,000.00 to $55,000.00 dollars, stock options, restricted stock, and other benefits and conditions of employment (i.e., training, mentoring, reward programs, and advancement opportunities) that are not enjoyed by a vast number of African American employees.

71.    African American applicants "for hire," and African American employees are openly discouraged from applying to positions for which they are qualified. They are often required to overcome artificial barriers that Caucasians are not required to overcome. They are advised by Caucasian supervisors and managers that they need not apply, or the qualifications for a position are tailored to meet the qualifications of a known and pre selected Caucasian candidate, or the position is filled before they have an equal and fair opportunity to apply.

24

72.    African American employees are subjected to racist and hostile remarks, retaliation, and retaliation harassment for complaining, and forced resignations or termination.  In this regard African Americans suffer discriminatory treatment in the employment context, and interruption of their careers.

73.    McGraw-Hill, despite the presence of an expanding workforce of qualified African Americans with Associate, Bachelor and Masters Degrees from recognized colleges, maintains its policies, practices, and programs that result in a significant discriminatory impact on African American employees; discourages African American applicants; and denies African American employees the substantial number of employment opportunities and promotions at McGraw-Hill.

74.    McGraw-Hill has failed, and otherwise refused to conduct an equal employment opportunity (non-discrimination) training program, conduct investigations of the numerous complaints made by African American employees of race discrimination and denial of fair and equal employment opportunities, or monitor its programs. McGraw-Hill has otherwise ignored the discriminatory impact of said practices and policies on African Americans and has failed and refused to take action to prevent, protect, and/or stop the Company's continuous illegal conduct towards Claimants, the class, and all others similarly situated.

75.    At all the times hereinafter required and during Claimants' employment, the Company's high ranking officials, supervisors, agents, and co-employees of McGraw-Hill, acting on behalf of the Company, had the highest power to recommend and implement policy affecting the terms and conditions of employees under their jurisdiction and with the requisite authority, to assure OFCCP and EEO compliance, and

25

to discipline personnel and recommend and influence employment action against an employee that violates those assurances under their jurisdiction.

76.    From in or about January 2003, up to including the present, and prior thereto, on a continuous basis, McGraw-Hill's working environment was set up so as to preclude or prevent African Americans from advancing in the Company maintaining "glass walls" and "glass ceilings."

77.    McGraw-Hill's recruiting process through, to, and including African American's employment termination and discriminatory actions, pervade the employment process, thus creating a policy, and pattern of practice; for example,

(a)    McGraw-Hill's recruitment practices targets universities that historically have a low number of African American graduates/population;

(b)    McGraw-Hill's recruitment practices ignore Historically Black Colleges that have a higher number of African American graduates, and post-graduates;

(c)    When and if the McGraw-Hill's staff attends targeted diversity events, for example, the National Black MBA Association's national and local chapters, McGraw-Hill does not follow up or hire qualified African American candidates from that program;

78.    Furthermore, the discriminatory practices continue through the retention and promotion stages and include for example:

(a)    African Americans (males/females) suffer less frequent in-grade promotions or wage increases;

26

304

(b)    African Americans (males/females) suffer less training and/or mentoring;

(c)    African American employees are less regarded than Caucasian employees. African American employees who "advocate" for, or refer for hire, a qualified African American candidate is less regarded than a Caucasian employee who advocates or refers a Caucasian candidate;

(d)    Caucasian employees are permitted to go through informal channels (*i.e.*, the "tap on the shoulder" route to success) that greatly increases their chances of being hired, whereas African Americans are compelled to go though the formal channels, hence decreasing their opportunity to be hired or promoted;

(e)    Caucasian employees who are "managed out" or voluntarily resign are more often replaced by Caucasians, whereas, African Americans who are "managed out" or voluntarily resign are replaced by non-African Americans;

(f)    In Human Resources, in particular; African American women are "managed out" with greater frequency then Caucasian women, even though there are a greater number of Caucasian women in Human Resources as compared with the number of African American women, for example;

(i)    Caucasian managers in S&P have the opportunity to do their own recruiting, rather than allowing the H.R. to recruit employees. As a result, Caucasian managers tend to more frequently hire other Caucasians rather than African Americans or set limits on the number of Black employees;

27

305

(ii)     Qualified African Americans are denied promotions more frequently than equally or less qualified Caucasians;

(iii)     If an African American is hired to a marginally elevated position or promoted in a Department, then Caucasians in that Department express the attitude that the hire or promotion was "race-based," and therefore the African American has no merit and not worthy of hire or promotion, thus reflecting a pervasive attitude and stereotype that substantiate African American's belief that they are less valued employees than their Caucasian counterparts;

(iv)     African American (male/female) employees are not included in outside social events that are necessary for career advancement (e.g., drinks at the Bars, golf, mixers and to their homes) that Caucasian employees attend organized by Caucasian managers or directors;

(v)     African Americans suffer a severe adverse impact in levels of Level 22 and above and corporate-wide.  Caucasian executives or managers are in the position to hire, promote, discipline and evaluate employee performances for merit salary increases, stock options and other benefits, that result in a severe adverse impact to African Americans;

(vi)     African Americans are discouraged from applying for promotions, or told that they are less qualified by reason of a "lack of a particular competency," while a Caucasian, who "lacks the same competency," is given the promotion;

28

(vii)    Caucasians are often promised positions, and African Americans are not. As a result, African Americans are advised not to apply for certain positions, or are otherwise discouraged from formally applying, and therefore fall through the tracking system;

79.    Further, African American employees have been subjected to a variety of racist remarks by the Caucasian, high ranking officials, and Vice Presidents of Human Resources, including:

(a)    African Americans in New Jersey are not hired because they do not own cars; (b) Black women should resolve their own problems; ( c) As long as I continue to look good I don't care what happens to those Black women; (d) Do you (Black employee) expect to make as much as a "White man." (e) I am not going to hire another Black woman; (f) I would not hire someone like them, referring to Blacks; (g) She was hired because she was Black; (h) She was promoted because she was Black; (i) We hired her (Black) to look good for the numbers; (j) Those persons (Blacks) should be happy that they have a job [referring to the INROADS STUDENTS (African American student interns)]; (k) References were made by management to "modern day lynching." (l) In response to complaining of discrimination "You are going to be forced to rot in your job, you will not get a promotion, and it's going to be like your in jail without a key." (m) Your people (Blacks) won't come to support you. (n) Blacks create problems for Blacks. (o) The Affinity Group Blacks will burn down the building [a reference to the slaves that rose up against the Masters quarters and burn down their homes]. (o) Executive V. P. of Human Resources said your complaints are a Black eye on the Department and he will block any promotion.

29

80.    Upon information and belief, for over three years, African American employees, including Human Resource personnel, have made formal and informal complaints in regard to the above matters, and other unfair treatment and inequities, in different contexts including, but not limited to: during exit interviews; during "one-on-one" meetings; in group meetings, and directly to Harold McGraw, CEO and President, David Murphy, Executive Vice President of Human Resources; Sara McAuley, Vice President of Human Resources; Richard Fisher, Vice President of Human Resources; Sheila O'Neal, Vice President of Human Resources, and other high ranking officials, managers, and Human Resource personnel.

81.    Despite said complaints, the Company has failed to take any action to remedy these violations or properly investigate these complaints.

82.    Though McGraw-Hill was, and is aware, of the many problems presented by African Americans as herein identified, the Company did not change its practices or implement recommendations made by many African American employees, or provide economic or leadership support to its African American employees who sought to make a change from within. McGraw-Hill's reaction was to retaliate against employees who complained.

83.    As a result, African Americans have been caused to suffer economic loss and damage, loss of compensation and other benefits, loss of merit and wage increases, stock options, pension contribution benefits, loss of back pay, and front pay damages, and emotional damages and injuries, humiliation, embarrassment, and loss of enjoyment of life.

30

## PRAYER FOR RELIEF

WHEREFORE, Claimants pray for relief and that the Respondent provide as follows:

a.    All damages which individual Claimants and those they represent have sustained as a result of Respondent's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discriminatory practices of Respondent;

b.    For Claimants' individual claims, all damages they have sustained as a result of respondent's conduct, including back pay, front pay, general and specific damages for lost compensation and job benefits they would have received but for the discriminatory practices of the respondent, damages for emotional distress, and punitive damages, according to proof;

c.    Exemplary and punitive damages in an amount commensurate with Respondent's ability to pay and to deter future conduct;

d.    A preliminary and permanent relief against Respondent and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in unlawful practices as alleged herein, including, but not limited to Respondent's practice of unlawful employment hiring, advancement and retention practices;

e.    A finding of probable cause that the practices complained of in this Charge are unlawful and violate Tile VII, 42 U.S.C. §2000e, *et seq.*, 42 U.S.C. §1981; New York State Executive Law §296 *et seq*; The New York City Administrative Code Sections 8-107(a) *et seq.* and 8-502 *et seq.*;

31

f.    Restoring Claimants to their rightful positions at McGraw-Hill;

g.    An assignment of Claimants and those they represent to those jobs they would now be occupying but for the discriminatory and/or retaliatory practices;

h.    An adjustment of wage rates and benefits, including stock options and other benefits for Claimants and those they represent to that level which Claimants would be enjoying but for the Respondent's discriminatory practices;

i.    EEOC intervention requiring Respondent to implement policies and procedures sufficient to prevent and address unlawful conduct in the future;

j.    Claimants seek for themselves, and on behalf of those they represent, similarly situated, for discrimination and retaliation based on race, compensatory relief, representing back pay, front pay and other employment benefits, together with interest on said amounts, and other compensatory damages and punitive damages. in an amount to be determined as reasonable, plus attorneys' fees and expert fees, with interest, costs and disbursements; and

k.    Costs incurred, including reasonable attorneys' fees, including Pre- and post-filing interest, as provided by law; and

l.    Such other and further relief, including a special master, as may be deemed appropriate and any equitable, including injunctive and declaratory relief as may be required in the interests of justice.

DATE: December 13, 2005
      Great Neck, New York

                         Respectfully submitted,
                         By:
                         Solotoff & Solotoff*
                         Lawrence Solotoff
                         Cheryl Solotoff
                         Darryn Solotoff
                         **Farrell Fritz, P.C.***
                         Kathleen Tomlinson

310

James Wicks
Domenique Moran
Cathleen Coyle
Steven Davi

*Attorneys for Claimants Jannie Pilgrim, Giovanna Henson, Rene DuBose, Jesan
Spencer, and Brenda Curtis.

33

311