**PRELIMINARY STATEMENT**

Pursuant to Rule 56.1 of the Local Civil Rules, Plaintiff GIOVANNA HENSON'S, BRENDA CURTIS' AND JESAN SPENCER, (hereinafter "Henson", "Curtis" and "Spencer), by their attorneys Solotoff & Solotoff, hereby submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment against Plaintiff Giovanna Henson, ("Henson"), Jesan Spencer ("Spencer"), and Brenda Curtis ("Curtis") ("Plaintiffs") served by Defendant McGraw-Hill (hereinafter "McGraw-Hill", "Company") or ("Defendant").  Defendant does not seek summary judgment dismissal of Plaintiff Pilgrim's claims in this case.

Plaintiffs bring this civil action seeking, declaratory and equitable relief, and monetary damages under 42 U.S.C §2000e et seq., (Title VII)(as amended); 42 U.S.C. §1981 *et seq.*; the New York State Human Rights Law, Executive Law §296 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code the City of New York, Sections 8-107(a) *et seq.* and 8-502 *et seq.*; for purposeful discrimination and retaliation, and for malice and reckless disregard for the federally protected rights of the Plaintiffs, due to Plaintiffs' race and color. (Solotoff Decl. Ex. "A" and "AA" EEOC Charges and Complaint)

At or about the time of the events occurring in this matter Plaintiff *Jannie Pilgrim*, was a Human Resources Generalist/Human Resources ("HR") Manager servicing Defendant's Financial Services Segment (including Structured Finance) ("Standard & Poor's" or "S&P"); *Giovanna Henson*, HR Coordinator, Corporate HR Dept.; *Jesan Spencer*, Senior Manager of HR in the Corporate Segment; and *Brenda Curtis*, Executive Assistant/Office Manager in the Data and Information Group of S&P.

Plaintiffs Jannie Pilgrim, Giovanna Henson, Brenda Curtis and Jesan Spencer, following numerous complaints by the Plaintiffs in writing and verbally to Defendant's HR officials as

1

herein after demonstrated, and on or about January 4, 2006 filed and served official EEO Charges. (Solotoff Cntr. Decl. ¶183)

On January 18, 2006 McGraw-Hill received a copy of Plaintiffs EEOC Charges, Letter of Jackson Lewis, Esqs. to EEOC) and responded on March 16, 2006. (Solotoff Cntr. Decl. ¶186, 187)

Defendant's high ranking officers, directors, managers and supervisors, directly involved in this matter were *David Murphy*, Exec. VP of HR; *William Harper*, VP of HR for the Business Information Group ("BIG"); *Ken Caruso,* Sr. Dir. of HR in the Corporate Segment; *Sheila O'Neill,* VP of HR in the Corporate Segment; *Brett Marschke*, VP of HR for IMS; *Richard Fisher*, Director of HR of S&P; *Vladimir Stadnyk*, Exec. Mgr. Dir. in the D&I Group of S&P, and other managers, supervisors and executives who are identified hereafter where and when relevant to the facts in this matter.

Plaintiffs present the material facts and evidence that significantly, clearly, and unambiguously demonstrate that Plaintiffs have a *prima facie* claim  and direct and circumstantial evidence of race discrimination (Henson), (Curtis), (Spencer); and/or suffered a hostile work environment (Spencer), or was constructively discharged (Spencer), and in all cases (Henson),(Curtis) and (Spencer) suffered retaliation in violation of the Civil Rights Act of 1964, Title VII, 42 U.S.C §2000e et seq., (Title VII)(as amended); 42 U.S.C. §1981 *et seq.*; the New York State Human Rights Law, Executive Law §296 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code the City of New York, Sections 8-107(a) *et seq.* and 8-502 *et seq.* (Solotoff Cntr. Decl. ¶174, 176)

**PLAINTIFF HENSON:**

Henson is an African American female and was first hired by McGraw-Hill in 1997. In May 2001 Henson received a Masters of Science Degree in Human Resources Management and

2

Labor Relations.  She was last employed as a Grade Level #13, Human Resource Coordinator in McGraw-Hill's Corporate Human Resources Department and met expectations in performance. She remained a Grade Level #13 from in or about 2001 to August 2005. In 2004-2005 Henson was a member of the African American Affinity Group.

From in or about 2003 to 2005 Henson applied for positions that she was qualified for. Henson is *not seeking to challenge any position that is time barred*.  Henson applied for a number of positions, more particularly, in 2004, <u>Talent Acquisition HR, Corporate</u> filled by a Caucasian temporary employee that Henson believes she was more qualified for. In 2005 she sought a promotion to an <u>HR Recruiting Specialist's</u> position that she was qualified for (denied on January 18, 2005)(covered by federal 42 U.S.C. §1981, state and local NYC Code statutes), and on June 1, 2005 she applied for a position as a <u>Human Resources Representative, Standard and Poor's (S&P) Division.</u> The VP of HR (S&P). Henson was qualified for the position and was denied the promotion because she was Black. Henson also contends that she was denied the <u>HR Recruiting Specialist's</u> position and the <u>Human Resources Representative, Standard and Poor's (S&P) Division</u>  position due to retaliation.  Henson, complained about the culture of unfair treatment against African American employees and of racism to high ranking officials in HR**.** Henson resigned under protest. Henson demonstrates hereinafter that she has a prima facie case, evidence of pretext, and direct and circumstantial evidence of discrimination and retaliation presenting significant, material, and genuine issues of fact for a jury to consider in her favor. (Plaintiffs' Resp. Counter Dec. ¶¶176, 177,a)

**PLAINTIFF CURTIS**

Curtis is an African American female and was first employed by McGraw-Hill in May 2002. She was a Grade Level #17. Her position was as Office Manager for McGraw-Hill

Security Services at S&P. She had "Expert" computer skills. Curtis held the position for three years and met expectations. From in or about 2005, and during her employment Curtis complained to her (Caucasian) Vlad Stadnyk, Executive Managing Director, and H.R., about the hostile racist conduct and discriminatory treatment she experienced by him and under his supervision.  On and after and prior to October 3, 2005 Curtis sought to be re-employed at McGraw-Hill.  She applied for positions that she was qualified for.  Curtis was denied positions that she was qualified for. Curtis was discriminated against and retaliated against, post-employment, because she complained of racism and discrimination during her employment. Curtis had remained ready willing and able to be reemployed. She has suffered discrimination and retaliation. Curtis demonstrates hereinafter that she has a prima facie case, evidence of pretext, and direct and circumstantial evidence of discrimination and retaliation presenting significant, material, and genuine issues of fact for a jury to consider in her favor. (Solotoff Cntr. Decl. ¶¶177,b. 182)

 **PLAINTIFF SPENCER**

    Spencer is an African American female and has a Masters Degree in Human Resources and Organizational Development.  She was first employed in December 2000. She is a Grade Level #19. She was a Senior Manager of Human Resources in McGraw-Hill's Business - Information and Media Services (IMS) responsible for providing human resources support for "Business Week" magazine employees. She received high ratings, salary increases and bonuses for her performances.  In February 2005 Spencer's H.R Senior Director (Caucasian) Kenneth Caruso took over her supervisor's prior position.  Shortly after Caruso became Director of Human Resources he made hostile and offensive remarks, and treated African American employees, and Spencer, in a hostile, discriminatory and offensive manner by treating her unfairly and unequally in regard to her terms and conditions of employment.  Shortly after she

filed the EEOC Charge in this matter, and the Company received it, she was involuntarily transferred to a position in HR supporting Aviation Week. High ranking HR officials including Murphy, Marschke, and Caruso, put in writing, their plan to "manage her out" of the company. Spencer was involuntarily transferred. Her HR duties and responsibilities were significantly and materially reduced to an intolerable level and she was forced to resign. She was constructively discharged. Spencer demonstrates hereinafter that she has a prima facie case, evidence of pretext, and direct and circumstantial evidence of discrimination, hostile work environment, retaliation, and constructive discharge presenting significant, material, and genuine issues of fact for a jury to consider in her favor. (Solotoff Cntr. Decl. ¶177,c.,181)

## STATEMENT OF FACTS

The statement of facts set forth in Plaintiff's Counter Declarations Rule 56.1 Statement in Opposition to the Summary Motion seeking dismissal of Plaintiffs Henson, Spencer, and Curtis, the deposition testimony, affidavits and exhibits annexed thereto and in response to Defendant's Declarations are incorporated herein by reference.

## ARGUMENT
### POINT I      FRCP RULE 56 SUMMARY JUDGMENT STANDARD

In this case there is sufficient evidence to permit a reasonable jury to return a verdict in plaintiffs' favor. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986); *Trans Sport, Inc. v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir. 1992). A Summary judgment is ordinarily inappropriate where an individual's "intent and state of mind are implicated." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1996) (reversing a summary judgment in which the record could support inference that employer's justification for termination was pretextual.) A motion for summary judgment may be granted under Fed. R. Civ. P. (FRCP) Rule 56 if the entire record demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to a summary judgment as a matter of law.

*Anderson v. Liberty Lobby, Inc.,* 277 U.S. 242, at 250; *Victory v. Hewlett-Packard Company*, 34 F.Supp.2d 809, 78 F.E.P.Cases 1718 (E.D.N.Y.1999). The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 at 255.

In moving for a summary judgment against a party the movant's burden will be to demonstrate an absence of evidence to support an essential element of the non-moving party's claim. *Geonaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). When viewing the evidence, the Court must "resolve all ambiguities, and credit all factual inferences that could be rationally drawn, in favor of the party opposing the summary judgment." *Cifra v. General Electric Company*, 252 F.3d 205, 85 F.E.P.Cases 1664 (2d Cir. 2001); The Court must "assess the record in light most favorable to the non-movant and … draw all reasonable inferences in [his] favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir. 1990); See *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

The party moving for summary judgment is initially responsible for demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.

The Second Circuit has repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo,* 22 F.3d at 1224.

The Court must be especially cautious in granting a summary judgment motion in a discrimination case "because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999).

**POINT II       THE STANDARD FOR PROVING RACE DISCRIMINATION**

    **A.      Burden Shifting Standard:**

The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) provided the basic allocation of burdens and the order of presentation of proof in a Title VII case alleging discriminatory treatment. *First,* the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination; *Second,* if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection;" *Third,* should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a *pretext* for discrimination.

Once a plaintiff has proven a *prima facie* case of race discrimination under the federal, state, and city laws, the burden shifts to the defendant to rebut the presumption of discrimination by producing admissible evidence of legitimate, nondiscriminatory reasons for plaintiff's termination, a burden-shifting approach consistent with the standard in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 36 L.Ed2d 668, 93 S.Ct. 1817 (1973); *Epstein v. Kalvin-Miller International, Inc.,* 100 F.Supp.2d 230 (S.D.N.Y. 2000). NYS Exec. Law and NYC Admin. Code and Tile VII apply the burden shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973); *North Shore Univ. Hospital v. Rosa,* 86 N.Y.2d 413, 633 N.Y.S.2d 462, 464, 657 N.E.2d 483 (N.Y.1995).

Moreover, the Second Circuit in *Fisher v. Vassar College*, 114 F.3d 1332, 74 F.E.P.109 (2d Cir.1997) (*en banc*), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, (1998) and in its holding in *James v. New York Racing Ass'n,* 233 F.3d 149 (2d Cir. 2000) held that the plaintiff must provide (i) evidence satisfying the minimal *McDonnell Douglas prima facie case*, coupled with evidence of  falsity of the employer's explanation; (ii) once the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency; (iii) the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it *reasonably supports* an *inference* of the facts plaintiff must prove. On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact. See, e.g. *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir. 1955).

### B. Standard For Establishing Pretext
Title VII provides that it is an "unlawful employment practice for an employer ... to discharge any individual ... because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). In

1991, "An unlawful employment practice is established when the complaining party demonstrates that race was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). An employment decision, then, violates Title VII when it is "based in whole or *in part* on discrimination." *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004) quoting *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997). To avoid summary judgment in an employment discrimination case, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995). The plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were a *pretext* for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 668 (1973)

Plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Texas Department of Community Affairs v. Burdine.,* 450 U.S. 248, 253, 101 S.Ct. 1089 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-805, 93 S.Ct. 1817 (1973),

A plaintiff may establish pretext by also demonstrating that the employer articulated a nondiscriminatory reason which: 1) had no basis in fact, 2) did not actuate the adverse employment action, or 3) was insufficiently weighty to motivate such a decision. The plaintiff may prove pretext by demonstrating weaknesses, implausibility, inconsistencies, incoherencies, or contradictions, mendacity, in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons.

9

*Webber v. International Paper Company*, 417 F.3d 229, 237 (1st Cir. 2005). See *Hopkins v. Electronic Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir.1999); *see also, Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir.2000).

      *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 148-49, 120 S.Ct. 2097 (2000) instructs that "[w]hether judgment as a matter of law is appropriate in any particular case" depends on a careful review of the total evidence adduced, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." "*Reeves* prevents courts from imposing a *per se* rule requiring in all instances that an [ADEA] claimant offer more than a prima facie case and evidence of pretext." *Schnabbel v. Abramson*, *232 F.3d 83, 90 (2d Cir*.2000). *Reeves* mandates a case-by-case approach, examining the entire record to determine whether the plaintiff could satisfy the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. The Second Circuit has recognized, a showing of disparate treatment is "a common and especially effective method of establishing [an] inference of discriminatory intent." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2000).

      The trier of fact may look at "[P]laintiff's *prima facie* case, combined with sufficient evidence ... that the employer's asserted justification is false" to determine that Plaintiff was discharged in part because of discriminatory reasons. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097 (2000). In defeating a summary judgment motion, Plaintiff must come forward with evidence that would be sufficient to support a jury verdict in her favor." *Ralkin v. New York City Transit Auth.*, 62 F. Supp.2d 989, 997 (E.D.N.Y. 1999); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). Plaintiff must show that a genuine issue of material fact exists that employer's proffered reasons for discharge

were false and that her employer was likely motivated by discriminatory purposes. *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1225 (2d Cir.1994). Plaintiff may show the existence of material facts through circumstantial, direct, or statistical evidence. Plaintiff may satisfy her burden of persuasion directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089 (1981). Plaintiff merely needs to show that Defendant's alleged reasons for discharge were not the only reasons for such discharge, and that other, discriminatory reasons were "at least one of the motivating factors." *Padilla v. Metro-North Commuter RR.,* 92 F.3d 117, 123 (2d Cir.1996), *quoting Cronin v. Aetna Life Ins., Co.,* 46 F.3d 196, 203 (2d Cir.1995). If the employer's motivation for discharging the employee is questionable, "the easier it will be to expose it as a pretext." *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012, n. 6 (1st Cir.1979). A rational trier of fact could conclude that Defendant treated employees in a non-protected group more favorably than those in the protected group. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

**POINT III:    HOSTILE WORK ENVIRONMENT**

Title VII prohibits an employer's conduct that "has the purpose or effect of ... creating an intimidating, hostile, or offensive working environment," and "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367 (1993). See *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404- 05 (1986). To prevail on a hostile work environment claim, a plaintiff must prove "(1) that [her] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment

11

to the employer." *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, (1993); *Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. at 2405-06; *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999); *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997); *Gregory v. Daly,* 243 F.3d 687 (2d. Cir. 2001).

An environment is sufficiently hostile or abusive, courts consider the totality of the circumstances, including such factors as "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson,* 180 F.3d at 437; *Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir.1999). A plaintiff may demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000). Diminishing the respect accorded a plaintiff by subordinates and thereby impairing their ability to perform her work can, in appropriate circumstances, contribute to a hostile work environment. *Carerro v. New York City Housing Auth.,* 890 F.2d 569, 579 (2d Cir.1989). Depriving an employee of a fair and equal opportunity to succeed at her position, with a threat "get on board or quit ," and it is not a joke, is a linkage to contributing to a hostile work environment. *Gregory v. Daly,* 243 F.3d 687, 693 (2d. Cir. 2001).  Alfano v. Costello 294 F.3d 365 (2nd Cir. 2002), *citing* Brown v. Henderson 257 F.3d 246C.A.2 (N.Y.),2001. It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII when it occurs because of an employee's [race], or other protected characteristic. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79-80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In determining whether an employee has been

discriminated against "because of *such individual's* ... race," 42 U.S.C. § 2000e-2(a)(1) the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment. *Connecticut v. Teal,* 457 U.S. 440, 453-54, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) ("The principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole."); *City of Los Angeles, Dep't of Water and Power v. Manhart,* 435 U.S. 702, 708, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978).

"A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination."); *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158 (7th Cir.1996) (rejecting the argument that plaintiff's replacement by a worker of the same race precluded the establishment of a prima facie case of race discrimination). Title VII protects any individual so long as that individual is mistreated because of her [race]. *See Pivirotto v. Innovative Sys. Inc.,* 191 F.3d 344, 354 (3d Cir.1999).

"The critical issue, is whether members of one class are exposed to disadvantageous terms or conditions of employment to which members of the other class are not exposed." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467-68 (2d Cir.2001) In other words, what matters in the end is not how the employer treated *other* employees, if any, of a different race, but how the employer *would have* treated *the plaintiff* had she been of a different race.

When discriminatory tangible employment actions are taken against an employee, courts look to a wide variety of often subtle, indications that a consideration prohibited by Title VII played a role in the employer's conduct. Absence of direct evidence does not defeat the suit. The cumulative weight of the evidence may be depended on. *Gregory v. Daly*, 243 F.3d 687, 695 (2d. Cir. 2001). For example, neither "sex-specific and derogatory terms" nor any evidence that "sexual desire" motivated the hostile conduct is needed to prove an actionable hostile work environment claim. Where the conduct at issue lacks any sexual component or any reference to

13

the victim's sex, could in context, be reasonably interpreted as having been taken on the basis of the plaintiff's sex related. *Gregory v. Daly*, 243 F.3d 687, 695 (2d. Cir. 2001).

## POINT IV:    CONSTRUCTIVE DISCHARGE

*Pennsylvania State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 2352 (2004) "Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 752, 118 S.Ct. 2257 (1998) "The phrase 'terms, conditions, or privileges of employment' [in Title VII] evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." Title VII encompasses employer liability for a constructive discharge. The Supreme Court identified "a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 760, 118 S.Ct. 2257 (1998)

A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.,* at 761, 118 S.Ct. 2257.  Tangible employment actions falls within the special province of the supervisor," who "has been empowered by the company as ... [an] agent to make economic decisions affecting other employees under his or her control." *Id.,* at 762, 118 S.Ct. 2257. The tangible employment action is in essential character, "an official act of the enterprise, a company act." *Ibid.* It is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." Often, the supervisor will "use [the company's] internal processes" and thereby "obtain the imprimatur of the enterprise." Ordinarily, the tangible employment decision "is documented in official company records, and may be subject to review by higher level

14

supervisors." When a supervisor takes a tangible employment action against a subordinate[,] ... it would be implausible to interpret agency principles to allow an employer to escape liability." *Id.,* at 762-763, 118 S.Ct. 2257.

*Petrosino v. Bell Atlantic*, 385 F.3d 210 (2d. Cir. 2004). Plaintiffs have been able to establish that employers acted with the specific intent to prompt employees' resignations. *See, e.g., Kirsch v. Fleet Street Ltd.,* 148 F.3d 149, 161-62 (2d Cir.1998) (upholding jury finding of constructive discharge where evidence indicated that employer nodded affirmatively when plaintiff suggested that the company was trying to force her to leave); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987) (holding constructive discharge supported by evidence that supervisor told employer "he would be fired at the end of [a] ... probationary period no matter what he did to improve his allegedly deficient performance"), prompting some district courts in this circuit to conclude that specific intent is necessary to a constructive discharge claim. *See Ternullo v. Reno,* 8 F.Supp.2d 186, 191 (N.D.N.Y.1998). Certainly, where such evidence exists, the *mens rea* requirement is easily established.

Whether the employer's deliberate actions rendered the employee's work conditions so intolerable as to compel resignation, may be assessed objectively by reference to a reasonable person in the employee's position. *Pennsylvania State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 2351 (2004) The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?").  Working conditions are intolerable when, viewed as a whole, and are "'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996).

In *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325-26 (2d Cir.1983). A constructive discharge occurs when the employer, rather than acting directly, "deliberately makes an

15

employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Young v. Southwestern Savings and Loan Assn.,* 509 F.2d 140, 144 (5th Cir.1975). In determining whether or not a constructive discharge has taken place, "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977); *accord, Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61 (5th Cir.1980).

**POINT V:    MIXED MOTIVE CASE**

In a mixed motive case, there is credible evidence of both permissible and impermissible factors influencing the challenged adverse action. *Luciano v. Olsten Corporation*, 110 F.3d 210, 218 (2d. Cir. 1997). Once the plaintiff sustains the burden of proving that despite the presence of permissible factors, an impermissible factor had a motivating role in the employment decision, the burden of going forward shifts to the employer to prove as an affirmative defense that it would have made the same decision even in the absence of the discriminatory factor. No heightened showing is required for mixed motive cases under Title VII, § 2000e-2(m). Direct evidence is not required under § 2000e-2(m). The protected trait "must have actually played a role in the employer's decision making process and had a determinative influence on the outcome. *Koski v. Standex International Corp.,* 307 F.3d 672, 678 (7th Cir.2002).

**POINT VI:    RETALIATION:**

Title VII prohibits retaliation for complaining of discrimination. In order to establish a *prima facie* case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004). "A plaintiff may prove that retaliation was a motivating factor behind an adverse employment action either '(1) indirectly, by showing that the protected

16

activity was followed closely by discriminatory treatment, *or* through circumstantial evidence such as *disparate treatment* of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." ' *Parrish v. Sollecito,* 258 F.Supp.2d 264, 268 (S.D.N.Y.2003), quoting *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000).

The plaintiff's burden as to a causal connection is a "light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement." *Rainola v. Bratton,* 243 F.3d 610, 624 (2d Cir.2001)

### A. Prima Facie Case of Retaliation
Plaintiffs Curtis and Spencer easily satisfy the first element of this retaliation claim. Plainly the filing of an EEOC complaint is a protected activity. *See Gregory v. Daly,* 243 F.3d 687, 701 (2d Cir.2001) The law protects employees in the filing of formal charges of discrimination ... so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. Also, undoubtedly termination is "an employment action disadvantageous to plaintiff."

A plaintiff may state a *prima facie* claim for retaliation even when her primary claim for discrimination is insufficient to survive summary judgment. *Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 136 (2d Cir.1999).

A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for a discharge." *Rainola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001). A plaintiff may prove retaliation was a substantial or motivating fact behind an adverse employment action *either* (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, *or* through other circumstantial evidence such as disparate treatment of fellow

17

employees who engaged in similar conduct; *or* (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.

### B.    Material Adversity and Reasonable Employee Standard

In *Burlington Northern & Santa Fe Railway Co., v White,* 548 U.S. 53, 126 S.Ct. 2405 (2006) the scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm. "The Supreme Court held that a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

The Court considers the significance of any given act of retaliation will often depend upon the particular circumstances. *Context matters.* "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." In *Burlington Northern & Santa Fe Railway Co., v White*, 548 U.S. 53, 126 S.Ct. 2405, at 2415, a schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a non-actionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. A legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." Finally, the Supreme Court noted that "contrary to the claim of the concurrence [of §703(a) and §704(a) of Title VII], this standard does *not* require a reviewing court or jury to consider 'the nature of the discrimination that led to

18

the filing of the charge." "Rather, the standard is tied to the challenged retaliatory act, not the

underlying conduct that forms the basis of the Title VII complaint. For    example,    whether    a

particular reassignment is *materially adverse* depends upon the circumstances of the particular

case, and should be judged from the perspective of a reasonable person in the plaintiff's position,

considering all the circumstances. The initial assignment may be objectively considered a better

job. Based on this record, a jury could reasonably conclude that the reassignment of

responsibilities would have been materially adverse to a reasonable employee.  Justice Alito

concurred that a "reassignment with significantly different responsibilities" may be a "tangible

employment action." Here, "[i]n essence, ⋯ the reassignment was a demotion." This was

virtually an admission that respondent was demoted when those responsibilities were taken away

from her.

  Transfers for complaining about a violation of one's civil rights may be considered an

adverse action if it can be demonstrated that the transfer and employer's actions are harmful to

the point that they could well dissuade a reasonable worker from making or supporting a charge

of discrimination.

**POINT VII    DISCRIMINATION IN HIRING, PROMOTIONS AND TRANSFERS**

  The Supreme Court has found that where an unsuccessful female applicant brought suit

under Title VII, 42 U.S.C.A. §§ 2000e et seq., of the Civil Rights Act of 1964, charging an

employer with sex discrimination in its hiring of a male applicant, the facts were sufficient to

support the inference that the applicant was denied the position on account of her sex. A*nderson

v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S. Ct. 1504 (1985)*.*  The Court's determination

that the findings of the district court regarding the female applicant's qualifications, the conduct

of her interview, and the bias of the male committee members lead the Court to conclude that the

female applicant was discriminated against on account of her sex. Title VII forbids employers to

make gender an indirect stumbling block to employment opportunities. See *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777 (1988); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849 (1971).

In denial of promotion "disparate treatment" employment cases the employee must establish that she applied for the position and had the qualifications for the position. *Davis v. Dalla Area Rapid Transit*, 383 F.3d 309, 318 (5th Cir. 2004); *Williams v. R.H.Donnelly Corp.*, 368 F.3d 123, 127 (2d Cir. 2004).

In order to establish a *prima facie* claim of discrimination based on a failure to promote, a plaintiff must show that (1) she is a member of a protected class, (2) she applied for promotion to a position for which he was qualified, (3) she was rejected for the position, and (4) the employer kept the position open and continued to seek applicants. *Mauro v. S. New England Telecomms., Inc.,* 208 F.3d 384, 386 (2d Cir.2000). In order to satisfy the second and third elements, which are at issue in this case, a plaintiff must show that she "applied for a specific position or positions and was rejected therefrom", *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 710 (2d Cir.1998).

## POINT VIII   § 1981 AND NYSHRL CLAIMS

As a general matter, employment discrimination claims brought pursuant to the Human Rights Law, and 42 U. S. C.§1981 are evaluated under the standards that apply to Title VII cases. *See Schiano v. Quality Payroll Systems, Inc.,* 445 F.3d 597, 609 (2d Cir.2006); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000); *Sorlucco v. New York City Police Dept.,* 888 F.2d 4, 6-7 (2d Cir.1989); *Rumala v. New York City Transit Authority,* No. 02-CV-3828 (SLT)(KAM), 2005 WL 2076596, *11 n. 13 (E.D.N.Y. Aug. 26, 2005); *Jessamy v. City of New Rochelle, New York,* 292 F.Supp.2d 498, 511 n. 15 (S.D.N.Y.2003).

In analyzing a hostile work environment claim brought under § 1981 and the NYSHRL, courts use the same standard of proof as applied in Title VII cases. *See Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000); *Reed,* 95 F.3d at 1177; *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987); *Woodcock v. Montefiore Med. Ctr.,* 2002 WL 403601, at *5-6 (E.D.N.Y.2002); *Garone v. United Parcel Servs., Inc.,* 2001 WL 984914, at *2 (E.D.N.Y. July 12, 2001); *see also Francis v. Chemical Banking Corp.,* 62 F.Supp.2d 948, 959 (E.D.N.Y.1999), *aff'd* 213 F.3d 626 (2d Cir.2000).

The Second Circuit has held that a retaliation claim under §1981 is cognizable where the retaliation was taken "in response to the claimant's assertion of rights that were protected by §1981." *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir.1998) (citing cases); *see also Hall v. New York Hosp.,* 2003 WL 22902125, at *3 (S.D.N.Y. Dec. 8, 2003) ("Retaliation claims are cognizable under §1981 as an effective remedy for racially motivated employment discrimination.") §1981 protects workers from discriminatory employment practices, including discrimination with respect to salary and compensation, and has also been held to protect workers from being retaliated against for complaining about these practices. *See, e.g., Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 39-40, 43 (2d Cir.1984); *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir.1998)

**POINT IX    EEOC CHARGE: RELATION BACK THEORY**

Even claims not asserted before the EEOC, and which would thus be barred by the failure to timely exhaust may nevertheless by pursued in a subsequent civil action if they are reasonably related to those that were filed with the agency. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir.2001). A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation *which can reasonably be expected to grow out of the charge that was made.'" Deravin v. Kerik,* 335 F.3d 195, 200-201

(2d Cir.2003). This Circuit has recognized that a claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made. *Deravin v. Kerik,* 335 F.3d 195, 201 (2d Cir.2003).

## POINT X     THE COMPANY.

McGraw-Hill was/is required to comply with all applicable federal, state and local laws, rules and regulations that prohibit, *inter alia,* race discrimination and retaliation in the employment context. (Solotoff Decl. Ex. A ¶¶21, 22, 23, 24, 25)(Solotoff Decl. Ex. B ¶¶21, 22, 23, 24). McGraw-Hill's high ranking officials have the authority to recommend and implement policy affecting the terms and conditions of employees employment, and have the authority to assure OFCCP and EEO compliance, and have the authority to discipline personnel and recommend and influence employment action against Title VII violating employees. (Solotoff Decl. Ex. A ¶¶80)(Solotoff Decl. Ex. B ¶¶80) (Solotoff Cntr. Dec. ¶192-193)

## POINT XI          ADMITTED KNOWLEDGE OF THEIR RESPONSIBILITY TO EXERCISE POWERS AND AUTHORITY TO INVESTIGATE DISCRIMINATION COMPLAINTS AND NOT RETALIATE AGAINST THOSE WHO HAD COMPLAINED

### A. Background, Policy and Procedure:

The Human Resource Department at McGraw-Hill knew, and had reason to know, of the Plaintiffs numerous complaints between 2005 and 2006. The Human Resource Department was dysfunctional. Many of their high ranking officials violated the company policy or outright violated those polices.

McGraw-Hill maintains "The Human Resources Guide to Working at The McGraw-Hill Companies" and a "Statement of the Open Door Policy." (Solotoff Decl. Ex. A ¶¶80)(Solotoff Decl. Ex. B ¶¶80) (Solotoff Decl. Ex. C)(Solotoff Decl. Ex. D). Employees may "express" "concerns" by talking to their supervisor, or the "next higher level of management," or, the

"Human Resources Department," orally and/or in writing. (Solotoff Decl. Ex. C)(Solotoff Decl. Ex. D) "The Human Resources Guide to Working at the McGraw-Hill Companies" and a "Statement of the Open Door Policy" also provides that "[w]hen a problem or dispute comes to a manager's attention," that manager should contact a "Human Resources representative" or with those "higher up in the organization." (Solotoff Decl. Ex. C)(Solotoff Decl. Ex. D). (Solotoff Cntr. Dec. ¶192-196)   McGraw-Hill's high ranking officials have the authority to recommend and implement policy affecting the terms and conditions of employees employment, and have the authority to assure OFCCP and EEO compliance, and have the authority to discipline personnel and recommend and influence employment action against Title VII violating employees. (Solotoff Cntr. Dec. ¶193)

Murphy, Executive Vice President of HR, stated that if an employee complains about racist comments to their manager, as the Plaintiffs did in this case, it is the manager's responsibility to conduct an investigation and advise an HR partner of the allegations. (Murphy Tr. 29) [***The fact of the investigation and its defense [of Pilgrim] is irrelevant and off limits to the jury. (Solotoff Decl. Ex. Iii at P. Hon. Magistrate Judge Peck's Order of Defendant waived the investigation and the sufficiency of the investigation as a defense as a good faith defense, and therefore the results of the investigation is off limits. (See Honorable Magistrate Judge Andrew J. Peck's Order March 11, 2008***)(Solotoff Decl. Ex. II)] (Solotoff Cntr. Dec. ¶199)

Murphy testified that the policy requires that if a complaint or racist and offensive conduct and comments are made to an HR manager about the manager, [as in this case by Pilgrim to Fisher; Curtis to Hunsucker and Stadnyk; Giovanna to O'Neil; and Spencer to Caruso; see below] concerning his or their own conduct, then the manager has to report it to his supervisor and advise the employee to raise it elsewhere too.  (Murphy Tr. 30).  If an employee is leaving the company, and complains of discrimination in an exit interview [as Henson did see

23

below], the interviewer should ask the employee for details, and obtain the names of any witnesses so that an HR employee could follow up. (Murphy Tr. 33-34) Murphy emphasized that a discrimination complaint can be made verbally and in writing (Murphy Tr. 58-59). (Solotoff Cntr. Dec. ¶200-203; 206) As is shown throughout, these policies were violated.

Plaintiffs Pilgrim, Henson, and Spencer were employed in Human Resources and were familiar with the EEO Policy and whether it was followed by the Defendant's management. Moreover, Plaintiffs Pilgrim, Henson, Spencer and Curtis followed the Policy when they expressed their concerns and complained of discrimination and/or retaliation to Human Resources and about Human Resources personnel as hereinafter detailed at length. (Solotoff Decl. Ex. AA) (Solotoff Cntr. Dec. ¶213)

**POINT XII    DIRECT EVIDENCE OF DISCRIMINATION AND PLAINTIFFS'**
**COMPLAINTS HENSON'S CLAIMS OF RACE DISCRIMINATION**

**A.    Evidence of HR Department and Corporate "Bad Faith" and Richard Fisher's, Dir. of HR for S&P, Bias Towards Black Employees and Hostile Comments as it effected Henson and Pilgrim:**

In June 2005 Henson (Black) applied for the Human Resources Representative position for S&P.  Fisher was the hiring manager and Director of HR for S&P. Henson was qualified for the position. Fisher did not hire Henson, and hired a Caucasian.  Henson was denied the promotion because she was a Black woman. Richard Fisher, the Dir. of HR (S&P), Pilgrim's Supervisor, made hostile comments about Black employees and Black women, and was hostile to Blacks.  He directly refused to hire a "Black woman" for the Human Resources Representative position because she was Black and said so. Henson resigned, and on her Exit Interview document in August, 2005 she complained of race discrimination.  Henson's complaint was never investigated by O'Neil, despite Pilgrim's continued complaints in July and August 2005 to O'Neil, and others, about Fisher.  (Pilgrim Tr. 99-100) (Solotoff Cntr. Dec. ¶215, 216, 225, 249,

251)  Henson clearly has a *prima facie* case of race discrimination. Title VII, 42 U.S.C. §2000e, *et seq., Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004) quoting *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997).

A plaintiff may establish pretext by also demonstrating that the employer articulated a nondiscriminatory reason which: 1) had no basis in fact, 2) did not actuate the adverse employment action, or 3) was insufficiently weighty to motivate such a decision. The plaintiff may prove pretext by demonstrating weaknesses, implausibility, inconsistencies, incoherencies, or contradictions, and mendacity in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons. *Webber v. International Paper Company*, 417 F.3d 229, 237 (1ˢᵗ Cir. 2005). See *Hopkins v. Electronic Data Sys. Corp.,* 196 F.3d 655, 662 (6th Cir.1999); *see also, Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 56 (1st Cir.2000).

**B.    Proof of Pretext and Direct Evidence of Race Discrimination; and "Bad Faith"**
Brookins was hired on *July 14, 2005* at her last interview.  Fisher made the decision to hire Brookins.  Aside from having lack of recall throughout his deposition, Fisher gave the implausible excuse, that he hired Brookins (Caucasian), because she was a Grade Level 16, who had a "2004 PMP" rating of #5 in her overall performance review [not a listed criteria or requirement for the position].  Fisher had no personal knowledge of Brookins' grade level and/or her numeric rating and performance. He never saw the performance appraisals of Brookins or of Henson. [O'Neill did not give Henson a completed or signed 2004 PMP]  He does not know who gave him the information about Brookins.  He thought he spoke to O'Neil *only* about Brookins. O'Neill did not speak about Henson, her subordinate, in support for the position. [see Henson Retaliation POINT XIII claim].   No such written performance appraisal for Brookins was provided or seen by Fisher. Fisher did not interview Henson, although he claimed to have

interviewed Brookins. Indeed, implausibly, the 2004 PMP had no numeric ratings for performance.  Grade Levels are more about salary then job responsibilities. Personnel doing the same work may have in-grade pay increases having nothing to do with their responsibilities. Grade Levels may vary between personnel performing the same jobs and responsibilities. Therefore, grade levels are not necessarily indicative of job responsibilities, as much as it may be indicative of a supervisor's favoritism towards an employee. Further, increased responsibilities on a job, or seniority, or greater experience, does not equate to getting assigned a particular or higher grade level. Grade levels may also be arbitrary or based upon other subjective considerations. (Solotoff Cntr. Dec. ¶221, 222, 253)(Henson Aff.16.).

What they knew and when they knew it:  On June I, 2005 Henson applied and was qualified for, and Fisher admitted, that Henson fully "meets the criteria" for, the HR Representative position. He refused to meet with Henson and should have interviewed her. Fisher admitted that he made the decision to hire Brookins in June of 2005, before Brookins was interviewed on July 14, 2005.  (Solotoff Cntr. Dec. ¶215, 216, 230).  Fisher's excuse for hiring a non-African American employee was not only a pretext for his known and stated intent not to hire a Black woman, but direct evidence that he was guilty of race discrimination.

Before July 8, 2005, and before Fisher announced his decision to hire Brookins, which was announced officially on July 14, 2005, Pilgrim complained that Fisher said to her, that he was not going to hire a "Black woman" for the position. Pilgrim complained to Harper, McAuley, Fisher, and O'Neill about Fisher's racist attitude and hostile remarks. Pilgrim attempted to protect herself, and the Company. Despite the fact that the HR Department knew of Fisher's stated intent, HR ignored Pilgrim's complaints, and retaliated against her for complaining. (Solotoff Cntr. Dec. ¶223).

26

From the period of February through July, 2005, Pilgrim complained to Richard Fisher, and other high ranking HR personnel, that Fisher, had made hostile and offensive racist comments to her. Fisher told her that if he had white males reporting to him he would not be having these problems about Blacks; he said to Pilgrim directly "What do you expect, to make as much as a white man?"; he repeatedly stated (5 or 6 times) that he did not intend to hire a Black woman for Melissa Hardy's position [the Human Resource Representative's position]; he said minority (Black) students (INROADS program) should be lucky that they are interviewing for a job; he complained that Black women can't get along; or Black women can't work it out; he said to Pilgrim, "your not being paranoid that your not getting any work;" (a reference to his retaliating against her for complaining); Pilgrim was told that the Blacks would not support her and that your own Blacks are against you; Fisher told Pilgrim and another Black employee that he was not hiring another "one of them" (meaning a Black) referring to the HR Representative position; Tom Gillen, a high ranking HR official, told Pilgrim, that other people heard Fisher make racial comments and the company did nothing about it. Fisher said that his comments "may come back home to bite him". (Solotoff Cntr. Dec. ¶227)

Pilgrim made numerous complaints to VP of HR, Sheila O'Neill, V.P. of HR, [the same O'Neill involved in Henson's retaliation in 2005 and Spencer's retaliation in 2006]; Richard Fisher; V.P. of HR, Bill Harper; V.P. of HR, John Gillen; and V.P. of HR Sara McAuly, and considered Management's failure to conduct an investigation of her complaints to be discrimination. Pilgrim also complained directly to Fisher and high ranking officials at H.R, including but not limited, to, by letter on or about August 18, 2005 to Terry McGraw, III (through counsel) and of her retaliation for complaining on November 9, 2005 (through counsel) to the Company. (Solotoff Cntr. Dec. ¶229, 230) Pilgrim also asked for a third party mediator, using THE FAIR PROCEDURE, to try resolve the problems she had with Fisher's attitude and

27

the problems she was having because she felt that she was being "set up to fail." Fisher admitted that he was taking away her work ["your not being paranoid that your not getting any work;"]; and refused to engage in mediation. (Solotoff Cntr. Dec. ¶227)

Pilgrim also complained in or about February, 2005, to Harper, the highest ranking Black employee in HR, VP of Human Resources, about Fisher's refusal to hire a Black woman for the Human Resources Representative position.  Harper did not conduct an investigation and neither did Sarah McAuley, Fisher's supervisor,  Murphy testified that he expected Harper to speak with McAuley, Fisher's Manager, so that an investigation could be conducted immediately.  Harper admitted that Pilgrim did complain to him about Fisher's intent not to hire a Black woman for the HR Representative position. Harper told Pilgrim that Fisher did not want to hire a complaining "Black woman" [referring to Henson as a "complainer"] [See Retaliation Claim]. Nothing was done about it. (Harper Tr. 90) (Solotoff Cntr. Dec. ¶203, 217)

Pilgrim also told management the following: Robin Hicks, an ex-employee, told O'Neill (Henson's supervisor, and Vice President of HR, Corporate) that Pilgrim felt she was being set up to fail for complaining and that many inappropriate things were said by Fisher and others on Pilgrim's HR her team.  Robin Hicks told Pilgrim, that O'Neill was well aware of the discrimination problems; Hicks said that at grade level #18 you really see the discrimination and unfair treatment, and O'Neill knew it; David Murphy said they "do not hire Blacks in Heightstown because they do not have cars;" Brian Jensen, an HR employee said that the McGraw-Hill's referral policy had an adverse impact on Blacks; and that Blacks have lower performance ratings on their PMPs supported by Data Depot data; Murphy said in a meeting with Pilgrim that Blacks have complained about unfair treatment, especially in HR; Debbie O'Connor said to Pilgrim that Black children do not get kidnapped; no one kidnaps Black children; O'Connor said Diana Ross has never done anything for her people.  If someone was

28

Black they were articulate; if someone was white they were smart; Pauline Meyers told Pilgrim that Allegretta would put the resumes of the candidates from the National Black MBA in the garbage; Pilgrim was also told that if there were two equal candidates, the white got the higher paying job; Alegretta asked Pilgrim if she dressed in "urban clothes" on the weekends. (Solotoff Cntr. Dec. ¶228).

It is respectfully submitted that Henson demonstrates substantial, compelling, and material genuine questions of fact and evidence of more than a *prima facie* case and evidence of pretext sufficient to go to a jury on her race discrimination claim. *Schnabbel v. Abramson*, *232 F.3d 83, 90 (2d Cir.*2000). Should this case be treated as a mixed motive case, there is more than sufficient credible evidence of impermissible factors influencing the challenged adverse action. *Luciano v. Olsten Corporation*, 110 F.3d 210, 218 (2d. Cir. 1997). Title VII strictly forbids employers to make race a direct or an indirect stumbling block to employment opportunities. See *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777 (1988); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849 (1971)

**PART XIII:   HENSON SUFFERED RETALIATION**

In 2004 and 2005 Henson complained to O'Neill that she wanted to progress in the Company and that she was not being allowed to. She was crying at her desk at work. Henson complained to O'Neill that she did not get a promotion she applied for, and told O'Neill that "You do not know what it is like being African American at McGraw-Hill." O'Neil replied, "[She] did not know what it is like being African American at McGraw-Hill." Henson was clear about her complaint. Henson also complained about unfair treatment to O'Neill "all the time." Henson was also told on January 18, 2005 that she was denied the HR Recruiting Specialist promotion that she was seeking at the time. Henson complained about being denied that promotion and all the other promotions that she had applied for. Henson was also sent home by

O'Neill on one occasion because Henson was inconsolable because she didn't get a particular position and that she could not advance in the company. Henson complained that she was being treated unfairly at the Company because she was an African American and that she wanted to progress in the company but she was not being allowed to. (Solotoff Cntr. Dec. ¶233-236).

Henson had often provided to O'Neill detailed Reports that showed that grade levels, turnover rates, salaries, and promotions of African American employees was lower than Caucasians in similar positions throughout the Company and that Blacks were leaving at a quicker rate. Henson also provided these Reports to Ivy Latimer, another of her supervisors, who was a Director of EEO and Diversity. Henson participated on and provided the surveys and reports that supported an ad-hoc (volunteer) Group of middle to high ranking African American employees that were trying to organize to urge the company into changing the culture of unfair treatment against African American employees in pay, promotions and retention. The AAAG was not officially sanctioned and did not get corporate funding for their projects. Pilgrim was one of the leaders of the AAAG in 2004-2005 and Henson was a member. Ivy Latimer said they weren't the flavor of the month, and Fisher took exception to the AAAG and Diversity Council and did not care about Pilgrim's and Henson's participation on the AAAG. Henson reviewed EEO-1s, Affirmative Action Plans, and Data Depot Reports. Henson pointed out that Africa American's were not in higher level positions, were leaving at a quicker rate, and that African Americans were in lower level position (Solotoff Cntr. Dec. ¶237-239, 241).

Henson also observed that African Americans were complaining about racism at their exit interviews and how they were treated at McGraw-Hill and nothing was done about it. Henson said that it was a hostile work environment working at McGraw-Hill because she saw African Americans leaving at a quicker rate, not being promoted, and not at the same level that Caucasians were at with the same education. Blacks did not have mentors. In or about 2004 and

2005 African American employees had complained in their exit interviews about racism and race discrimination and nothing was done about it. These facts were brought out at the AAAG meetings, or conference calls, that Henson attended. (Solotoff Cntr. Dec. ¶242-243).

Henson also applied for a position Talent Acquisition HR, Corporate. It was filled by a Caucasian temporary employee that Henson believes she was more qualified for. O'Neill did not advocate for Henson. Henson discussed her work with the AAAG at her interviews. (Solotoff Cntr. Dec. ¶242-245). Latimer and Henson advocated to O'Neill that more had to be done to improve the equality and treatment of African American employees at the Company, including diversity, recruiting, promotions and salaries. "We also raised these concerns at the AAG meetings." ( Henson Aff.  ¶11 ) (Solotoff Cntr. Dec. ¶246) Personnel in HR talked amongst themselves about African American employees that had complained about race discrimination. (Solotoff Cntr. Dec. ¶248)

The Company retaliated against employees that they wanted to fire and who complained about discrimination by "managing them out" [See Curtis's testimony and Spencer's testimony] Pilgrim suffered retaliation by management significantly and materially reducing her job duties and responsibilities because she had no work; she was told by high ranking HR officials that she will be set up to fail and then call it a performance problem; that other Blacks were set up to fail; she was told that she will be blamed for things she did not do; she will be denied training; Pilgrim was told that David Murphy would directly prevent her from getting a transfer or promotion; that a discrimination complaint against HR was a Black eye on the Department; Pilgrim was also told she will rot in jail without a key; will not be promoted or transferred and that she has no future with the company, they will refuse to meet with her, or provide her the material she needs to do her job; meetings will be canceled or she will be disinvited; Pilgrim was told that Sara McAuley, VP of HR over Fisher, did not want her there anymore; they won't say

31

she's fired, they will just give her nothing to do ("manage her out of the business."). Pilgrim was taken off the AAAG and the Diversity Council she created. The retaliation continued despite Solotoff writing another letter this time complaining of Retaliation. (Solotoff Cntr. Dec. ¶232)

On August 8, 2005 Jordan Grant at a meeting with Terry McGraw and David Murphy complained about the treatment of African Americans at McGraw-Hill. He told them that African Americans are at a disadvantage with corporate ratings, that there are no African Americans of any rank above Director in Corporate Ratings and so there is no one to represent them at crucial meetings, there is a feeling that it is very difficult for African Americans to ascend through the organization, the long term retention rate of African Americans is low, performance is not always accurately reported and that the problem is exacerbated by the culture of the firm. He tells them that at least one manager has underreported the success of his African American employee and that an employee of S & P has made blatantly racially offensive remarks, received diversity counseling but persists in his offensive behavior and is still employed by the company. Pilgrim also knew of other Blacks that complained to McGraw about how Blacks were being treated at M.H. At the AAAG meetings, Blacks were complaining that they were being treated unfairly. They wanted to help change the Company, bring in talented people of color at all levels of the company, help with the retention of Black people, obtain mentoring for Black people, gain more access to Senior level employees. They made comments about how work life could be made better for Black employees. (Solotoff Cntr. Dec. ¶239)

On August 12, 2005 Henson complained at her Exit Interview that Henson's complaints were never investigated. (Solotoff Decl. Ex. L)(Henson Af. ¶ 13). It is incredible to believe, that given the totality of the circumstances, and that while Fisher admitted that following up a claim of race discrimination on an Exit Interview was important to the company because, even if the employee left, the individuals are still working for the company and the company needs to

resolve the issue. (Fisher 121-122); and O'Neill, Henson's Direct Report, admitted she should have known of Henson's complaints on her Exit Interview. It was important to O'Neill, especially because Henson was her subordinate. It was important because the company is competing for employees in the business world. Pilgrim also complained that Fisher was not investigating the Exit Interviews she conducted of employees complaining about racism, that she brought to Fisher's attention; no investigation of Henson's complaints were investigated. It is simply more plausible that they already knew in advance of her resignation. (O'Neill Tr. 92-96) (Henson Aff. ¶ 13) (Solotoff Cntr. Dec. ¶249-251)

Henson's numerous complaints about herself, and the treatment of other Black employees, constitutes clear and unmistakable protected activity. Management was clearly upset by her advocating for Black employees in the company. Fisher treated her like he treated Pilgrim as a complaining "Black woman." Henson remained a participant in the AAAG, and she continued to work on Data Depot reports with Ivy Latimer and O'Neill.

The Defendant purports that O'Neill criticized Henson regarding her work. (See Rasin's Declaration Ex "R" purportedly written by O'Neill on February 9, 2005). Henson had not ever seen this document before. O'Neill did not counsel her on these matters and Henson did not receive a warning, orally or in writing, about these matters, or a Performance Improvement Plan (PIP). It is however important to note that the document, and other documents like this in this case demonstrating a pattern, (re: Curtis: Stadnyk, November 11, 2005); (re: Spencer: Caruso, June 13, 2006) are written shortly after the employee complains of unfair or discriminatory treatment (Henson complained about losing the promotion in January 2005.) (Henson Aff. ¶17

A plaintiff may prove that retaliation was a motivating factor behind an adverse employment action either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, *or* through circumstantial evidence such as *disparate treatment* of

fellow employees who engaged in similar conduct [Pilgrim was a leader in the AAAG]; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." ' *Parrish v. Sollecito,* 258 F.Supp.2d 264, 268 (S.D.N.Y.2003), quoting *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). The plaintiff's burden as to a causal connection is a "light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement." *Rainola v. Bratton,* 243 F.3d 610, 624 (2d Cir.2001). A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for a discharge." *Rainola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001).  Henson was not fired. She resigned shortly after being denied the promotion by Fisher in July 2005. *Context matters.* "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." In *Burlington Northern & Santa Fe Railway Co., v White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006).  Plaintiff Henson demonstrates that she exercised her rights under Title VII, and that she engaged in unmistakable protected activity, and that she suffered material adverse harm and injury that a reasonable employee in her position would be dissuaded from complaining.  The Supreme Court held that a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  For all the reasons herein stated, it is respectfully submitted that Defendant's application seeking dismissal of Henson's claims should be denied.

**POINT XIV   SPENCER'S CLAIMS OF RACE DISCRIMINATION**
**                AND HOSTILE WORK ENVIRONMENT**

Spencer is an African American female and has a Masters Degree in Human Resources and Organizational Development.  She was first employed in December 2000. She was a Grade

Level #19. She was a Senior Manager of Human Resources in McGraw-Hill's Business - Information and Media Services (IMS) responsible for providing human resources support for "Business Week" magazine employees. Spencer's H.R Senior Director (Caucasian) demeaned her with hostile and offensive remarks, and discriminated against Spencer, by treating her unfairly and unequally in regard to her terms and conditions of employment. Spencer complained to his supervisors and high ranking officials about racism, discrimination and hostile work environment. (Solotoff Cntr. Dec. ¶257)

From December 2000 until December 2002, Spencer performed well in her position and her performance was reflected in the overall ratings she received from Harper on her 2001 and 2002 annual performance reviews, which were "performance exceeded expectations," the second highest possible rating. In 2003 Spencer was evaluated with a #4 "Exceeds Expectations" on Employee Relations, Talent Acquisitions, Director 360 Degree Assessments, and Sexual Harassment Trainings and received a pay increase for the year.   In 2004 Spencer received a rating of "Frequently Exceeds Performance Standards" for Leadership Development; and "Frequently Exceeds Performance Standards" for PMP Training for which Spencer received a bonus. Spencer received "Demonstrated Strength" for creating internal partnerships; effective presentations, presents well, has an energizing presence and is engaging, clearly conveys information and ideas through a variety of media to individuals or groups as proficient; provides timely guidance and feedback to help others strengthen specific knowledge and develop key areas to accomplish tasks or solve problems. Managers report that she does this very well a "Demonstrated Strength." She also received Demonstrated Strength for staying with a plan of action until the plan is obtained despite obstacles. She also received "Effective Communications" in 2004. She received a pay increase for her performance. (Solotoff Cntr. Dec. ¶259-262)

As Senior Manager of Human Resources, Spencer's responsibilities included, partnering with department heads, determining in what way they needed HR assistance, developed competency based questions, entry level employees, interns, managers and directors, oversees, manages and coordinates all aspects of the intern programs, develops a diversity slates, completes the competency based questionnaires, handles and resolves employee relations issues to make sure that no issue led to litigation, conduct trainings, develops and manages the sexual harassment trainings, partners or meets with business department heads, recruits for the administrative assistant position of the president of Business Week, handles all employee relations with health care group, disseminates information on an as needed basis to all businesses that were supported, meets with employees to address benefits issues and concerns, reviews the numbers of individuals in each of the departments based upon data sent by the group that works on affirmative action, initiates and develops a leadership development programs to provide updates on HR's accomplishments for the business and communicate results of surveys. (Spencer Tr. 47-48) (Solotoff Cntr. Dec. ¶258)

Caruso became her supervisor in February/March 2005. When Spencer was in his office, Caruso, often and almost daily, would curse, use "fuck" and "shit" and referred to women as "Bitches" "in every conversation". Caruso used this offensive language in front of her and other African American employees. He did not use the same offensive language with white male or white females when they came into his office. Spencer told Caruso that Blacks were concerned about how they were being treated. He said "then they should leave." (Solotoff Cntr. Dec. ¶263)

Spencer complained to Caruso about his discriminatory attitude. After she complained to him he started reducing her responsibilities and her job duties. He gave her clerical work and took away her visibility with her business partners. He told other managers not to come to her but to go directly to him. He started taking away her job duties. Spencer complained to Caruso

36

about his attitude from the Spring of 2005 to October 2005 and he did not stop.  (Solotoff Cntr. Dec. ¶262-264, 266, 269).

Spencer complained to Brett Marschke, Caruso's direct report, about race discrimination His continued cursing and treating her as a Black employee in a demeaning way, and reducing her job duties and responsibilities for complaining created a hostile work environment. She complained to Marschke about the way she was being treated by Caruso on December 13, 2005. Spencer went into great detail about how Caruso treats the African American employees differently than the Caucasian employees. Spencer told Marschke that he was foul and abusive and that he would look directly at her and would refer to women as "Bitches" and that she was being discriminated against.  (Solotoff Cntr. Dec. ¶270)

Marschke said that when Spencer came to him. She was very upset and troubled. Marschke spoke with Caruso and told him that Spencer complained about discrimination. (Solotoff Cntr. Dec. ¶271, 272). Shortly after Spencer complained to Marschke, Shelia Mitchell, (Black) subordinate, met with Marschke in Decembers 2005 and the meeting was rescheduled for January 6, 2006. She complained to Marsche about the same things Spencer was complaining about, including the foul and offensive, hostile language and his attitude towards Blacks. (Solotoff Cntr. Dec. ¶274)

Marschke allowed Caruso to get away with what he did. Marschke never followed up to find out if Caruso's use of profanity and the word "Bitches" stopped  nor  does not know if Caruso's use of profanity continued after he spoke with him. Marschke never got back to Spencer. (Solotoff Cntr. Dec. ¶273).   Caruso's conduct created a hostile work environment directly related to Spencer and Sheila Mitchell's being a person of color. The more he knew Spencer objected to his foul and abusive conduct, the more he demeaned and offended her, by continuing the conduct; his threats that complaining "minorities should leave," and by behaving

37

in a manner that he knew was offensive to the Black employees under his supervision. By isolating his Black subordinates and behaving in this manner the more hostile matters became. When he coupled her complaints with taking away her job duties and responsibilities matters worsened. Spencer was a high achiever. She loved her job and career. Her salary increases and bonuses were directly tied into her supporting over 400 employees and directors at Business Week. (Solotoff Cntr. Dec. ¶258). Diminishing the respect accorded a plaintiff by subordinates and thereby impairing their ability to perform her work can, in appropriate circumstances, contribute to a hostile work environment. *Carerro v. New York City Housing Auth.,* 890 F.2d 569, 579 (2d Cir.1989). Depriving an employee of a fair and equal opportunity to succeed at her position, with a threat "get on board or quit ," and it is not a joke, is a linkage to contributing to a hostile work environment. *Gregory v. Daly*, 243 F.3d 687, 693 (2d. Cir. 2001). It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII when it occurs because of an employee's [race], or other protected characteristic. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79-80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In determining whether an employee has been discriminated against "because of *such individual's* ... race," 42 U.S.C. § 2000e-2(a)(1) the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment. *Connecticut v. Teal,* 457 U.S. 440, 453-54, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). Racial epithets were not used by Caruso. However, his conduct towards Spencer and Sheila Michell was every bit of and because of their race. For example, neither "sex-specific and derogatory terms" nor any evidence that "sexual desire" motivated the hostile conduct is needed to prove an actionable hostile work environment claim. Where the conduct at issue lacks any sexual component or any reference to the victim's

38

sex, could in context, be reasonably interpreted as having been taken on the basis of the plaintiff's sex related. *Gregory v. Daly*, 243 F.3d 687, 695 (2d. Cir. 2001).

It is respectfully submitted, given the totality of the circumstance, and the context in which the offensive and demeaning behavior occurred, and Caruso's discriminatory treatment directly related to and in connection with his offensive treatment of Spencer directly related to her race, clearly demonstrates a *prima facie* case of "race discrimination" and "hostile work environment."

Defendant's attempt to challenge Spencer's performance under Caruso lacks any credibility and is *pretextual.* Defendant's challenge of Spencer regarding a list of diversity candidates not being recruited, lends itself to absurdity. The candidates were highly qualified. Recruitment decisions are made by others for a variety of reasons. Many of the listed candidates were derived under Harper's supervision, under his direction, and at least one of the names on the list was at his insistence and suggestion. Other concerns attributed to not following Caruso's directions, occurred before he was ever hired. Defendant's references a minor inconsequential event that concerned an honest disagreement on the grading of an employee from a#13 to a #14. Reference to a lower rating on a PMP, where otherwise the PMP is strong and complimentary lends to a weak argument. It appears that Defendant's were digging deep into the barrel to see what they could find. Spencer was awarded pay increases and bonuses under Harper and could not receive any salary increases because of her forced resignation in early 2007. Her salary increases and bonuses were based on her performance and hard work until Caruso changed everything. (Spencer Aff ¶¶ 4-8). Plaintiff satisfies her burden of persuasion directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089 (1981). For example, Plaintiff merely

needs to show that Defendant's alleged reasons for discharge were not the only reasons for such discharge, and that other, discriminatory reasons were "at least one of the motivating factors." *Padilla v. Metro-North Commuter RR.,* 92 F.3d 117, 123 (2d Cir.1996), *quoting Cronin v. Aetna Life Ins., Co.,* 46 F.3d 196, 203 (2d Cir.1995). Spencer suffered disparate treatment and a hostile work environment directly attributable to her race. It is respectfully submitted that the evidence supports a finding in her favor on both counts.

**POINT XV    SPENCER'S CLAIMS OF RETALIATION AND CONSTRUCTIVE DISCHARGE**

Spencer filed an EEOC Charge with the EEOC; it was received by the Company on or about January 16, 2006. The Company responded to the EEOC on March 16, 2006. (Solotoff Decl. Ex AA)(Solotoff Decl. Ex. BB)(Solotoff Decl. Ex. CC) Spencer's EEOC Charge includes claims for, and allegations of, hostile work environment. The EEOC did investigate the claims of hostile work environment. (Solotoff Cntr. Dec. ¶275).  A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation *which can reasonably be expected to grow out of the charge that was made.'"  Deravin v. Kerik,* 335 F.3d 195, 200-201 (2d Cir.2003).

Murphy, Caruso, Marschke and Harper and O'Neill were aware of Spencer's EEOC Charge in January-February 2006, weeks before they signed Caruso's 2005 PMP in March 2006, setting a goal to: "[W]e" will pursue the route of counseling Spencer "out of the" company. It was signed on March 19, 2006 by Murphy, Marschke signed it on March 21, 2006, and Caruso signed it on March 20, 2006. This is "smoking gun" evidence of their intent to retaliate against Spencer and force her to leave the company. (Solotoff Decl.Ex. DD at D07591) (Solotoff Cntr. Dec. ¶276, 282). Incredibly, Harper denied knowing about the EEOC Charges, or of participating in response to the EEOC Charge, at the time Spencer was involuntary transferred to BIG on May

30, 2006. This is not credible, four of his higher ranking HR employees, under his supervision were involved, in naming his department in the Charge. (Solotoff Cntr. Dec. ¶280-281).

In April 2006, Spencer was told by O'Neill that the decision was made for her to go to BIG (Business Information Group). Marschke was the senior H/R person for the information and media group which was supervised by William Harper. Spencer met with O'Neill and clearly stated that she "did not want to be transferred to BIG" and told her why. Spencer gave O'Neill four reasons why she did not want to go to BIG. O'Neill knew that the transfer of Spencer to BIG was *"involuntary."* (O'Neill Tr. 206-213, 221, 224)(Solotoff Decl. Ex. R at D07531)(Spencer Tr. 105, 109). O'Neill told Spencer "she had to go." Spencer felt her career was threatened and that she had no choice or be insubordinate if she did not follow orders to make the transfer to BIG.

Spencer even had her therapist call O'Neill to complain on Spencer's behalf. The papers transferring Spencer to BIG were initiated by Caruso and Harper. O'Neill told Spencer "she had to go." Spencer felt her career was threatened and that she had no choice and would be insubordinate if she did not go to BIG. Spencer had her therapist call O'Neill to complain on Spencer's behalf.

Caruso knew in March 2006, well before Spencer ever knew that the decision had already been made to transfer Spencer to BIG, weeks after the EEOC Charge was received. Incredibly, Harper denied knowing or speaking to O'Neill about Spencer's transfer to BIG (Aviation Week). (Harper Tr. 55). Yet, the papers transferring Spencer to BIG were initiated by Caruso and Harper. On April 13, 2006 O'Neill spoke to Harper at a meeting with Marschke and Harper to discuss transferring Spencer to BIG. (O'Neill Tr. 208) (Solotoff Cntr. Dec. ¶290-291). Spencer told O'Neill that she liked working in Business Week and did not want to leave. O'Neill knew that Spencer liked being an H/R professional and how important her work was to her.

Before May 31, 2006, Caruso, Marschke and O'Neill knew that Caruso was being reassigned to J.D. Powers well before having to force Spencer to be transferred involuntarily. Marschke testified at his deposition that it really wasn't necessary for Spencer to be transferred to BIG. (Marschke Tr.113) (Solotoff Cntr. Dec. ¶285, 287-289, 296).

At BIG Spencer's job duties, goals and responsibilities were significantly and materially altered, diminished, and reduced substantially (over 80%) and constituted a demotion. For a complete very detailed list of all of the job duties and responsibilities that were taken away from Spencer, see her Affidavit. (Spencer's Aff. ¶14).  HR management was upset and considered it a "black eye" on the department that she (Pilgrim) filed a formal EEO complaint (Pilgrim Aff.¶5). It was apparent that HR did not want Spencer involved in anything other than simple administrative or clerical HR matters.  *Petrosino v. Bell Atlantic*, 385 F.3d 210 (2d. Cir. 2004). Plaintiffs have been able to establish that employers acted with the specific intent to prompt employees' resignations. *See, e.g., Kirsch v. Fleet Street Ltd.,* 148 F.3d 149, 161-62 (2d Cir.1998) (upholding jury finding of constructive discharge when plaintiff received a "head nod" that suggested that the company was trying to force her to leave); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987).

On June 13, 2006, Caruso wrote a blistering letter (Solotoff Decl. Ex. Q) to Spencer's HR file. This letter ("smoking gun") details how angry he was at her filing her discrimination EEOC Charge. This letter was not unlike O'Neill writing a memo in February 2005 about Henson after Henson complained.  Marschke testified that it was first time he had ever seen such a letter like Caruso's, June 13, 2006 letter by an HR supervisor who was ever the subject of an EEOC Complaint against a subordinate, who was a charging party. (Marschke 155-156, 158)

Spencer was at BIG from June 2006 to January 2007.  On February 2, 1007 Spencer resigned and told O'Neill that she felt she was reduced to doing nothing at BIG, that her role as a

Senior HR Manager was much less than it ever was at Business Week, and she gave O'Neill examples. She told O'Neill that after working for six years, to be treated in this manner, and that she could not take it anymore. She felt she had to leave the Company and made arrangements to do so in January 2007. (Solotoff Decl. 277-279, 292). It is respectfully submitted that Spencer presents clear and overwhelming evidence of retaliation, and constructive discharge. Complaining to Marschke in December 2005, about discrimination, and filing the EEOC Charge was protected activity. What followed within weeks of her complaining, was a concerted effort and plan to involuntarily transfer Spencer, reduce her job duties and responsibilities significantly, and materially and "manage her out of the company. She was constructively discharged.

**POINT XVI   CURTIS'S CLAIMS OF RACE DISCRIMINATION
           AND RETALIATION POST-TERMINATION**

> **A.  Direct Evidence of Stadnyk's Bias against Black Employees:**

Plaintiff was employed as an <u>Office Manager</u>, Grade Level #17 ($73,000.00 per year salary)(Curtis's salary was twice that of Henson and equivalent to Pilgrim's salary) in the E-Business Department of S&P in the Securities Services Division of McGraw-Hill beginning on or about May 29, 2002, working for the Executive Managing Director of Securities Services, Vladimir Stadnyk. Curtis was considered an "expert" on computers and computer software. (Solotoff Decl. 300, 301).

Stadnyk told Curtis that Lasina Ahmad (Black) a receptionist, had previously complained about race discrimination against Peggy Bartolone, (Caucasian), her prior supervisor. Stadnyk told Curtis that he wanted Ahmad fired.  He told Curtis that she had to force her out of the business/company. Stadnyk told Curtis to give Lasina Ahmad, a receptionist, work she could not do or handle, and no other receptionist was doing. He said that because you're here she can't say it is discrimination because "you're Black and she's Black."  Curtis complained to Stadnyk that

43

Ahmad should not have to do more than what she was already doing and that it was similar to what other receptionists were doing. Stadnyk told Curtis to get it done because he wants the position. Curtis complained to Joyce Hunsucker, Dir. at Human Resources, that Lasina Ahmad could not do work she was not trained for and she would not have to do as a receptionist. Hunsucker told Curtis, you have to give her this work because that's the way we're going to get her out. Hunsucker told Curtis that Hunsucker spoke with legal and Hunsucker said this is the way we're going to get her out. We have to give her work that we know she cannot do "so we can say she's not up to par." (Solotoff Decl. 301-306).

As is later relevant to Cutis's case, Stadnyk tried to make an issue with Ahmad's attendance because she took an FMLA leave. There was no issue of attendance. She did not have an attendance problem. Nevertheless, Lasina Ahmad was "managed out" of the business and forced to resign. Gail Whalen told Curtis that they were targeting her to get [Lasina Ahmad] her out. (Solotoff Decl. 308-310).

Curtis complained to Stadnyk that Caucasian male employees referred to the Evaluations Department as the "ghetto;" she complained to Stadnyk that he was not enforcing the dress code fairly and that Black employees were sent home to change their clothes, or buy new clothes, but Caucasian employees, who violated the dress code, were not. Stadnyk said he did not care about that "Black and White shit." Stadnyck often referred to her, and her staff as the "hired help". Curtis told him that she was offended by his comments, as racial comments, and she insisted that he stop. Stadnyk said he would continue making the statement and "she should roll with it." Stadnyck also refused to refer to Curtis as his Office Manager. He insisted on calling her an Administrative Assistant, which was a lesser position in grade and salary. He refused to recognize her full title and respect her position. He even evaluated her on her PMPs and her letter of reference as an Administrative Assistant. Moreover, Stadnyck did not include Curtis as a

direct report to dinners or functions with all the other direct reports. Stadnyck did not include Curtis as a direct report to dinners or functions with all the other direct reports. A Black administrative assistant stole something from the company.  Stadnyk would often say to Curtis, when she was carrying a box, "What are you stealing."   She took offense to his repeated comments that she was stealing something as relating to her as a person of color. (Solotoff Decl. 314-316).

On or about July 2005 Plaintiff Curtis was told that her job was eliminated. However, Vlad Stadnyck did not change his physical office location or office and continued to require an employee with less than Curtis' qualifications to work for him. Curtis was also told that Eccri Gutierrez (Caucasian female) was going to take over Curtis' desk.  Curtis had been training Eccri Gutierrez as an Administrative Assistant throughout the year prior to Curtis being terminated. Nevertheless, Stadnyck fired Curtis. (Solotoff Decl. 318). Before Curtis left the Company she complained of racism and discrimination to Pilgrim, Gattinella, and Pierre Davis, Esq. (Curtis Tr. 134, 142)(Pilgrim Aff. ¶ 2). (Solotoff Decl. 317).

On September 14, 2005 Curtis signed a Termination and Release Agreement ("Agreement") dated August 25, 2005. The Agreement did not preclude Curtis from seeking re-employment at the Defendant**.** (Solotoff Decl. 322). Joyce Hunsucker, was a Director of Human Resources, and had worked as an HR Generalist supporting S&P and worked with Richard Fisher, Dir. Of HR of S&P, and Plaintiff Jannie Pilgrim, Human Resource Manager/Generalist at S&P.  Hunsucker and Fisher reported to Sara McAuley, VP of Human Resources. Stadnyk provided Curtis with a false and erroneous letter of reference. The letter of reference was demeaning and mischaracterized Curtis as an "Administrative Assistant" from May 29, 2002 until October 3, 2005." Curtis' entire performance evaluation (PMP) prepared by Stadnyck for

45

2004 was based erroneously, implausibly, and incredibly on his treating her as a administrative assistant, which she was not.   (Solotoff Decl. 325, 326, 328).

On or about October 3, 2005 Curtis complained to Gatinella, VP. Of Human Resources, and Pierre Davis, Esq. of race discrimination and insisted that the "first letter" of reference be changed. Stadnyck refused to make the change. Curtis needed the letter for reference purposes. She indicated on the "first letter" that she asked Joyce Hunsucker to make the necessary change. Stadnyk and Hunsucker refused to make the change and she would have to take the reference letter the way it was. It was changed only after Curtis spoke to Gattinella. (Solotoff Decl. 330, 331).

Curtis had complained on numerous occasions about race discrimination by Stadnyk and/to Stadnyk, to Human Resources (Hunsucker, Gattinella, Pilgrim, and Gatinella, and/or Pierre Davis, Esq. house counsel). (Pilgrim Aff. ¶ 2 ). Curtis complained to Plaintiff Pilgrim about race discrimination. Curtis told Pilgrim that she was upset that she was let go and that she told Pierre Davis that there was discrimination within McGraw-Hill.  She also told Pilgrim that Davis did not want to hear about it. Curtis was not given an exit interview. She complained that African American employees trained "white people" to replace them as their managers and who later evaluated the Black employees.   She complained that what she observed was very demeaning. She complained that Joyce Hunsucker would not get back to Curtis on positions that were open that Curtis qualified for until they were filled.  She complained that she was lied to that the hiring manager was out of town in London when he was actually in the office next door. (Solotoff Decl. 332-335).

**B.    Direct Evidence of Stadnyk's Bias Against Curtis Post-Employment
       The Defendant's Retaliation Against Her:**
       Pilgrim acknowledged that Brenda Curtis complained to her about race discrimination.

She also complained to Joyce Hunsucker, HR Manager who handled Employee Relation issues.

She complained to Pierre Davis, the McGraw-Hill corporate attorney. She informed Pilgrim that during her conversation with Mr. Davis, Curtis complained to him about race discrimination that she experienced and the discrimination that she witnessed that happened to Blacks at McGraw-Hill. (Pilgrim Aff. ¶2.)

Pilgrim also stated that she was at a Structured Finance meeting, after Brenda Curtis was no longer employed (October 3, 2006) with Standard & Poor's. During the meeting, Nancy Tameo stated that Brenda Curtis applied for a few positions in Structured Finance. She also stated that she was not going to hire Brenda or grant her an interview. She said it was because Brenda had made complaints about Vlad Stadnyk, and she would not be considering her for any open positions in Structured Finance. (Pilgrim Aff. ¶2.)

In or about November 2005, Curtis was interviewed for two positions in Structured Finance. One position was for a position as Administrative Assistant-LOC; and the other was Administrative Assistant-Criteria. In or about November 2005, Curtis was also interviewed by Nancy Tameo, Office Manager for Structured Finance, S&P, for those positions; and then by Blessing Mariano, HR Recruiter for the positions. Curtis understood at that time that Nancy Tameo had the authority to decide whether to hire her for both positions. (Solotoff Decl. 336, 337, 338).

Curtis reviewed a document purporting to be an interview on November 11, 2005 between Vlad Stadnyk, and Blessing Mariano, HR Recruiter. Curtis later learned and was advised that on or about November 11, 2005, Mariano Blessings interviewed Vlad Stadnyck regarding her performance under his supervision. Stadnyck made false and negative references about Curtis' performance to Blessings Mariano sabotaging her ability to get reemployed. For example, among other things, Stadnyk told Blessings Mariano criticizing Curtis's attendance as a single parent with "child care" issues, which he stated "prevented her from getting to work on

47

time." This was false and never was an issue while she was employed. (Solotoff Decl. 336, 337-340, 341).

Stadnyk is guilty of "mendacity." Stadnyk denied under oath that he never heard of Blessings Mariano and does not know Nancy Tameo. He also said he did not speak to Blessings Mariano. He also lied when he testified that he did not tell any one about what is identified in the November 11, 2005 interview by Blessings Mariano with Stadnyk, [entitled "Vlad Stadnyck Feedback November 11, 2005"]. He denied making comments about Curtis having child care issues, attendance problems, or having any contact with a hiring manager or recruiter about Curtis. (Solotoff Decl. 336, 337-340, 341).

Indeed, Stadnyk had made no issue over Curtis' attendance or "child care" issues while she was working for him as an Office Manager. Moreover he authorized and permitted her work day to start between 9:30 A.M. and 9:45 A.M. This false charge by him regarding Curtis' attendance was reminiscent of his false complaints about Lasina Ahmad, the receptionist that also complained of race discrimination, and her FMLA leave, that was also proper at the time, that he tried to use as an excuse to get rid of Ahmad. In his interview with Mariano Stadnyk also criticized Curtis' handling of the receptionist Lasina Ahmad, (person of color) which he stated "spiraled and became a large problem instead of being resolved quickly." He also stated in his November 13, 2005 interview that a future manager "should coach [Curtis] on how to exercise diplomacy."  Diplomacy was never an issue with Curtis. See reference to her 2003 and 2004 PMPs below. This complaint by him is inconsistent with her 2004 PMP and reminiscent of his complaints about Lasina Ahmad, it was also false, contrived, pretextual, and designed to assure that Blessing Mariano and Nancy Tameo, and others, would not re-hire Curtis.

48

Indeed, they had decided not hire Curtis and told Pilgrim so.  Curtis's interviews were a complete sham. Curtis was denied re-employment because of Stadnyk's comments to Blessing Mariano and to Tameo. Nancy Tameo told Pilgrim around October 2005 that they will not hire Curtis because of her complaints against Stadynk. (Solotoff Decl. 342, 343, 344).

Nancy Tameo swore under oath that Curtis was qualified for the four structured finance positions. She told Curtis she was "over qualified" for the Structured Finance Positions. Stadnyk's comments to Blessings Mariano were contradictory and inconsistent with Curtis's her true performance and professionalism and his evaluations of that performance (albeit as an Administrative Assistant). (Solotoff Decl. Ex. X) (Curtis Aff.¶1-16 )(See Nancy Tomeo's Aff. ¶4 confirming Curtis' qualifications for the two positions.) (See Pilgrim's Aff ¶ 2 ) demonstrating the true reasons for Curtis' not being hired for those positions in Structured Finance and its connection to Stadnyk's comments against Curtis. (Solotoff Decl. 342, 343, 344, 347).)

**POINT XVII        CURTIS' APPLICATIONS TO MCGRAW-HILL FOLLOWING HER TERMINATION: AND DENIAL OF RE-EMPLOYMENT**

Curtis applied for a number of Administrative Assistant positions. Curtis filed for the Admin. Asst. Chief Information Officer of Technology for S&P. (Rasin Decl. Ex. LL.)  Curtis was an Office Manager and had trained and supervised Administrative Assistants for years while at McGraw-Hill. She was more qualified for this position than any other candidate. She was classified an "Expert" in proficiency on Microsoft Excel and Spreadsheets.  She had filed an application for this position on September 16, 2005.  The position was filled with an external hire on November 21, 2005. Curtis filed for an Administrative Assistant in Data Operations for McGraw-Hill. Curtis was an Office Manager for Vlad Stadnyk, Executive Managing Director of Data & Information Services. Curtis was more qualified for the position. The position was awarded to begin on November 28, 2005. She was not interviewed or even given an opportunity

to contest for the position. Curtis applied for an Administrative Assistant position in S&P Ratings. (Rasin Decl. Ex. RR.) Curtis was an Office Manager and had trained and supervised Administrative Assistants for years while at McGraw-Hill. She was more qualified for this position than any other candidate. She had filed an application for this position on November 20, 2005. The interviewer was Blessings Mariano the same interviewer who had spoken to Stadnyk and Nancy Tomeo on or about November 11, 2005, which he denies. The position remained open and was not filled until May11, 2006. Curtis filed her official EEO Charge with the EEOC and the company in January-March 2006. She was not interviewed for the position. The employee hired for the position was not African American, and only demonstrated "Advanced" proficiency in Microsoft Excel and Spreadsheets. Curtis applied for an Administrative Assistant position serving Structured Finance and reporting to Paul Kelly, the Managing Director of Ratings for Structured Finance. Curtis was more qualified for this position. Nancy Tomeo was the Office Manager for the group, acting as a proxy for Kelly, was to screen the applicants and determine which of them would move on to a second round of interviews with him. (Tomeo-Farrelly Aff. ¶ 3). Curtis also applied to be the Administrative Assistant to the Senior Vice President of Global Client Services & Sales. Curtis was qualified for this position. She had filed an application for this position on September 1, 2005. The position remained open. The position requisition was not cancelled until April 3, 2006. (Solotoff Decl. 336, 337-340, 341, 349-361). Curtis suffered disparate treatment and retaliation directly attributable to her race. It is respectfully submitted that the evidence supports a finding in her favor on both counts.

## CONCLUSION

For all the reasons set forth above, Plaintiffs Henson, Spencer and Curtis requests that the Defendant's motion for summary judgment be denied in all respects, and that Plaintiffs be permitted to try their claims before this Honorable Court and a jury.

Dated: Great Neck, New York
July 17, 2008

Trial Counsel:
s// L. Solotoff
Lawrence Solotoff (LS1356)
Cheryl Solotoff (CS3013)
SOLOTOFF & SOLOTOFF, ESQS.
Plaintiff's Counsel
P.O.Box 4686
Great Neck, New York 11023
Office No.     (516) 466-5522
Facsimile No.  (516) 466-5562

TO:
Gregory 1. Rasin
Elise M. Bloom
Steven D. Hurd
1585 Broadway
New York, New York 10036-8299
Telephone: 212.969.3000
Fax: 212.969.2900
Email: grasin@proskauer.com
Attorneys for Defendant

51