**EXHIBIT F**

1

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4          -----------------------------------------x

5          JANNIE PILGRIM, GIOVANNA HENSON, JESAN

6          SPENCER and BRENDA CURTIS,

7                              Plaintiffs,     Case No.

8              -against-                       07CIV 6618

9          THE McGRAW-HILL COMPANIES, INC.,

10                             Defendant.       **ORIGINAL**

11         -----------------------------------------x

12                              April 15, 2008

13                              2:30 p.m.

14

15            Deposition of KENNETH CARUSO, held at

16         the offices of Proskauer Rose, LLP, 1585

17         Broadway, New York, New York, pursuant to

18         notice, before Renate Reid, Registered

19         Professional Reporter and Notary Public of

20         the State of New York.

21

22

23

24

25

```
1                        Kenneth Caruso

2        Marschke?

3             A.  I was.

4             Q.  And to whom did he report?

5             A.  He reported to David Murphy.

6             Q.  Who is David Murphy?

7             A.  I believe his title is executive

8        vice president of human resources for the

9        McGraw-Hill companies.

10            Q.  When it was -- the offer presented

11       itself that you go to JD Power &

12       Associates, was that verbally or in

13       writing?

14            A.  Initially, the opportunity was

15       presented to me verbally, before I decided

16       to accept.  Once I made it clear that I

17       would be willing to make the transfer, the

18       offer was presented in writing.

19            Q.  When did you make the decision to

20       accept the offer?

21            A.  In June of 2006.

22            Q.  Can you be more specific; when in

23       June?

24            A.  I can't.

25            Q.  At the time that you made -- you
```

9

```
 1                    Kenneth Caruso
 2   decided to accept the offer, what were you
 3   doing at McGraw-Hill, and working on any
 4   specific projects at that time?
 5           MS. BLOOM:  Object to the form of
 6       the question.  You can answer.
 7       A.  I was working as the human
 8   resources generalist for Business Week.
 9   No special projects, to my recollection.
10       Q.  Well, it would seem to me, then,
11   in order for you to leave, you had to make
12   arrangements for your departure, is that
13   correct, with the company?
14           MS. BLOOM:  Object to the form of
15       the question.  You can answer.
16           MR. SOLOTOFF:  I'll rephrase the
17       question.
18       Q.  Before leaving, did you plan on
19   how you were going to leave McGraw-Hill in
20   New York City, in terms of your work?
21       A.  Well, my -- the position that I
22   held at Business Week was subsequently
23   posted so that a new candidate or a new
24   individual could be identified for the
25   role.
```

|  |  |
|---|---|
| 1 | Kenneth Caruso |
| 2 | Q.  And when was it posted? |
| 3 | A.  I don't know the exact date. |
| 4 | Q.  Do you know who filled your |
| 5 | position after you left? |
| 6 | A.  It was John Quinonas. |
| 7 | Q.  What title did he assume when he |
| 8 | filled that position? |
| 9 | A.  I believe it was also senior |
| 10 | director of human resources. |
| 11 | Q.  It was human resources working in |
| 12 | Business Week? |
| 13 | A.  Yes. |
| 14 | Q.  Do you know when he filled that |
| 15 | role? |
| 16 | A.  In September of 2006. |
| 17 | Q.  How long was that position vacant, |
| 18 | that is, from the time you departed to go |
| 19 | to California to work for JD Power & |
| 20 | Associates, to the time that Mr. Quinonas |
| 21 | filled your old position? |
| 22 | A.  Approximately six or seven weeks, |
| 23 | from August 1st -- I performed both roles |
| 24 | for that period of time. |
| 25 | Q.  What were the both roles? |

Kenneth Caruso

1

2    A.   The Business Week role and the JD

3    Power & Associates role.

4    Q.   Where did you perform those both

5    roles; was that out of California --

6    A.   Yes.  In West Lake Village,

7    California.

8    Q.   Who filled the position that Jesan

9    Spencer had?

10        MS. BLOOM:  Objection.

11        MR. SOLOTOFF:  I'll withdraw the

12    question.

13    Q.   Did there come a time that Jesan

14    Spencer was no longer working under your

15    supervision?

16    A.   Yes.

17    Q.   When was that?

18    A.   Jesan transferred out of the

19    Business Week human resources team, I

20    believe, in the end of May of 2006.

21    Q.   And what was her position before

22    she transferred?

23    A.   I believe it was senior manager of

24    human resources.

25    Q.   Was she one of your direct

1                    Kenneth Caruso

2        reports?

3            A.  She was.

4            Q.  Were there any others?

5            A.  Sheila Mitchell.

6            Q.  And anyone else?

7            A.  No.

8            Q.  Who filled Jesan Spencer's

9        position after she transferred out from

10       under your supervision?

11           A.  It was filled after I had

12       transferred out to JD Power & Associates.

13           Q.  You said that was in or around

14       June of 2006?

15           A.  No.  I transferred to JD Power &

16       Associates on August 1st of 2006.

17           Q.  Who filled Ms. Spencer's position,

18       between the time she was transferred in

19       May out of her role and before you went to

20       JD Power?

21               MS. BLOOM:  Object to the form of

22           the question.  You can answer.

23           A.  The position remained open.

24           Q.  Was there a time where the

25       position was no longer remained open?

1                        Kenneth Caruso

2        well aware that your question implies

3        information that's not accurate and

4        doesn't accurately reflect his earlier

5        testimony.

6            MR. SOLOTOFF:  Again, you're

7        speaking for him.

8            MS. BLOOM:  I'm not speaking for

9        him.

10       Q.  Do you recall your earlier

11   testimony?

12           MS. BLOOM:  Excuse me.  I'm not

13       speaking for him, but it is my job to

14       insure that the questions are

15       appropriate, and that one wasn't.

16           MR. SOLOTOFF:  It is.

17           MS. BLOOM:  We'll have to agree to

18       disagree on that.

19           MR. SOLOTOFF:  Okay.

20       Q.  Was Jesan Spencer transferred to

21   BIG?

22       A.  Jesan began working with BIG, I

23   think, on May 31st, 2006.

24       Q.  On May 31st, 2006, when she began

25   working at BIG, was that as a result of a

79

<pre>
 1                    Kenneth Caruso
 2      transfer?
 3           A.  It was as a result of a transfer.
 4           Q.  Did you approve of the transfer?
 5               MS. BLOOM:  Object to the form of
 6           the question.  You can answer.
 7           A.  I was not involved at all in the
 8      transfer discussions.
 9           Q.  Whether you were involved in the
10      transfer discussions or not, did you
11      approve of the transfer?
12               MS. BLOOM:  Object to the form of
13           the question.  You can answer.
14           A.  I was not asked to approve.
15           Q.  Did you fight for Jesan Spencer to
16      stay in her job under your supervision?
17           A.  I did not.
18               MR. SOLOTOFF:  I'd like to have
19           this marked as Caruso number 2.  It
20           had been previously marked as O'Neill
21           12.
22               (Caruso Exhibit 2 was marked for
23           identification).
24           Q.  Can you, please, identify this
25      document.
</pre>

1                              Kenneth Caruso
2          counseling.
3               Who is the "we" referring to?
4               A.  I'm not sure the precise reference
5          that Brett intended there.  The way I
6          interpreted that was, the human
7          resource -- the larger human resources
8          organization.
9               Q.  Did the larger organization
10         include yourself as the "we", in your
11         goals in your PMP?
12              MS. BLOOM:  Object to the form of
13              the question, to the extent it
14              mischaracterizes the testimony.
15              There's been no testimony about any
16              goals in this PMP.
17                You can answer.
18              A.  My goal, as outlined at the
19         beginning of the year, is not relevant to
20         this statement.  My goal is to assess the
21         staff and coach the staff to appropriate
22         performance thresholds.
23              Q.  Did you coach Jesan Spencer that
24         it was the company's interest to counsel
25         her out of the Business Week business?

1                     Kenneth Caruso

2          MS. BLOOM:  Object to the form of

3      the question.  You can answer.

4          A.  I never had any conversations with

5      Jesan about a transfer out of the Business

6      Week organization HR team.

7          Q.  The next sentence says, "this will

8      not be easy, recognizing that Ken's

9      natural style is one that is most likely

10     more aggressive results oriented than

11     either of these people are accustomed to".

12          Who wrote that?

13          A.  Brett Marschke.

14          Q.  And who are, "these people"?

15          A.  I interpreted it as a reference to

16     Sheila and Jesan.

17          Q.  To Sheila Mitchell and Jesan

18     Spencer, correct?

19          A.  Correct.

20          Q.  It says, "it will be up to Ken to

21     insure that he has effective relationships

22     with his staff, even if we pursue the

23     route of counseling them out of the

24     business".

25          What does that mean, "up to you"?

1                    Kenneth Caruso

2        A.   I interpreted that to mean that my

3    responsibility was to insure that I had

4    effective relationships with my staff.

5        Q.   While they pursue the route of

6    counseling them out of the business?

7            MS. BLOOM:   Object to the form of

8        the question.   Mischaracterizes the

9        document and the testimony.

10           MR. SOLOTOFF:   I'll rephrase it.

11       Q.   Was that your understanding, that

12   that was to -- that you were to maintain

13   effective relationships while the company

14   pursued the route of counseling them out

15   of the business?

16           MS. BLOOM:   Objection to the form

17       of the question.   Mischaracterizes the

18       document.   You can answer.

19           THE WITNESS:   I'm sorry, can you

20       repeat the question?

21        (Record was read back).

22       A.   My understanding was that I was to

23   maintain effective relationships with

24   them, regardless of what was occurring by

25   or from the larger organization.

1                       Kenneth Caruso

2           Q.   To your knowledge, was Jesan

3    Spencer counseled out of the business?

4           A.   No.

5           Q.   How do you know that?

6           A.   To my knowledge, Jesan's role

7    within BIG, it was never presented to

8    me -- I was not involved in those

9    discussions and it was never presented to

10   me as her being counseled out.

11          Q.   That was in your PMP, was it not?

12              MS. BLOOM:  Object to the form of

13          the question.  Mischaracterizes the

14          document.  What was in her PMP?

15              MR. SOLOTOFF:  For her to be

16          counseled out.

17          A.   No, it's not.

18          Q.   That's your testimony?

19          A.   It presents a -- my understanding

20   of the document and the comments, is that

21   it presents a speculative, even if.

22          Q.   Does it present an expectation?

23          A.   No.

24          Q.   Does it define how it's supposed

25   to be accomplished?

1                    Kenneth Caruso

2          MS. BLOOM:  Object to the form of

3      the question.  Mischaracterizes his

4      testimony and the document.

5      A.  It does not define how or states

6      conclusively if it is to be accomplished.

7      Q.  Where it says, "this will not be

8      easy", why is that in this statement, to

9      your knowledge, unless it was their

10     intention to do so?

11         MS. BLOOM:  Objection.

12     Mischaracterizes his testimony and the

13     document.

14         MR. SOLOTOFF:  I'm asking the

15     question, Counsel.

16         MS. BLOOM:  Excuse me.  You can't

17     ask questions that mischaracterize

18     documents or his testimony.

19         MR. SOLOTOFF:  The record has your

20     objection.

21     Q.  You understand the question?

22         MS. BLOOM:  Actually, the record

23     doesn't have my objection, because you

24     were talking over me.  I object to

25     your question.  It mischaracterizes

1                          Kenneth Caruso

2          the testimony and the document.  It

3          doesn't say this will --

4                MR. SOLOTOFF:  Now, you're

5          testifying.

6                MS. BLOOM:  I'm not testifying.

7                MR. SOLOTOFF:  Now, you're

8          testifying.  You made your objection,

9          but now you just stepped over your

10         objection.

11           Do you want to tell the witness what

12         to say?

13               MS. BLOOM:  You can argue with me

14         all you want.

15               MR. SOLOTOFF:  I will.  Because

16         you're stepping over your boundaries.

17               MS. BLOOM:  Reading pieces of

18         statements in a document

19         mischaracterizes the document, and you

20         compound the problem with your

21         question when it also mischaracterizes

22         the witness's testimony.

23               MR. SOLOTOFF:  That's your

24         objection.

25               MS. BLOOM:  That is my objection.

1                          Kenneth Caruso

2          Q.   Please answer the question.

3               MS. BLOOM:   If you can.

4          A.   I interpreted the phrase, "this

5     will not be easy", as referencing the fact

6     that I was expected to maintain effective

7     relationships, and no reference to the

8     speculative about counseling them out of

9     the business.

10         Q.   It says, "we need to raise the

11    bar, but need to do so in a way that

12    people continue to feel that they are

13    treated fairly, with respect.   Sometimes

14    this can be a fine line".

15              Who wrote that?

16         A.   Brett Marschke.

17         Q.   Does that sound like a guidance to

18    you, in some form?

19              MS. BLOOM:   Object to the form of

20              the question.   You can answer.

21         A.   I interpreted that as a

22    constructive coaching statement from

23    Brett.

24         Q.   Now, you knew that this was

25    written in your PMP before you signed

1                        Kenneth Caruso

2          Q.   Have you ever heard of employees

3     complaining that -- about being managed

4     out of the company?

5          A.   Have I ever heard employees

6     complaining about being managed out of the

7     company?

8          Q.   Yes.

9          A.   I have not been involved in

10    conversations on that topic, as it relates

11    to the broader McGraw-Hill corporation.

12    The vocabulary for the business, in my

13    experience within McGraw-Hill, always

14    referenced the specific business area or

15    business unit in which you were working.

16    In this case, Business Week.

17         Q.   It doesn't use the words,

18    "Business Week" does it, in this sentence?

19         A.   It does not.

20         Q.   Have you ever heard the expression

21    made by an employee that they felt that

22    they were being managed out of the

23    company?  Have you ever heard that

24    expression, by any employee, while you

25    were a senior director of human resources?

1              Kenneth Caruso

2         A.  I have heard the term.  It's not

3    one that we use particularly within

4    McGraw-Hill.

5         Q.  Have you ever heard the term, in

6    McGraw-Hill, by employees that they

7    complained that they're being set up to

8    fail?

9              MS. BLOOM:  Object to the form of

10             the question.  You can answer.

11        A.  Again, I'm aware of that concept.

12   It's not one about which I've heard

13   specific complaints at McGraw-Hill.

14        Q.  What does that concept mean to

15   you?

16        A.  It actually references, in my

17   opinion, the way that goals are defined

18   and their adherence to those SMART

19   principles that we discussed.  In other

20   words, if a goal is not specific,

21   measurable, achievable or relevant, then,

22   the employee's ability to be successful

23   against those goals might be called into

24   question.

25        Q.  Did there come a time where you

```
 1                        Kenneth Caruso
 2        learned that Jesan Spencer had made a
 3        complaint about your conduct as a
 4        supervisor?
 5              MS. BLOOM:  Object to the form of
 6              the question.  You can answer.
 7              A.   I am aware that Jesan had made a
 8        complaint about my conduct.  I don't
 9        believe it was specifically related to my
10        supervision of her.
11              Q.   Weren't you her supervisor?
12              A.   I was.
13              Q.   And what was the nature of the
14        complaint concerning your conduct?
15              A.   I believe that she had complained
16        about my use of language in the office.
17              Q.   What kind of language?
18              MS. BLOOM:  What kind of language
19              did she complain about; is that the
20              question?
21              Q.   You referred to language.
22                 What do you mean by language?
23              MR. SOLOTOFF:  I'll rephrase the
24              question.
25              A.   My reference is to colorful
```

105

1                        Kenneth Caruso
2            language.
3                    Q.   What does that mean?
4                    A.   Curse words.
5                    Q.   What curse words?
6                    A.   As I recall, it was about my use
7            of the word, "bitch" and the word, "fuck".
8                    Q.   Do you deny ever using those words
9            in the presence of Jesan Spencer?
10                   MS. BLOOM:   Objection to the form
11                   of the question.   You can answer.
12                   MR. SOLOTOFF:   I'll rephrase the
13                   question.
14                   Q.   Did you use the word "bitch" in
15            the presence of Jesan Spencer?
16                   A.   I did.   It was never a reference
17            to Jesan, and only used as an expletive in
18            the context of phrases like "son of a
19            bitch" or "what a bitch", meaning bitch of
20            a situation, etcetera.
21                   Q.   Did it refer to a woman -- women
22            as being bitches, like, "she's a bitch"?
23                   A.   Not that I recall.
24                   Q.   If Jesan said that you made the
25            reference to the word bitches in reference

1                      Kenneth Caruso
2          to women, in her presence, would she be
3          lying?
4               A.   She would be.
5               Q.   Do you think the word bitch is an
6          appropriate word in the workplace?
7               A.   I do not.
8               Q.   Do you think it's appropriate to
9          use the reference of regarding a bitch, as
10         offensive to Jesan Spencer?
11              MS. BLOOM:  Object to the form of
12              the question.  You can answer.
13              THE WITNESS:  I'm sorry, I didn't
14              understand the question.
15              MR. SOLOTOFF:  I'll rephrase the
16              question.
17              Q.   How often did you use the word
18         bitch in Jesan Spencer's presence?
19              MS. BLOOM:  Objection.
20              Mischaracterizes his testimony.  You
21              can answer.
22              A.   I'm not aware of the exact number
23         of times.
24              Q.   Was it more than once?
25              A.   It was.

1                           Kenneth Caruso

2          Q.   Was it more than ten times?

3          A.   Approximately ten.

4          Q.   Was it every day?

5          A.   Not to my recollection.

6          Q.   Almost every day?

7          A.   No.   My use of the word would

8    occur in high stress situations, when

9    there was a large volume of work to get

10   done and I would become stressed as a

11   result of, you know, outside factors.

12         Q.   Give us every context in which you

13   used the word bitch.

14         A.   I'm sorry?

15         Q.   Give us every context in which you

16   used the word bitch.

17         A.   As I said, it was a -- as an

18   expletive, to blow off steam, and usually

19   as part of, you know, one of two phrases;

20   either "son of a bitch" or "what a bitch",

21   to refer to the situation.

22         Q.   Ms. Spencer complained about your

23   use of the word bitch.

24              Was it appropriate for her to

25   complain about it, if you used it in the

1                    Kenneth Caruso
2    context in which you just described?
3         A.  It was.
4              MR. SOLOTOFF:  Read my question
5         again, and his answer, please.
6           (Record was read back).
7         Q.  Why was it appropriate for her to
8    complain?
9         A.  Because those are inappropriate
10   words for the workplace, and they made her
11   uncomfortable.
12        Q.  Could you see if she was -- could
13   you see, by looking at her, whether she
14   was uncomfortable when you made those
15   statements?
16        A.  I was unaware that she was being
17   made uncomfortable by these words, until
18   her complaint was brought to my attention
19   from Brett.
20        Q.  When was it brought to your
21   attention?
22        A.  I believe, in December of 2005.
23        Q.  Could you understand how Jesan
24   Spencer, as an African/American female,
25   would be offended by the use of the word

113

```
 1                         Kenneth Caruso
 2              A.  I did.
 3              Q.  What were your words?
 4              A.  At the time?
 5              Q.  Yes.
 6              A.  I would have said, I'm sorry.
 7              Q.  What did you say?
 8              A.  I believe I said, I'm sorry.
 9              Q.  Did you say what you were sorry
10         about?
11              A.  For using the word and for
12         offending her.
13              Q.  After that, did you continue to
14         use the word, bitch, in her presence?
15              A.  Not to my recollection, no.  I do
16         remember a number of weeks after that
17         first conversation, actually speaking with
18         her again on the topic, to ask if, in
19         accordance with my original commitment to
20         her to stop, I had, in fact, stopped.  And
21         she -- her feedback to me, at the time,
22         was that yes.
23              Q.  When was that conversation?
24              A.  Probably three weeks afterwards,
25         four weeks after.
```

114

```
1                         Kenneth Caruso
2              Q.  Four weeks after your initial
3         apology?
4              A.  My initial apology.  A number of
5         weeks afterwards.
6              Q.  After that conversation, did you
7         then continue to use the word, bitch, in
8         her presence?
9              A.  I don't think so.
10             Q.  You're not sure?
11             A.  No, I'm sure I did not.
12             Q.  Did you have any other
13        conversations with Brett Marschke
14        regarding Jesan Spencer's complaints,
15        other than the one you've already
16        testified to?
17             A.  Not another conversation, as it
18        related to my use of language.  There was,
19        later then, in 2006, another complaint
20        that Jesan made, I believe first to Sheila
21        O'Neill and then to Brett.  Brett found
22        out through Sheila.
23             Q.  When was that conversation with
24        Brett concerning Sheila O'Neill's comment
25        to Brett?
```

156

```
 1                    Kenneth Caruso
 2      with the Equal Employment Opportunity
 3      Commission?
 4           A.  I did not.
 5           Q.  Did you discriminate against Jesan
 6      Spencer?
 7           A.  I did not.
 8           Q.  Did you create a hostile work
 9      environment for Jesan Spencer as an
10      employee under your supervision?
11           A.  I did not.
12           Q.  Did you retaliate against Jesan
13      Spencer?
14           A.  I did not.
15           MR. SOLOTOFF:  I have no further
16      questions.
17           (Recess taken from 7:01 to 7:05 p.m.)
18      CONTINUED EXAMINATION BY
19      MR. SOLOTOFF:
20           Q.  Did you ever write a memorandum
21      and formal complaint against Jesan
22      Spencer?
23           A.  I did.
24           Q.  When was that?
25           A.  In mid-June, 2006.
```

1                          Kenneth Caruso

2              Q.   Why?

3              A.   I wrote it to insure that my

4         perspectives were represented.

5                   MR. SOLOTOFF:  I have no further

6              questions.

7         EXAMINATION BY

8         MS. BLOOM:

9              Q.   Mr. Caruso, you testified a short

10        while ago, in response to a question from

11        counsel, that you did not believe that

12        your employment could be terminated if the

13        company found that you had violated the

14        EEOC policy.

15                 Is that your understanding?

16             A.   To clarify, if a violation of the

17        EEOC policy were found, my termination

18        is -- would be possible, would be likely.

19             Q.   So, it's your testimony here today

20        that if you were found to have violated

21        the company's EEO policy, the company

22        potentially could terminate your

23        employment?

24             A.   That's right.

25                  MR. SOLOTOFF:  Note my objection.