**EXHIBIT I**

1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK
       ---------------------------------------X
4      JANNIE PILGRIM, GIOVANNA HENSON, JESAN

5      SPENCER and BRENDA CURTIS,

6
                         Plaintiffs,
7
                  - against -          CASE NO.: 07CIV 6618
8
       THE McGRAW-HILL COMPANIES, INC.,
9

10                       Defendant.
       ---------------------------------------X
11
                                                    COPY
12            DEPOSITION OF BRETT MARSCHKE, taken by

13     Plaintiffs, pursuant to Notice on Friday, April 18,

14     2008, commencing at 9:39 a.m., before Chandra D.

15     Brown, a Registered Professional Reporter and Notary

16     Public within and for the State of New York.

17

18

19

20

21

22

23

24

25

```
1                    B. Marschke

2          MS. BLOOM:  Object to the form of the

3     question to the extent that it mischaracterizes

4     the document.

5          It's only a piece of the document that

6     you're quoting from.

7          You can answer.

8     A    Can you repeat the question?

9     Q    Do you recall reading a reference in Ken

10    Caruso's PMP that made reference to pursuing

11    counseling Jesan Spencer out of the business?

12         MS. BLOOM:  Object to the form of the

13    question.

14         You can answer.

15    A    I remember that section of the PMP, yes.

16         That happened.

17    Q    What do you remember about that section of

18    the PMP?

19    A    I remember that section -- I remember the

20    section -- I remember the section talking about

21    Ken's ability to effectively manage the group, his

22    group, the H/R team, within BusinessWeek.

23         I remember the section of the document --

24    the commentary in that section of the document that

25    I gave Ken -- the feedback that I gave Ken was when
```

1                          B. Marschke

2    we are counseling people on his team, that we need

3    to do it in a way that is fair, equitable, and that

4    that should be the case -- that should be the case,

5    even if we end up at an end point of counseling an

6    individual out of the business.

7              Again, that being an end point, not a

8    process.

9        Q    What I'm still trying to understand, what

10   the meaning of the term "counseling" means.

11             Is that in and of itself a process?

12       A    I think we counsel employees all the time

13   about a number of matters.

14       Q    What does counseling mean?

15             MS. BLOOM:  Objection.  Asked and

16        answered.

17             You can answer it again.

18             MR. SOLOTOFF:  I haven't gotten an answer

19        yet.

20             MS. BLOOM:  I think you've gotten the

21        answer three or four times, but that's fine.

22             Go ahead and answer the question again.

23       A    I don't understand the -- understand the

24   question.

25       Q    I think you're defining counseling by

24

                                B. Marschke

1

2    using the word "counseling."

3          What I'm trying to get at is to understand

4    what the process of counseling means.

5          A    Counseling would mean sitting down,

6    talking to an individual about strengths; talking to

7    an individual about weaknesses; talking about areas

8    where they can improve skills, where they can apply

9    skills that they already have.

10         Q    Who does that counseling?

11         A    I think managers throughout the business

12   are responsible -- have some responsibility for

13   doing that with employees.

14         MR. SOLOTOFF:  Can I have this marked as

15         Marschke 1, please.

16         (Whereupon, the aforementioned 2005 PMP of

17         Kenneth Caruso Bates-stamped D07588 through

18         D07591, was marked as Marschke Exhibit 1 for

19         identification as of this date by the

20         reporter.)

21   BY MR. SOLOTOFF:

22         Q    Mr. Marschke, I ask you to take a look at

23   what has been marked as Marschke No. 1.

24         MR. SOLOTOFF:  A copy has been provided to

25         counsel.

25

1                          B. Marschke

2       Q    Can you identify this document?

3       A    (Witness views document.)

4            This looks like Ken Caruso's review

5    for 2005.

6       Q    First of all, do you recall signing this

7    document -- or signing it by computer form?

8       A    I recall signing a -- I recall signing a

9    review for Ken in 2005.

10           I'm a bit confused why Sheila O'Neill's

11   name would be on it.

12           MS. BLOOM:  We'll stipulate that this is

13           the 2005 review.

14           MR. SOLOTOFF:  I would like to have this

15           marked as Marschke No. 2.

16           (Whereupon, the aforementioned 2005 PMP of

17           Kenneth Caruso Pages 684 through 702 (not

18           Bates-stamped) , was marked as Marschke Exhibit

19           2 for identification as of this date by the

20           reporter.)

21

22  BY MR. SOLOTOFF:

23           MS. BLOOM:  We're going to object to the

24           use of the unredacted one in the deposition.

25           MR. SOLOTOFF:  You've made your objection.

27

B. Marschke

2      MS. BLOOM:  On the record.

3      I just want to make sure that there is no

4   ex parte calls to the court.  If there is going

5   to be a call placed to the court, I want to be

6   present and on the phone.

7      MR. SOLOTOFF:  We would never do that.

8      MS. BLOOM:  Just making sure that there is

9   no misunderstanding and no miscommunication

10   about that.

11      MR. SOLOTOFF:  Let's go back on the

12   record.

13   BY MR. SOLOTOFF:

14      Q    Mr. Marschke, did you sign Ken Caruso's

15   2005 PMP?

16      A    Yes, I believe I did.

17      Q    Who else signed Ken Caruso's PMP?

18      Who else would have signed his 2005?

19      A    It would have been Ken, and it would have

20   been -- myself, Ken, David Murphy.

21      Q    Okay.

22      Generally, when do you sign the PMPs?

23      A    Typically, they are completed within the

24   first quarter of the calendar year.

25      Q    Is that within March or May, or April,

28

1                               B. Marschke

2    May?

3         A     It's typically within the March time

4    frame.

5         Q     That would have been the case for Ken

6    Caruso's 2005 PMP, correct?

7         A     Yes.

8         Q     The 2005 PMP that you recall of Ken

9    Caruso, that was not prepared by Sheila O'Neill,

10   correct?

11        A     No.  No, it wasn't.

12        Q     Okay.

13              She was not his -- he was not a

14   subordinate under her, correct?

15        A     No.  That is correct.

16        Q     And he was a subordinate under you?

17        A     That is correct.

18        Q     And Ken Caruso was your direct report?

19        A     That is correct.

20        Q     And you were David Murphy's direct report?

21        A     I reported to David Murphy.

22        Q     Okay.

23              Where was Sheila O'Neill in the scheme of

24   things?

25        A     Sheila O'Neill was the corporate -- she

                    B. Marschke

1    worked in corporate H/R.  I'm in information and

2    media, and Sheila kind of sits off to the side in

3    corporate H/R.

4        Q    Would there be any circumstances that you

5    could think of in which Sheila O'Neill would have

6    signed Ken Caruso's PMP?

7            MS. BLOOM:  In 2005?

8        Q    In 2005.

9        A    No.

10       Q    Okay.

11           Now, earlier you talked about counseling

12   an employee.

13           And is there a formal process in the

14   company; that is, a policy on what that means, to

15   counsel an employee?

16       A    I don't believe that there is.

17       Q    Is there a practice that has taken place

18   over the years that you were there, as to what

19   counseling an employee is, in terms of the process

20   of counseling?

21       A    I don't believe that there is a standard

22   process.  I mean, I think the notion of counseling

23   is -- I mean, as a concept, is understood.

24       Q    Is that a term of art in the Human

```
 1                        B. Marschke
 2    Resources field, the word "counseling" an employee?
 3              MS. BLOOM:   Objection to the form of the
 4         question.
 5              You can answer.
 6         Q    Do you understand what I'm saying?
 7         A    No.
 8              Maybe you can phrase the question a
 9    different way.
10         Q    The word "counseling" an employee, is that
11    used in the company that you're at right now, that
12    phrase, "to counsel an employee"?
13              MS. BLOOM:   Object to the form of the
14         question.
15              You can answer.
16         A    We counsel employees at my current
17    company.
18         Q    I'm trying to understand, counseling an
19    employee is not some very specific process that
20    McGraw-Hill created on its own?
21         A    I think that's right.
22         Q    Was there a training program on how to
23    counsel employees?
24         A    Not that I'm aware of.
25         Q    Okay.
```

31

B. Marschke

1

2          Is it possible that one human-resource

3     person might counsel employees differently than

4     another human-resource person?

5          A     I think that that's -- I think that, you

6     know, there is a general concept of what appropriate

7     counseling is, but there is latitude, I think,

8     within that, depending upon the circumstances that

9     the practitioner is facing.

10         Q     What I'm going to do is, I'm going to ask

11    you questions based on your understanding of

12    counseling and not based on someone else's practice

13    of counseling.

14              I think you described counseling as

15    working with the employee to gain their cooperation?

16              MS. BLOOM:  Object to the form of the

17         question.

18              You can answer.

19         A     No.  It's not gaining cooperation.  It's

20    identifying strengths and weaknesses, and looking

21    for ways to apply the strengths and to improve on

22    weaknesses.

23         Q     Does that require --

24         A     -- as part of the counseling process.

25         Q     I'm sorry.

32

1                      B. Marschke

2      A     That's okay.

3      Q     Does that require the employee's

4  cooperation, the person being counseled?

5      A     I think it's certainly a healthier

6  dialogue if there is participation on the part of

7  the employee, but it's not, you know -- it can't be

8  a one-way conversation.

9            I think we would expect, kind of, managers

10  to take action to counsel people, whether the

11  employee was engaged or not.

12      Q     What do you mean by "take action"?

13      A     Just taking action to ensure that the

14  counseling is done.

15            Because the employee doesn't participate

16  or is unwilling to participate doesn't relieve the

17  manager from the responsibility to engage with the

18  employee.

19      Q     What if the employee does not agree to go

20  along with the recommendation to transfer the

21  employee from one part of the business to another

22  part of the business?

23            MS. BLOOM:  Objection to form of the

24            question and also mischaracterizes the

25            testimony.

33

```
1                    B. Marschke
2          You can answer.
3          MR. SOLOTOFF:  I didn't ask him this
4     question yet.  Your recall is not very good.
5          MS. BLOOM:  I think the record speaks for
6     itself, and if you haven't, then you haven't.
7     And -- but my objection is on the record.
8          As I said, the record will speak for
9     itself.
10    A     Can you repeat the question?
11    Q     If an employee does not voluntarily agree
12    to being transferred out of the department the
13    employee is in, what action is taken in that case?
14         MS. BLOOM:  Object to the form of the
15    question.
16         Speculative.  Mischaracterizes the record.
17         You can answer.
18    A     I don't know if there is any action taken.
19         I think there should be a discussion as
20    to -- if there is an opportunity that presented
21    itself and the employee didn't want to avail
22    themselves, I think there is a discussion that
23    happens as to why.
24    Q     Does counseling the employee include, in
25    your mind, transferring the employee against their
```

```
 1                      B. Marschke
 2    will?
 3        A    No.
 4        Q    In other words, you seek to obtain a
 5    mutual consensus as to what action has to be taken
 6    in the counseling process?
 7        A    Repeat the question?
 8        Q    I'll rephrase it.
 9             I assume you've counseled employees; am I
10    correct?
11        A    Sure.
12        Q    We're only talking about you.
13        A    Right.
14        Q    You try to gain the employee's consent; am
15    I correct?
16        A    No.
17        Q    Do you try to gain the employee's
18    participation in the counseling process?
19        A    Yes.  I think it's a healthier dialogue if
20    we are communicating.
21        Q    As you understand it, the counseling
22    process could include transferring an employee from
23    one position to another, whether they want to go or
24    not?
25        A    I think that, at the end of the counseling
```

35

1                              B. Marschke

2    process, it could result in -- there's any number of

3    things that could come out of a counseling process,

4    but one thing that could come out of it is a

5    transfer.

6        Q    I'm trying to figure out whether that

7    transfer is one which is voluntary, as opposed to

8    one that is involuntary?

9              MS. BLOOM:  Object to the form of the

10        question.

11             You can answer.

12        A    I mean, typically, I think it would be

13    voluntary.

14        Q    But it would be -- it would not be typical

15    if it was involuntary, correct?

16             MS. BLOOM:  Object to the form of the

17        question.

18             You can answer.

19        A    Certainly less common.

20        Q    Do you know whether that has been done,

21    while you were supervisor and vice president of

22    Human Resources, under your jurisdiction?

23        A    If what has been done?

24        Q    An employee was involuntarily transferred

25    from one position to another, arising out of the

36

1                        B. Marschke

2    counseling process?

3       A    Not that I can recall.

4       Q    Do you know whether Jesan Spencer was

5    voluntarily or involuntarily transferred from her

6    position at BusinessWeek to the position in BIG?

7       A    I believe that that was voluntarily.

8       Q    What gives you that belief?

9       A    My recollection of Jesan's moving to work

10   with the BIG group, based on conversations I believe

11   that I had with Sheila O'Neill.

12      Q    Anyone else?

13      A    No.  I think it was principally, you know,

14   principally Sheila and -- obviously, I had had a

15   conversation with the manager within BIG, the vice

16   president within BIG that, you know, Jesan was a

17   potential resource.  And my recollection of my

18   conversations with him was that -- to the best of my

19   memory, that his view was that it was a voluntary

20   transfer.

21      Q    Tell us about the conversation you had

22   with Sheila O'Neill concerning Jesan Spencer and her

23   transfer to BIG.

24      A    My recollection was, we were aware that

25   Ken and Jesan were not working well together within

```
 1                    B. Marschke
 2   BusinessWeek and that, again, my recollection was
 3   that Sheila had discussed the possibility of
 4   transferring to a different group within the
 5   company, within the Human Resources function.  So
 6   out of the business unit, but still within the Human
 7   Resources function.
 8             And I remember a conversation with her,
 9   potentially identifying the BIG group as someplace
10   that -- you know, kind of given the need there, as a
11   potential place for Jesan to transfer to.
12        Q    Well, where was this conversation?
13        A    I can't be sure.  You know, I seem to
14   remember it being -- it was, obviously, at our
15   building on Sixth Avenue.  I'm not sure if it was on
16   my floor or Sheila's floor.  I can't be certain.
17        Q    Was anyone else present?
18        A    I don't believe that there was.
19        Q    What did you say to Sheila O'Neill in that
20   conversation?
21        A    I think I just -- I think I expressed the
22   view that it might be an appropriate role for Jesan.
23        Q    Were you aware of a plan to counsel Jesan
24   Spencer out of the business?
25        A    No.
```

38

B. Marschke

1

2    Q    Wasn't that part of Ken Caruso's PMP?

3    A    No.  I think there is a -- once again,

4    there was no plan to counsel Jesan out of the

5    business or the company.

6    Q    Was there a plan to counsel her out of the

7    department, from one department to the other?

8    A    No.  It was a possible outcome.  I think

9    it was a possible outcome of Ken's ongoing

10    interaction with Jesan.

11    Q    Was there a plan to counsel Jesan Spencer

12    period, just to counsel her?

13    A    Yes.  I think that -- a plan -- I think

14    there was the notion that we could make the team

15    more effective if Ken were to actively counsel

16    Jesan.

17    MR. SOLOTOFF:  Can you please repeat the

18    answer.

19    (Whereupon the requested answer was read

20    back by the Court Reporter.)

21    BY MR. SOLOTOFF:

22    Q    You said, "we could."

23    Who were you referring to as "we"?

24    A    "We" was in the context of -- I'm sorry, I

25    don't remember saying --

1                        B. Marschke

2              MR. SOLOTOFF:  I just had it read back.

3              THE WITNESS:  Can you read it back again,

4       please?

5              (Whereupon the requested answer was read

6       back by the Court Reporter.)

7       A      I think "we" would mean Ken and I,

8  although the responsibility for the actual

9  counseling resided with Ken.

10      Q      Do you know whether Ken counseled Jesan

11  Spencer in 2005 -- or rather, in 2006?

12      A      In 2006.  I believe he did, or at least

13  he, I believe, at the very least tried to.

14             Going back to our earlier discussion, I am

15  uncertain as to the level of interaction between the

16  two.

17      Q      Okay.

18             Was there anyone else who was to

19  participate in counseling Jesan Spencer to leave her

20  position at BusinessWeek and go to BIG?

21             MS. BLOOM:  Object to the form of the

22      question.  Mischaracterizes the testimony.

23             You can answer.

24             MR. SOLOTOFF:  I'll rephrase it.

25      Q      Was Ken involved in the counseling process

1                              B. Marschke

2    with Jesan Spencer to have her transferred from

3    BusinessWeek to BIG?

4              MS. BLOOM:   Object to the form of the

5         question.   Mischaracterizes the testimony.

6              You can answer.

7         A    I don't remember.   I don't remember Ken

8    being involved.

9         Q    Do you know who was involved?

10        A    It was certainly around -- the ultimate

11   decision to -- for Jesan to move from BusinessWeek

12   to BIG involved myself, Sheila O'Neill, Bill Harper,

13   and Jesan.

14             I think I'm fairly certain of that.

15   Whether or not Ken actively participated in that, I

16   just don't remember.

17        Q    Okay.

18             Do you know whether Jesan Spencer was

19   counseled regarding her position at BusinessWeek?

20        A    I believe that she was.

21        Q    By whom?

22        A    By Ken.

23        Q    Anyone else?

24        A    I think that I -- over the period of the

25   end of '05 into '06, as a matter of the issues that

41

1                           B. Marschke

2    Jesan brought forward, some of the problems that she

3    articulated, I know I spoke to her and Sheila

4    O'Neill also spoke to her.

5        Q    Who made the decision, if you know, that

6    Jesan Spencer go from her position at -- from her

7    H/R business at BusinessWeek to an H/R position at

8    BIG?

9        A    My recollection was, throughout the

10   process, Jesan and Sheila had talked about the

11   possibility of transferring out of BusinessWeek if a

12   position opened up.

13            I identified a need within BIG, and I

14   believe it was Sheila and Jesan that agreed that

15   that would be an appropriate spot.

16       Q    How did you get the impression that Jesan

17   Spencer agreed that that was the appropriate spot?

18       A    From talking with Sheila.

19       Q    You didn't talk to Jesan Spencer, correct?

20       A    I don't remember if I talked to Jesan.   I

21   do remember talking to Sheila.

22            Obviously, I remember talking to Bill as

23   well.

24       Q    To Bill Harper?

25       A    Bill Harper.

42

B. Marschke

1

2      Q      Can you please tell us when that

3  conversation was with Bill Harper?

4      A      It's difficult to remember the specific

5  date, but I want to say first quarter of 2006;

6  March, April, maybe even May.  I just don't quite

7  remember the date.

8              I remember talking to Sheila.  I seem to

9  remember Sheila saying that the conversation that --

10  that she had a conversation with Jesan that a

11  transfer would be something that we should consider.

12             I knew Bill had had -- Bill had requested

13  of me some additional resources down at BIG, given

14  all of the work that he had.

15             I went and spoke to Bill, and I informed

16  him that Jesan might be a possibility.

17     Q      Did you speak with Ken Caruso about Jesan

18  Spencer going from BusinessWeek to BIG?

19     A      I don't remember.  I don't remember.

20             I don't remember talking to Ken.

21     Q      Did Mr. Caruso express a desire that Jesan

22  Spencer be transferred from BusinessWeek to BIG?

23     A      No, he did not.

24     Q      Did he believe that her transfer would

25  suit Jesan, that that transfer from BusinessWeek to

1                          B. Marschke

2        A    No.

3        Q    Did Sheila O'Neill describe to you her

4   conversations with Jesan Spencer and whether Jesan

5   Spencer was crying at any time?

6             MS. BLOOM:  Object to the form of the

7        question.

8             You can answer.

9        A    I don't remember.

10       Q    After Jesan Spencer was transferred to

11  BIG, what were her job duties?

12            MS. BLOOM:  Object to the form of the

13       question.

14            You can answer.

15       A    When Jesan --

16            MR. SOLOTOFF:  I just want to get this

17       correct.

18       Q    You testified earlier she was transferred

19  to BIG; am I correct?

20            MS. BLOOM:  Objection.  He testified she

21       transferred.

22       Q    Did Jesan Spencer transfer to BIG

23  voluntarily?

24       A    Yes.

25       Q    What gives you that information?

109

1                    B. Marschke

2        A    I believe that was a conversation that I

3   had had with Sheila O'Neill.

4        Q    Sheila O'Neill did not tell you that Jesan

5   Spencer did not want to be transferred to BIG,

6   correct?

7        A    Can you repeat the question?

8        Q    Sheila O'Neill did not tell you that Jesan

9   Spencer did not want to be transferred to BIG?

10       A    No.  I don't remember having that

11  conversation with Sheila O'Neill.

12       Q    But it is your impression that it was

13  Sheila O'Neill who told you that Jesan Spencer

14  wanted to be transferred to BIG?

15       A    My recollection is that Jesan was open to

16  a transfer out of BusinessWeek into another role

17  given, you know, the dynamics between her and Ken.

18            And my understanding was that the BIG

19  assignment was one that was comparable and that

20  there was no issue around it.

21       Q    The idea that there was no issue around

22  it, you got that from Sheila O'Neill, correct?

23       A    That's my recollection.

24       Q    What was Jesan Spencer's job duties at

25  BIG?

1                          B. Marschke

2        A    She was working as a generalist in a

3    similar capacity to what she was working at in

4    BusinessWeek.

5              The best of my recollection was that there

6    were a number of business -- a number of units

7    within BIG:  Aviation Week, there was a technology

8    group, there may have been one other group as well.

9              It was a -- BIG was a newly formed group.

10   It was a pretty big business.  And one of the women

11   who was working in the business, Toi Eaton, was

12   having just difficulty keeping up with everything

13   that was going on within BIG from an H/R

14   perspective.

15             So the role that Jesan would be playing

16   was one of generalist supporting those units working

17   with Toi.

18       Q    Who is Toi Eaton?

19       A    Toi Eaton is another H/R manager that

20   works in BIG reporting to Bill Harper.

21       Q    Was Toi Eaton a director of Human

22   Resources?

23       A    I don't recall her title.

24       Q    Was it Toi Eaton that supervised Jesan

25   Spencer?