**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
JANNIE PILGRIM, GIOVANNA HENSON,
JESAN SPENCER, BRENDA CURTIS,                    Civil Action No.: 07-6618 (CM) (AJP)

                                  Plaintiffs,


             -against-

                                                    PLAINTIFFS HENSON'S
                                                    CURTIS'S, AND
                                                    SPENCER'S RESPONSES
                                                    AND COUNTER
                                                    RULE 56.1
                                                    DECLARATIONS



THE MCGRAW-HILL COMPANIES, INC.,

                                  Defendant.
--------------------------------------------------------X


        Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, PLAINTIFFS HENSON, CURTIS AND SPENCER submits

their response in TO DEFENDANT'S Rule 56.1 STATEMENT by their attorneys Solotoff &

Solotoff, and hereby respectfully submits the following Statement of Material Facts that

demonstrates that there are significant, material, relevant, and genuine issues of fact to be tried.

Defendant has not moved for Summary Judgment as to Plaintiff Jannie Pilgrim. Plaintiffs

HENSON, CURTIS AND SPENCER respond to Defendant's 56.1 Declarations as follows:

        Plaintiffs also oppose the Defendant's Motion for Summary Judgment and respectfully

submit PLAINTIFFS' RESPONSES AND COUNTER RULE 56.1 DECLARATION

STATEMENT supported by Plaintiffs' Local Rule 56.1 Statement of Significant, Material and

Genuine issues of fact that demonstrates that there are significant, material, relevant, and genuine

issues of fact to be tried by a jury and that Defendant's Local Rule 56.1 Statement is disputed as herein set forth. Plaintiffs respectfully submit their responses to Defendants' Rule 56.1 Declaration Statement and Counter Declaration, in further response and in opposition to the Motion for Summary Judgment with accompanying transcript testimony, exhibits and affidavits as annexed..[1]

## I.    DEFENDANT'S STATEMENT OF PROCEDURAL BACKGROUND AND PLAINTIFFS' RESPONSES.

Defendant's Declaration No. 1. On December 16, 2005, Plaintiffs Giovanna Henson, Jesan Spencer, and Brenda Curtis ("collectively Plaintiffs") filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging claims of discrimination on the basis of race and retaliation for opposition to unlawful employment actions. (Rasin Decl. Ex. M)

Plaintiffs' Response in Opposition No. 1: Denied. Plaintiffs' filed on January 4, 2006 Plaintiffs Giovanna Henson, Jesan Spencer, and Brenda Curtis ("collectively Plaintiffs" and Renee DeBose) filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC").

Defendant's Declaration No. 2. On May 21, 2007, the EEOC issued Notices of Right to Sue to all of the Plaintiffs. (Rasin Decl. Ex. N)

---

[1] References to the deposition transcripts of Jannie Pilgrim, Giovanna Henson, Jesan Spencer, Brenda Curtis, David Murphy, William Harper, Ken Caruso, Sheila O'Neill, Brett Marschke, Richard Fisher, Vladimir Stadnyk, John Gillen, Dawanna Veneable, and Marianne Gattinella are noted as "Pilgrim Tr. -," "Henson Tr. _," "Spencer Tr. _," "Curtis Tr. _," "(Murphy Tr. _," "Harper Tr. _," "Caruso Tr. _," "O'Neill Tr. _," "Marschke Tr. _," "Fisher _," "Stadnyk Tr. _," "Gillen Tr._," "Veneable Tr._," and "Gattinella Tr. _," respectively, and are annexed to the Solotoff Rule 56.1 Decl. in Opp. as Ex. A, - BB respectively. All other exhibits annexed to the Solotoff Decl. are noted herein as "Solotoff Ex._."

Plaintiffs' Response in Opposition No. 2: Plaintiffs' admit that on May 21, 2007 the EEOC issued Notices of Right to Sue to all of the Plaintiffs. Plaintiffs timely filed this lawsuit on July 23, 2007.

Defendant's Declaration No. 3. Thereafter, on July 23, 2007, Henson, Spencer and Curtis, along with Plaintiff Jannie Pilgrim, jointly filed a Complaint with this Court, alleging the same claims of race discrimination and retaliation as stated in their EEOC charges. (Rasin Decl. Ex. L)

Plaintiffs' Response in Opposition No. 3:  Denied. Plaintiffs filed this civil action seeking, declaratory and equitable relief, and monetary damages under 42 U.S.C §2000e et seq., (Title VII)(as amended); 42 U.S.C. §1981 *et seq.*; the New York State Human Rights Law, Executive Law §296 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code the City of New York, Sections 8-107(a) *et seq*. and 8-502 *et seq.*; for purposeful discrimination and retaliation, and for malice and reckless disregard for the federally protected rights of the Plaintiffs, and for violation of applicable rules and regulations prohibiting discrimination and retaliation in the employment context, to redress the violation of Plaintiffs' rights by Defendant, and for the deprivation by Defendant of various terms, conditions, and privileges of Plaintiffs' employment due to Plaintiffs' race and color. (Solotoff Decl. Ex. A).

Defendant's Declaration No. 4.  In the Complaint, Plaintiffs assert claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 *et seq.* ("§ 1981 "); the New York State Human Rights Law, New York Executive Law § 296 *et seq.* ("NYSHRL"); and, the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107(a), 8-502 *et seq.* ("NYCHRL"). (Rasin Decl. Ex. L ¶ 3.).

Plaintiffs' Response in Opposition No 4: Plaintiffs admit that their Complaint, assert claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 *et seq.* ("§ 1981 "); the New York State Human Rights Law, New York Executive Law § 296 *et seq.* ("NYSHRL"); and, the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107(a), 8-502 *et seq.* ("NYCHRL"). (Solotoff Decl. Ex. A)

## II. THE COMPANY.

### A. <u>Background</u>

Defendant's Declaration No. 5. McGraw-Hill is a worldwide corporation engaged in publishing and information services with its headquarters located in New York City. *(See* The McGraw-Hill Companies, Inc., "About Us: Overview," wwww.mcgraw-hill.comlaboutus/overview.shtml (last accessed May 15, 2008).

Plaintiffs' Response in Opposition No. 5:   Plaintiffs admit that McGraw-Hill is a worldwide corporation engaged in publishing and information services with its headquarters located in New York City.  Plaintiffs further add that McGraw-Hill was/is required to comply with all applicable federal, state and local laws, rules and regulations that prohibit, inter alia, race discrimination and retaliation in the employment context. Plaintiffs object to a blanket reference to the world wide web the contents of which are irrelevant, prejudicial, and self serving advertisement, having nothing to do with the particular facts and circumstances in the context of Plaintiffs' employment and effecting these plaintiffs, the terms and conditions of their employment and the violations their civil rights suffered as a result of the acts and conduct of offending Supervisors at work. There is no doubt that Defendant's agents are aware of the obligations and responsibilities under Title VII, and all other applicable civil rights laws. (Solotoff Decl. Ex. A ¶¶21, 22, 23, 24 and Solotoff Decl. Ex. B ¶¶21, 22, 23, 24).

Defendant's Declaration No. 6. The Company is divided into three operating segments: (1) McGraw-Hill Education ("MHE"); (2) Financial Services, including Standard & Poor's ("S&P"); and (3) Information and Media Services ("IMS"). *(See* The McGraw-Hill Companies, Inc., "About Us: Overview," www.mcgraw-hill.com/aboutus/overview.shtml (last accessed May 15, 2008).

Plaintiffs' Response in Opposition No. 6:  Plaintiffs admit that the Company is divided into three operating segments: (1) McGraw-Hill Education ("MHE"); (2) Financial Services, including Standard & Poor's ("S&P"); and (3) Information and Media Services ("IMS"). Plaintiffs object to a blanket reference to the world wide web advertisement the contents of which are irrelevant, prejudicial, and self serving, having nothing to do with the particular facts and circumstances effecting these plaintiffs and the offending Supervisors at work and in their employment context.

Defendant's Declaration No. 7. A Corporate Segment provides support services including Human Resources to these three operating segments. (Murphy Tr. 103-04; Fisher Tr. 6; O'Neill Tr. 4-5; Marschke Tr. 122).

Plaintiffs' Response in Opposition No. 7:  Plaintiffs admit that the "Corporate Segment" provides support services including Human Resources to the three operating segments. For example, William Harper, VP of HR for the Business Information Group ("BIG"); and Sheila O'Neill, VP of HR in the Corporate Segment were directly involved in the matters concerning Plaintiff Pilgrim, Plaintiff Henson, and Plaintiff Spencer in this case*; Richard Fisher, Dir. Of HR of S&P was directly involved in the matters concerning Plaintiffs Pilgrim, Henson, and Curtis in this case.

Defendant's Declaration No. 8. Plaintiffs Spencer and Henson worked for the Corporate Segment during the periods of their alleged discrimination while Plaintiff Curtis worked for S&P. (See Rasin Decl. Ex. 0.)

Plaintiffs' Response in Opposition No. 8: Plaintiffs admit that Spencer and Henson worked for the Corporate Segment during the periods of their alleged discrimination while Plaintiff Curtis worked for S&P. Plaintiff Pilgrim and Curtis worked for S&P and were subject to support services from Human Resources by S&P and from Corporate Human resources.

B.    **Defendant's Policies**

Defendant's Declaration No. 9. McGraw-Hill has an Equal Employment Opportunity ("EEO") Policy confirming its commitment to the principles of equal employment opportunity for all individuals. ( Rasin Decl. Ex. P at DOOI145-46.)

Plaintiffs' Response in Opposition No. 9: Plaintiffs admit that McGraw-Hill has a document captioned Commitment to Diversity and Equal Employment Opportunity ("EEO") that it is obligated to enforce. Plaintiffs include reference to two Exhibits that were the subject of deposition testimony in the case: "The Human Resources Guide to Working at The McGraw-Hill Companies" and a "Statement of the Open Door Policy." (Solotoff Decl. Ex. A ¶80)(Solotoff Decl. Ex. C)(Solotoff Decl. Ex. D)

Defendant's Declaration No. 10. McGraw-Hill's EEO Policy encourages any employee who feels he or she has been denied equal opportunity or subjected to discrimination to raise their concerns without fear of retaliation. *(See* Rasin Decl. Ex. P at DOOI145-46.)

Plaintiffs' Response in Opposition No. 10: Admit.

Defendant's Declaration No. 11. McGraw-Hill has several avenues for employees to raise EEO concerns internally without precluding charges of discrimination filed with the EEOC or

state and local fair employment agencies, including the Open Door Policy, the Fast and Impartial Resolution ("FAIR") program, and the Employee Hotline. *(See* Rasin Decl. Ex. P.)

Plaintiffs' Response in Opposition No. 11: Plaintiffs admit that McGraw-Hill's Equal Employment Opportunity ("EEO") policy cited by Defendant's Counsel (Ex. P) purports to have several avenues for employees to raise EEO concerns of harassment internally without precluding charges of discrimination filed with the EEOC or state and local fair employment agencies, including an Open Door Policy, a Fast and Impartial Resolution ("FAIR") program, and the Employee Hotline.

Defendant's Declaration No. 12. All of these policies are explained and made accessible to every employee on the Company's intranet. (See Rasin Decl. Ex. P.)

Plaintiffs' Response in Opposition No. 12: Denied. Plaintiffs admit that McGraw-Hill's policies are accessible. Plaintiffs deny the policies are implemented. Spencer says McGraw-Hill has rules and the rules do nothing for you. It is all lip service. It looks nice on paper. (Spencer Tr. 266) (Solotoff Decl. Ex. A)

## III. DEFENDANT'S DECLARATIONS AS TO PLAINTIFF GIOVANNAHENSON.

### A. Henson's Employment History.

Defendant's Declaration No. 13. Henson began employment with McGraw-Hill on or about June 16, 1997 in the position of Junior Research Associate at S&P. (Henson Tr. 23-24, 32.)

Plaintiffs' Response in Opposition No. 13: Admit.

Defendant's Declaration No. 14. At the time of her hire, Henson initially earned $26,000 per year and her position was a grade level 11. (Henson Tr. 23-24.)

Plaintiffs' Response in Opposition No. 14: Admit.

Defendant's Declaration No. 15. Henson worked at the JJ Kenny Division of S&P as a Research Associate for approximately three to four years, during which time she received several salary increases and promotions. (Henson Tr. 32-35.)

Plaintiffs' Response in Opposition No. 15: Admit.

Defendant's Declaration No. 16. While she worked at S&P, Henson attended the New York Institute of Technology and received a Master's of Science Degree in Human Resources Management and Labor Relations in 2001. (Henson Tr. 14-15, 35.)

Plaintiffs' Response in Opposition No. 16: Admit.

Defendant's Declaration No. 17. Henson's last position at S&P was Senior Research Associate, at a grade level 13 and a salary of $35,000. (Henson Tr. 33-35.)

Plaintiffs' Response in Opposition No. 17: Admit.

**B. Henson's Performance as HR Coordinator.**

Defendant's Declaration No. 18. On or about March 20, 2001, Henson applied for and received a promotion to the position of Human Resources ("HR") Coordinator working in the McGraw-Hill Corporate Segment. (Henson Tr. 35-37.)

Plaintiffs' Response in Opposition No. 18: Admit.

Defendant's Declaration No. 19. Henson's promotion was an "in-grade" promotion meaning that her grade level remained at level 13. (Henson Tr. 31.)

Plaintiffs' Response in Opposition No. 19: Admit.

Defendant's Declaration No. 20. As an HR Coordinator, Henson was initially assigned to work for Dina Parello (Caucasian), Human Resources Director, and Sheila O'Neill (Caucasian), Vice President of Human Resources in the Corporate Segment. (Henson Tr. 40, 137.)

8

Plaintiffs' Response in Opposition No. 20: Admit.

Defendant's Declaration No. 21. Approximately six or seven months after Henson became an HR Coordinator, Parello became dissatisfied with Henson's performance and Henson was assigned to report exclusively to O'Neill. (Henson Tr. 40.)

Plaintiffs' Response in Opposition No. 21: Denied. This is a mischaracterization of her testimony. Henson also reported to Ivy Latimer. (Henson Tr. 40.)

Defendant's Declaration No. 22. Henson's responsibilities as an HR Coordinator included, among other things: scheduling interviews for job applicants; conducting new hire orientation; compiling new hire materials and packets; assisting O'Neill in employee and manager training by setting up the Power Point presentations for the training sessions; assisting with the Performance Management Program ("PMP") used to evaluate employees; organizing take-our-daughters-to-work day; compiling information for McGraw-Hill's Affirmative Action Plans and Diversity Reports; keeping schedules for O'Neill, Parello and Ivy Latimer (African American), Director of EEO and Diversity Initiatives; and, providing administrative support to O'Neill, Parello, Latimer and Cherise Little (African American), Human Resources Representative. (Henson Tr. 40-48.)

Plaintiffs' Response in Opposition No. 22: Denied. This is a mischaracterization, and incomplete statement, of her testimony. (Henson Tr. 40-48.)

Defendant's Declaration No. 23. Because Henson directly reported to her, O'Neill was responsible for reviewing Henson's performance and completing annual performance evaluations for her. (Henson Tr. 138.)

Plaintiffs' Response in Opposition No. 23: Admit.

Defendant's Declaration No. 24. As an HR Coordinator, Henson's performance was satisfactory and she received overall performance ratings of "performance achieved expectations" on her annual performance reviews for 2001, 2002 and 2003. (Henson Tr. 137-39; Rasin Decl. Ex. Q at D00114, D00123 & D00135.)

Plaintiffs' Response in Opposition No. 24: Admit. Henson also received overall performance ratings of "performance achieved expectations" on her annual performance reviews for 2001, 2002 and 2003. Henson received "Performance Exceeded Expectations" (RATINGS OF #4) surrounding "accountability/ ownership" in 2001; "accountability/ownership" and "drive for results" in 2002; and in 2003 "accountability/ownership." (Rasin Decl. Ex. Q at DOO113, DOO121, DOO134)

Defendant's Declaration No. 25. In 2004, McGraw-Hill implemented a new performance appraisal system called "Performance Management Process" ("PMP"). (Harper Tr. 31-33, 42-43.)

Plaintiffs' Response in Opposition No. 25: Admit. McGraw-Hill implemented a new performance appraisal system called "Performance Management Process" ("PMP") that did not include a numerical grading system. (See for example Rasin Decl. Ex. Q at DOO152);

Defendant's Declaration No. 26. Henson received an overall rating of "fully meets performance standards" on her performance review for 2004. (Henson Tr. 137-39; Rasin Decl. Ex. Q at D00163.)

Plaintiffs' Response in Opposition No. 26: Denied. Henson's 2004 PMP was never completed, signed by Henson's supervisor, or by Henson. (Rasin Decl. Ex. Q at D00163.)

Defendant's Declaration No. 27. The "fully meets performance standards" rating Henson received in 2004 under the new system is equivalent to the "performance achieved expectations" rating that she received on her reviews under the old appraisal system. (Henson Tr. 137-39)

Plaintiffs' Response in Opposition No. 27: Denied. Henson never received a completed or official PMP for 2004. A "fully meets performance standards" rating is equivalent to the "performance achieved expectations." (Rasin Decl. Ex. Q at D00163.)

Defendant's Declaration No. 28. While Henson's overall performance ratings as an HR Coordinator were satisfactory, Henson's performance reviews noted that she exhibited deficiencies with detail oriented projects such as proofreading and with her communications and interpersonal skills. (Rasin Decl. Ex. Q at D00133, D00134)

Plaintiffs' Response in Opposition No. 28: Denied. In 2003 Henson's evaluation for the category of Technical Expertise, rated her as "Performance Achieved Expectations." Henson was not noted for "deficiencies" with detail oriented projects such as proofreading and with her communications and interpersonal skills. Indeed, Henson received "Performance Exceeded Expectations" for "Accountability/Ownership" which includes her work on projects, goals, and outcomes, with minimum supervision; and that all materials were in good order for transitioning the program coordination to the Talent Acquisition Team in the fall of 2003. She made a strong contribution to the success of the "Lunch and Learns." (Rasin Decl. Ex. Q at D00133, D00134)(Henson Tr. 165)

Defendant's Declaration No. 29. At O'Neill's suggestion, Henson took a course on communications skills to help her improve them. (Henson Tr. 154-55)

Plaintiffs' Response in Opposition No. 29:  Denied. Henson attended a one day training program on communications in or about 2003, but not because O'Neill indicated that she had

issues that Henson needed help or needed to improve in communications.  Henson attended training programs on any programs that were available. (Henson Tr. 155-156)

Defendant's Declaration No. 30. Despite the communications course that Henson took, in February 2005, O'Neill provided Henson with a verbal warning regarding her performance problems. O'Neill advised Henson that Henson continued to exhibit deficiencies with respect to her interpersonal and communication skills. (Rasin Decl. Ex. R.)

Plaintiffs' Response in Opposition No. 30: Denied. Henson never saw Exhibit "R" before and she did not receive a warning, written or oral about these matters.  This document was written shortly after she complained to O'Neill on January 18, 2005.  (See Henson Aff. ¶ ¶ 17, 18)(Henson Tr. 156, 157, 159).

**C. Henson's Applications for Promotion.**

Defendant's Declaration No. 31. Henson claims that she applied for the following positions in 2003, 2004 and 2005: (i) Talent Acquisition Specialist in the Corporate Segment in or about June 2003; (ii) Human Resources Representative at IMS in or about September 2003; (iii) Human Resources Representative at MHE between October and December 2003; (iv) Recruiting Specialist, Campus Recruiting at S&P in or about November 2004; and, (v) Human Resources Representative at S&P in or about June 2005. (Rasin Decl. Ex. L at ¶¶ 44-45; Henson Tr. 103-5, 111, 115, 119-30.)

Plaintiffs' Response in Opposition No. 31: Admit.

Defendant's Declaration No. 32. The job requisition form for HR Representative Position at IMS demonstrates that it was posted internally on McGraw-Hill's website as a job opening in or about September 2003. (Rasin Decl. Ex. S at D07416.)

Plaintiffs' Response in Opposition No. 32: Admit.

Defendant's Declaration No. 33. The job requisition form for the HR Representative position at MHE demonstrates that the position became open in or about October 2003 and was filled in or about December 2003. (Rasin Decl. Ex. T at D07457; *see also* Henson Tr. 111)

Plaintiffs' Response in Opposition No. 33: Admit.

Defendant's Declaration No. 34. The Recruiting Specialist, Campus Recruiting position at S&P involved long hours, traveling to different college campuses and attending career fairs. (O'Connor Aff. ¶4.)

Plaintiffs' Response in Opposition No. 34: Denied. Henson traveled on recruiting events including traveling to Florida and Wisconsin and she worked long hours. Henson stated in her application for the position that she was willing to travel. (Henson 129)(Solotoff Ex. G at D07303)

Defendant's Declaration No. 35. Organizing first round interview schedules on university campuses and final round interviews as well as working with campus recommended vendors to prepare for Company briefings and special events were significant components of the Recruiting Specialist, Campus Recruiting position. (O'Connor Aff. ¶ 4.)

Plaintiffs' Response in Opposition No. 35: Denied. Henson had interview experience at McGraw-Hill and recruiting experience at McGraw-Hill. (Solotoff Decl. Ex. E)(Solotoff Decl. Ex. G at D07307)

Defendant's Declaration No. 36. Experience working with university career services offices was preferred for the Recruiting Specialist, Campus Recruiting position due to the volume of the work load. (O'Connor Aff. ¶ 4.)

Plaintiffs' Response in Opposition No. 36: Denied. Henson was more qualified than Blessing Mariano for the position, Henson had a Master's Degree and Mariano did not, Henson

had recruitment experience with McGraw-Hill and Mariano was an outsider, Henson had higher required skill with 9/17 and Mariano had 7/17, and Henson had higher asset score of 2/4 than Mariano's 1/4. (Solotoff Decl. Ex. F D07315-D07334; F at D07321)(Solotoff Decl. Ex. G D07298-D07314; G at D07304)

Defendant's Declaration No. 37. The Recruiting Specialist, Campus Recruiting position was a grade level 16, which was three grade levels higher than Henson's grade level at the time of her application to this position (*i.e.,* grade level 13). (Henson Tr. 127-28.)

Plaintiffs' Response in Opposition No. 37: Denied. Grade levels were more about salary than job responsibilities.  Grade levels may vary between personnel performing the same jobs and responsibilities. (Henson Aff.  ¶ 16)

Defendant's Declaration No. 38. The job opening for the Recruiting Specialist, Campus Recruiting position was posted internally on McGraw-Hill's intranet and Henson submitted an application through the intranet. (O'Connor Aff. ¶ 4.)

Plaintiffs' Response in Opposition No. 38: Admit.

Defendant's Declaration No. 39. The hiring manager for the Recruiting Specialist, Campus Recruiting position, Deborah O'Connor, interviewed candidates for the position including Henson and Blessing Mariano (Asian). (O'Connor Aff. ¶ 5-6.)

Plaintiffs' Response in Opposition No. 39: Denied. Henson was qualified and interviewed for the position. She was rejected for the position on or about January 18, 2005. The hiree was not African American. (Solotoff Decl. Ex. H)

Defendant's Declaration No. 40. Mariano had extensive prior work experience in campus recruiting and had been doing the exact same job as the Recruiting Specialist, Campus

Recruiting position at her prior employer, Morgan Stanley. (O'Connor Aff. ¶ 6; Rasin Decl. Ex. U)

Plaintiffs' Response in Opposition No. 40: Denied. Henson was more qualified than Blessing Mariano for the position, Henson had a Master's Degree and Mariano did not, Henson had recruitment experience with McGraw-Hill and Mariano was an outsider, Henson had higher required skill with 9/17 and Mariano had 7/17, and Henson had higher asset score of 2/4 than Mariano's 1/4. (Solotoff Decl. Ex. F D07315-D07334; F at D07321)(Solotoff Decl. Ex. G D07298-D07314; G at D07304)

Defendant's Declaration No. 41. Henson has no personal knowledge as to Mariano's prior experience in campus recruiting. (Henson Tr. 130)

Plaintiffs' Response in Opposition No. 41: Denied. Henson did not know what Mariano's qualifications were for the job. However, the reasons given to Henson for her not getting the job was that she did not have any financing recruiting experience. This made no sense because Henson worked in finance at McGraw-Hill for three years, had extensive recruiting experience, assisted with National Black MBA, National Laraza recruiting, traveled to Florida and Wisconsin as was willing to travel. (Henson Tr. 129)(Solotoff Decl. Ex. I).

Defendant's Declaration No. 42. Henson has admitted that she does not know whether Mariano was qualified for the Recruiting Specialist position at McGraw-Hill. (Henson Tr. 130.)

Plaintiffs' Response in Opposition No. 42: Denied. Henson did not know what Mariano's qualifications were for the job. However, the reasons given to Henson for her not getting the job was that she did not have any financing recruiting experience. This made no sense because Henson worked in finance at McGraw-Hill for three years, had extensive recruiting experience,

assisted with National Black MBA, National Laraza recruiting, traveled to Florida and Wisconsin as was willing to travel. (Henson Tr. 129)(Solotoff Decl. Ex. I).

Defendant's Declaration No. 43. During the selection process for the Recruiting Specialist position, O'Connor learned that Henson had previously applied for this position but had withdrawn from consideration. (Henson Tr. 124-25; O'Connor Aff. ¶ 5.)

Plaintiffs' Response in Opposition No. 43: Admit.

Defendant's Declaration No. 44. Henson did not have experience preparing campus interview schedules, nor did she have experience working with university career services offices. (O'Connor Aff. ¶ 5.)

Plaintiffs' Response in Opposition No. 44: Denied. The reasons given to Henson for her not getting the job was that she did not have any financing recruiting experience. This made no sense because Henson worked in finance at McGraw-Hill for three years, had extensive recruiting experience, assisted with National Black MBA, National Laraza recruiting, traveled to Florida and Wisconsin as was willing to travel. (Henson Tr. 129)(Solotoff Ex. I).

Defendant's Declaration No. 45. O'Connor offered the Recruiting Specialist position to Mariano because of her extensive prior relevant work experience and Financial Services industry experience. (O'ConnorAff. ¶ 6; Henson Tr. 124)

Plaintiffs' Response in Opposition No. 45: Denied. The reasons given to Henson for her not getting the job was that she did not have any financing recruiting experience. This made no sense because Henson worked in finance at McGraw-Hill for three years, had extensive recruiting experience, assisted with National Black MBA, National Laraza recruiting, traveled to Florida and Wisconsin as was willing to travel. Henson was more qualified than Blessing Mariano for the position, Henson had a Master's Degree and Mariano did not, Henson had

recruitment experience with McGraw-Hill and Mariano was an outsider, Henson had higher required skill with 9/17 and Mariano had 7/17, and Henson had higher asset score of 2/4 than Mariano's 1/4. (Solotoff Decl. Ex. F D07315-D07334; F at D07321)(Solotoff Decl. Ex. G D07298-D07314; G at D07304) (Henson Tr. 129)(Solotoff Decl. Ex. I).

Defendant's Declaration No. 46. Henson applied for the Human Resources Representative position at S&P in or about June 2005. (Henson Tr. 119.)

Plaintiffs' Response in Opposition No. 46: Admit.

Defendant's Declaration No. 47. The hiring manager for the HR Representative position at S&P, Rich Fisher, interviewed candidates for this position, including Henson and Jessica Brookins (Hispanic). (Fisher Tr. 167-68.)

Plaintiffs' Response in Opposition No. 47: Denied. Henson was not interviewed by Richard Fisher for the HR Representative position at S&P.   (Solotoff Decl. Ex. J)(Solotoff Decl.Ex. K)(Fisher Tr. 104)

Defendant's Declaration No. 48. Henson has never supervised Brookins and admittedly knows nothing about Brookins' work experience or background. (Henson Tr. 122-23.)

Plaintiffs' Response in Opposition No. 48: Admit.

Defendant's Declaration No. 49. Fisher determined that Brookins was the best candidate for the HR Representative position because she was employed at a grade level 16, which was the same grade level as the position, while Henson was only a grade level 13, and Brookins had received higher ratings on her performance evaluations than Henson. (Fisher Tr. 169-70, 172; *see also* Henson Tr. 31.)

Plaintiffs' Response in Opposition No. 49: Denied. Henson, African American, was qualified for the position as HR Representative. Fisher refused to hire a Black woman for the job,

and said so.  He refused to conduct any interview with Henson, knowing that she was Black. Henson met all the criteria for the position. His explanation for selecting Brookins is a pretext for refusing to select or provide Henson with a fair opportunity for the position. He also lacks any specific recall in support of his statements. (Fisher Tr. 165-173)(Pilgrim Tr. 98-100)(Henson's Aff ¶ 14).

Defendant's Declaration No. 50. Fisher considered the candidates' grade levels because the grade levels depict the level of responsibility the candidates held in their current positions. (Fisher Tr. 172.)

Plaintiffs' Response in Opposition No. 50: Denied. (Fisher Tr. 165-173)(Henson's Aff ¶ ¶ 6, 16).

Defendant's Declaration No. 51. Fisher ultimately offered the position to Brookins. (Fisher Tr. 169-70, 172.)

Plaintiffs' Response in Opposition No. 51: Denied. Fisher made the decision to hire Brookins in June 2005 before he interviewed Brookins or Henson. (Fisher Tr. 168, 169).

**D. Henson's Alleged Protected Activity.**

Defendant's Declaration No. 52. On or about December 20, 2004, O'Neill witnessed Henson crying at her desk and asked her why she was crying, and the two of them had a discussion regarding several upsetting events in Henson's life. (Henson Tr. 70, 74-76, 78.)

Plaintiffs' Response in Opposition No. 52:  Denied. On January 23, 2004 Henson was robbed.  She told O'Neill about the robbery via telephone on January 26, 2004 and discussed it with her the week she came back from work. A year later on January 18, 2005 after Henson was denied the HR Recruiting Specialist promotion and after being denied many other promotions she applied for she cried at her desk because the position was not given to her or an African

American. She complained to O'Neill about this event and no other event. She complained to O'Neill that she did not get the promotion and told her that "You do not know what it is like being African American at McGraw-Hill. (Henson Tr. 75, 76, 216) (Henson Aff ¶ ¶ 3, 4, 5).

Defendant's Declaration No. 53. During her discussion with O'Neill, Henson described how she had been robbed at gun point while visiting a friend in Harlem. (Henson Tr. 76, 78.)

Plaintiffs' Response in Opposition No. 53: Denied. Henson was complaining of her treatment as an African American employee at the company. O'Neill knew she was complaining about losing the promotion.(Henson Tr. 74, 76, 78 ), (Henson Aff ¶ 5)

Defendant's Declaration No. 54. In reference to Henson's experience of being robbed, Henson stated, "You don't know what it's like being black" and O'Neill responded, "Yes, that's right. I don't know what it's like being black." (O'Neill Tr. 150.)

Plaintiffs' Response in Opposition No. 54: Denied. Henson was clearly complaining about not getting the promotion. O'Neill's response was that "She did not know what it is like being African American at McGraw-Hill." Henson thought her response was offensive, humiliating and inappropriate coming from the Vice President of Human Resources, Corporate. Henson had provided her often with detailed reports showing that grade levels, turnover rates, salaries and promotions of African American employees was lower than Caucasians in similar positions throughout the Company. She was not crying or complaining about an event that took place a year prior. (Henson Tr. 74, 75, 76), (Henson Aff ¶¶ 5, 6 )

Defendant's Declaration No. 55. O'Neill did not understand that Henson's comment about being black was purportedly intended by Henson to be a complaint of racism or discrimination at McGraw-Hill. (O'Neill Tr. 90, 149-50.)

Plaintiffs' Response in Opposition No. 55: Denied. O'Neill understood that Henson's complaints about being an African American at McGraw-Hill was a complaint about unfair treatment due to her race at McGraw-Hill because Henson told her that what had happened to other African American employees was happening to her. (Henson Aff ¶ 9 )

**E. Henson's Resignation.**

Defendant's Declaration No. 56. In or about June 2005, Henson applied for a position with the New York City Department of Education ("NYCDOE"). (Henson Tr. 144-48.)

Plaintiffs' Response in Opposition No. 56: Denied. Henson applied for positions at McGraw-Hill and at the NYC Dept. of Education in June 2005. (Henson Tr. 144-145.) (Solotoff Decl. Ex. K)

Defendant's Declaration No. 57. On her application of employment to the NYCDOE, Henson stated that her reasons for leaving McGraw-Hill were "voluntary" and that she was in search of a "better opportunity." (Rasin Decl. Ex. V.)

Plaintiffs' Response in Opposition No. 57: Denied.  Henson stated to NYCDOE that her reasons for leaving McGraw-Hill were "voluntary" and that she was in search of a "better opportunity." It was inappropriate for her to state on the application to NYCDOE that she was denied a promotion because she was Black and a person of color. On her exit interview with McGraw-Hill she stated that she suffered race discrimination and unfair treatment. (Solotoff Decl. Ex. L at 3889-3890)(Henson Aff.  ¶ 13).

Defendant's Declaration No. 58. On or about July 17, 2005, Henson was offered the position of Special Assistant to the Deputy Director Medical Leaves and Benefits at the NYCDOE at a starting salary of $68,000. (Henson Tr. 25-29, 148.)

Plaintiffs' Response in Opposition No. 58: Admit.

Defendant's Declaration No. 59. Henson's salary at McGraw-Hill on July 2005 was approximately $45,000. (Henson Tr. 29.)

Plaintiffs' Response in Opposition No. 59: Admit.

Defendant's Declaration No. 60. A few days after Henson was offered the position at the NYCDOE, she accepted the job. (Henson Tr. 25-29, 148.)

Plaintiffs' Response in Opposition No. 60: Denied. Henson accepted the City position on or about July 22, 2005, she gave McGraw-Hill notice on August 1, 2005 and her last day at work was August 12, 2005. (Henson Tr. 148)

Defendant's Declaration No. 61. Shortly after accepting the position at the NYCDOE, Henson resigned her employment at McGraw-Hill and August 12, 2005 was her last day. (Henson Tr. 148.)

Plaintiffs' Response in Opposition No. 61:  Denied. On her exit interview with McGraw-Hill she stated that she suffered race discrimination and unfair treatment. (Solotoff Decl. Ex. L)


## IV. DEFENDANT'S DECLARATIONS AS TO PLAINTIFF JESAN SPENCER.

### A. Spencer's Employment History.

Defendant's Declaration No. 62. Spencer began employment with McGraw-Hill on or about December 5, 2000, as a Senior Manager of Human Resources ("HR") in the Corporate Segment. (Spencer Tr. 15.)

Plaintiffs' Response in Opposition No. 62: Admit.

Defendant's Declaration No. 63. At the time of her hire, Spencer earned $85,000 per year and was a grade level 19. (Spencer Tr. 33, 36.)

Plaintiffs' Response in Opposition No. 63: Denied, At the time of her hire, Spencer earned $80,000.00 per year and was a grade level 19. (Solotoff Decl. Ex. FF)

Defendant's Declaration No. 64. From her hire through February 2005, she was part of a group that provided HR support to the Publication Services Group ("PSG") (a part of the IMS segment) and reported directly to Bill Harper (African American), Director of Human Resources for PSG. (Spencer Tr. 33, 56, 128; Harper Tr. 7-8, 40.)

Plaintiffs' Response in Opposition No. 64: Admit.

Defendant's Declaration No. 65. As Senior Manager of Human Resources, Spencer's responsibilities included, among others: organizing and conducting employee training; coordinating the intern and other diversity recruitment programs; resolving employee relations issues and addressing employees' questions; and, providing HR support to her clients, the management employees of Business Week and the other business departments within PSG which included PLATTS, Aviation Week and Healthcare Information Services. (Spencer Tr. 47-49; Harper Tr. 5, 7-9.)

Plaintiffs' Response in Opposition No. 65:  Denied. As Senior Manager of Human Resources, Spencer's responsibilities included all of the above listed responsibilities plus partner with the department heads, develop competency based questions for interns, employees, managers and directors, oversee manage and coordinate all aspects of the intern program, develop a diversity slate, handle and resolve all employee related issues, partner and meet with the business department heads, review affirmative action data, communicate survey results and develop leadership programs for department heads (Spencer Tr. 47-49)(Harper Tr. 5, 7-9)

B.    **Spencer's Performance under Harper's Supervision**

Defendant's Declaration No. 66. From December 2000 until December 2002, Spencer performed well in her position and her performance was reflected in the overall ratings she received from Harper on her 2001 and 2002 annual performance reviews, which were "performance exceeded expectations," the second highest possible rating. (Spencer Tr. 180, 184; Harper Tr. 40-42.)

Plaintiffs' Response in Opposition No. 66: Admit.

Defendant's Declaration No. 67. In 2003 and 2004, Harper determined that Spencer's performance reflected a need for improvement in certain crucial areas including verbal communications skills and conducting training, which caused Harper to receive mixed feedback on her performance from their PSG clients. (Harper Tr. 48-49; Rasin Decl. Ex. W, X, and Y)

Plaintiffs' Response in Opposition No. 67: Denied. In 2003 Spencer was evaluated with a #4 "Exceeds Expectations" on Employee Relations, Talent Acquisition, Director 360 Degree Assessments, and Sexual Harassment Training and received a pay increase for the year.  In 2004 Spencer received a rating of "Frequently Exceeds Performance Standards" for Leadership Development; and "Frequently Exceeds Performance Standards" for PMP Training for which Spencer received a bonus. Spencer received "Demonstrated Strength" for creating internal partnerships; effective presentations, presents well, has an energizing presence and is engaging, clearly conveys information and ideas through a variety of media to individuals or groups as proficient; provides timely guidance and feedback to help others strengthen specific knowledge and develop key areas to accomplish tasks or solve problems. Mangers report that she does this very well a "Demonstrated Strength." She also received Demonstrated Strength for staying with a plan of action until the plan is obtained despite obstacles. She also received "Effective Communications" in 2004. She received a pay increase for her performance. (Solotoff Decl. Ex.

23

M at D00629, D00631)(Solotoff Decl. Ex. N at D03378-3379, D03379-D03380, D03385-003386, D03387-D3389)

Defendant's Declaration No. 68. Harper provided feedback to Spencer regarding her performance and, on at least one occasion, spoke to her about her poor management of the training programs for their clients. (Rasin Decl. Ex. Y at D00825.)

Plaintiffs' Response in Opposition No. 68: Denied. Spencer is not aware of the document which is undated and not seen before. Spencer's trainees scored her training programs very well. (Spencer Aff. ¶ 3 )

Defendant's Declaration No. 69. Harper suggested that Spencer receive coaching from a communications specialist, Peter Delisser, to improve her verbal communications skills. (Rasin Decl. Ex. W at D00632.)

Plaintiffs' Response in Opposition No. 69: Denied. Spencer initiated on her own to speak to Peter Delisser and no coaching from Delisser was arranged or necessary. (Spencer Aff. ¶ 4 )

Defendant's Declaration No. 70. Spencer failed to build effective relationships with Business Week department heads in 2003 partially because she did not begin the process until the third quarter of the year, despite Harper's request in early 2003 to build these relationships throughout the entire year. (Rasin Decl. Ex. W at D00630.)

Plaintiffs' Response in Opposition No. 70: Denied. In 2003 Spencer received a rating of #4 for Employee Relations which include communication skills. Spencer also met with the directors of the departments on employee relations, building business partnerships, and delivering training to Platt's employees throughout the year.  (Rasin Decl. Ex. W at D00629, and D00631)

Defendant's Declaration No. 71. Spencer received negative feedback from clients directly for not handling employee relations issues correctly, such as the criticism she received for mishandling the hiring process of intern Sang Mi Pale (Rasin Decl. Ex. Y at D00801.)

Plaintiffs' Response in Opposition No. 71: Denied. This allegation related to a single isolate matter concerning a disagreement over what grade level to be assigned to a prior intern Sang Mi Pale.  (Spencer Aff. ¶ 5 ).

Defendant's Declaration No. 72. Spencer failed to meet her 2004 performance goal of recruiting diverse candidates for the editorial side of Business Week when none of the ten candidates she identified were found suitable for hire. (Rasin Decl. Ex. X at D03380-81.)

Plaintiffs' Response in Opposition No. 72: Denied. Spencer provided a list of diverse qualified candidates for the editorial side of Business Week. The editorial staff is responsible for making the hiring decisions that include many variables. (Spencer Aff. ¶6).

Defendant's Declaration No. 73. As a result of Spencer's performance deficiencies as determined by Harper, Spencer's performance reviews from Harper for 2003 and 2004 were not as strong as her reviews in the years prior and she received an overall rating of "performance achieved expectations" on her 2003 review and a rating of "fully meets performance standards" on her 2004 review. (Rasin Decl. Ex. W at D00632 & X at D003392.)

Plaintiffs' Response in Opposition No. 73: Denied. In 2003 Spencer received four ratings of (#4), three ratings of (#3) and one rating of (#2), therefore her overall total performance was very strong.  Indeed, in 2004 Spencer received two "Frequently Exceeds," three "Fully Meets," and one "Meets Performance;" five "Demonstrated Strengths," and three "Proficient" and no "Needs Improvement." Her 2004 performance review states that she launched 360 initiatives that went very well based upon client comments and observation, "Jesan also achieved the rare

accomplishment of getting support and buy-in for this initiative on both the business side and editorial side of Business Week.  This is no small feat". It also states that, "an overall rating of 4 was given by the participants who attended the overview prior to the formalized PMP training. This was an example of Jesan taking charge of a high profile and key corporate HR initiative for her client base.  She was proactive and insightful regarding the special needs of the editorial staff in using the PMP software."  It goes on to state that Spencer completed the focus group with BusinessWeek and Aviation Week employees prior to the deadline dates. (Rasin Decl. Ex. W)(Rasin Decl. Ex. X)

Defendant's Declaration No. 74. In 2004, McGraw-Hill had implemented a new online performance appraisal system called "Performance Management Process" ("PMP"). (Harper Tr. 31-33, 42-43.)

Plaintiffs' Response in Opposition No. 74: Admit.

Defendant's Declaration No. 75. The "fully meets performance standards" rating Spencer received in 2004 under the new PMP system is equivalent to the "performance achieved expectations" rating that she received on her 2003 review under the old appraisal system. (Harper Tr. 42-43.)

Plaintiffs' Response in Opposition No. 75: Admit.

C. **Spencer's Performance under Caruso's Supervision**

Defendant's Declaration No. 76. In February 2005, Harper was promoted to the position of Vice President of Human Resources for the Business Information Group ("BIG") (a part of the IMS segment) and Ken Caruso joined McGraw-Hill as a Senior Director of Human Resources in the Corporate Segment. (Spencer Tr. 63-64; Harper Tr. 9-10.)

Plaintiffs' Response in Opposition No. 77: Admit.

Defendant's Declaration No. 77. Upon joining McGraw-Hill, Caruso became Spencer's direct supervisor and their services were dedicated to providing HR support to Business Week. (Spencer Tr. 63-64; Harper Tr. 8-9.)

Plaintiffs' Response in Opposition No. 77: Admit.

Defendant's Declaration No. 78. Like Harper, Caruso determined that Spencer exhibited deficiencies with respect to her oral communications skills and clarity in conducting training sessions and noted them in her mid-year review for 2005 which took place in August 2005. (Caruso Tr. 34-35, 73; Rasin Decl. Ex. AA.)

Plaintiffs' Response in Opposition No. 78:  Denied. Spencer's 2005 mid-year review provides that Spencer "is currently at target on her goals and trending in some cases to exceeds," on competencies, "is proficient or better on all." At target on "customer focus" and on scheduling and coordination of the PMP process, has been "strong." A process of managing hundreds of managers and employees is no small tasks, yet she "executed efficiently and with a few hiccups." Spencer demonstrated "high degree of professionalism" in her (training) style and an ability to be "articulate even when under rapid fire questioning." On "employee relations (ER)" (communications) Spencer is "trending at exceeds." She handles 90% of all ER issues, across the business unit, with little involvement or direction from Caruso. (Rasin Decl. Ex. AA at D004007-D04008)

Defendant's Declaration No. 79. Throughout the second-half of 2005, Caruso received serious and continued complaints about Spencer from their clients at Business Week regarding her communication skills, lack of organization and responsiveness, and failure to follow through in response to their questions and requests. (Rasin Decl. Ex. Z; Caruso Tr. 70, 72.)

Plaintiffs' Response in Opposition No. 79: Denied. Jim Ellis, a Director on the Editorial side of Business Week, rated Spencer as "demonstrated solid," "competent," "no big problems," "fantastic anticipating issues," and "aggressive". (Rasin Decl. Ex. Y at D00831).

Defendant's Declaration No. 80. Caruso noted deficiencies with respect to Spencer's diversity recruitment efforts in 2005, similar to the deficiencies noted in 2004. (Rasin Decl. Ex. X & Z.)

Plaintiffs' Response in Opposition No. 80: Denied. As to 2004, see response to No. 73. On the 2005 mid year review, Spencer was rated as "successful in identifying diverse candidates of a consistently high caliber." Spencer was rated in "Staffing and Recruitment" as "Fully Meets." Spencer challenged this review as it was written after the filing of her EEOC Charge that was received on January 16, 2006. Marschke signed the review March 2, 2006. Spencer signed the overall review "Under Protest" (Rasin Decl. Ex. Z at 3995, 4007).

Defendant's Declaration No. 81. Spencer failed to recognize that the candidates she had identified for interviews and placement at McGraw-Hill were not a good fit for the Company and recommended candidates that were clearly too senior and/or experienced for its hiring needs. *(Id.)*

Plaintiffs' Response in Opposition No. 81: Denied. On the 2005 mid year review, Spencer was rated as "successful in identifying diverse candidates of a consistently high caliber." A number of the candidates were sourced by Harper. All the candidates were qualified. Caruso noted that Spencer identified only one candidate out of a dozen potential employees, as clearly too senior for any present or future need. Spencer was rated in "Staffing and Recruitment" as "Fully Meets." Spencer challenged this review as it was written after the filing of her EEOC Charge that was received on January 16, 2006. Marshke signed the review March 2, 2006.

Spencer signed the overall review "Under Protest". A number of the candidate's Spencer had been sourced under Harper, and at least one candidate was referred to Spencer by Harper. All the candidates were exceptionally qualified. (Spencer Aff. ¶ 7) (Rasin Decl. Ex. Z at 3995, 4007)

Defendant's Declaration No. 82. Caruso noted her performance deficiencies in Spencer's performance evaluation for 2005 and gave her an overall rating of "target achievement" on the evaluation, the same rating that Harper had given her for 2003 and 2004. (Spencer Tr. 80; Rasin Decl. Ex. Z.)

Plaintiffs' Response in Opposition No. 82: Denied. On the 2005 mid year review, Spencer was rated as "successful in identifying diverse candidates of a consistently high caliber." Caruso noted that Spencer identified only one candidate out of a dozen potential employees, as clearly "too senior" (too old) for any present or future need. Spencer was rated in "Staffing and Recruitment" as "Fully Meets.". Spencer challenged this review as it was written after her filing of her EEOC Charge that was received on January 16, 2006. Brett Marschke signed the review March 2, 2006. Spencer signed the overall review "Under Protest" (Rasin Decl. Ex. Z at 2995, 4007).

Defendant's Declaration No. 83. The performance deficiencies that Caruso noted in Spencer's evaluation for 2005 were consistent with the deficiencies he had noted in her 2005 mid-year review, which took place in August 2005, and with the deficiencies Harper observed and noted in her performance reviews for 2003 and 2004. (Rasin Decl. Ex. W, X, Z, and AA.)

Plaintiffs' Response in Opposition No. 83: Denied. See Spencer's response to 78 through 82.

Defendant's Declaration No. 84. Spencer received annual salary increases for 2005 and 2006, and her title, benefits, grade level and goals remained the same. (Spencer Tr. 78-79; Caruso Aff. ¶ 6.)

Plaintiffs' Response in Opposition No. 84: Denied. Spencer's reputation was lost, Caruso reduced her from a Senior HR Manager to a clerk. Caruso did not tell Spencer that he allotted an increase in salary for her.(Spencer Tr. 78-79).

**D. Spencer's Complaints About Caruso.**

Defendant's Declaration No. 85. In or about December 2005, Spencer complained to Brett Marschke, the Vice President of Human Resources for IMS that Caruso cursed in her presence in the workplace used a disrespectful tone and demeanor toward her, and reduced her job responsibilities. (Marschke Tr. 48-51; Spencer Tr. 85-91; Rasin Decl. Ex. BB.)

Plaintiffs' Response in Opposition No. 85: Denied. Spencer complained to Marschke about Caruso's cursing, his treatment of her, his attitude towards her, his demeanor and his work ethic toward her. She told Marschke that he would ask the white males and white females how they were doing, say good morning and good afternoon to them but ignored her. He treated her differently than he treated the Caucasian males and females. She was upset and crying when she went to Marschke.(Spencer Tr.86, 87)(Solotoff Dec. Ex. P)(Marschke Tr. 48,52)

Defendant's Declaration No. 86. During her conversation with Marschke in December 2005, Spencer wondered aloud whether Caruso's conduct toward her was discriminatory. (Marschke Tr. 48-51; Rasin Decl. Ex. BB.)

Plaintiffs' Response in Opposition No. 86: Denied. Spencer told Marschke that she felt Caruso treated her differently than he did white men and white women and that he discriminated against her. Marschke's notes say "discrimination". Marschke admitted Spencer inferred an

element of race when complaining about Caruso. Marschke said Spencer was very specific about her complaints. (Solotoff Dec. Ex. P) (Spencer Tr.86, 87)(Marschke Tr. 66, 78)

Defendant's Declaration No. 87. Marschke told Spencer that he would discuss her complaint about Caruso with O'Neill and speak with Caruso. (Spencer Tr. 83-84; Marschke Tr. 61-62; O'Neill Tr. 54, 59.)

Plaintiffs' Response in Opposition No. 87: Denied. Brett never got back to Spencer .and never followed up with her about her complaints. Marschke is a high ranking HR person and he did not do anything for Spencer. Marschke never followed up with either Caruso or Spencer to see if the cursing had stopped and if Caruso stopped looking directly at Spencer while referring to "bitches". (Spencer Tr. 113)(Marschke Tr. 105)

Defendant's Declaration No. 88. Spencer's duties were not significantly or systematically reduced under Caruso. There were occasions when Caruso would assume responsibility for a particular task previously performed by Spencer, but this was task specific and based on issues with her performance of that particular task. (Caruso Aff. ¶¶ 4-5.)

Plaintiffs' Response in Opposition No. 88: Denied. Caruso reduced her job duties to nothing, gave her clerical work and took away her visibility with her business partners. She no longer went to department head meetings, no longer recommended for committees, no longer interfaced with the business units. He told other managers not to go to her and he took her job away.(Spencer Tr. 74, 131, 132)

Defendant's Declaration No. 89. Spencer's grade level, title and goals never changed while she reported to Caruso and she received a salary increase. (Spencer Tr. 78-79; Caruso Aff. ¶ 6.)

Plaintiffs' Response in Opposition No. 89: Denied. Spencer received an annual salary increase for 2005 under Harper. Spencer did not receive an increase for her work for the year 2006 she had left in early 2007 and would not have given an increase. In 2006 Spencer's title, benefits, and grade level remained the same. However she was "involuntarily" transferred in May 2006 to BIG, shortly after she complained of discrimination and the Company received her EEOC Charge on January 16, 2007 and Responded to the EEOC on March 16, 2006. Spencer was retaliated against for complaining of discrimination to Marschke and filing an EEOC Charge with the EEOC. Her job duties, goals and responsibilities were significantly and materially altered, diminished, and reduced, and she was involuntarily transferred to a position to perform meaningless, repetitive administrative assignments and clerical functions with the purpose of being "managed out of the Company." She no longer was given the responsibilities and duties she enjoyed consistent with an individual of her title and position.  She no longer reported or supported managers and directors as she had done in the past. She was denied any opportunity or goals that would allow for pay increases, bonuses, accolades, training, and awards in the areas that she had performed with great success in the past. She felt like a worthless person, a "dog" or a "slave." She was out of the loop at Business Week.(Spencer Tr. 73- 75, 81- 82).

Defendant's Declaration No. 90. After being contacted by Marschke, O'Neill spoke with Spencer regarding her allegations about Caruso's cursing, disrespectful treatment and reduction in her duties. (Spencer Tr. 87-91; O'Neill Tr. 13, 51-52.)

Plaintiffs' Response in Opposition No. 90: Denied. Spencer told O'Neill about Caruso's racist attitude and how she was being treated by him.  Spencer complained to O'Neill about Caruso's use of the word "bitches" in reference to woman only in the presence of Blacks and how she was being treated like a slave.(Spencer Tr. 102-103, 217)

Defendant's Declaration No. 91. O'Neill understood that Spencer was complaining about Caruso's use of foul language in the workplace and a reduction in her responsibilities but did not interpret Spencer to be a complaining of discrimination. (O'Neill Tr. 13, 51-52, 57, 65,214-15.)

Plaintiffs' Response in Opposition No. 91: Denied. Two African American female employees, Spencer on December 13, 2005, and Mitchell on January 5, 2006, on two separate independent occasions, complained of discrimination to Marschke, arising out of Caruso's foul and offensive and hostile conduct in their presence. They each complained that Caruso called females "Bitches" in their presence.  Caruso made these comments to the two African American female employees under him. Spencer and Mitchell complained to Marschke.  Plaintiff Spencer also filed her EEOC complaint on December 16, 2005, the Company and HR knew of the EEOC Complaint by January-February 2006 and Murphy, Marschke, Caruso, and O'Neill participated in responding to Plaintiff Spencer's Charges to the EEOC on March 16, 2006.  On March 19, 2006 Murphy signed the Caruso PMP, Marschke signed it on March 21, 2006, and Caruso signed it on March 20, 2006.  Together, they created in writing that Caruso's goal as planned was to manage Spencer out of the Company.  In other words to fire her, by involuntarily transferring Spencer out of her Sr. HR Manager's position at Business Week, into BIG, and forcing her to leave.  They knew there was no need to transfer Spencer from her position as HR for Business Week because they knew that they had planned to reassign Caruso to California (Solotoff Decl. Ex F). (Solotoff Decl. Ex. O)(Solotoff Decl. Ex. P)(Solotoff Decl. Ex. N)(Solotoff Decl. Ex. AA)(Solotoff Decl. Ex CC)(Marschke Tr. 91, 96, 113) (Murphy Tr. 105-106)

Defendant's Declaration No. 92. Marschke spoke with Caruso regarding Spencer's allegations and reprimanded him for his use of profane language in the workplace. (Marschke Tr. 87; Caruso Tr. 110.)

Plaintiffs' Response in Opposition No. 92: Denied. Caruso continued to curse and refer to women as "Bitches" in the presence of the African American females. Caruso required Spencer to keep a list of the times and dates of his cursing.  Spencer found this to be insulting and demeaning. Marschke does not know if Caruso continued to use profanity after he spoke with him. On June 13, 2006 Caruso also wrote a memo to Human Resources and Spencer's Personnel file attacking Spencer for insubordination, defamatory conduct, and denied any wrong doing. (Solotoff Decl. Ex. Q) (Spencer Aff. ¶ 8)(Marschke 105)

Defendant's Declaration No. 93. When Marschke spoke with him, Caruso expressed dismay at Spencer's allegations and struggled to recall when he had used profane language in her presence. (Caruso Tr. 104-112; Marschke Tr. 62, 67-69.)(Spencer Aff.  ¶ 9)

Plaintiffs' Response in Opposition No. 93: Denied. Caruso continued to curse and refer to women as "Bitches" in the presence of Spencer.  On June 13, 2006 Caruso wrote a blistering memo to Human Resources and Spencer's Personnel file attacking Spencer for insubordination, defamatory conduct, and denied any wrong doing. Marschke never saw a supervisor who was the subject of an EEOC Complaint write a formal complaint like that. (Marschke 155, 156, 158)

Defendant's Declaration No. 94. Caruso admitted to Marschke that he may have used the words "fuck" and "shit" and that he may have used the word "bitch" as an expletive in the context of phrases like "son of a bitch" or "what a bitch" in reference to stressful situations. (Caruso Tr. 104-112; Marschke Tr. 62, 67-69.)

Plaintiffs' Response in Opposition No. 94: Denied. Caruso referred to woman as "bitches". (Spencer Tr. 72 ).

Defendant's Declaration No. 95. Caruso denies having used the word "bitch" by itself in Spencer's presence or in reference to Spencer, any woman specifically or women in general. (Caruso Tr. 104-106.)

Plaintiffs' Response in Opposition No. 95: Denied. Caruso referred to women as "bitches" in her presence and Mitchell's presence. (Spencer Tr. 72, 73).(Solotoff Decl. Ex. O)(Solotoff Decl. Ex. P)

Defendant's Declaration No. 96. Caruso never said "fuck you" to Spencer or explicitly called Spencer a "Bitch." (Spencer Tr. 102, 158.)

Plaintiffs' Response in Opposition No. 96: Denied. He would look directly at Spencer and curse and say "Fuck" and he would look at Spencer and say "Bitch" when she was the only person in the room. (Spencer Tr. 102, 158 ).

Defendant's Declaration No. 97. Caruso did not curse exclusively to or in the presence of African American employees. (Spencer Tr. 225-26.)

Plaintiffs' Response in Opposition No. 97: Denied. Caruso is guilty of mendacity. Caruso admitted to using the word "Bitch" at least ten times. Caruso continued to curse and refer to women as "Bitches" in the presence of the African American females.  He did not curse and refer to women as "Bitches" in the presence of Caucasian males and Caucasian female employees. The temp overheard Caruso's cursing, while she was outside of his office, and complained to Spencer at the time, saying "I do not know how you can take it." The cursing that was overheard by the temp was when Spencer was in the room alone with Caruso. (Spencer Tr. 225-226) (Spencer's Aff. ¶ 10).

Defendant's Declaration No. 98. Spencer never heard Caruso make a racial slur. (Spencer Tr. 117.)

Plaintiffs' Response in Opposition No. 98: Denied. Spencer complained that Caruso's behavior in the presence of people of color was foul and offensive, disrespectful and demeaning, and that was the basis for her complaint about his racist attitude towards her and Sheila Mitchell, as African Americans. For example, when Spencer told Caruso that minorities were unhappy with the way they were being treated, Caruso said, "These minorities should leave.".   He did treat people of color in a hostile and demeaning manner. Referring to women as "Bitches" and using other foul and abusive language in their presence of Spencer. Coming from a Caucasian, Director of Human Resources, in the presence of African American women in Human Resources, is particularly derogatory and inappropriate and offensive.  He did not use the word "Bitches" to white males or white females. Caruso's conduct was hostile because of Spencer's race.(Spencer Tr. 117, 157,217 ) (Spencer Aff. 11 )

Defendant's Declaration No. 99. Caruso told Marschke that he would be more careful not to use foul language in the workplace and he thereafter apologized to Spencer. (Caruso Tr. 110-13.) Spencer told O'Neill that Caruso had stopped cursing. *(Id.)*

Plaintiffs' Response in Opposition No. 99: Denied. Caruso did not apologize. (Spencer Aff. 12 )

Defendant's Declaration No. 100. Following his conversation with Marschke, Caruso stopped cursing in the workplace and in Spencer's presence. (Spencer Tr. 98-101; *see also* Caruso Tr. 113-14; O'Neill Tr. 75.)

Plaintiffs' Response in Opposition No. 100: Denied. Caruso stopped using the word "Bitch" only for a short period, at which time Spencer told O'Neill that he had.  Shortly thereafter he continued to curse and refer to females as "Bitches" and told Spencer he cannot help himself, that he would continue to curse and use offensive language and that it was her job

to make a list. By this point in time Spencer was threatened with being set up to fail and managed out of the business. (Spencer Tr. 98, 99 ). (Spencer Aff. ¶13)

Defendant's Declaration No. 101. Spencer told O'Neill that Caruso had stopped cursing. (*Id.*)

Plaintiffs' Response in Opposition No. 101: Denied. Caruso continued to curse for months after Spencer complained to O'Neill and Spencer told O'Neill that he was still cursing. Caruso stopped cursing when Spencer told O'Neill she wanted to interview for another job in Education.(Spencer 98, 99)(Solotoff Decl. Ex. R at D03775-03776).

### E.     Spencer's Transfer.

Defendant's Declaration No. 102. O'Neill followed up with Spencer regarding her complaint of Caruso's behavior and asked Spencer if she would meet with O'Neill and Caruso so that O'Neill could mediate any remaining problems Spencer perceived. (Spencer Tr. 91-92.)

Plaintiffs' Response in Opposition No. 102: Denied. O'Neill did not have a reputation of solving problems with minorities. For example, she did not solve the problems of Robin Hicks, Marci Brown, Angela King, and Terry Irrizarry, all of whom complained of discrimination. Plaintiff filed the EEOC complaint on January 4, 2006, the Company and HR knew of the EEOC Complaint by January-February 2006 and responded to Plaintiff Spencer's Charges on March 16, 2006. On the same date Murphy, Marschke, and Caruso planned to "involuntarily" transfer Spencer out of her Sr. HR Manager's position at Business Week, to BIG. Murphy, Marschke, Caruso, and O'Neill intended to manage Spencer out of the business and force her to quit. There was no need to transfer Spencer because they knew that Caruso was being reassigned to California. (Solotoff Decl. N Caruso's 2005 )(Spencer Tr. 91-92).

Defendant's Declaration No. 103. Spencer refused to meet with O'Neill and Caruso to mediate the problems she claimed to have with Mr. Caruso. (Spencer Tr. 91-92.)

Plaintiffs' Response in Opposition No. 103: Denied. See Response to 102. Plaintiff refused to meet with O'Neill as a mediator because O'Neill does not have a reputation for solving problems when it comes to minorities. She didn't do it for Marci Brown, Terry Irizarry, Jannie Pilgrim, and others. O'Neill's way of solving discrimination complaints is to offer them packages to leave.  (Spencer Tr. 91-92 )

Defendant's Declaration No. 104. After Spencer refused to meet with O'Neill and Caruso, in or about April 2006, Spencer requested to O'Neill that she be transferred from her position and O'Neill agreed to look into the available options. (Spencer Tr. 101; O'Neill Tr. 205-206.)

Plaintiffs' Response in Opposition No. 104: Denied.Spencer did not want to leave Business Week.  Because her job was reduced to nothing she asked to be transferred and interviewed for a position in Education with Mike McGlynn. (Solotoff Decl. Ex. R at D03776, D03777).

Defendant's Declaration No. 105. Following Spencer's request to transfer her, O'Neill in conjunction with Marschke and Harper evaluated the Company's business needs and determined that there was an opening for a Senior HR Manager position in the Business Information Group ("BIG") that was comparable to Spencer's current position. (O'Neill Tr. 206-213; Marschke Tr. 90, 108-110; Harper Tr. 53-54.)

Plaintiffs' Response in Opposition No. 105: Denied. Plaintiff filed the EEOC Complaint in January 4, 2006, the Company and HR knew of the EEOC Complaint and responded to Plaintiff Spencer's Charges on March 16, 2006. On the same date Murphy, Marschke, and

Caruso planned to involuntarily transfer Spencer out of her Sr. HR Manager's position at Business Week to BIG.   There was no need to transfer Spencer because they knew that Caruso was being reassigned to California. O'Neill knew that the transfer of Spencer would be involuntary. Spencer felt her career and job were in jeopardy. She felt seriously threatened. O'Neill specifically knew that the transfer of Spencer to HR at BIG, would be involuntary. O'Neill falsely stated to Marshke, and/or Marshke falsely stated that he was told by O'Neill, that Spencer wanted a transfer. Indeed, in either case, Spencer did not want to be transferred to BIG. (Spencer Tr. 105, 109 (O'Neill Tr. 206-213, 221, 224 )(Solotoff Decl. Ex. R at D07531)

Defendant's Declaration No. 106. Due to the growth and business needs at BIG at the time, Harper, as the Vice President of BIG, had been asking Marschke for additional support and he was pleased to accept Spencer. (Harper Tr. 54-56.)

Plaintiffs' Response in Opposition No. 106: Denied. Harper denied speaking to O'Neill about Spencer's transfer to BIG (Harper Tr. 55 ).

Defendant's Declaration No. 107. The position at BIG had the same title, the same pay, the same benefits, the same grade level and the same job responsibilities as Spencer's current position. (Spencer Tr. 109; Harper Tr. 58-59, 129-30)( Marschke Tr. 108-110.)

Plaintiffs' Response in Opposition No. 107: Denied. The responsibilities and job duties that were taken away from Spencer are: she was excluded from Director and Departmental meetings; I was precluded from writing position descriptions; she was not given access to Lawson, which was a computer program that was required to be used for leveling jobs and exit interviews; other HR secretaries, coordinators, and managers of lesser grade than she was had access on a daily basis; she was denied access to the database for employee information, her training role was significantly reduced; her designing and implementing training projects or

programs was non-existent; she was not included in presidential and department head meetings; my handling of employee relations issues were reduced by over 80%; she was prevented from being involved in employee resolution issues or to apply resolution skills; she was not involved in leadership development programs or needs analysis; she was no longer involved in sourcing potential recruits ;she was no longer involved in working with other organizations where minority candidates may be available, she was not involved in working on assigned projects with staffing and recruitment; she was not given an opportunity to meet with or review candidates; my diversity goals and responsibilities were non existent; she was no longer involved in leadership development projects; her visibility with directors who she needed to support was seriously effected; she no longer worked on RIFs, and her role was clerical administrative.    The responsibilities and job duties she had for Business Week provided her with opportunities for promotion, pay increases and bonuses. she no longer had that opportunity at BIG. (Spencer Aff. ¶ 14 )

Defendant's Declaration No. 108. Spencer expressed her desire to accept the position at BIG to Harper. (Harper Tr. 54-56.)

Plaintiffs' Response in Opposition No. 108: Spencer was told she had to go to BIG. Spencer had her therapist call O'Neill to complain on her behalf.  Plaintiff filed the EEOC complaint in December 2005, the Company and HR knew of the EEOC Complaint by February 2006 and responded to Plaintiff Spencer's Charges on March 16, 2006. On the same date Murphy, Marschke, and Caruso planned to involuntarily transfer Spencer out of her Sr. HR Manager's position at Business Week to BIG.  There was no need to transfer Spencer because they knew that Caruso was being reassigned to California. On or about March 16, 2006, at the time the Company responded to Spencer's EEOC Charge, O'Neill approached Spencer and tried

to get Spencer to consider a transfer as a solution to getting away from Caruso. By April-May 2005, Spencer refused to be transferred and met with O'Neill to explain why. O'Neill knew that any transfer of Spencer would be involuntary. Spencer felt her career and job were in jeopardy. She felt seriously threatened. O'Neill specifically knew that any transfer of Spencer to HR at BIG, would be involuntary. O'Neill falsely stated to Marschke, and/or Marschke falsely stated that he was told by O'Neill, that Spencer wanted a transfer. Indeed, in either case, Spencer did not want to be transferred to BIG. (Solotoff Decl. Ex. R)(Spencer 171) (O'Neill Tr. 206-213, 221, 224)

Defendant's Declaration No. 109. Spencer also initially expressed interest in the position to O'Neill, but later told O'Neill that she was reluctant to leave her current position with BusinessWeek. (O'Neill Tr. 206207, 212-213.)

Plaintiffs' Response in Opposition No. 109: Denied. Spencer was told she had to go to BIG. Spencer had her therapist call O'Neill to complain on her behalf. Plaintiff filed the EEOC complaint in December 2005, the Company and HR knew of the EEOC Complaint by February 2006 and responded to Plaintiff Spencer's Charges on March 16, 2006. On the same date Murphy, Marschke, and Caruso planned to involuntarily transfer Spencer out of her Sr. HR Manager's position at Business Week to BIG. There was no need to transfer Spencer because they knew that Caruso was being reassigned to California. On or about March 16, 2006, at the time the Company responded to Spencer's EEOC Charge, O'Neill approached Spencer and tried to get Spencer to consider a transfer as a solution to getting away from Caruso. By April-May 2005, Spencer refused to be transferred and met with O'Neill to explain why. O'Neill knew that any transfer of Spencer would be involuntary. Spencer felt her career and job were in jeopardy. She felt seriously threatened. O'Neill specifically knew that any transfer of Spencer to HR at

41

BIG, would be involuntary. O'Neill falsely stated to Marschke, and/or Marschke falsely stated that he was told by O'Neill, that Spencer wanted a transfer. Indeed, in either case, Spencer did not want to be transferred to BIG. O'Neill says it is not the general practice of the Company to transfer an employee to a position they do not want to go to. (Solotoff Decl. Ex. R)(Spencer 107, 171) (O'Neill Tr. 206-213, 215, 221, 224)

Defendant's Declaration No. 110. Around the same time that Spencer became reluctant to transferring, Spencer came to O'Neill and accused Caruso of inappropriately grabbing himself near her cubicle. (O'Neill Tr. 51-52)( Spencer Tr. 95-96.)

Plaintiffs' Response in Opposition No. 110: Denied. On April 4, 2006 Mitchell call O'Neill to tell her that Spencer is in her cubicle very upset.  Spencer complains to O'Neill that she was at her desk when Caruso came to her cubicle and grabbed his crotch.  Spencer is visibly upset and crying. O'Neill questions Caruso who said he had gained weight and might have tugged on his shirt.  Caruso testified under oath that he might have adjusted his shirt because he had been losing weight. (Caruso Tr. 119-120)(Solotoff Decl. Ex R at D03778, D03785)

Defendant's Declaration No. 111. The day following Spencer's accusation, O'Neill spoke to Caruso regarding Spencer's allegation of him inappropriately grabbing himself and Caruso denied doing so. (Caruso Tr. 114-120, 148-49.)

Plaintiffs' Response in Opposition No. 111: Denied. Caruso admitted that his conduct may have been construed in such a fashion. O'Neill questions Caruso who said he had gained weight and might have tugged on his shirt.  Caruso testified under oath that he might have adjusted his shirt because he had been losing weight. (Solotoff Decl. Ex R at D03778, D03785) (Caruso Tr. 114-120, 148-49.)

Defendant's Declaration No. 112. O'Neill felt that Spencer's complaint, coupled with her refusal to mediate her problems, demonstrated the unsalvageable nature of her relationship with Caruso and the need for Spencer's transfer. (O'Neill Tr. 207-208.)

Plaintiffs' Response in Opposition No. 112: Denied. Spencer was told she had to go to BIG. Spencer had her therapist call O'Neill to complain on her behalf. Plaintiff filed the EEOC complaint in December 2005, the Company and HR knew of the EEOC Complaint by February 2006 and responded to Plaintiff Spencer's Charges on March 16, 2006. On the same date Murphy, Marschke, and Caruso planned to involuntarily transfer Spencer out of her Sr. HR Manager's position at Business Week to BIG. There was no need to transfer Spencer because they knew that Caruso was being reassigned to California. On or about March 16, 2006, at the time the Company responded to Spencer's EEOC Charge, O'Neill approached Spencer and tried to get Spencer to consider a transfer as a solution to getting away from Caruso. By April-May 2005, Spencer refused to be transferred and met with O'Neill to explain why. O'Neill knew that any transfer of Spencer would be involuntary. Spencer felt her career and job were in jeopardy. She felt seriously threatened. O'Neill specifically knew that any transfer of Spencer to HR at BIG, would be involuntary. O'Neill falsely stated to Marschke, and/or Marschke falsely stated that he was told by O'Neill, that Spencer wanted a transfer. Indeed, in either case, Spencer did not want to be transferred to BIG. (Solotoff Decl. Ex. R)(Spencer 171) (O'Neill Tr. 206-213, 221, 224)

Defendant's Declaration No. 113. In early June 2006, Spencer transferred to the Senior Human Resources Manager position at BIG. (Spencer Tr. 174-75.)

Plaintiffs' Response in Opposition No. 113: Denied. Spencer understood that she was told she must go to BIG. The transfer was involuntary. (Spencer Tr. 110, 171)

Defendant's Declaration No. 114. As a Senior Human Resources Manager at BIG, Spencer reported directly to Toi Eaton (Asian), Director of Human Resources at BIG, who reported to Harper, and she did not have any contact with Caruso. (Harper Tr. 56-57.)

Plaintiffs' Response in Opposition No. 114: Admit.

Defendant's Declaration No. 115. Caruso transferred to the position of Senior Director of Human Resources at the JD Power & Associates a division of McGraw-Hill in California on or about July 31, 2006. (Caruso Tr. 5-7.)

Plaintiffs' Response in Opposition No. 115: Denied. Murphy, Marschke, Caruso, and O'Neill knew in April-May 2006 that Caruso was being reassigned to California, J.D. Powers and Associates. Nevertheless, they forced Spencer into an involuntary transfer, a transfer that did not have to occur if Caruso was leaving. Spencer was forced to pack her belongings out of HR at Business Week by May 31, 2006. Caruso knew he was reassigned to J.D. Powers before Spencer was transferred. Spencer feels she did nothing wrong and does not understand why she cannot stay in Business Week when Caruso is transferring to California. Nevertheless, as is customary when employees file discrimination complaints against the Company, Caruso wrote a blistering attack letter against Spencer to Human Resources attacking Spencer to go in her Human Resources files.  (Solotoff Decl. Ex. Q). (Spencer Tr. 107)(Caruso Tr. 27, 29 ).

Defendant's Declaration No. 116. Spencer was not supervised by any of the individuals whom she claims discriminated or retaliated against her while at BIG. (Spencer Tr. 62-63.)

Plaintiffs' Response in Opposition No. 116: Denied. Her position fell under the jurisdiction of Murphy, Marschke, Harper and O'Neill and who were also involved in the transferring process.  (O'Neill Tr. 77, 86)(Marschke  Tr. 91, 96)(Murphy Tr. 105-106).Harper Tr. 71)

Defendant's Declaration No. 117. While working at BIG, Spencer requested a reduced schedule as well as a leave period to deal with personal and family issues. (Spencer Tr. 169-170, 176.)

Plaintiffs' Response in Opposition No. 117: Denied. Spencer took a short leave at the end of 2006.(Spencer Aff.¶ 15) (Spencer Tr. 169-170)

Defendant's Declaration No. 118. Despite her reduced schedule, Spencer's responsibilities as a Senior Human Resources Manager at BIG were similar to those she had while working a full schedule under Caruso, which included conducting training, designing job descriptions, recruitment efforts such as developing a list of candidates for hire to Aviation Week, and providing HR support to her clients. (Spencer Tr. 174-76; Harper Tr. 58-59, 127-30.)

Plaintiffs' Response in Opposition No. 118: Denied. Spencer's job responsibilities were significantly reduced from June 2006 through February 2, 2007 (Spencer Aff. ¶ 16)

Defendant's Declaration No. 119. During the time that she worked at BIG, O'Neill asked Spencer how she was doing and Spencer responded positively. (O'Neill Tr. 215-16.)

Plaintiffs' Response in Opposition No. 119: Denied. O'Neill did not ask Spencer how she was doing. (Spencer Aff. ¶ 17).

Defendant's Declaration No. 120. In early 2007, Spencer told O'Neill that she had decided to resign her employment with McGraw-Hill. (Spencer Tr. 237-38.)

Plaintiffs' Response in Opposition No. 120: Admit.

Defendant's Declaration No. 121. When Spencer told O'Neill that she was resigning, O'Neill asked her to reconsider and offered to speak with Harper about Spencer's dissatisfaction with her assignments which Spencer mentioned in that conversation. (O'Neill Tr. 215-16; Spencer Tr. 238-39.)

Plaintiffs' Response in Opposition No. 121: Denied. Spencer resigned in February 2, 2007. Spencer was forced out of the company. O'Neill did not ask Spencer to reconsider.(Spencer Tr. 238-239)(Spencer Aff. ¶. 18)

Defendant's Declaration No. 122. Spencer declined O'Neill's offer to speak with Harper on Spencer's behalf and told O'Neill she had already decided to resign. (Spencer Tr. 238-39.)

Plaintiffs' Response in Opposition No. 122: Spencer resigned on February 2, 2007. Spencer was forced out of the company. "Do not rehire."  (Spencer Tr.151-152, 235-236).

Defendant's Declaration No. 123. By the time Spencer declined O'Neill's offer and told O'Neill she was resigning, Spencer had already decided to start her own business and had begun the process of buying and registering a business in her name, d/b/a Spencer Healthy Life. (Spencer Tr. 16, 20, 160-61, 243-44, 255-57; Rasin Decl. Ex. CC.)

Plaintiffs' Response in Opposition No. 123: Denied. Spencer was forced to seek new employment because she felt forced out of the business. The involuntary transfer and reduction of her job duties and responsibilities was very emotional and painful experience. Spencer was at times depressed and at times experienced suicidal ideations, and had her therapist call O'Neill to give Spencer an opportunity to adjust to the loss of her career. It was very unusual for a therapist to call O'Neill. (Spencer Tr. 262)(O'Neill Tr. 223)

Defendant's Declaration No. 124. Spencer registered her business, d/b/a Spencer Healthy Life, on or about May 5, 2006, which was before her transfer to the position at BIG and approximately nine months before her resignation. (Rasin Decl. Ex. CC.)

Plaintiffs' Response in Opposition No. 124: Denied. Spencer did not own a business in 2006.  She had worked on weekends to supplement her income selling health foods for some one else. She was unincorporated and had a tax ID No. Her career was as a full time Human

Resource Manager with an MS in Human Resources. She made very little money if at all selling health food supplements on the weekends. She was three years away from a pension plan and had no intention of giving up her career.. (Spencer Aff. ¶ 19).

Defendant's Declaration No. 125. Her entire life Spencer had desired to start her own business. (Spencer Tr. 243- 44.)

Plaintiffs' Response in Opposition No. 125: Denied. Spencer supplemented her income. Spencer earned over $90,000.00 per year and had a few years left for ten years vesting in the McGraw-Hill retirement Plan. Spencer was very upset and distraught with how she was treated at the Company. In May and June 2006 Spencer discussed suicidal ideations with her therapist and with O'Neill fearing that her career was coming to an end. Throughout the fall months and early winter she had nothing to do at work. She had decided to leave. In late December 2006 and January 2007 a health food store became available in the market place. (Spencer Aff. ¶ 20).

Defendant's Declaration No. 126. On or about February 2, 2007, Spencer resigned from her position at McGraw Hill and now works at Spencer Healthy Life. (Spencer Tr. 16,243-44.)

Plaintiffs' Response in Opposition No. 126: Admit.

## V.    DEFENDANT'S DECLARATIONS AS TO PLAINTIFF BRENDA CURTIS.

### A.    Curtis's Employment History

Defendant's Declaration No. 127. Curtis was employed as an Office Manager in the E-Business Department of S&P in the Securities Services Division of McGraw-Hill beginning on or about May 29, 2002, working for the Executive Managing Director of Securities Services, Vladimir Stadnyk. (Rasin Decl. Ex. DD.)

Plaintiffs' Response in Opposition No. 127:  Admits.

Defendant's Declaration No. 128. In late July 2005, due to a corporate reorganization within S&P, Curtis' position was eliminated and when Stadnyk was promoted to his supervisor's position, Executive Managing Director of Data Information Services. Stadnyk's supervisor's Administrative Assistant, Ecri Gutierrez, then became his Administrative Assistant. (Stadnyk Tr. 13-14, 17-19; Rasin Decl. Ex. EE.)

Plaintiffs' Response in Opposition No. 128:  Denied. On or about July 2005 Plaintiff Curtis was told that her job was eliminated. However, Vlad Stadnyck did not change his physical office location or office and continued to require an employee with Curtis' qualifications to work for him. Curtis was also told that Eccri Gutierrez (Caucasian female) was going to take over Curtis' desk.  Curtis, was the Office Manager for Vlad Stadnyck at the time and was well qualified to work as an Administrative Assistant to Vlad Stadnyck. Curtis had been training Eccri Gutierrez as an Administrative Assistant throughout the year prior to Curtis being terminated.  Nevertheless, Stadnyck fired Curtis, ostensibly because her job was being eliminated. In or about late August 2005, Stadnyk hired Eccri Gutierrez, Curtis' trainee, without an interview. Curtis was qualified for the position. Joyce Hunsucker, Director of Human Resources, and Sarah McAuley, VP of Human Resources over S&P helped Stadnyk coordinate the hiring of Eccri Gutierrez instead of Curtis. (Curtis Tr. 114); (Stadnyk Tr. 14, 17-21).

Defendant's Declaration No. 129. Curtis was advised of the elimination of her position in July of 2005, and the fact that Gutierrez was to become Stadnyk's Administrative Assistant, Curtis was kept on the S&P payroll until October 3, 2005. *(Id.)*

Plaintiffs' Response in Opposition: No. 129 Admit Plaintiff admits that she was advised of the elimination of her position in July of 2005, and the fact that Eccri Gutierrez was to become

Stadnyk's Administrative Assistant. Curtis was kept on the S&P payroll until October 3, 2005 and continued to train Eccri Gutierrez. (Curtis Tr. 114).

Defendant's Declaration No. 130. On September 14, 2005, in exchange for valid consideration, Curtis signed a Termination and Release Agreement. *(Jd.;* Curtis Tr. 131.)

Plaintiffs' Response in Opposition No. 130: Admit.

Defendant's Declaration No. 131. Curtis released McGraw-Hill from any liability that may have arisen out of her employment, including any liability under Title VII, § 1981, the NYSHRL and the NYCHRL. (Rasin Decl. Ex. EE.)

Plaintiffs' Response in Opposition No. 131: Admit.

Defendant's Declaration No. 132. Upon her separation, Stadnyk provided Curtis with an erroneous letter of reference. (Rasin Decl. Ex. FF.)

Plaintiffs' Response in Opposition No. 132: Admit.

Defendant's Declaration No. 133. The first draft of the letter states that Curtis' position was eliminated due to a reorganization, that she "shared her expertise with computer applications with other support staff' and developed "efficiencies for the business unit," and explicitly recognizes that Curtis "consistently performed at a professional level" of the staff. *(Id.)*

Plaintiffs' Response in Opposition No. 133: Denied. Stadnyk refused to state that she was his Office Manager and not an Administrative Assistant. They demeaned her true title as Office Manager and demoted her in the letter. (Curtis Tr. 111-112).

Defendant's Declaration No. 134. After she received the letter, Curtis asked Stadnyk to revise the letter to include more detail. (Curtis Tr. 111-112).

Plaintiffs' Response in Opposition No. 134: Denied. They refused to make any changes to correct her title and true position as an Office Manager until after she spoke with Pierre Davis, Esq. (Curtis Tr. 111-112).

Defendant's Declaration No. 135. On October 6, 2005, pursuant to her request, Stadnyk provided a second, more detailed letter of reference to Curtis. (Rasin Decl. Ex. GG.)

Plaintiffs' Response in Opposition No. 135: Denied. The Corrected "second letter" properly referred to Curtis as his "Office Manager.") (Rasin Decl. Ex. DD.)

Defendant's Declaration No. 136. In that letter, Stadnyk stated that Curtis "shared her computer applications expertise with other staff and management, developed tracking spreadsheets, and other efficiencies for the business unit, and created training materials for the online T&E reporting and office supply purchasing systems. She consistently performed at a professional level and was a productive member of my staff." *(Id.)*

Plaintiffs' Response in Opposition No. 136: Denied. The Corrected "second letter" properly referred to Curtis as his "Office Manager." (Rasin Decl. Ex. DD.)

### B.    Curtis's Applications to McGraw-Hill Following Her Termination

Defendant's Declaration No. 137. Following her termination, Curtis alleges she applied for eight positions with McGraw-Hill: (1) Administrative Assistant/Office Manager to Vice President in Global Licensing and Contracts; (2) an Office Manager position in Vista Research Inc.; (3) an Assistant Compliance Officer Position; (4) an Administrative Assistant position to the Chief Information Officer of Technology for S&P; (5) a Graphic Design Position in Marketing; (6) an Administrative Assistant position in Corporate and Government Ratings; (7) an Administrative Assistant position in S&P Ratings; (8) an Administrative Assistant position serving Structured Finance and reporting to Paul Kelly; and (9) an Administrative Assistant to

the Senior Vice President of Global Client Services & Sales. (Rasin Decl. Ex. L,-r 54; Curtis Tr. 144-159, 161, 163; Rasin Decl. Ex. HH, 11, LL, NN, PP, RR & TT; Farrelly Aff. ¶ 3.)

Plaintiffs' Response in Opposition No. 137:  Denied. She applied for more positions than are listed above.  (Solotoff Decl. Ex. S)

Defendant's Declaration No. 138. Curtis contends the positions for which she applied after her discharge were discriminatorily given to pre-selected Caucasian candidates (Rasin Decl. Ex. L, ¶ 54).

Plaintiffs' Response in Opposition No. 138:  Denied. Curtis alleged that she applied for seven positions that she was qualified for. She alleged that some of the positions were for positions of a lesser Grade than that of an Office Manager and that some of the positions were filled with pre-selected candidates. (Rasin Decl. Ex. L, ¶ 54.)

Defendant's Declaration No. 139. Since Vista Research Inc. was acquired by McGraw-Hill in April 2005, there has been no opening for an Office Manager position and neither Curtis nor anyone else was interviewed or hired for such a position. (Maffei Aff. ¶ 3.)

Plaintiffs' Response in Opposition No. 139:  Curtis is not challenging the hiring for this position.

Defendant's Declaration No. 140. On August 5, 2005, Curtis Applied for an Assistant Compliance Officer position. The position required a four year degree. (Rasin Decl. Ex. JJ; Bolger Aff.  ¶ 3.)

Plaintiffs' Response in Opposition No. 140:  Curtis is not challenging the hiring for this position.

Defendant's Declaration No. 141. Curtis had only obtained her GED, and had never worked as a compliance officer. (Curtis Tr. 44-45, 159.)

Plaintiffs' Response in Opposition No. 141:  Admit

Defendant's Declaration No. 142. The hiring manager offered the position to the most qualified candidate, an African American woman with a Bachelor's Degree in Business Administration and six years of compliance experience. (Rasin Decl. Ex. KK; Bolger Aff. ¶¶ 4, 5.)

Plaintiffs' Response in Opposition No. 142:  Curtis is not challenging the hiring for this position.

Defendant's Declaration No. 143. Curtis also applied to be the Administrative Assistant for the Chief Information Officer of Technology for S&P. (Rasin Decl. Ex. LL.)

Plaintiffs' Response in Opposition No. 143:  Admit.

Defendant's Declaration No. 144. Initially, the hiring manager selected an African American woman he felt held the skill set required for the position, having previously served as an Administrative Assistant in Data Operations for McGraw-Hill. (Held Aff. ¶ 5.)

Plaintiffs' Response in Opposition No. 144:  Denied. Curtis was an Office Manager for Vlad Stadnyk, Executive Managing Director of Data & Information Services. Curtis was more qualified for the position. The position was awarded to start on November 28, 2005. (Solotoff Decl. Ex. S at D07642).

Defendant's Declaration No. 145. When that candidate chose to remain with her current manager and turned down the position, the hiring manager chose to hire another African American woman who held the requisite experience, having previously served as Executive Assistant/IS Project Coordinator to the Chief Information Office of Par Pharmaceuticals, Inc., where she was responsible for vendor/contract relations for hardware and software maintenance as well as wireless communication services. (Held Aff. ¶ 6.)

Plaintiffs' Response in Opposition No. 145:  Denied. Curtis was an Office Manager for Vlad Stadnyk, Executive Managing Director of Data & Information Services. Curtis was more qualified for the position. She was not interviewed or given an opportunity to contest for the position. (Solotoff Decl. Ex. S at D07642)

Defendant's Declaration No. 146. The successful candidate held a Bachelor's Degree and had worked previously as a Research Assistant for an S&P customer, Goldman Sachs Group. (Held Aff. ¶ 6.)

Plaintiffs' Response in Opposition No. 146:  Curtis cannot challenge this declaration one way or the other.

Defendant's Declaration No. 147. Unlike the selected candidate, Curtis did not hold a bachelor's degree. (Curtis Tr. 43-45.)

Plaintiffs' Response in Opposition No. 147:  Admit.

Defendant's Declaration No. 148. Curtis also alleges she applied for a Graphic Design Position in Marketing. (Curtis Tr. 148; Rasin Decl. Ex. NN.)

Plaintiffs' Response in Opposition No. 148:  Admit.

Defendant's Declaration No. 149. The responsibilities of this position included creating advertising and digital marketing materials and reviewing design work to ensure brand compliance and consistency. (Cederholm Aff. ¶ 4; Rasin Decl. Ex. 00.)

Plaintiffs' Response in Opposition No. 149:  Admit.

Defendant's Declaration No. 150. A bachelor's degree and four to eight years of graphic design experience was required. *(Id.)*

Plaintiffs' Response in Opposition No. 150:  Admit.

Defendant's Declaration No. 151. Curtis, having never worked as a graphic designer, had neither the requisite degree nor experience required for this position. (Curtis Tr. 44-45, 148.)

Plaintiffs' Response in Opposition No. 151:  Admit.

Defendant's Declaration No. 152. The successful candidate (Caucasian) had a bachelor's degree and over five years of experience in graphic design. (Cederholm Aff. ¶ 6.)

Plaintiffs' Response in Opposition No. 152:  Admit.

Defendant's Declaration No. 153. In addition, the hiree was already doing graphic design for S&P as an outside contractor when Curtis applied. *(Id.)*

Plaintiffs' Response in Opposition No. 153:  Curtis does not challenge this declaration.

Defendant's Declaration No. 154. Curtis applied for an Administrative Assistant/Office Manager position in Global Licensing and Contracts. (Rasin Decl. Ex. HH.)

Plaintiffs' Response in Opposition No. 154:  Curtis is not challenging the hiring for this position on the grounds that the employee hired was hired on August 30, 2005.

Defendant's Declaration No. 155. An African American woman who worked at S&P since 1993 and was already working in Global Licensing and Contracts as a temporary Administrative Assistant/Contract Coordinator applied for and was awarded this position. (Rasin Decl. Ex. II; Inglesh Aff. ¶ 4).

Plaintiffs' Response in Opposition No. 155:  Curtis is not challenging the hiring for this position on the grounds that the employee hired was hired on August 30, 2005.

Defendant's Declaration No. 156. Curtis also applied for an Administrative Assistant position in Corporate & Government Ratings. (Rasin Decl. Ex. PP.)

Plaintiffs' Response in Opposition No. 156:  Curtis is not challenging the hiring for this position on the grounds that the employee hired was hired on September 21, 2005.

Defendant's Declaration No. 157. An Hispanic woman with a Bachelor's Degree and over nine years of experience working in S&P's Financial Services Ratings area was hired for the position. (Coughlin Aff. ¶¶ 3, 4; Rasin Decl. Ex. QQ.)

Plaintiffs' Response in Opposition No. 157:  Curtis is not challenging the hiring for this position on the grounds that the employee hired was hired on September 21, 2005.

Defendant's Declaration No. 158. The candidate who was hired had previously served as Administrative Assistant to one of the hiring manager's direct reports in the Corporate and Government Ratings Group. (Coughlin Aff. ¶ 5.)

Plaintiffs' Response in Opposition No. 158:  Curtis is not challenging the hiring for this position on the grounds that the employee hired was hired on September 21, 2005.

Defendant's Declaration No. 159. Curtis applied for an Administrative Assistant position in S&P Ratings. (Rasin Decl. Ex. RR.)

Plaintiffs' Response in Opposition No. 159:  Admit.

Defendant's Declaration No. 160. An Hispanic woman who came highly recommended by the hiring manager's colleagues, and had eight years of prior experience working with BusinessWeek, filled the position. (Stein Aff. ¶ 5; Rasin Decl. Ex. SS.)

Plaintiffs' Response in Opposition No. 160:  Denied. Curtis who was an Office Manager and had trained and supervised Administrative Assistants for years while at McGraw-Hill contends that she was greater qualified for this position than any other candidate. She was classified an "Expert" in proficiency on Microsoft Excel and Spreadsheets.  She had filed an application for this position on November 20, 2005.  The interviewer was Mariano Blessings, the same interviewer who had spoken to Stadnyk and Nancy Tomeo on or about November 11, 2005. Stadnyck made negative references about Curtis to the interviewer which were not in her

PMP reviews and Curtis states that these comments seriously and intentionally blocked her chances for these positions.. The position remained open and was not filled until May11, 2006. Curtis filed her official EEO Charge with the EEOC and the company in January-March 2006. She was not interviewed for the position. The employee hired for the position was not African American, and only demonstrated "Advanced" proficiency in Microsoft Excel and Spreadsheets. (Solotoff Decl. Ex T)(Solotoff Decl. Ex. U)(Solotoff Decl. Ex V)(Solotoff Decl. Ex. W)(Solotoff Decl. Ex. X)(Curtis Aff. ¶ 8, 9, 10, 11, 12, 13, 14, 15)

Defendant's Declaration No. 161. Curtis applied for an Administrative Assistant position serving Structured Finance and reporting to Paul Kelly, the Managing Director of Ratings for Structured Finance (Curtis Tr. 135-36).

Plaintiffs' Response in Opposition No. 161:  Admit.

Defendant's Declaration No. 162. The Office Manager for the group, acting as a proxy for Kelly, was to screen the applicants and determine which of them would move on to a second round of interviews with him. (Tomeo-Farrelly Aff. ¶ 3).

Plaintiffs' Response in Opposition No. 162: Admit.

Defendant's Declaration No. 163. After receiving Curtis's resume through her sister, who worked in Structured Finance at the time of Curtis's application, the Office Manager added her to her list of potential candidates for the position. (Tomeo-Farrelly Aff. ¶ 4).

Plaintiffs' Response in Opposition No. 163: Admit.

Defendant's Declaration No. 164. After interviewing Curtis, however, the Office Manager did not select her to move on to the second round of interviews, but selected three other applicants, including an African American woman, to move on to the next round of interviews. (Tomeo-Farrelly Aff. ¶ 5).

Plaintiffs' Response in Opposition No. 164: Denied. Curtis was told that she was too skilled for the job.(Solotoff Decl. Ex. X)(Curtis Tr. 39, 134 )

Defendant's Declaration No. 165. Curtis also applied to be the Administrative Assistant to the Senior Vice President of Global Client Services & Sales. (Rasin Decl. Ex. TT.)

Plaintiffs' Response in Opposition No. 165: Admit.

Defendant's Declaration No. 166. Hiring for this position was cancelled due to the fact that the Vice President traveled frequently and found he did not need a full-time Administrative Assistant, particularly in light of the assistance he received from both the Administrative Assistant to his direct report and the Administrative Assistant to the President for Global Client Services & Sales when necessary. (George Aff. ¶ 5).

Plaintiffs' Response in Opposition No. 166:  Denied. Curtis was qualified for this position. She had filed an application for this position on September 1, 2005.  The position remained open.  The position requisition was not cancelled until April 3, 2006. (Solotoff Decl. Ex  Y)

Defendant's Declaration No. 167. As a result, neither Curtis nor anyone else was interviewed or hired for the position. (George Aff. ¶ 6.)

Plaintiffs' Response in Opposition No. 167:  Denied.  Curtis contends that she was qualified for this position. She had filed an application for this position on September 1, 2005. The position remained open.  The position requisition was not cancelled until April 3, 2006. (Solotoff Decl. Ex Y)

### C.    Curtis's Complaints of Racial Discrimination

Defendant's Declaration No. 168. Curtis contends that, in retaliation for her complaint to Gattinella and her alleged complaints of discriminatory treatment to Stadnyk, Hunsucker,

Whelan and Menon, she was not selected for the positions for which she applied after her discharge (Curtis Tr. 133-37) and Stadnyk failed to provide her with a proper letter of recommendation (Curtis Tr. 133-34).

Plaintiffs' Response in Opposition No. 168: Denied. Plaintiff Curtis' response to this declaration is stated above in Plaintiffs' Response to Defendant's Declaration, throughout and to avoid repetition, with the same force or effect. (Solotoff Decl. Ex. Z)

Defendant's Declaration No. 169. On September 30, 2005, Curtis spoke to Marianne Gattinella, the Vice President of Human Resources, as part of Gattinella's investigation into Plaintiff Jannie Pilgrim's complaint through her lawyer of discriminatory treatment. (Defendant's Objections and Supplemental Answers to Plaintiffs' Second Demand on Defendant for Interrogatories; Gattinella Tr. 46-48.) Curtis told Gattinella that she had "some concerns around alleged discriminations, from her perspective, that she had seen." (Gattinella Tr. 63.)

Plaintiffs' Response in Opposition No. 169:  Plaintiff admits she spoke to Marianne Gatinella on or about September 30, 2005 and complained that she was a victim of discrimination at McGraw-Hill.  (Solotoff Decl. Ex. Z)

Defendant's Declaration No. 170. Curtis contends she also complained of discriminatory treatment to Stadnyk, Joyce Hunsucker, a former Director of Human Resources, Gail Whelan, a former Director of Human Resources, and Prema Menon. (Curtis Tr. 89-90, 173.)

Plaintiffs' Response in Opposition No. 170: Admit and she also complained to Pilgrim.(Pilgrim Aff. ¶ 2)

Defendant's Declaration No. 171. McGraw-Hill denies that such complaints were ever made.

Plaintiffs' Response in Opposition No. 171: Denied. (Curtis Tr.76, 89-90, 173)(Pilgrim Aff. ¶ 2 )

Defendant's Declaration No. 172. Stadnyk testified Curtis never made any complaints of discrimination to him. (Stadnyk Tr. 26.)

Plaintiffs' Response in Opposition No. 172:  Denied. Vlad told her to give work to Lasina that she could not do because they wanted to get rid of her for complaining about discrimination. He told her Lasina could not complain because she is Black and so is Curtis. When she complained to Vlad he said he did not give a shit about black white shit.(Curtis Tr. 25, 76, 80 )

Defendant's Declaration No. 173. Neither Gattinella, Stadnyk, Whelan, Menon, nor Hunsucker ever shared any alleged complaints by Curtis with any of the hiring managers at issue. (Inglesh Aff. ¶ 6; Coughlin Aff. ¶ 7; Bolger Aff. ¶ 6, George Aff. ¶ 7; Held Aff. ¶ 7; Stein Aff. ¶ 6; Cederholm Aff. ¶ 7; Farrelly Aff. ¶ 6; Maffei ¶ 4.) The hiring managers had no knowledge of Curtis's purported complaints. *(Id.)*

Plaintiffs' Response in Opposition No. 173:  Denied. Gattinella, who holds a high ranking position in HR was told by Curtis that she was the victim of discrimination at McGraw-Hil. should have conducted an investigation into Curtis's complaints of discrimination. Stadnyck told Blessing Mariano negative things about Curtis.  She was the recruiter for both the Office Manager for Structured Finance S & P and the Administrative Assistant LOC position.(Solotoff Decl. Ex. Z)(Curtis Aff. ¶ 5, 6, 7, 8, 9, 10, 11 12, 13)

**PLAINTIFFS HENSON'S, CURTIS' AND SPENCER'S
COUNTER LOCAL RULE 56.1 DECLARATIONS IN
OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Civil Rules, Plaintiff GIOVANNA HENSON'S, BRENDA CURTIS' AND JESAN SPENCER, (hereinafter "Henson", "Curtis" and "Spencer), by their attorneys Solotoff & Solotoff, hereby submits their Rule 56.1 Counter Declarations to the declarations and statement served by Defendant McGraw-Hill (hereinafter "McGraw-Hill", "Company") or "Defendant"). Defendant does not seek summary judgment dismissal of Plaintiff Pilgrim's claims in this case.

Indeed, the Defendants' Rule 56.1 Statement appears to be argumentative, and mischaracterizes Plaintiffs' testimony without addressing the issues in the case. Further, Plaintiff objects to the extent that Defendant's assertions are statements of opinion of legal counsel, and/or are conclusions, or argument intentionally taken out of context, designed to obfuscate and mislead, and/or misrepresent the alleged evidence cited by Defendant that simply does not support their assertions.

Plaintiff responded to Defendant's assertions in their Plaintiffs' Response to Defendant's Rule 56.1 Statement under separate cover. The following represents Plaintiff's Counter Declarations and Local Rule 56.1(b) Statement of facts that Plaintiffs contend there exists genuine issues of material facts to be tried before a jury.

**PRELIMINARY STATEMENT**

174.    Plaintiffs bring this civil action seeking, declaratory and equitable relief, and monetary damages under 42 U.S.C §2000e et seq., (Title VII)(as amended); 42 U.S.C. §1981 *et*

seq.; the New York State Human Rights Law, Executive Law §296 et seq. (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code the City of New York, Sections 8-107(a) et seq. and 8-502 et seq.; for purposeful discrimination and retaliation, and for malice and reckless disregard for the federally protected rights of the Plaintiffs, and for violation of applicable rules and regulations prohibiting discrimination and retaliation in the employment context, to redress the violation of Plaintiffs' rights by defendant, and for the deprivation by defendant of various terms, conditions, and privileges of Plaintiffs' employment due to Plaintiffs' race and color. (Solotoff Decl. Ex. AA)

175.    Following numerous complaints by the Plaintiffs in writing and verbally to Defendant's HR officials, on or about December 16, 2005 Plaintiffs had duly filed and served official EEO Charges placing the Defendant and the Equal Employment Opportunity Commission [EEOC] on notice of their claims and demands in this matter. Plaintiffs Pilgrim and Spencer were employed by the Company at the time, and Plaintiff Curtis was seeking employment at the time.  On January 18, 2006 McGraw-Hill received a copy of Plaintiffs EEOC Charges (Solotoff Decl. Ex. BB) and responded on March 16, 2006. (Solotoff Decl. Ex. CC) No other application for the relief herein sought has been made to this or any other Court of competent jurisdiction.  On or about May 21, 2007 Plaintiffs had requested and received a "Right-to-Sue" Letters from the EEOC in this matter and has commenced this action within the requisite limitations of time, has exhausted all available administrative remedies and will timely notify the NYC Human Rights Commission of this lawsuit. (Solotoff Decl. Ex. AA)

176.    As more particularly set forth hereinafter, three of the Plaintiffs (Pilgrim, Henson, and Spencer) are educated (Masters Degrees), and were an experienced Human Resource ("HR") Manager (Spencer), Generalist (Pilgrim), or an HR Coordinator (Henson).

Curtis was an expert in computer software and programs as an Executive Assistant/Office Manager. Plaintiffs show the material facts and evidence that significantly, clearly, and unambiguously demonstrate that Plaintiffs have a *prima facie* claim of race discrimination, and in some cases hostile work environment, in some cases constructively discharged, and in all cases retaliation in violation of the Civil Rights Act of 1964, Title VII, 42 U.S.C §2000e et seq., (Title VII)(as amended); 42 U.S.C. §1981 *et seq.*; the New York State Human Rights Law, Executive Law §296 *et seq.* (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code the City of New York, Sections 8-107(a) *et seq.* and 8-502 *et seq.* (Solotoff Decl. Ex. AA)

177.    It is respectfully submitted, as is more particularly set forth hereinafter, the material, relevant, and critical events, and the totality of the circumstances, concerning Plaintiffs' claims of adverse employment action, interference with their ability to work, and pain and injury as is demonstrated hereinafter by the testimony, documentary evidence, and affidavits of witnesses, will show that:

**Brief Summary Statement of the Facts:**

a.)    Henson:   In June 2005 Henson, a Human Resource Coordinator, sought promotion to a Human Resource Representative position at Standard & Poors ("S&P"). (Solotoff Decl. Ex. K) Richard Fisher, (Caucasian) Director of Human Resources (herein "Fisher") outright refused to hire a Black for the position and said so. Fisher told Jannie Pilgrim (HR Generalist under Fisher's supervision), on a number of occasions, that this was his intent.  Pilgrim complained (see references to Pilgrim's testimony hereinafter) to Fisher, in advance of any employment decision by Fisher; Pilgrim complained to William Harper,

VP of HR for the Business Information Group ("BIG"); and Sheila O'Neill, VP of HR in the Corporate Segment. As is more detailed herein, O'Neill was directly involved in the matters concerning Plaintiff Pilgrim, Plaintiff Henson, and Plaintiff Spencer in this case; Pilgrim also complained to Sarah McAuley, VP of Human Resources, Fisher's supervisor. On August 12, 2005 Henson resigned "under protest" complaining of race discrimination and unfair treatment in violation of her rights. (Solotoff Decl. Ex. L)

b.)     Curtis:  In the summer of 2005 was an Executive Assistant/Office Manager earning over $73,000.00 per year for Vlad Stadnyk, (hereinafter "Stadnyk") Executive Managing Director of Securities Services. Curtis was considered an "expert" in computer software programs and spreadsheets. She was an Office Manager for three years from 2002 to October 3, 2005 when she was terminated ostensibly due to a reorganization of only her position. She was replaced by a Caucasian trainee of hers, who was hired as an Administrative Assistant who took over her desk for Stadnyk.  Prior to her termination Curtis had complained of race discrimination and of a racially hostile work environment before she was terminated. She was required by Joyce Hunsucker, Director of HR (and who worked with Fisher) and Stadnyk to force a (Black) receptionist who had complained of race discrimination, to quit. They wanted the receptionist fired, but to avoid the obvious, they directed Curtis, that because she was Black, she could manage the receptionist out of the company by giving her work they knew the receptionist cannot do, and was not trained to do. Curtis complained to Pilgrim, Hunsucker, Stadnyk, Gattinella, Pierre Davis, Esq. and others of race discrimination and unfair treatment, and hostile work environment towards Black employees. Following Curtis's termination she sought to reapply for other positions at McGraw-Hill, such as in Structured Finance (S&P), and other Administrative Assistant

positions, that she was qualified for, or more qualified for, than the other candidates. Stadnyk intervened in the process and falsely and inappropriately demeaned Curtis assuring that Curtis would not be rehired in Structured Finance, and for other positions, even those that remained open after October 3, 2005 that she was qualified for. (Solotoff Decl. Ex. AA)

**c.)**     Spencer:     Spencer was a very good employee who was awarded, salary increases, and bonuses. She was a career employee at McGraw-Hill with three years left to achieve a ten year vesting in her Pension Plan. On December 13, 2005 Spencer, Senior Human Resources Manager for IM, supporting Business Week, complained to Brett Marschke, (Caucasian) Vice President of HR for IM, (hereinafter "Marschke") of race discrimination and hostile work environment caused by Kenneth Caruso, Director of Human Resources, (Caucasian) (hereinafter "Caruso") her supervisor, for race discrimination, unfair and unequal treatment, and using foul and offensive language in her presence and in the presence of African American employees.   On January 18, 2006 McGraw-Hill received a copy of Plaintiff Spencer's EEOC Charges and McGraw-Hill responded, with the aid of these officials, and O'Neill, VP of HR, to the EEOC on March 16, 2006.   On March 19, 2006 three days later, David Murphy*, Executive Vice President of Human Resources, Corporate (hereinafter "Murphy"); Marschke, and Caruso, together, agreed to fire Spencer by managing Spencer out of the company.  In May 2006 Spencer was "involuntarily" transferred out of her prestigious position supporting hundreds of employees and directors at Business Week to a dead end job, with significantly and materially substantially reduced job duties, responsibilities and goals. On February 2, 2007 Spencer resigned.  (Solotoff Decl. Ex. AA)(Solotoff Decl. Ex. BB)(Solotoff Decl. Ex. CC)(Solotoff Decl. Ex. DD)(Spencer Tr. 196)

178.    Indeed, a plain reading of the facts, defendant's admissions, contradictions, and inconsistencies, and implausible positions, and "mendacity," and the "temporal proximity" of the events, supporting documents, deposition testimony, and documentary evidence in this case [as are more particularly set forth hereinafter] demonstrates Defendant is guilty of bad faith, intentional race discrimination, and ["smoking gun"] evidence of retaliation, grossly failing to ever take any reasonable steps (under the circumstances) to stop the illegal conduct, refusing and failing to take any disciplinary action against the offending high ranking Managers and Executives, and rather than comply with the law, outright attempts to cover up Managements' obvious desire to fire the Plaintiffs and do so by forcing the Plaintiffs to quit their careers at McGraw-Hill. Management's modus operandi was to either set them up to fail, and/or create intolerable circumstances to manage them out. Management either out right discriminated against the Plaintiff and/or targeted the Plaintiff for retaliatory conduct for complaining of discrimination, rather than to comply with Title VII's mandate or McGraw-Hill's poorly drafted anti-harassment and anti-retaliation policy.

## POINT I

## THE NAMED PLAINTIFFS

179.    Pilgrim is an African American woman and a resident of the State of New Jersey. Pilgrim was first employed in 2000. In 2005 Pilgrim was employed as a Human Resource Manager in McGraw-Hill's Standard & Poor's (hereinafter "S&P") Division of the Company. She was forced to resign, under protest, on February 6, 2006. (Solotoff Decl. Ex. EE)

180.    Henson is an African-American woman and a resident of the State of New York. Henson was first employed in 1997. In or about March 2001 she was employed as a Human Resource Coordinator in McGraw-Hill's Corporate (hereinafter "Corporate") Human Resources

Department. She was employed by McGraw-Hill until August 12, 2005 when she resigned under protest. (Solotoff Decl. Ex. E)(Solotoff Decl. Ex. L)

181.    Spencer is an African American woman and a resident of Yonkers, New York. Spencer was first employed in December 2000. She was a Senior Manager of Human Resources in McGraw-Hill's Business Information and Media Services (hereinafter "IMS"), responsible in part for supporting "Business Week". She was employed by McGraw-Hill to on or about February 2, 2007. In her final year of employment, prior to being "involuntarily" transferred, Spencer provided human resources support primarily to Business Week.(Solotoff Decl. Ex. FF) (Spencer Tr. 15, 33)

182.    Curtis is an African American woman and a resident of Brooklyn, New York. Curtis was first employed in 2002.   More recently she was employed as an Executive Assistant/Office Manager McGraw-Hill Security Services at S&P. She was terminated from her job on October 3, 2005. (Solotoff Decl. Ex. GG).

## POINT II

### PLAINTIFFS' DECLARATIONS AS TO TEMPORAL PROXIMITY AND PROCEDURAL BACKGROUND

183.    On December 16, 2005, Plaintiffs Jannie Pilgrim, Human Resources Generalist/Human Resources ("HR") Manager servicing Defendant's Financial Services Segment (including Structured Finance) ("Standard & Poor's" or "S&P"); Giovanna Henson, HR Coordinator, Corporate HR Dept.; Jesan Spencer, Senior Manager of HR in the Corporate Segment; and Brenda Curtis, Executive Assistant/Office Manager in the Data and Information Group of S&P; ("collectively Plaintiffs") filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging claims of discrimination on the basis

of race, color, sex, disparate treatment, hostile work environment, and retaliation for opposition to unfair and unequal treatment and discriminatory practices. (Solotoff Decl. Ex. AA).

184.    At the time of the filing of the EEOC Charge Plaintiffs Pilgrim and Spencer were employed at the Defendant. Plaintiff Curtis was seeking re-employment and had a number of job applications pending. (Solotoff Decl. Ex. AA)(Solotoff Decl. HH).

185.    Plaintiffs alleged in the EEOC Charge discrimination, among other things hostile work environment, and retaliation claims. "(Solotoff Decl. Ex. AA, at ¶¶10, 49, 68, 72, 79).

186.    On January 18, and 19, 2006 Defendant received the Plaintiffs' Notices of EEOC Charges. (Solotoff Decl. Ex. BB)

187.    The January 18, and 19, 2006 dates are critical to demonstrating Corporate knowledge, "temporal proximity" to events, and Defendant's agents' "mendacity" and denials of knowledge of said complaints, applicable to Henson, Spencer, and Curtis as hereinafter detailed, and notwithstanding prior complaints of discrimination as hereinafter further demonstrated, Plaintiff Pilgrim and Spencer were still employed by the Defendant on January 18, 2006, and Plaintiff Curtis was seeking re-employment with the Defendant at the time. (Solotoff Decl. Ex. AA) (Solotoff Decl. Ex. EE) (Solotoff Decl. Ex. HH)(Spencer Tr. 196).

188.    For example, Spencer complained, among other things, that her supervisor [Kenneth Caruso, Caucasian, Sr. Dir. of HR] demeans her with foul and offensive language calling females "Bitches" treats her with a lack of respect, in part by reason of her color. He sets her up for failure, with a hostile, angry, condescending, and disrespectful attitude that he does not demonstrate to Caucasian employees and other employees not of color. (Solotoff Decl. Ex. AA, ¶¶10, 49)

189.     Plaintiffs also alleged, for example, **"**African American employees have been subjected to a variety of racist remarks by the Caucasian, high ranking officials, and Vice Presidents of Human Resources, including:  (a) African Americans in New Jersey are not hired because they do not own cars; (b) Black women should resolve their own problems; ( c) As long as I continue to look good I don't care what happens to those Black women; (d) Do you (Black employee) expect to make as much as a "White man." (e) I am not going to hire another Black woman; (f) I would not hire someone like them, referring to Blacks; (g) She was hired because she was Black; (h) She was promoted because she was Black; (i) We hired her (Black) to look good for the numbers; (j) Those persons (Blacks) should be happy that they have a job [referring to the INROADS STUDENTS (African American student interns)]; (k) References were made by management to "modern day lynching." (l) In response to complaining of discrimination "You are going to be forced to rot in your job, you will not get a promotion, and it's going to be like you're in jail without a key." (m) Your people (Blacks) won't come to support you. (n) Blacks create problems for Blacks. (o) The Affinity Group Blacks will burn down the building [a reference to the slaves that rose up against the Masters quarters and burn down their homes]. (o) Executive V. P. of Human Resources said your complaints are a Black eye on the Department and he will block any promotion." (Solotoff Decl. Ex. AA, ¶79).

190.     Critical to establishing knowledge, "temporal proximity" of events, and "mendacity" applicable to Henson, Spencer and Curtis, and on or before March 16, 2006, Defendant's agents responded to the Plaintiffs' EEOC Charges, obviously including reference to, or comments from, Defendant's high ranking officers, directors, managers and supervisors, David Murphy, Exec. VP of HR; William Harper, VP of HR for the Business Information Group ("BIG"); Ken Caruso, Sr. Dir. of HR in the Corporate Segment; Sheila O'Neill, VP of HR in the

Corporate Segment; Brett Marschke, VP of HR for IMS; Richard Fisher, Dir. Of HR of S&P; Vladimir Stadnyk, Exec. Mgr. Dir. in the D&I Group of S&P. (Solotoff Decl. Ex. CC)

191.    Between January 16, 2006 and March 16, 2006 each, of the above named high ranking officials individually, and/or together, were involved in and helped respond to, knew and had reason to know, of Plaintiffs' complaints of discrimination, hostile work environment, and retaliation. (Solotoff Decl. Ex. BB and CC)

## POINT III
## THE COMPANY.

192. McGraw-Hill is a worldwide corporation engaged in publishing and information services with its headquarters located in New York City.  Plaintiffs further add that McGraw-Hill was/is required to comply with all applicable federal, state and local laws, rules and regulations that prohibit, *inter alia*, race discrimination and retaliation in the employment context. (Solotoff Decl. Ex. A ¶¶21, 22, 23, 24, 25)(Solotoff Decl. Ex. B ¶¶21, 22, 23, 24).

193.    McGraw-Hill's high ranking officials have the authority to recommend and implement policy affecting the terms and conditions of employees employment, and have the authority to assure OFCCP and EEO compliance, and have the authority to discipline personnel and recommend and influence employment action against Title VII violating employees. (Solotoff Decl. Ex. A ¶¶80)(Solotoff Decl. Ex. B ¶¶80)

## POINT IV
## ADMITTED KNOWLEDGE OF THEIR RESPONSIBILITY TO EXERCISE POWERS AND AUTHORITY TO INVESTIGATE DISCRIMINATION COMPLAINTS AND NOT RETALIATE AGAINST THOSE WHO HAD COMPLAINED

194.    McGraw-Hill has two Policy Exhibits that were the subject of deposition testimony in the case: "The Human Resources Guide to Working at The McGraw-Hill

Companies" and a "Statement of the Open Door Policy." (Solotoff Decl. Ex. A ¶¶80)(Solotoff Decl. Ex. B ¶¶80) (Solotoff Decl. Ex. C)(Solotoff Decl. Ex. D)

195.    The Human Resources "Guide to Working at The McGraw-Hill Companies" and a "Statement of the Open Door Policy" provides in greater detail that employees may "express" "concerns" by talking to their supervisor, or the "next higher level of management," or, the "Human Resources Department," seek "mediation" orally and/or in writing. (Solotoff Decl. Ex. C)(Solotoff Decl. Ex. D)

196.    The Human Resources Guide to Working at the McGraw-Hill Companies" and a "Statement of the Open Door Policy" also provides that "[w]hen a problem or dispute comes to a manager's attention," that manager should contact a "Human Resources representative" or with those "higher up in the organization." (Solotoff Decl. Ex. C)(Solotoff Decl. Ex. D)

197.    David Murphy admitted that the 2005 EEO Policy of the Company did not give examples of what is racial harassment or if its impact on employees. (Murphy Tr. 22)

198.    Murphy recognized that the company could be liable for punitive damages as a remedy for intentionally violating the EEO Policies and the law. (Murphy Tr. 28)

199.    Murphy also stated that if an employee complains about racist comments to their manager, as the Plaintiffs did in this case, it is the manager's responsibility to conduct an investigation and advise an HR partner of the allegations. (Murphy Tr. 29) *The fact of the investigation and its defense is irrelevant and off limits to the jury. (Solotoff Decl. Ex. Iii at P. Hon. Magistrate Judge Peck's Order of Defendant waived the investigation and the sufficiency of the investigation as a defense as a good faith defense, and therefore the results of the investigation is off limits. (See Honorable Magistrate Judge Andrew J. Peck's Order March 11, 2008*)(Solotoff Decl. Ex. II)

200.    Murphy admitted that if the complaint is about the manager concerning his own conduct, then the manager has to report it to his supervisor and advise the employee to raise it elsewhere too.  (Murphy Tr. 30).

201.    If an employee has heard an offensive comment by a supervisor and goes to HR, HR has to record the allegations, go to a manager of the supervisor and they would have to begin an investigation. (Murphy Tr. 32)

202.    If an employee is leaving the company, and complains of discrimination in an exit interview, the interviewer should ask the employee for details, and obtain the names of any witnesses so that an HR employee could follow up. (Murphy Tr. 33-34)

203.    Pilgrim complained to Harper about Fisher's refusal to hire a Black woman for the Human Resources Representative position, a position that Henson was applying for. Murphy expected Harper to speak with McAuley, Fisher's Manager, so that an investigation could be conducted immediately. Harper did not conduct an investigation and neither did Sarah McAuley. (Murphy Tr. 37-38)(Harper Tr. 90-92)(Solotoff Decl. Ex. JJ)

204.    Harper admits that Pilgrim did complain to him about Fisher's intent not to hire a Black woman for the HR Representative position. (Harper Tr. 90)

205.    Murphy testified that a complaint can be made verbally and in writing, and that a Supervisor should request that the complaint be put in writing. (Murphy Tr. 58-59).

206.    Murphy and Marschke admit that counseling an employee out of the business is the same as counseling them out of the company. (Murphy Tr. 107-108)(Marschke Tr. 46)

207.    Murphy admits that it is inappropriate for a Caucasian supervisor (Fisher) to say to a Black subordinate (Pilgrim) do you "expect to make as much as a white man."(Murphy Tr. 135) and that Blacks have to work out their own problems, is not appropriate. (Murphy Tr. 135)

71

and if Pilgrim made these complaints to Fisher's supervisor or higher up in HR, Murphy expected to know about it. (Murphy Tr. 136-137)

208.   Murphy described that a complaint by an employee of being set up to fail, is a serious complaint and should be investigated. (Murphy Tr. 169).

209   Murphy, Caruso Marschke and Harper were aware of Spencer's EEOC Charge in January -February 2006, before Murphy, Marschke and Caruso signed Caruso's 2005 PMP in March 2006, setting a goal to counsel Spencer out of the company. O'Neill admits that she saw the top page of Spencer's EEOC Charge (Solotoff Decl. Ex. DD at D07601) (Murphy Tr. 105-106) (Caruso Tr. 122)(Marschke Tr. 91, 96)(Harper Tr. 71)(O'Neill Tr. 77, 86)

210.   Caruso admits that transferring a subordinate employee as a direct result of filing a complaint would be retaliation, and changing an employee's job duties in a negative way would be retaliation and could lead to constructive discharge. (Caruso Tr. 125).

211.   O'Neill admits that it was not appropriate for Fisher to have made comments about "Black women," or "Black women should get along." (O'Neill Tr. 101).

212.   O'Neill admits she should have known about Henson's Exit Interview and that Pilgrim's complaints that she was being set up to fail should have been treated as a complaint. (Solotoff Decl. Ex. KK at D03787) (O'Neill Tr. 93, 126)

213.   Plaintiffs Pilgrim, Henson, and Spencer were employed in Human Resources and were familiar with the EEO Policy and whether it was adhered to by the Defendant's management. Moreover, Plaintiffs Pilgrim, Henson, Spencer and Curtis followed the Policy when they expressed their concerns and complained of discrimination and/or retaliation as hereinafter detailed at length. (Solotoff Decl. Ex. AA)

**POINT V**
**DIRECT EVIDENCE OF DISCRIMINATION**

72

### AND PLAINTIFFS' COMPLAINTS
### HENSON'S CLAIMS OF RACE DISCRIMINATION

214.    Henson is an African American female and was hired by McGraw-Hill in 1997. In May 2001 Henson received a Masters of Science Degree in Human Resources Management and Labor Relations. She was last employed as a Grade Level #13, Human Resource Coordinator in McGraw-Hill's Corporate Human Resources Department. She remained a Grade Level #13 from in or about 2001 to August 2005. In 2004-2005 Henson was a member of the African American Affinity Group along with Pilgrim. (Henson Aff.  ¶ ¶ 7, 10 )(Henson Tr. 14-15, 31, 33-35)

215.    From in or about 2003 to 2005, Henson applied for positions that she was qualified for. In 2005 Henson applied for a number of positions including a position as a Human Resources Representative for the Standard and Poor's (S&P) Division. (Solotoff Decl. Ex. J) (Solotoff Decl. Ex. K)

216.    Richard Fisher, the Dir. of HR (S&P), Pilgrim's Supervisor, made hostile comments about Black employees and Black women, and was hostile to Blacks.  He directly refused to hire a "Black woman" for the Human Resources Representative position. (Pilgrim Tr. 99-100)

217.    Pilgrim complained to Harper that Fisher was not going to hire a Black woman for the HR Representative position. Harper and O'Neill admitted that it was inappropriate for Fisher to make comments about Black employees, and had made the decision before he even began to interview for the position. Harper did not speak to Fisher and he did not investigate Pilgrim's complaint. Harper took no action. (Harper Tr. 91-93)(Pilgrim Tr. 99-100) (O'Neill Tr. 101)

218.    On June I, 2005 Henson applied for and was qualified, and Fisher admits that fully "meets the criteria" for the HR Representative position. (Solotoff Decl. Ex. J at D01126) (Fisher Tr. 166)

219.    Fisher refused to meet with Henson and should have interviewed her. (Fisher Tr. 168)

220.    Fisher admitted that he made the decision to hire Brookins in June of 2005 before she was even interviewed on July 14, 2005.  Fisher decided to hire a Caucasian, Jessica Brookins, for the HR. Representative position.  He did not speak to O'Neill, Henson's supervisor, about Henson's performance. Fisher lacked any specific recall as to the events or who he spoke with and did not see any documents or performance reviews of Brookins. (Fisher Tr. 169, 172 - 173)

221.    Fisher gave the excuse that he hired Brookins, without truly knowing she had a higher grade kevel and a stronger numeric rating and performance. He never saw the performance appraisals of Brookins. He does not know who gave him the information about Brookins. He thought Brookins may have had a Rating of #5 in her performance review. He admitted it would have been out of the ordinary for him to have spoken to O'Neill.  No such performance appraisal for Brookins was provided or seen by Fisher. (Fisher Tr. 169, 170, 172 - 173)

222.    Indeed, the 2004 PMP had no numeric ratings for performance, and grade levels were not necessarily an indication of an employee's responsibilities. (Fisher Tr. 169)(Henson Aff. ¶ 16 ) (Pilgrim Aff. ¶  )(Spencer Aff. ¶  ).

223.    On July 8, 2005, before Fisher makes the decision to hire Brookins, which is made on July 14, 2005, Pilgrim complained to O'Neill about Fisher's racist attitude. Pilgrim complained that Fisher said that if Fisher had a group of Caucasian Males reporting to him Fisher would not be having any problems about Black. He did not intend to hire a Black person for that position.  Fisher told Pilgrim, and July 8, 2005 Pilgrim complained to O'Neill, that Fisher said as long as I look good I don't care what happens, "Why can't you two Black women get along". (Solotoff Decl. Ex. R at D07533) (Pilgrim Tr. 99-100, 106-107)

224.    Fisher's excuse for hiring a non-African American employee is a pretext for his known intent not to hire a Black woman for the Human Resources Representative position (Pilgrim Aff. ¶   )(Spencer Aff. ¶   ).

225.    Henson was denied the promotion because she was a Black woman. It was the last job Henson applied for at McGraw-Hill.  (Pilgrim Tr.99-100)(Henson Tr. 97)

226.    Pilgrim complained about discrimination and hostile racist comments directed at her by her (Caucasian) supervisor, Richard Fisher, who made repeated continuous hostile and offensive remarks which reflected his bias attitude towards Black employees. (Solotoff Decl. Ex. A)

227.    Fisher said that if he had white males reporting to him he would not be having these problems about Blacks; he said to Pilgrim "What do you expect to make as much as a white man?; he repeatedly stated that he did not intend to hire a Black woman for Melissa Hardy's position [the Human Resource Representative's position that Plaintiff Henson (Black) was qualified for and applied for in June 2005 and not hired]; he said minority students (INROADS program) should be lucky that they are interviewing for a job; he has said that his

comments may come back home to bite him; he complained that Black women can't get along; or Black women can't work it out; he said to Pilgrim, your not being paranoid that your not getting any work; Pilgrim was told that the Blacks would not support her and that your own Blacks are against you; Fisher told Laticia Archie that he was not hiring another one of them (meaning a Black) referring to Hardy's job; Gillen said other people heard Fisher make racial comments and the company did nothing about it. (Pilgrim Tr. 52, 53, 57, 95, 99-101, 105, 128-129, 138, 152 - 153 155, 157, 186, 268, 269)

228.    Robin Hicks told O'Neill that Pilgrim told her that she felt she was being set up to fail and that many inappropriate things were said by Fisher and others on her team. Robin Hicks told Pilgrim that O'Neill was well aware of the discrimination problems; she said that at level 18 you really see the discrimination and unfair treatment and O'Neill knew it, David Murphy said they do not hire Blacks in Heightstown because they do not have cars; Brian Jensen says that their referral policy has an adverse impact on blacks; and that Blacks have lower performance ratings on their PMPs supported by data depot data; Murphy said in a meeting with Pilgrim that Blacks have complained about unfair treatment, especially in HR; Debbie O'Connor Black children do not get kidnapped; no one kidnaps black children; O'Connor said Diana Ross has never done anything for her people.  If someone was Black they were articulate; if someone was white they were just smart; Pauline Meyers told Pilgrim that Allegretta would put the resumes of the candidates from the National Black MBA in the garbage; Pilgrim was also told that if there were two equal candidates the white got the higher paying job; Alegretta asked Pilgrim if she dressed in urban clothes on the weekends. (Solotoff Decl. Ex. R at D07539) (Pilgrim Tr. 52, 53, 57, 95, 99-101, 105, 128, 129, 138, 152, 153, 155, 157, 186, 268, 269)

229.    Pilgrim made numerous complaints to VP. of HR, Sheila O'Neill; V.P. of HR, Richard Fisher; V.P. of HR, Bill Harper; V.P. of HR, John Gillen; and V.P. of HR Sara McAuly, and considered Management's failure to conduct an investigation on her complaints to be discrimination. (Pilgrim Tr.180-181)

230.    Pilgrim complained directly to Fisher and high ranking officials at H.R, including but not limited, to, by letter on or about August 18, 2005 to Terry McGraw, III and of retaliation on November 9, 2005 to the Company. (Solotoff Decl. Ex KK)(Solotoff Decl Ex. LL)

231.    Pilgrim asked for a third party mediator to resolve Fisher's attitude and the racial comments using THE FAIR PROCEDURE. Fisher refused. (Pilgrim Tr. 116)

232.    The Company retaliated against employees that they wanted to fire and who complained about discrimination by "managing them out".  Pilgrim suffered retaliation by management significantly and materially reducing her job duties and responsibilities because she had no work; she was told by high ranking HR officials that she will be set up to fail and then call it a performance problem; that other Blacks were set up to fail; she was told that she will be blamed for things she did not do; she will be denied training; Pilgrim was told that David Murphy would directly prevent her from getting a transfer or promotion; that a discrimination complaint against HR was a Black eye on the Department; Pilgrim was also told she will rot in jail without a key; will not be promoted or transferred and that she has no future with the company, they will refuse to meet with her, or provide her the material she needs to do her job; meetings will be canceled or she will be disinvited; Pilgrim was told that Sara McAuley, VP of HR over Fisher, did not want her there anymore; they won't say she's fired, they will just give her nothing to do ("manage her out of the business."). Pilgrim was taken off the AAAG and the

Diversity Council she created. The retaliation continued despite Solotoff writing another letter this time complaining of Retaliation. (Solotoff Decl. Ex. LL) (Pilgrim Tr. 90-92, 96, 102-103, 164, 167, 174, 210, 212, 214, 236).

## PART IV
## HENSON SUFFERED RETALIATION

233.    In 2004 and 2005 Henson complained to O'Neill that she wanted to progress in the Company and that she was not being allowed to. Henson complained about racism and unfair treatment to O'Neill "all the time."  (Henson Tr. 73-74)  (Henson Aff. ¶ ¶ 5, 6, 8)

234.    Henson was told on January 18, 2005 that she was denied the HR Recruiting Specialist promotion that she was seeking at the time. On January 18, 2005 Henson cried at her desk about being denied that promotion and all the other promotions that she had applied for. The position was not given to an African American or Henson. (Henson Aff. ¶ ¶4, 5, 6 )(Solotoff Decl. Ex. H)(Henson Tr. 74-75).

235. On January 18, 2005, O'Neill saw Henson crying at her desk at work. Henson complained to O'Neill that she did not get the promotion. Henson told O'Neill that "You do not know what it is like being African American at McGraw-Hill." O'Neil replied, "[She] did not know what it is like being African American at McGraw-Hill." Henson was clear about her complaint. (Henson Tr. 76) (Henson Aff. ¶ 5 )

236.    Henson was sent home by O'Neill on one occasion because Henson was inconsolable because she didn't get a particular position and that she could not advance in the company. O'Neill's response "that she did not know what it was like being African American working at McGraw-Hill." was offensive, humiliating and inappropriate coming from the Vice President of Human Resources, Corporate. Henson complained about losing the promotion, that she was being treated unfairly at the Company because she was an African American and that

she wanting to progress in the company but she was not being allowed to. (Henson Tr. 70, 74-75)(Henson Aff. ¶ 5)

237.    Henson had often provided to O'Neill detailed Reports that showed that grade levels, turnover rates, salaries, and promotions of  African American employees was lower than Caucasians in similar positions throughout the Company and that Blacks were leaving at a quicker rate. Henson also provided these Reports to Ivy Latimer, another of her supervisors, who was a Director of EEO and Diversity. (Henson Tr. 54, 70, 75)(Henson Aff. ¶ 6)

238.    Henson participated on and provided the surveys and reports that supported the AAAG that complained about the culture of unfair treatment against African American employees and of racism to high ranking officials in HR. Fisher took exception to the AAAG and Diversity Council and did not care about Pilgrim's and Henson's participation on the AAAG and the Diversity Council.(Pilgrim Tr. 142)(Henson Aff. ¶  7)

239.    On August 8, 2005 Jordan Grant at a meeting with Terry McGraw and David Murphy complained about the treatment of African Americans at McGraw-Hill. He told them that African Americans are at a disadvantage with corporate ratings, that there are no African Americans of any rank above Director in Corporate Ratings and so there is no one to represent them at crucial meetings, there is a feeling that it is very difficult for African Americans to ascend through the organization, the long term retention rate of African Americans is low, performance is not always accurately reported and that the problem is exacerbated by the culture of the firm.  He tells them that at least one manager has underreported the success of his African American employee and that an employee of S & P has made blatantly racially offensive remarks, received diversity counseling but persists in his offensive behavior and is still employed by the company.  Pilgrim also knew of other Blacks that complained to McGraw about how

Blacks were being treated at M.H.  At the AAAG meetings, Blacks were complaining that they were being treated unfairly. They wanted to help change the Company, bring in talented people of color at all levels of the company, help with the retention of Black people, obtain mentoring for Black people, gain more access to Senior level employees. They made comments about how work life could be made better for Black employees. (Solotoff Decl. Ex MM)(Solotoff Ex. NN) (Pilgrim Tr. 118-119, 123, 125 )

240.    Henson was a member of the voluntary African American Affinity Group (AAAG) and provided charts, and diagrams, to support the AAAG's attempt to correct disparate treatment of African Americans at McGraw-Hill. Ivy Latimer said they weren't the flavor of the month. (Henson Aff. ¶ 7) (Henson Tr. 132)(Pilgrim Tr.142)

241.    Henson often advocated to Ivy Latimer that African American employees were not being treated equally in the Company. She and Latimer complained to O'Neill that there weren't many people of Color in high level positions in the Company. O'Neill and Latimer often grouped African Americans, with other minorities, to disguise the negative impact on African American employees statistically. (Henson Tr. 132)(Henson Aff.  ¶ 8)

242.    Henson reviewed EEO-1s, Affirmative Action Plans, Data Depot Reports. Henson pointed out that Africa American's were not in higher level positions, were leaving at a quicker rate, and that African Americans were in lower level position. (Henson Aff. ¶6) (Henson Tr.  42, 54)

243.    Henson also observed that African Americans were complaining about racism at their exit interviews and how they were treated at McGraw-Hill and nothing was done about them. (Henson Tr. 55)

244.    Henson said that it was a hostile work environment working at McGraw-Hill because she saw African Americans leaving at a quicker rate, not being promoted, and not at the same level that Caucasians were at with the same education. Blacks did not have mentors. Henson asked O'Neill to advocate for her. Henson applied for the Human Resources Representative at S&P position but O'Neill only spoke about Brookins to Fisher and did not mention Henson even though she knew Henson had applied for that job.(Henson Tr. 69-70) (Fisher Tr. 172-173)

245.    Henson applied for a position Talent Acquisition HR, Corporate. It was filled by a Caucasian temporary employee that Henson believes she was more qualified for. O'Neill did not advocate for Henson. Henson discussed her work with the AAAG at her interviews.(Henson Tr. 112, 169)

246.    In or about 2004 and 2005 African American employees had complained in their exit interviews about racism and race discrimination and nothing was done about it. These facts were brought out at the AAAG meetings, or conference calls, that Henson attended. (Henson Aff. ¶ 10)(Henson Tr. 55)

247.    In 2004 and 2005 O'Neill and Latimer discussed, in Henson's presence, the Reports Henson prepared that showed that African Americans have not been treated equally in regards to promotions and development.  Latimer and Henson advocated to O'Neill that more had to be done to improve the equality and treatment of African American employees at the Company, including diversity, recruiting, promotions and salaries. We also raised these concerns at the AAG meetings.( Henson Aff. ¶11 )

248.    Personnel in HR talked amongst themselves about African American employees that had complained about race discrimination. (Henson Aff. ¶ 12 )

249.    On August 12, 2005 Henson complained at her Exit Interview that "Had I been given an opportunity to grow professionally and develop I would have never left. The McGraw-Hill Companies. My experiences at the company have shown me that African Americans and other minorities have not been treated fairly in regards to promotions and development.  This directly impacts professional development and compensation.  I pursued a higher degree to further my career path at The McGraw-Hill Companies.  I pursued a Master's degree in Human Resource Management and Labor Relations at the New York Institute of Technology.  However, I was denied six or more opportunities at The McGraw-Hill Companies. Most of the times I was never given a clear explanation as to why I was denied the positions that I applied for.  I have been an employee of The McGraw-Hill Companies for eight years and I feel that there should have been some type of "follow up" especially since I was an internal candidate.  Many times this was not the case." Henson's complaints were never investigated. (Solotoff Decl. Ex. L)(Henson Af. ¶ 13).

250.    Fisher admitted that following up a claim of race discrimination on an Exit Interview was important to the company because, even if the employee left, the individuals are still working for the company and the company needs to resolve the issue. (Fisher 121-122)

251.    O'Neill, Henson's Direct Report, admitted she should have known of Henson's complaints on her Exit Interview. It was important to O'Neill, especially because Henson was her subordinate. It was important because the company is competing for employees in the business world.  Pilgrim also complained that Fisher was not investigating the Exit Interviews she conducted of employees complaining about racism, that she brought to Fisher's attention. (O'Neill Tr. 92-96)  (Pilgrim Aff. ¶ 13).

252.    The McGraw-Hill 2004 PMP had no numbered ratings. Therefore, Richard Fisher's reference that Jessica Brookins as having a #5 rating on her 2004 PMP is false. (Henson Aff. ¶ 14).

253.    Henson never signed a 2004 PMP concerning her performance. It was not completed by O'Neill. (Henson Aff. ¶ 15).

254.    Grade Levels is more about salary then job responsibilities. Personnel doing the same work may have in-grade pay increases having nothing to do with their responsibilities. Grade Levels may vary between personnel performing the same jobs and responsibilities. Therefore, grade levels are not necessarily indicative of job responsibilities, as much as it may be indicative of a supervisor's favoritism towards an employee. Further, increased responsibilities on a job, or seniority, or greater experience, does not equate to getting assigned a particular or higher grade level. Grade levels may also be arbitrary or based upon other subjective consideration. (Henson Aff. ¶ 16).

255.    Henson was shown Rasin's Declaration Ex "R" purportedly written by O'Neill on February 9, 2005.  Henson had not ever seen this document before.  O'Neill did not counsel her on these maters and Henson did not receive a warning, orally or in writing, about these matters. Note the document was purportedly written by O'Neill shortly after Henson complained about losing the promotion in January 2005. (Henson Aff. ¶17).

256.    Henson was employed for eight (8) years with McGraw-Hill and had not seen any such document about her like this. (Henson Aff. ¶ 18).

### POINT V
### SPENCER'S CLAIMS OF RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

257.    Spencer is an African American female and has a Masters Degree in Human Resources and Organizational Development.  She was first employed in December 2000. She was a Grade Level #19. She was a Senior Manager of Human Resources in McGraw-Hill's Business - Information and Media Services (IMS) responsible for providing human resources support for "Business Week" magazine employees. Spencer's H.R Senior Director (Caucasian) demeaned her with hostile and offensive remarks, and discriminated against Spencer, by treating her unfairly and unequally in regard to her terms and conditions of employment. Spencer complained to his supervisors and high ranking officials about racism, discrimination and hostile work environment. (Solotoff Decl. Ex. "A")

258.    As Senior Manager of Human Resources, Spencer's responsibilities included, partnering with department heads, determining in what way they needed HR assistance, developed competency based questions, entry level employees, interns, managers and directors, oversees, manages and coordinates all aspects of the intern programs, develops a diversity slates, completes the competency based questionnaires, handles and resolves employee relations issues to make sure that no issue led to litigation, conduct trainings, develops and manages the sexual harassment trainings, partners or meets with business department heads, recruits for the administrative assistant position of the president of Business Week, handles all employee relations with health care group, disseminates information on an as needed basis to all businesses that were supported, meets with employees to address benefits issues and concerns, reviews the numbers of individuals in each of the departments based upon data sent by the group that works on affirmative action, initiates and develops a leadership development programs to provide updates on HR's accomplishments for the business and communicate results of surveys. (Spencer Tr. 47-48)

259.    From December 2000 until December 2002, Spencer performed well in her position and her performance was reflected in the overall ratings she received from Harper on her 2001 and 2002 annual performance reviews, which were "performance exceeded expectations," the second highest possible rating. (Spencer Tr. 180, 184)

260.    In 2003 Spencer was evaluated with a #4 "Exceeds Expectations" on Employee Relations, Talent Acquisitions, Director 360 Degree Assessments, and Sexual Harassment Trainings and received a pay increase for the year.   In 2004 Spencer received a rating of "Frequently Exceeds Performance Standards" for Leadership Development; and "Frequently Exceeds Performance Standards" for PMP Training for which Spencer received a bonus. Spencer received "Demonstrated Strength" for creating internal partnerships; effective presentations, presents well, has an energizing presence and is engaging, clearly conveys information and ideas through a variety of media to individuals or groups as proficient; provides timely guidance and feedback to help others strengthen specific knowledge and develop key areas to accomplish tasks or solve problems. Managers report that she does this very well a "Demonstrated Strength." She also received Demonstrated Strength for staying with a plan of action until the plan is obtained despite obstacles. She also received "Effective Communications" in 2004. She received a pay increase for her performance. (Rasin Decl. Ex. W at D00629, D00631)( Rasin Decl. Ex. X at D03378-3379, D03379- D03380; D03385-003386; D00387-D0389)

261.    In 2003 Spencer received a rating of #4 for Employee Relations which includes communication skills. Spencer also met with the directors of the departments on employee relations, building business partnerships, and delivering training to Platt's employees throughout the year.  (Solotoff Decl. Ex. M at D00629,  D00631)

262.    Indeed, in 2003 Spencer received four ratings of (#4), three ratings of (#3) and one rating of (#2), therefore her overall total performance was very strong. Indeed, in 2004 Spencer received two "Frequently Exceeds," three "Fully Meets," and one "Meets Performance;" five "Demonstrated Strengths," and three "Proficient" and no "Needs Improvement." (Rasin Decl. Ex. W)

263.    Caruso became her supervisor in February/March 2005. Caruso called her into his office and referred to woman as "bitches" and he would use "fuck" and "shit" in every conversation. Caruso used this offensive language in front of her and other African American employees.  He did not use the same offensive language with white male or white females. (Spencer Tr. 72-73).

264.    Spencer told Caruso that Blacks were concerned about how he was treating them. He said then they should leave. (Spencer Tr. 73)

265.    Spencer felt that Caruso treated her like a worthless person, "like a dog or a slave".  Spencer was never treated like that at McGraw-Hill by anyone before working for Caruso. (Spencer Tr. 73-74)

266.    Spencer complained to Caruso about his discriminatory attitude.  After she complained to him he reduced her responsibilities to nothing, gave her clerical work and took away her visibility with her business partners.  He told other managers not to come to her but to go directly to him.  He took away her job duties. (Spencer Tr. 74)

267.    Spencer said she felt like a "nanny".  Caruso made her buy gifts for others and escort employees to social security.  Spencer worked at McGraw-Hill for many years and had a Master's Degree, networked, loved her job, and now, after she complained to Caruso, she felt

like "a nobody".   She felt discriminated against and alienated because he was taking her credentials away. (Spencer Tr. 75)

268.    After Spencer complained to Caruso about discrimination and unfair treatment, he started to give her very little work, her phone barely rang, he did not include her in department head meetings, did not advise her of scheduling, he did not share necessary information with her that she needed to do her job. He gave her misinformation.  It got to the point where she did not know what was going on in Business Week and that she was "out of the loop." (Spencer Tr. 81-82)

269.    Spencer complained to Caruso about his attitude from the Spring of 2005 to October 2005 and he did not stop.  (Spencer Tr. 82-83)

270.    Spencer decided to complain to Brett Marschke, Caruso's direct report, about race discrimination when Caruso said that "complaining minorities should leave." His continued cursing and treating her as a Black employee in a demeaning way, was considered by her to be a hostile work environment. She complained to Marschke about the way she was being treated by Caruso on December 13, 2005. Spencer went into great detail about how Caruso treats the African American employees differently than the Caucasian employees. Spencer told Marschke that he was foul and abusive and that he would look directly at her and would refer to women as "Bitches" and that she was being discriminated against.  (Spencer Tr.85-86) (Solotoff Decl. Ex. P)(Marschke Tr. 78)

271.    Marschke said that when Spencer came to him she was very upset and troubled. (Marschke Tr. 49, 52)

272.    Marschke spoke with Caruso and told him that Spencer complained about discrimination. (Marschke Tr. 67)

273.     Marschke allowed Caruso to get away with what he did. Marschke never followed up to find out if Caruso's use of profanity and the word "bitches" stopped  nor  does not know if Caruso's use of profanity continued after he spoke with him. Marschke never got back to Spencer. (Spencer Tr. 111)(Marschke Tr. 105)

274.     Shortly after Spencer complained to Marschke, Shelia Mitchell, Caruso's other African American subordinate, met with Marschke in Decembers 2005 and the meeting was rescheduled for January 6, 2006. She complained to Marsche about the same things Spencer was complaining about, including the offensive, hostile language and his attitude towards Blacks. (Marschke Tr. 70)(Solotoff Decl. Ex. O)

275.     Spencer filed an EEOC Charge with the EEOC; it was received by the Company on or about January 16, 2006. The Company responded to the EEOC on March 16, 2006. (Solotoff Decl. Ex AA)(Solotoff Decl. Ex. BB)(Solotoff Decl. Ex. CC)

276.     Murphy, Caruso, Marschke and Harper were aware of Spencer's EEOC Charge in January -February 2006, before Murphy, Marschke and Caruso signed Caruso's 2005 PMP in March 2006, setting a goal to counsel Spencer out of the company. O'Neill admits that she saw the top page of Spencer's EEOC Charge. (Solotoff Decl. Ex DD)(Solotoff Decl. Ex. R)  (Murphy Tr. 105-106) (Caruso Tr. 122)(O'Neill Tr. 77).(Marschke Tr. 91) (Harper Tr. 71) O'Neill admits that she saw the top page of Spencer's EEOC Charge (O'Neill Tr. 86), (Marschke Tr. 96)

## POINT VI
## SPENCER'S CLAIMS OF RETALIATION AND
## CONSTRUCTIVE DISCHARGE

277.     On or about March 10, 2006 O'Neill and Spencer spoke.  Spencer told O'Neill about Caruso's racist attitude and how she was being treated by him.  She complained to O'Neill

about how he treats Whites differently than Blacks. He treats Whites with respect and ingratiates himself with white males and females but not with Black Woman. (Spencer Tr. 87-88)

278.    Spencer complained to O'Neill about Caruso's use of the word "Bitches" in reference to woman only in the presence of Blacks, how he ordered her out of the room, how she was cursed at every day looking directly at her, belittled her every day and that she felt she was being treated like a slave. Spencer told O'Neill that the way she was treated by Caruso was because of her race and that he did not use those words, "Bitches" nor his attitude towards anybody but a black female. (Spencer Tr. 102-103, 217)

279.    Murphy, Caruso, Marschke, O'Neill and Harper were aware of Spencer's EEOC Charge in January-February 2006, before Murphy, Marschke and Caruso signed Caruso's 2005 PMP in March 2006, setting a goal to counsel Spencer out of the company. O'Neill admits that she saw the top page of Spencer's EEOC Charge (Solotoff Decl. Ex DD)(Solotoff Decl. Ex R)(Murphy Tr. 105-106) (Caruso Tr. 122)(O'Neill Tr. 77, 86).(Marschke Tr. 91) (Harper Tr. 71) (Marschke Tr. 96).

280.    Harper denied knowing about the EEOC Charges, or of participating in the preparation of the Company's response to the EEOC Charge, or into its investigation of the charges at the time of Spencer's involuntary transfer to BIG on May 30, 2006. (Harper Tr. 57-58).

281.    Harper had four HR employees (Pilgrim, DeBose[2], Spencer, and Henson), two of whom were high ranking employees under his direct supervision (Jesan Spencer, Senior Human Resource Manager supporting Business Week and Renee DeBose, Director of Human Resources for PLATTS) who had filed their EEOC Charges on January 4, 2006. The Company received

---

[2] **DeBose was HR Director of PLATTS, signed a separation agreement and resigned from the company.**

the EEOC Charge on January 18 2006. When pressed, Harper changed his testimony that he knew about DeBose and Spencer's complaints of race discrimination and contributed to the Company's Response dated March 16, 2006. (Harper Tr. 66)

282.    On March 19, 2006 Murphy signed the Caruso PMP, Marschke signed it on March 21, 2006, and Caruso signed it on March 20, 2006.  Together, they created in writing the goal that "we" will pursue the route of counseling them, (Spencer and Mitchell) out of the business. Counseling Spencer out of the business meant counseling her out of McGraw-Hill. Caruso has worked very closely with both Spencer and Mitchell and over the last 4.5 months, and Marschke knew that he remains unconvinced that either of them have long-term potential. This plan is written within a few weeks of the Company's receiving Spencer's EEOC Complaint and within days of the Company's submitting its EEOC's response. In July 2006, Mitchell resigns and takes a package (Solotoff Decl.Ex. DD at D07591) (Murphy Tr 107-108 ) (Marschke Tr. 46)(Caruso Tr. 56)

283.    In early March 2006 Spencer tells O'Neill that Caruso is still cursing and that she is interested in the position in Education with Mike McGlynn.   She has two interviews for the position. (Solotoff Decl. Ex. R at D03775-03776)

284.    In March of 2006 Caruso receives a $65,000.00 bonus.  Caruso is offered a promotion with a ten percent pay increase to transfer to a position with McGraw-Hill at JD Powers in California. Management knew of his transfer before forcing Spencer to leave her position supporting Business Week.  (Caruso Tr. 27, 29)

285.    In March 2006 Caruso knew and was told of the decision to transfer Spencer to BIG. (Caruso Tr. 117)

286.    On April 4, 2006 Shelia Mitchell calls O'Neill to tell her that Spencer is in her cubicle very upset. Spencer complains to O'Neill that she was at her desk when Caruso came to her desk and grabbed his crotch. Spencer is visibly upset and crying.  O'Neill questions Caruso who said he had gained weight and might have tugged on his shirt.  Caruso testified under oath that he might have adjusted his shirt because he had been losing weight. (Caruso Tr. 119-120)(Solotoff Decl. Ex R at D03778, D03785)

287.    On April 6, 2006 Spencer complained to O'Neill about how she was set up to fail under Caruso, and that he does not want Black females working under him. (O'Neill Tr. 221, 225, 226, 229, 234) (Solotoff Decl. R at D03787)

288.    In April 2006, before the interview process for the Education job is completed, Spencer is told by O'Neill that the decision was made for her to go to BIG (Business Information Group). Marschke was the senior H/R person for the information and media group which was supervised by William Harper.  Spencer met with O'Neill and clearly stated that she "did not want to be transferred to BIG" and told her why. Spencer gave O'Neill four reasons why she did not want to go to BIG. O'Neill knew that the transfer of Spencer to BIG was "involuntary." (O'Neill Tr. 206-213, 221, 224)(Solotoff Decl. Ex. R at D07531)(Spencer Tr. 105, 109)

289.    O'Neill told Spencer "she had to go."  Spencer felt her career was threatened and that she had no choice and would be insubordinate if she did not go to BIG. Spencer had her therapist call O'Neill to complain on Spencer's behalf. The papers transferring Spencer to BIG were initiated by Caruso and Harper provided the new accounting codes for the transfer to BIG. (O'Neill Tr. 206-213, 221, 224) (Spencer Tr. 171)

290.    Harper denied speaking to O'Neill about Spencer's transfer to BIG (Aviation Week). (Harper Tr. 55)

291.    O'Neill testified that on April 13, 2006 O'Neill spoke to Harper at a meeting with Marschke and Harper to discuss transferring Spencer to BIG.  (Solotoff Decl. Ex. R at D003795) (O'Neill Tr. 208)

292.    Once the turnaround document was signed by Marschke and Caruso the transfer was a fait accompli. Spencer was subsequently "involuntarily" transferred to a position with BIG. Spencer told O'Neill that she liked working in Business Week and did not want to leave. O'Neill knew that Spencer liked being an H/R professional and how important her work was to her. Spencer told O'Neill that she loved HR, liked recruiting, did special projects, inroads, surveys, assessments and strategy for development (O'Neill Tr. 214, 219, 226)(Solotoff Decl. R at D03781)

293.    Spencer feels that she did nothing wrong and does not understand why she could not stay in Business Week with a new manager replacing Caruso. This was her dream job. (Spencer Tr. 107)(Solotoff Decl. Ex. at D03778-D03779, D03785)

294.    On May 2, 2006 O'Neill speaks with Mike McGlynn about the position that was still open but not offered to Spencer. (Solotoff Decl. Ex R at D03798)

295.    On May 10, 2006 Spencer tells O'Neill that she is not treated as a person, that she is angry, that this was not about performance and how unhappy she was about her involuntary transfer to BIG (O'Neill Tr. 234-235)(Solotoff Decl. R at  D03804)

296.    Spencer was forced to pack her belongings out of HR at Business Week by May 31, 2006. Caruso knew he was reassigned to J.D. Powers before Spencer was transferred. Nevertheless, Caruso wrote a blistering attack letter against Spencer to Human Resources attacking Spencer to go in her files. This was the first time that Marschke ever saw a supervisor

of HR, who was the subject of an EEOC Complaint, write a formal complaint of a subordinate, who was a charging party.  (Marschke 155-156, 158)

297.    At BIG Spencer's job duties, goals and responsibilities were significantly and materially altered, diminished, and reduced, and she forced into a position to perform meaningless, repetitive, administrative assignments and clerical functions. She no longer was given the responsibilities and duties she enjoyed that allowed her to receive pay increases, bonuses, accolades, training, and goals in the areas that she had performed with great success. She would have nothing to do and she would walk around the block and twiddle her thumbs (Spencer 234-235, 237)

298.    Spencer had no work to do and she was being forced out of the Company. She felt that she worked late nights and that she worked so hard to be somebody at McGraw-Hill and it was all taken away. (Spencer Tr. 235, 262)

299.    On February 2, 1007 Spencer tells O'Neill that she is reduced to doing nothing at BIG, that her role was much less than it was at Business Week and she gave O'Neill examples. She told O'Neill that after six years she could not take it anymore and she felt she had to leave the Company. (O'Neill Tr. 234-236).

## POINT VII
## CURTIS'S CLAIMS OF RACE DISCRIMINATION
## AND RETALIATION POST-TERMINATION

300.    Plaintiff was employed as an Office Manager in the E-Business Department of S&P in the Securities Services Division of McGraw-Hill beginning on or about May 29, 2002, working for the Executive Managing Director of Securities Services, Vladimir Stadnyk. (Solotoff Decl. Ex. OO)

301.    Curtis was considered an "expert" on computers and computer software. (Solotoff Decl. Ex PP at D00044).

302.    Stadnyk told Curtis that Lasina Ahmad (Black) a receptionist, had previously complained about race discrimination against Peggy Bartolone, (Caucasian), Stadnyk told Curtis that he wanted Ahmad fired.    He told Curtis that she had to force her out of the business/company. (Curtis Tr. 23-25)

303.    Stadnyk told Curtis to give Lasina Ahmad, a receptionist, work she could not do or handle, and no other receptionist was doing. He said that because you're here she can't say it is discrimination because you're Black and she's Black. (Curtis Tr. 25)

304.    Curtis complained to Stadnyk that Ahmad should not have to do more than what she was already doing and that it was similar to what other receptionists were doing.  Stadnyk told Curtis to get it done because he wants her out of that position.  He wants her out of here.  Do whatever you have to do to get the job done. (Curtis Tr. 27)

305.    Curtis complained to Joyce Hunsucker, Dir. at Human Resources, that Lasina Ahmad could not do work she was not trained for and this work is work she would not have to do as a receptionist. Hunsucker told Curtis, you have to give her this work because that's the way we're going to get her out.  (Curtis Tr. 28).

306.    Joyce Hunsucker told Curtis that Hunsucker spoke with legal and Hunsucker said this is the way we're going to get her out. We have to give her work that we know she cannot do so we can say she's not up to par.  (Curtis Tr. 29-30).

307.    Curtis went to Stadnyk to offer to train Ahmad and help save her position. His response to Curtis was that Ahmad can't complain because she's Black and you're Black. (Curtis Tr. 30-32)

308.    Management tried to make an issue with Ahmad's attendance because she took an FMLA leave. There was no issue of attendance. She did not have an attendance problem. (Curtis 30-32)

309.    Nevertheless, Lasina Ahmad was managed out of the business and forced to resign. (Curtis Tr. 33).

310.    Gail Whelen told Curtis that we are targeting her to get [Lasina Ahmad] her out. She filed a race discrimination charge against Bartolone. (Curtis Tr. 89)

311.    Curtis complained to Stadnyk that Caucasian male employees referred to the evaluations department as the "ghetto." (Curtis Tr. 79)

312.    Curtis complained to Stadnyk that he was not enforcing the dress code fairly and that Black employees were sent home to change their clothes, or buy new clothes, but Caucasian employees who violated the dress code were not. Stadnyk said he did not care about that "Black and White shit." (Curtis Tr. 80)

313.    Stadnyck often referred to her and her staff as the "hired help". Curtis told him that she was offended by the comment as a racial comment and he insisted that he would continue making the statement and she should roll with it. (Curtis Tr.95- 98).

314.    Stadnyck refused to refer to Curtis as the Office Manager and insisted on calling her an administrative assistant which was a lesser position in grade and salary. He did that in her PMPs and his letter of reference. (Solotoff Decl. Ex. 3) (Curtis Tr. 99-100, 111-112).

315.    Stadnyck did not include Curtis as a direct report to dinners or functions with all the other direct reports. (Curtis Tr. 101-104)

316.    Frank Cicotta had a Black administrative assistant who stole something from the company.  Stadnyk would often say to Curtis, and at times when she was carrying a box, "What

are you stealing." She took offense to his repeated comments that she was stealing something as relating to her color as a Black person. (Curtis 129-130).

317.    Before Curtis left the Company she complained of racism and discrimination to Pilgrim, Gattinella, and Pierre Davis, Esq. (Curtis Tr. 134, 142)(Pilgrim Aff. ¶ 2).

318.    On or about July 2005 Plaintiff Curtis was told that her job was eliminated. However, Vlad Stadnyck did not change his physical office location or office and continued to require an employee with less than Curtis' qualifications to work for him. Curtis was also told that Eccri Gutierrez (Caucasian female) was going to take over Curtis' desk.  Curtis was the Office Manager for Vlad Stadnyck at the time and was well qualified to work as an Administrative Assistant to Vlad Stadnyck. Curtis had been training Eccri Gutierrez as an Administrative Assistant throughout the year prior to Curtis being terminated.  Nevertheless, Stadnyck fired Curtis, ostensibly because her job was being eliminated. In or about late August 2005, Stadnyk hired Eccri Gutierrez, Curtis' trainee, without an interview. Curtis was qualified for the position. Joyce Hunsucker, Director of Human Resources, and Sarah McAuley, VP of Human Resources over at S&P helped Stadnyk coordinate the hiring of Eccri Gutierrez instead of Curtis. Stadnyk stayed in the same office. Hunsucker and Sarah McAuley replaced Curtis with Eccr Gutierez).  (Curtis Tr. 114); (Stadnyk Tr. 14, 17-21).

319.    Curtis was told that Eccri was not as skilled as Curtis, and that Stadnyk complained, after Curtis left, that Eccri could not do the work that Curtis did. (Curtis Tr. 117-119).

320.    Plaintiff admits that she was advised of the elimination of her position in July of 2005, and the fact that Eccri Gutierrez was to become Stadnyk's Administrative Assistant. Curtis

was kept on the S&P payroll until October 3, 2005 and continued to train Eccri Gutierrez. (Curtis Tr. 114).

321.    September 14, 2005 Curtis signed a Termination and Release Agreement ("Agreement") dated August 25, 2005. The Agreement did not preclude Curtis from seeking re-employment at the Defendant. Curtis was told she would get first shot at a job in the Company and that Hunsucker would help her.   Other people told Curtis about job openings before Hunsucker did..(Solotoff Decl. Ex. GG )(Curtis Tr. 165)

322.    The Agreement, among other things, required that Curtis submit the Agreement to Joyce Hunsucker, Director of Human Resources. (Solotoff Decl. Ex. GG)

323.    Joyce Hunsucker, was a Director of Human Resources, and had worked as an HR Generalist supporting S&P and worked with Richard Fisher, Dir. Of HR of S&P, and Plaintiff Jannie Pilgrim, Human Resource Manager/Generalist at S&P.  Hunsucker and Fisher reported to Sara McAuley, VP of Human Resources. (Fisher Tr. 187)(O'Neill Tr. 260); (Gillen Tr. 12)

324.    The Termination and Release Agreement provides for a general release of federal and state statutory claims to the date of the Agreement. She did not waive or release the Defendant of liability for post-employment discrimination or retaliation.(Solotoff Decl. Ex. GG)

325.    Stadnyk provided Curtis with a false and erroneous letter of reference. (Solotoff Decl. Ex. QQ ).

326.    Stadnyck harbored a racial bias towards Curtis as a Black employee under his direct supervision. This bias included a bias against Black employees who complained of race discrimination. He called Curtis the hired help, did not include her in his direct report dinners or functions. and did not recognize her position as an Office Manager.(Solotoff Decl. Ex. QQ)(Curtis Tr. 77)

327.    Stadnyck's "first letter" of reference was grossly in error, and was demeaning to Curtis. It was further evidence of his bias towards her as a Black employee, and that he harbored a negative attitude towards her because she was Black. He expressed that bias in a number of ways and at times adding to the hostile environment she suffered. (Solotoff Decl. Ex. QQ)

328.    The letter of reference was demeaning and mischaracterized Curtis as an "Administrative Assistant" from May 29, 2002 until October 3, 2005." It would adversely injure her future employment opportunities if she were viewed as an administrative assistant and not an Office Manager. She was his "Office Manager" with supervisory duties over administrative assistants. Stadnyk's reference to a lesser position and title was not merely an accidental statement or oversight it was intentional and disrespectful.  Stadnyk constantly referred to Curtis as an administrative assistant.  Curtis' entire performance evaluation (PMP) prepared by Stadnyck for 2004 was based erroneously, implausibly, and incredibly on his treating her as a administrative assistant, which she was not.  (Solotoff Decl. Ex. QQ)(Solotoff Decl. Ex RR at D03286)(Curtis Tr. 99-100).

329.    Curtis complained to Stadnyck that it was inappropriate to refer to her often as his "hired help" or as an "administrative assistant" since she was his Office Manager. It hurt her as a Black employee, and especially because she had a titled position that paid over $70,000.00 in 2005. (Office Manager). He also routinely demeaned her role, title, and position as Office Manager and commonly referred to her as his "hired help."  Stadnyck would never refer to her as his Office Manager. His PMP evaluations were based on the false premise that she was a administrative assistant.  There is a clear distinction between an Office Manager and an Administrative Assistant. Office Managers are grade level #17 and Administrative Assistants are grade level #15.  (Curtis Tr. 92-100) (Rasin Decl. Ex. DD.)

330.    On or about October 3, 2005 Curtis complained to Gatinella, VP. Of Human Resources, and Pierre Davis, Esq. of race discrimination and insisted that the "first letter" of reference be changed. Stadnyck refused to make the change. Curtis needed the letter for reference purposes. She indicated on the "first letter" that she asked Joyce Hunsucker to make the necessary change.  Stadnyk and Hunsucker refused to make the change and she would have to take the reference letter the way it was. It was changed only after Curtis spoke to Gattinella. (Curtis Tr. 111-112) (Solotoff Decl. Ex. Z). (Rasin Decl. Ex. FF and GG).

331.    After Curtis complained, the Stadnyk reference letter was changed to read and refer to Curtis correctly as the Office Manager. (See Solotoff Decl. Ex. SS)

## CURTIS SUFFERED RETALIATION AND RACE DISCRIMINATION POST-EMPLOYMENT BY REASON OF STADNYK'S CONDUCT AFTER SHE LEFT EMPLOYMENT ON OCTOBER 3, 2005

332.    Clearly Curtis had complained on numerous occasions about race discrimination by Stadnyk and/to Stadnyk, to Human Resources (Hunsucker, Gattinella, Pilgrim, and Gatinella, and/or Pierre Davis, Esq. house counsel). (Pilgrim Aff.  ¶ 2 ).

333.    Curtis complained to Plaintiff Pilgrim about race discrimination. Curtis told Pilgrim that she was upset that she was let go and that she told Pierre Davis that there was discrimination within McGraw-Hill.  She also told Pilgrim that Davis did not want to hear about it. (Pilgrim Tr. 200) (Curtis Tr. 135, 142)

334.    Curtis spoke with Gatinella .and was specific about her complaint of race discrimination. (Solotoff Decl. Ex. Z) (Curtis Tr. 135, 142)..

335.    Curtis was not given an exit interview. She complained that African American employees trained "white people" to replace them as their managers and who later evaluated the Black employees.  She complained that what she observed was very demeaning. She complained

that Joyce Hunsucker would not get back to Curtis on positions that were open that Curtis qualified for until they were filled. She complained that she was lied to that the hiring manager was out of town in London when he was actually in the office next door (Curtis Tr. 135, 136, 142)

## DIRECT AND CIRCUMSTANTIAL EVIDINCE
## OF RETALIATION FOR COMPLAINING

336. Curtis reviewed a document purporting to be an interview on November 11, 2005 between Vlad Stadnyk, Executive Managing Director of Data & Information Services and Blessing Mariano, Human Resources Recruiter. (Solotoff Decl. Ex. W)(Curtis Aff. ¶ 4)

337. In or about November 2005, Curtis was interviewed for two positions in Structured Finance. One position was for a position as Administrative Assistant-LOC; and the other was Administrative Assistant-Criteria. (Solotoff Decl. Ex S) (Curtis Aff.¶ 5 ).

338. In or about November 2005, Curtis was interviewed by Nancy Tomeo, Office Manager for Structured Finance, S&P, for both positions; and then by Blessing Mariano, HR Recruiter for both positions. (Solotoff Decl. Ex. S) (Curtis Aff. ¶ ¶ 5, 6 )(Solotoff Decl. Ex. T)

339.. Curtis understood at that time that Nancy Tomeo had the authority to decide whether to hire her for both positions. (Curtis Aff.¶ 7).

340. Curtis later learned and was advised that on or about November 11, 2005, Mariano Blessings interviewed Vlad Stadnyck regarding her performance under his supervision. Stadnyck made false and negative references about Curtis' performance to Mariano Blessings sabotaging her ability to get reemployed. (Solotoff Decl. Ex. T)(Solotoff Decl. Ex. X) (Curtis Aff.¶ 8)

341. Among other things, Stadnyk told Mariano Blessings criticizing Curtis' attendance as a single parent with "child care" issues, which he stated "prevented her from

getting to work on time." This was false and never was an issue while she was employed. (Solotoff Decl. Ex. X) (Curtis Aff.¶ 9 )

342.    Stadnyk denies and/or lied when he said under oath he never heard of Mariano Blessings and does not know Nancy Tomeo.  He also lied when he said he did not speak to Mariana Blessings. He lied that he did not tell any one about what is identified in the November 11, 2005 interview by Mariano Blessings with Stadnyk, entitled "Vlad Stadnyck Feedback November 11, 2005". He denied making comments about Curtis having child care issues, attendance problems, or cannot contain an employee or contain the employee. Stadnyk denies having any contact with a hiring manager or recruiter about Curtis. (Solotoff Decl. Ex. X) (Solotoff Decl. Ex. T)(Stadnyk Tr. 29, 50, 93-95, 97).

343.    Stadnyk made no issue over Curtis' attendance or "child care" issues while she was working for him as an Office Manager. Moreover he authorized and permitted her work day to start between 9:30 A.M. and 9:45 A.M. This false charge by him regarding Curtis' attendance was reminiscent of his false complaints about Lasina Ahmad and her FMLA leave that was also proper at the time, but used as an excuse to get rid of Ahmad. (Curtis Aff.¶ 10).

344.    Stadnyk also criticized Curtis' handling of the receptionist Lasina Ahmad, (person of color) which he stated "spiraled and became a large problem instead of being resolved quickly." This complaint by him is inconsistent with her 2004 PMP and reminiscent of his complaints about Lasina Ahmad, it was also false, contrived, pretextual, and designed to assure that Blessing Mariano and Nancy Tomeo, and others, would not re-hire Curtis. Curtis was denied re-employment because of Stadnyk's comments to Blessing Mariano and through her to  Tomeo. Nancy Tomeo told Pilgrim that they will not hire Curtis because of her complaints against Stadynk.. (Solotoff Decl. Ex. X)(Solotoff Decl. Ex. T) (Curtis Aff.¶ 11)(Pilgrim ¶ 2)

345.    He also stated that a future manager "the manager should coach her on how to exercise diplomacy." Diplomacy was never an issue with Curtis. See reference to her 2003 and 2004 PMPs below. (Solotoff Decl. Ex. X) (Curtis Aff.¶ 15 ).

346.    Nancy Tomeo told Pilgrim that Stadnyk complained about Curtis based on what he told Mariano Blessings and Tomeo said they were not going to hire Curtis. Pilgrim understood those issues included Curtis' complaints of race discrimination against Stadnyk. Pilgrim had previously told Gatinella and Richard Fisher of Curtis' race discrimination complaints. Gatinella called Curtis in response to Pilgrim's race discrimination complaints against Fisher. (Curtis Tr. 139). [See hereinafter Plaintiffs' Response in Opposition to Defendant's Rule 56.1 Statement wherein Plaintiffs detail Fisher's bias towards Blacks, and his direct refusal to hire a "Black employee" for a particular position and said so. That Black employee was Plaintiff Giovanna Henson.]

347.    Thereafter, Nancy Tomeo called Curtis and told her she was over qualified for the Structured Finance Positions. (Curtis Tr. 135-136, 154).

348.    Curtis considers the comments by Stadnyk to Mariano Blessings as the substantial and material reason for her being blocked from re-employment not only for the two positions in Structured Finance, but for all the other positions that she filed for, and qualified for, and was denied even though some of those positions remained open and unfilled for months, and even though Hunsucker said she would assist Curtis.  Hunsucker did not call Curtis about any job. Hunsucker said she put her name in for positions and this turned out not to be true.  (Curtis Tr. 167)

349.    Curtis was qualified for the two structured finance positions. Stadnyk's comments to Mariano Blessings were contradictory and inconsistent with her true performance and

professionalism and his evaluations of that performance. (Solotoff Decl. Ex. X) (Curtis Aff.¶ )(See Nancy Tomeo's Aff. ¶4 confirming Curtis' qualifications for the two positions.) (See Pilgrim's Aff ¶ ) demonstrating the true reasons for Curtis' not being hired for those positions in Structured Finance and its connection to Stadnyk's comments against Curtis.)

350.    For example, in Curtis' 2004 PMP Stadnyk writes "Brenda continues to execute her duties as a Senior Administrative Assistant in a professional and diligent manner.  She is eager to take on tasks and tries to resolve issues in a creative manner.  She is engaging with colleagues and senior execs and attempts to provide assistance on her own initiative without being asked." (Solotoff Decl. Ex. RR) (Curtis Tr. 258) (Curtis Aff.¶ ).

351.    Stadnyk's comments to Mariano Blessings, was entirely false, inappropriate, pretextual, inconsistent, and contradictory to what he wrote in Curtis 2004 PMP.  Further, no where in Curtis's 2004 PMP does he make any negative reference to her attendance, or that child care prevented her from coming to work on time, or of poor diplomacy. (Curtis Aff.¶ ). (See Solotoff Decl. Ex. RR)

352.    For example, in Curtis' 2002 PMP Vlad Stadnyk writes "Picked up senior AA responsibilities for SPSS quickly upon retirement of long standing AA.  Quick study with all duties transitioned seamlessly.  Completed all objectives as prescribed in full.  Handling difficult personnel issue under her supervision diplomatically.  Will need to resolve by 1st Q 2003. Handling integration of senior AA staff.  Mature, very professional demeanor. Excellent technology skills. Diligent with strong follow-up on assigned tasks.  Very perceptive with respect to interpersonal relationships resulting in very effective work atmosphere. (Solotoff Decl. Ex. TT ) (Curtis Aff.¶ ).

353.    Curtis was not Stadynk's "Senior Administrative Assistant".  Curtis was at all times his Office Manager and found his constant erroneous reference to Curtis being an Administrative Assistant and the hired help as demeaning. (Curtis Aff.¶   )(Solotoff Decl. Ex. OO)

## CURTIS' APPLICATIONS TO MCGRAW-HILL FOLLOWING HER TERMINATION: AND DENIAL OF RE-EMPLOYMENT

354.    Following her termination, Curtis applied for a number of Administrative Assistant positions. Curtis filed for the Admin. Asst. Chief Information Officer of Technology for S&P. (Rasin Decl. Ex. LL.)  Curtis was an Office Manager and had trained and supervised Administrative Assistants for years while at McGraw-Hill. She was more qualified for this position than any other candidate. She was classified an "Expert" in proficiency on Microsoft Excel and Spreadsheets.  She had filed an application for this position on September 16, 2005. The position was filled with an external hire on November 21, 2005.

355.    Curtis filed for an Administrative Assistant in Data Operations for McGraw-Hill. Curtis was an Office Manager for Vlad Stadnyk, Executive Managing Director of Data & Information Services. Curtis was more qualified for the position. The position was awarded to begin on November 28, 2005. She was not interviewed or even given an opportunity to contest for the position.

356.    Curtis also she applied for a Graphic Design Position in Marketing. (Curtis Tr. 148)( Rasin Decl. Ex. NN.) Curtis does have a graphics computer background.

357.    Curtis applied for an Administrative Assistant position in S&P Ratings. (Rasin Decl. Ex. RR.) Curtis was an Office Manager and had trained and supervised Administrative Assistants for years while at McGraw-Hill. She was greater qualified for this position than any other candidate. She was classified an "Expert" in proficiency on Microsoft Excel and

Spreadsheets.  She had filed an application for this position on November 20, 2005.  The interviewer was Mariano Blessings the same interviewer who had spoken to Stadnyk and Nancy Tomeo on or about November 11, 2005, which he denies.  The position remained open and was not filled until May11, 2006.

358.    Curtis filed her official EEO Charge with the EEOC and the company in January-March 2006.  She was not interviewed for the position. The employee hired for the position was not African American, and only demonstrated "Advanced" proficiency in Microsoft Excel and Spreadsheets.  (Solotoff Decl. Ex UU)(Solotoff Decl. Ex. VV)(Solotoff Decl. Ex. WW)(Solotoff Decl. Ex. XX).

359.    Curtis who was an Office Manager and had trained and supervised Administrative Assistants for years while at McGraw-Hill contends that she was more qualified for this position than any other candidate. She was classified an "Expert" in proficiency on Microsoft Excel and Spreadsheets.  She had filed an application for this position on November 20, 2005.  The interviewer was Mariano Blessing, the same interviewer who had spoken to Stadnyk and Nancy Tomeo on or about November 11, 2005, which he denied under oath.  The position remained open and was not filled until May11, 2006.  Curtis filed her official EEO Charge with the EEOC and the company in January-March 2006.  She was not interviewed for the position. The employee hired for the position was not African American, and only demonstrated "Advanced" proficiency rather than "Expert" proficiency in Microsoft Excel and Spreadsheets.  (Solotoff Decl. Ex VV)(Solotoff Decl. Ex. XX).

360.    Curtis applied for an Administrative Assistant position serving Structured Finance and reporting to Paul Kelly, the Managing Director of Ratings for Structured Finance (Curtis Tr. 135-36).

361.    Curtis was more qualified for this position. (Solotoff Decl. Ex.  )  resume

362.    Nancy Tomeo was the Office Manager for the group, acting as a proxy for Kelly, was to screen the applicants and determine which of them would move on to a second round of interviews with him. (Tomeo-Farrelly Aff. ¶ 3).

363.    After receiving Curtis's resume the Office Manager, Nancy Tomeo added her to her list of potential candidates for the position before November 11, 2005. (Tomeo-Farrelly Aff. ¶ 4).

364.    Curtis also applied to be the Administrative Assistant to the Senior Vice President of Global Client Services & Sales. (Rasin Decl. Ex. TT)

365.    Curtis was qualified for this position. She had filed an application for this position on September 1, 2005.  The position remained open.  The position requisition was not cancelled until April 3, 2006. (Solotoff Decl. Ex. YY).

Dated: Great Neck, New York
July 17, 2008

Trial Counsel:
/s// L. Solotoff
Lawrence Solotoff (LS1356)
Cheryl Solotoff (CS3013)
SOLOTOFF & SOLOTOFF, ESQS.
Plaintiff's Counsel
P.O.Box 4686
Great Neck, New York 11023
Office No.     (516) 466-5522
Facsimile No.  (516) 466-5562

TO:
Gregory 1. Rasin
Elise M. Bloom
Steven D. Hurd
1585 Broadway
New York, New York 10036-8299
Telephone: 212.969.3000
Fax: 212.969.2900
Email: grasin@proskauer.com
Attorneys for Defendant